Nos. 24-2643, 24-2644 (consol.)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| BENJAMIN SCHOENTHAL, MARK WROBLEWSKI, JOSEPH VESEL, and DOUGLAS WINSTON, | ) Appeal from the United States ) District Court for the Northern ) District of Illinois, Western ) Division |
| Plaintiffs-Appellees, | ) |
| | ) |
| v. | ) |
| | ) |
| KWAME RAOUL, in his official capacity as Attorney General of Illinois; ROBERT BERLIN, in his official capacity as State's Attorney of DuPage County, Illinois; and EILEEN O'NEILL BURKE, in her official capacity as State's Attorney of Cook County, Illinois, | ) ) No. 3:22-cv-50326 ) ) ) ) ) ) |
| Defendants-Appellants. | ) The Honorable ) IAIN D. JOHNSTON, ) Judge Presiding. |

**BRIEF AND SHORT APPENDIX OF DEFENDANTS-APPELLANTS KWAME RAOUL AND ROBERT BERLIN**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

**ALEX HEMMER**
Deputy Solicitor General
**R. SAM HORAN**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3312

Attorneys for Defendants-Appellants
Kwame Raoul and Robert Berlin

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

JURISDICTIONAL STATEMENT ......................................................................... 1

ISSUE PRESENTED ................................................................................................ 3

STATEMENT OF THE CASE ................................................................................ 4

    Factual and Legal Background .......................................................................... 4

    Procedural Background ....................................................................................... 5

SUMMARY OF ARGUMENT ............................................................................... 8

ARGUMENT ........................................................................................................... 10

I.     This court reviews a district court's grant of summary judgment *de novo*. ..... 10

II.     States may implement firearm restrictions that are consistent with the Nation's historical tradition of regulation. .......................................................... 11

III.     The public-transit restriction is consistent with the Nation's historical tradition of regulating firearms on passenger railroads. ................................... 15

    A.     The Nation has a well-established historical tradition of restricting access to firearms on passenger railroads and in other crowded spaces. ...................................................................................................... 16

    B.     The public-transit restriction is consistent with this historical tradition of prohibiting railroad passengers from carrying loaded or unsecured firearms. ................................................................................ 21

    C.     The district court's and plaintiffs' reasons for disregarding this tradition are unpersuasive. ................................................................... 24

IV.     The public-transit restriction is consistent with the Nation's historical tradition of regulating firearms in sensitive places. ......................................... 31

    A.     The public-transit restriction and historical sensitive-place regulations impose comparable burdens. ................................................ 32

B.    The public-transit restriction and historical sensitive-place regulations are comparably justified. ....................................................... 35

C.    The district court's and plaintiffs' counterarguments lack merit.......... 40

CONCLUSION ............................................................................................................ 45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF RULE 30 COMPLIANCE

SHORT APPENDIX

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Andrews v. State,*
 50 Tenn. 165 (1871) ............................................................................. 18

*Antonyuk v. James,*
 120 F.4th 941 (2d Cir. 2024) ........................................................*passim*

*Bazile v. Fin. Sys. of Green Bay, Inc.,*
 983 F.3d 274 (7th Cir. 2020) ............................................................... 1

*Bevis v. City of Naperville,*
 85 F.4th 1175 (7th Cir. 2023).................................... 11, 12, 30, 35, 36

*Chi. Burlington & Quincy R.R. Co. v. Iowa,*
 94 U.S. 155 (1876) ............................................................................. 24

*District of Columbia v. Heller,*
 554 U.S. 570 (2008) ................................. 11, 13, 14, 15, 29, 33, 38, 43

*Dowd v. Albany Ry.,*
 62 N.Y.S. 179 (App. Div. 1900) ......................................................... 20

*English v. State,*
 35 Tex. 473 (1871) ............................................................................. 18

*Frey v. Nigrelli,*
 661 F. Supp. 3d 176 (S.D.N.Y. 2023) .......................................... 19, 24

*Glass v. Dachel,*
 2 F.3d 733 (7th Cir. 1993) ................................................................ 11

*Hill v. State,*
 53 Ga. 472 (1874)............................................................................... 18

*Kipke v. Moore,*
 695 F. Supp. 3d 638 (D. Md. 2023) .............................................. 38, 39

*Lake Shore & Mich. S. Ry. Co. v. Smith,*
 173 U.S. 684 (1899) ........................................................................... 24

*Lehman v. City of Shaker Heights,*
    418 U.S. 298 (1974) ........................................................................... 38

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ............................................................. 11, 14, 43

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) ......................................................................*passim*

*Pa. R.R. Co. v. Langdon,*
    92 Pa. 21 (1879) ........................................................................ 20, 22

*People v. Mosley,*
    33 N.E.3d 137 (Ill. 2015) ................................................................. 23

*Poole v. N. Pac. R. Co.,*
    19 P. 107 (Or. 1888) ........................................................................ 22

*State v. Huntly,*
    25 N.C. 418 (1843) .......................................................................... 16

*State v. Shelby,*
    2 S.W. 468 (Mo. 1886) .................................................................... 18

*State Auto Prop. & Cas. Ins. Co. v. Brumit Servs., Inc.,*
    877 F.3d 355 (7th Cir. 2017) .......................................................... 11

*Ten Pas v. Lincoln Nat'l Life Ins. Co.,*
    31 F.4th 541 (7th Cir. 2022) ........................................................... 10

*Township of Pine Grove v. Talcott,*
    86 U.S. (19 Wall.) 666 (1874) ......................................................... 25

*United States v. Class,*
    930 F.3d 460 (D.C. Cir. 2019) ........................................................ 38

*United States v. Rahimi,*
    602 U.S. 680 (2024) .................................................................*passim*

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) (*en banc*) .......................................... 43

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ........................................................................ 42

*Wolford v. Lopez*,
  116 F.4th 959 (9th Cir. 2024)...........................................................*passim*

**Historical Constitutions and Statutes**

Statute of Northampton 1328, 2 Edw. 3 c.3 (Eng.)  ...................................... 16

1889 Ariz. Sess. Laws 16, No. 13, § 3 ........................................................ 17

Del. Const. of 1776, art. 28............................................................... 34, 36

1870 Ga. Laws 421, No. 285, § 1 ............................................................... 17

1647 Md. Laws 215.................................................................................. 34

1650 Md. Laws 273.................................................................................. 36

Mass. Rev. Stat. ch. 134, § 16 (1836) ......................................................... 29

1875 Mo. Laws 50, § 1 ............................................................................. 17

1852 N.M. Laws 67, § 3 ........................................................................... 17

1787 N.Y. Laws 344, ch. 1 ........................................................................ 35

1890 Okla. Stats. 412, ch. 25, art. 47, § 7 ................................................... 17

1869-1870 (1st Sess.) Tenn. Pub. Acts 23, ch. 22, § 2.................................... 17

1870 Tex. Gen. Laws 63, ch. 46, § 1...................................................... 17, 38

1871 Tex. Gen. Laws 25, ch. 34, § 3........................................................... 17

1786 Va. Acts 35, ch. 49 ............................................................... 16, 35, 36

**Statutes and Rules**

28 U.S.C.
  § 1291 ....................................................................................... 2
  § 1331 ....................................................................................... 1
  § 2107 ....................................................................................... 2

Fed. R. App. P. 4................................................................................... 2

Fed. R. Civ. P. 56 ............................................................................................. 10

430 ILCS
    66/10 ...................................................................................................... 5
    66/25 ...................................................................................................... 5
    66/65 ............................................................................................. 1, 3, 5
    66/70 ......................................................................................... 5, 34, 35

720 ILCS
    5/24-1 ................................................................................... 4, 5, 22
    5/24-1.6 ................................................................................ 4, 5, 22
    5/24-2 ..................................................................................................... 5

730 ILCS
    5/5-4.5-55 ........................................................................................... 35
    5/5-4.5-60 ........................................................................................... 35

**Other Authorities**

2 W.F. Bailey, *The Law of Jurisdiction* (1899) ........................................... 25

Brief of *Amicus Curiae* the Independent Institute in Support of Petitioners,
    *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1 (2022)
    (No. 20-843), 2021 WL 3127146................................. 14, 26, 27, 36, 44

Joshua Hochman, Note, *The Second Amendment on Board:*
    *Public and Private Historical Traditions of Firearm Regulation,*
    133 Yale L.J. 1676 (2024) ............................................. 19, 20, 21, 22, 25, 26, 30

*Jewell's Digest of the City Ordinances of the City of New Orleans*
    (Edwin L. Jewell ed., 1882), https://tinyurl.com/2chyazt6 .............................. 17

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine:*
    *Locational Limits on the Right to Bear Arms,*
    13 Charleston L. Rev. 205 (2018) .................................. 14, 26, 27, 44

New Orleans, La., An Ordinance Respecting Public Balls art. 1 (Oct. 27, 1817),
    *reprinted in General Digest of the Ordinances and Resolutions of the*
    *Corporation of New Orleans* 371 (1831), https://tinyurl.com/2x826arx ........... 17

## JURISDICTIONAL STATEMENT

Plaintiffs — four Illinois residents — filed this action in September 2022 to challenge the constitutionality of section 65(a)(8) (the "public-transit restriction") of the Illinois Firearm Concealed Carry Act ("Act").  Doc. 1 ¶¶ 14-17, 65-77.[1]  Plaintiffs alleged that this provision, which restricts the circumstances under which individuals can lawfully carry concealed weapons on public transit and certain related properties, 430 ILCS 66/65(a)(8), violated the Second Amendment to the U.S. Constitution, as incorporated against the States by the Fourteenth Amendment.  Doc. 1 ¶¶ 65-77.

The district court lacked jurisdiction over plaintiffs' claims to the extent that plaintiffs sought relief with respect to provisions of the Act that they did not demonstrate a desire to violate or named defendants who were not responsible for enforcing the Act against them.  SA9-11; *see Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020) (standing is jurisdictional).  The district court otherwise had jurisdiction over the case under 28 U.S.C. § 1331 because plaintiffs' claims raised a federal question.

On August 30, 2024, the district court entered an opinion and order granting in part plaintiffs' motion for summary judgment and otherwise dismissing plaintiffs' claims for lack of jurisdiction.  SA2, 49-50.  Judgment was entered the same day.

---

[1]  This brief cites entries on the district court's docket as "Doc.," entries on this court's docket as "7th Cir. Doc.," and the short appendix as "SA."

Doc. 109.[2]  Defendants Berlin and Raoul (collectively, "state defendants") filed a

notice of appeal on September 19, 2024, Doc. 115, and defendant Burke's predecessor

in office, Kimberly M. Foxx, filed a notice of appeal on September 20, 2024, Doc. 117.

Both notices of appeal were timely under 28 U.S.C. § 2107(a) and Fed. R. App. P.

4(a)(1)(A) because they were filed within 30 days of the order and judgment being

challenged on appeal.  This court has jurisdiction over this appeal from a final

judgment under 28 U.S.C. § 1291.

---

[2]  On October 10, 2024, this court entered a limited remand to permit the district
court to issue a corrected judgment, 7th Cir. Doc. 9, which was issued on October 11,
2024, Doc. 130.  As this court's order explained, this procedure did not affect the
validity of defendants' notices of appeal.  7th Cir. Doc. 9.

## ISSUE PRESENTED

Whether section 65(a)(8) of the Illinois Firearm Concealed Carry Act, which prohibits individuals from carrying concealed handguns on public transit unless such handguns are unloaded and secured, violates the Second Amendment.

## STATEMENT OF THE CASE

**Factual and Legal Background**

This case concerns Illinois's authority to regulate where individuals can lawfully carry concealed firearms within the State — and, in particular, whether it can prohibit the carriage of concealed, loaded firearms on public transportation.

Illinois is home to "an extensive and nationally-significant mass transit system."  Doc. 64-1 at 46 (expert report of Professor Joshua Salzmann).  The Chicago Transit Authority ("CTA"), which serves the Chicago region, is the nation's second-largest transportation system, serving more than 545 million riders per year.  *Id.*  The Metra commuter rail, which also serves the greater Chicago area, has an annual ridership of more than 81 million.  *Id.* at 47.  There are also significant public transit systems elsewhere in the State.  *Id.*  In 2022, for instance, bus lines in Peoria, Springfield, and Rockford transported 1.7 million, 1.1 million, and 941,000 riders, respectively.  *Id.*  Many of these riders are children:  Chicago public schools distribute CTA fare cards to students, and CTA offers reduced student fares and encourages elementary- and high-school students to use its services.  Doc. 88 at 31-32.

Illinois comprehensively regulates who can publicly carry concealed firearms and where those firearms can be carried.  As a general matter, it is unlawful to carry a firearm in public.  720 ILCS 5/24-1(a)(4), (a)(10); *id.* § 5/24-1.6(a).  For over a decade, though, Illinois has permitted residents to obtain concealed-carry licenses pursuant to the Firearm Concealed Carry Act, and allowed such licenseholders to generally carry concealed pistols, revolvers, or handguns in public for self-defense.

430 ILCS 66/10; 720 ILCS 5/24-1(a)(4)(iv), (a)(10)(iv); *id.* § 5/24-1.6(a)(3)(A-5); *id.*
§ 5/24-2(a-5).  Like most States, however, Illinois has designated certain "prohibited
areas" in which even concealed-carry licenseholders may not carry a loaded and
accessible firearm.  430 ILCS 66/65.  Such locations include schools, *id.* § 66/65(a)(1);
childcare facilities, *id.* § 66/65(a)(2); courthouses, *id.* § 66/65(a)(4); hospitals, *id.*
§ 66/65(a)(7); and, as relevant here, "[a]ny bus, train, or form of transportation paid
for in whole or in part with public funds," as well as associated buildings and parking
areas, *id.* § 66/65(a)(8).  But the restriction on public-transit systems is not absolute,
in that Illinois law permits such a licenseholder to bring a firearm on public transit if
it is "broken down in a non-functioning state," is not "immediately accessible," or is
"unloaded and enclosed in a case" or other container.  720 ILCS 5/24-1(a)(4)(i)-(iii),
(a)(10)(i)-(iii); *id.* § 5/24-1.6(c).[3]  A licenseholder is permitted, in other words, to
transport his or her firearm on public transit, but not to carry it in a loaded and
accessible state.

**Procedural Background**

  Plaintiffs are four Illinois residents with FOID cards and concealed-carry
licenses.  Doc. 1 ¶¶ 14-17, 31, 38, 45, 52.  They filed this case in September 2022,
arguing that the public-transit restriction violates the Second Amendment in that it
interferes with their ability to carry handguns for self-defense while riding public

---

[3]  The first two statutory exceptions apply to all Illinois residents, while the third
exception applies only to residents who have a Firearm Owner's Identification, or
"FOID," Card.  720 ILCS 5/24-1(a)(4)(i)-(iii), (a)(10)(i)-(iii); *id.* § 5/24-1.6(c).  To
obtain and maintain a concealed-carry license, an Illinois resident must have a FOID
Card.  430 ILCS 66/25(2), 66/70(h).

transit.  *Id.* ¶¶ 65-77.  Plaintiffs named as defendants Attorney General Kwame Raoul and State's Attorneys Rick Amato, Robert Berlin, Eric Rinehart, and Kimberly Foxx (the predecessor in office of defendant-appellant Burke).  *Id.* ¶¶ 18-22.  The parties conducted fact and expert discovery and cross-moved for summary judgment. Docs. 63, 67, 69.

On August 30, 2024, the district court issued an opinion and order denying defendants' motions, granting plaintiffs' motion in part, and dismissing certain claims against certain defendants for lack of subject-matter jurisdiction.  SA1-50.  As to subject-matter jurisdiction, the court held that plaintiffs had standing to challenge the public-transit restriction only with respect to modes of transit they sought to ride — Metra trains and, for plaintiffs Vesel and Winston, CTA buses.  SA9.  The court also held that plaintiffs lacked standing to sue defendants Amato or Rinehart, since no plaintiff expressed any desire to ride public transit in the counties in which those defendants had enforcement authority.  SA10-11.[4]

Turning to the merits of plaintiffs' Second Amendment claims, the court held both that plaintiffs' proposed conduct fell within the Second Amendment's plain text, SA23-27, and that defendants had not shown that the public-transit restriction was consistent with the Nation's historical tradition of firearm regulation, SA27-48.  The

---

[4]  The court also held, responding to defendants' argument that plaintiffs lacked standing to challenge the restriction to the extent it prohibits the concealed carry of firearms in buildings, real property, or parking areas associated with public transit, Doc. 65 at 5-6, that plaintiffs "ha[d] standing with respect to [such areas] as far as [is] needed to board" transit vehicles, SA10.  State defendants do not challenge that holding on appeal.

court rejected defendants' argument that the restriction was analogous to historical regulations of firearms both on railroads and in sensitive places like schools. SA36-43. Although the district court agreed that railroads in the nineteenth century had imposed various restrictions on the carriage of firearms, including some that had "barred firearms completely," it rejected the relevance of those regulations on the ground that the railroads in question were private entities. SA36-37. And although it recognized that the Supreme Court had relied on private firearms regulations when identifying other sensitive places, it held that whether private rules mattered to the analysis was a question "above [its] pay grade." SA37 n.43. Finally, the court rejected the analogy between public-transit systems and other sensitive places the Supreme Court had previously recognized, reasoning that the analogy swept too broadly and would permit the designation of "almost any" location as a sensitive place. SA41-43.

Concluding that plaintiffs had forfeited any argument in favor of injunctive relief, the court declared the public-transit restriction unconstitutional as applied to plaintiffs' "carrying . . . concealed firearm[s] for self-defense" on the public-transit modes that plaintiffs had described a desire to ride, as well as on associated "real property to the extent necessary to ride" those modes. SA49-50.

## SUMMARY OF ARGUMENT

In declaring the public-transit restriction unconstitutional, the district court failed to recognize that the statute is consistent with the principles that underpin the Nation's regulatory tradition in at least two independent ways.

First, the public-transit restriction is consistent with the Nation's historical tradition of limiting access to unsecured firearms on passenger railroads, a tradition that itself was preceded by a broader history of restricting access to firearms in crowded spaces. As both the Second and Ninth Circuits have recognized, there is a well-established and representative tradition of prohibiting or restricting access to firearms in crowded spaces. Around the time of the ratification of the Fourteenth Amendment, several of the country's most significant railroads built on that tradition by prohibiting passengers from carrying loaded or unsecured firearms on their trains. The public-transit restriction precisely matches those historical regulations in how and why it limits access to firearms, and accordingly is constitutional. The district court's failure to credit these railroad regulations because of their purportedly private nature conflicts with the conclusion of the only circuit to consider this history, ignores the authorities on which the Supreme Court has relied in assessing the scope of the right to bear arms, and misunderstands the nature of the historical inquiry under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Properly interpreted, this historical tradition squarely encompasses the public-transit restriction.

8

Second, the public-transit restriction fits within the Nation's historical tradition of prohibiting or limiting access to firearms in sensitive places, such as courthouses, government buildings, legislative assemblies, polling places, and schools. The modern statute imposes, if anything, a lesser burden than did the historical regulations by permitting individuals to transport concealed handguns on public transit as long as those handguns are unloaded and secured (rather than barring their carriage altogether), while resembling the historical measures in geographic scope and penalties. And it tracks its historical analogues not only in its purpose of protecting public safety and order but also in the features of the regulated space that make that purpose particularly relevant, including the need to protect government operations, the presence of vulnerable populations, and the likelihood of crowding in a confined area. Given these similarities between the public-transit restriction and historical sensitive-place regulations, the district court's view that recognizing public transit as a sensitive place might nullify Second Amendment rights in cities is without merit, as are the other arguments raised by plaintiffs — and rejected by the district court — below.

# ARGUMENT

Illinois has determined that it can best protect public safety and order by prohibiting the carriage of concealed, loaded firearms on public-transit systems. Its decision is "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 33-34, and accordingly does not violate the Second Amendment. Specifically, the public-transit restriction falls within our Nation's historical tradition in two independent ways: as the descendant of firearm restrictions imposed by passenger railroads and by analogy to historical regulations of firearms in sensitive places repeatedly recognized as constitutional by the Supreme Court. The district court's contrary decision is flawed and, if affirmed, would break with opinions of the Second and Ninth Circuits, *see Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024); *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), each of which recognizes the validity of historical traditions that justify Illinois's public-transit restriction, but which the district court rejected. This court should reverse the decision below and remand with instructions to enter judgment in favor of defendants.

## I.    This court reviews a district court's grant of summary judgment *de novo*.

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Ten Pas v. Lincoln Nat'l Life Ins. Co.*, 31 F.4th 541, 545 (7th Cir. 2022). This court reviews a district court's grant of summary judgment *de novo*. *Ten Pas*, 31 F.4th at 545. "Where facts are not disputed, if a district court grants one party's motion for summary judgment and denies the other party's cross-motion, this

court can reverse and award summary judgment to the losing party below." *State Auto Prop. & Cas. Ins. Co. v. Brumit Servs., Inc.*, 877 F.3d 355, 357 (7th Cir. 2017) (quoting *Glass v. Dachel*, 2 F.3d 733, 739 (7th Cir. 1993)).

## II. States may implement firearm restrictions that are consistent with the Nation's historical tradition of regulation.

The Supreme Court has repeatedly and consistently held that States may restrict access to firearms in ways that are consonant with the Nation's historical tradition. *United States v. Rahimi*, 602 U.S. 680, 691 (2024); *Bruen*, 597 U.S. at 30; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion); *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008). Illinois's decision to prohibit the carriage of loaded, unsecured handguns on public transit falls squarely within that tradition.

The Supreme Court's opinion in *Bruen* establishes a two-step framework for analyzing the constitutionality of a firearm restriction. A court must first assess whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 24; *see Bevis v. City of Naperville*, 85 F.4th 1175, 1191 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024). If the plaintiff's proposed course of conduct falls within the Second Amendment's text, the State may show that regulation of that conduct is nonetheless constitutional "by demonstrating that [the regulation] is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Generally, evaluating a regulation's consistency with historical tradition requires "reasoning by analogy" to determine whether the challenged measure and a proposed historical analogue are "relevantly similar." *Id.*

at 28-29.  That analogical inquiry, the Court explained, can usually be answered by examining "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29; *see Bevis*, 85 F.4th at 1192.  But the Court emphasized that the inquiry requires the State to identify only "a well-established and representative historical *analogue*, not a historical *twin*."  *Bruen*, 597 U.S. at 30 (emphasis in original).  Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  *Id.*  And "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," given that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."  *Id.* at 27.

The Supreme Court's recent opinion in *Rahimi* further underscores States' authority to regulate firearms consistent with historical principles.  The lower court in that case had held unconstitutional a federal law without a direct analogue from the Founding Era, rejecting as insufficient each of the federal government's proposed analogues.  602 U.S. at 701.  But the Court reversed, explaining that the lower court had erred in adopting too narrow an understanding of *Bruen*, which was "not meant to suggest a law trapped in amber."  *Id.* at 691.  The Court again explained that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791."  *Id.* at 691-92.  Rather, a court must assess "whether the challenged regulation is consistent with the *principles* that underpin our regulatory

12

tradition." *Id.* at 692 (emphasis added). As Justice Barrett emphasized in a concurring opinion, "[h]istorical regulations reveal a principle, not a mold." *Id.* at 740 (Barrett, J., concurring).

The Supreme Court's decisions thus establish that States may impose firearm restrictions that are "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, but likewise establish that historical regulations do not act as "a regulatory straitjacket," *id.* at 30. On the contrary, "even where historical analogues are not close matches to the challenged law, they may evince principles underpinning our Nation's regulatory tradition, and it is sufficient for the government to show that its law is consistent with those principles." *Wolford*, 116 F.4th at 978.

One such principle — repeatedly recognized in the Supreme Court's modern Second Amendment cases — is that States may restrict access to firearms in sensitive locations like courthouses, government buildings, legislative assemblies, polling places, schools, and "analogous sensitive places." *Bruen*, 597 U.S. at 30. The Supreme Court has emphasized the sensitive-places principle since its landmark opinion in *Heller*. The Court there explained that, although the Second Amendment protects an individual right to bear arms for self-defense, that right, "[l]ike most rights, . . . is not unlimited." 554 U.S. at 626. "From Blackstone through the 19th-century cases," the Court observed, "commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* The Court thus instructed that

13

"nothing in [its] opinion should be taken to cast doubt" on various longstanding firearm restrictions, including "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* The Court underscored the same limitation two years later in *McDonald*, explaining that *Heller* "made . . . clear" that "'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings'" are constitutional. 561 U.S. at 786 (plurality opinion) (quoting *Heller*, 554 U.S. at 626).

*Bruen* not only reaffirmed the sensitive-places principle but also identified it as a basis for appropriate analogical reasoning. The Court there explained that although the "historical record," as set out in two secondary sources,[5] identified only a small number of "'sensitive places' where weapons were altogether prohibited" (a list that included "legislative assembles, polling places, and courthouses," in addition to schools and government buildings), the historical record also indicated "no disputes regarding the lawfulness of such prohibitions," and so the Court deemed it "settled" that carriage could be prohibited in such places without contravening the Second Amendment. 597 U.S. at 30. And, it stated, courts could now "use analogies to those historical regulations of 'sensitive places' to determine that modern

---

[5] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018); Brief of *Amicus Curiae* the Independent Institute in Support of Petitioners at 11-17, *Bruen*, 597 U.S. 1 (No. 20-843), 2021 WL 3127146 (hereinafter Independent Institute Brief).

regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original).[6]

In sum, a firearm regulation is constitutional if it "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692. "[L]aws forbidding the carrying of firearms in sensitive places" embody one such principle. *Bruen*, 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626). Here, as discussed below, Illinois's public-transit restriction is consistent with those principles in at least two independent ways: as the descendant of firearm restrictions imposed by passenger railroads and by analogy to historical sensitive-places regulations.

## III. The public-transit restriction is consistent with the Nation's historical tradition of regulating firearms on passenger railroads.

To start, the public-transit restriction is constitutional because it is consistent with a well-established historical tradition of prohibiting unsecured firearms on passenger railroads — a tradition that was itself preceded by and is consistent with a broader history of restricting access to firearms in crowded spaces. The challenged law imposes a similar burden on Second Amendment rights for the same reasons as did these historical regulations. For that reason, the Ninth Circuit recently held that a state law that, like the challenged statute, restricted access only to loaded or unsecured firearms on public transit, while permitting the transportation of

---

[6] Similarly, although the Court had no occasion to discuss sensitive-place regulations while upholding the statute at issue in *Rahimi*, Justices Barrett and Kavanaugh both recognized the constitutionality of such laws in concurring opinions. 602 U.S. at 735 (Kavanaugh, J., concurring); *id.* at 740 (Barrett, J., concurring).

unloaded, secured arms, "almost certainly would be constitutionally permissible."

*Wolford*, 116 F.4th at 1002.  The district court erred in holding otherwise.

>  **A.    The Nation has a well-established historical tradition of restricting access to firearms on passenger railroads and in other crowded spaces.**

The public-transit restriction follows from a long line of regulations that, since

the Founding, have restricted access to firearms in crowded spaces.  In particular, the

challenged statute builds on historical regulations within this tradition that

prohibited passengers from carrying loaded or unsecured firearms on railroads.

As both the Second and Ninth Circuits have held, the Nation has "a well-

established tradition of prohibiting firearms at crowded places."  *Wolford*, 116 F.4th

at 986; *accord Antonyuk*, 120 F.4th at 1019; *see id.* at 1018-26 (discussing historical

evidence).  That tradition stretches as far back as the 1328 Statute of Northampton,

a "British statute forbidding going or riding 'armed by night [ ]or by day, in fairs[ ]

[or] markets.'"  *Antonyuk*, 120 F.4th at 1019 (first alteration in original) (quoting

Statute of Northampton 1328, 2 Edw. 3 c.3 (Eng.) (Doc. 64-39)).  During the

Founding Era, at least one State, Virginia — the Nation's largest — adopted a similar

statute, 1786 Va. Acts 35, 35, ch. 49 (Doc. 64-40); *see Antonyuk*, 120 F.4th at 1019-20,

and North Carolina law incorporated a similar prohibition, *see State v. Huntly*, 25

N.C. 418, 420-21 (1843).[7]  And New Orleans built on this history with an 1817

---

[7]  Plaintiffs disputed below whether North Carolina ever enacted legislation based on the Statute of Northampton.  Doc. 87 at 33.  But since the North Carolina Supreme Court squarely held that the State's Founding Era common law incorporated the same offense, *see Huntly*, 25 N.C. at 420-21, that dispute is beside the point, *see Rahimi*, 602 U.S. at 693-98 (relying on historical common law).

ordinance prohibiting firearms in ballrooms.  New Orleans, La., An Ordinance Respecting Public Balls art. 1 (Oct. 27, 1817), *reprinted in General Digest of the Ordinances and Resolutions of the Corporation of New Orleans* 371 (1831), https://tinyurl.com/2x826arx; *see Wolford*, 116 F.4th at 986-87.[8]

This tradition continued around the time of the ratification of the Fourteenth Amendment.  Shortly before the Civil War, "New Mexico prohibited firearms at any ball or fandango" (that is, "an assembly where dancing and frolicking are carried on").  *Wolford*, 116 F.4th at 986 n.5, 987 (cleaned up); *see* 1852 N.M. Laws 67, 67, 69, § 3.  During Reconstruction, at least four States — Georgia, Missouri, Tennessee, and Texas — "passed laws prohibiting weapons in . . . crowded places such as assemblies for 'educational, literary or scientific purposes, or . . . ball room[s], social part[ies,] or other social gathering[s].'"  *Antonyuk*, 120 F.4th at 1020 (quoting 1870 Tex. Gen. Laws 63, 63, ch. 46, § 1 (Doc. 64-43)); *see* 1870 Ga. Laws 421, 421, No. 285, § 1; 1875 Mo. Laws 50, 50-51, § 1; 1869-1870 (1st Sess.) Tenn. Pub. Acts 23, 23-24, ch. 22, § 2; 1871 Tex. Gen. Laws 25, 25-26, ch. 34, § 3 (adding additional restricted areas to 1870 law); *see also Wolford*, 116 F.4th at 986-88 (discussing these laws).  In the late 1800s and early 1900s, the territories of Arizona, Montana, and Oklahoma did the same. *See Antonyuk*, 120 F.4th at 1020 (citing 1889 Ariz. Sess. Laws 16, 17, No. 13, § 3 (Doc. 64-45); 1890 Okla. Stats. 412, 496, ch. 25, art. 47, § 7 (Doc. 64-46)); *see also*

---

[8]  In 1879, New Orleans expanded this prohibition to cover "any theatre, public hall, tavern, pic-nic ground, place for shows or exhibitions, house or other place of public entertainment or amusement."  *Jewell's Digest of the City Ordinances of the City of New Orleans* 1 (Edwin L. Jewell ed., 1882), https://tinyurl.com/2chyazt6; *see Wolford*, 116 F.4th at 987.

*Wolford*, 116 F.4th at 987 (describing an analogous 1903 Montana law).  In short, by the turn of the century, at least nine States or territories expressly prohibited the possession of firearms in crowded places.

Contemporary state supreme court decisions uniformly upheld these statutes as constitutional.  *Cf. Bruen*, 597 U.S. at 68 (describing "judicial scrutiny" as relevant to the analysis); *Wolford*, 116 F.4th at 981 ("[I]f courts unanimously confirmed laws as constitutional, that evidence . . . suggests that the laws were constitutional . . . .").  The Georgia Supreme Court held in *Hill v. State*, 53 Ga. 472, 474, 476 (1874), that that State's restriction on carriage in "public gathering[s]" did not violate the right to bear arms, reasoning that, "[a]t such places, the bearing of arms of any sort[ ] is an eye-sore to good citizens, offensive to peaceable people," and "an indication of a want of proper respect for the majesty of the laws."  The state supreme courts of Missouri, Tennessee, and Texas reached the same conclusion.  *See State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886); *Andrews v. State*, 50 Tenn. 165, 182 (1871); *English v. State*, 35 Tex. 473, 478-79 (1871).[9]  These opinions show, as the Second Circuit explained, "that the Nation not only tolerated the regulation of firearms in . . . crowded spaces, but also

---

[9]  As the Second Circuit explained in *Antonyuk*, although the Supreme Court in *Bruen* criticized the Texas Supreme Court's decision in *English* as an outlier, "it did so only insofar as *English* held that the state could lawfully restrict carriage to those with 'reasonable grounds for fearing an unlawful attack.'"  120 F.4th at 1021 n.83 (quoting *Bruen*, 597 U.S. at 64).  *Bruen* therefore does not "cast doubt on *English*'s holding as to the . . . Texas statute's separate restriction relating to public assembly," which — far from being an outlier — is consistent with the other state statutes and decisions described above.  *Id.*; *cf. Rahimi*, 602 U.S. at 700 ("The conclusion that [a group of historical regulations] are not a historical analogue for a broad prohibitory regime like [the one at issue in *Bruen*] does not mean that they cannot be an appropriate analogue for a narrow one.").

18

found it aberrational that a state would be unable to regulate firearms . . . in such spaces." *Antonyuk*, 120 F.4th at 1021; *accord Wolford*, 116 F.4th at 987-88 (same).

Around this time, this tradition of restricting access to firearms in crowded spaces extended to an emerging new context: railroads. As one of the State's expert historians explained below, although public transit is relatively new and did not exist during the Founding or Reconstruction Eras, private passenger trains began appearing in the nineteenth century, and the companies that provided this service regularly restricted firearms. *See* Doc. 64-11 (expert report of Dr. Brennan Rivas) at 25-26. Specifically, at least five major railroad companies in the late 1800s restricted access to firearms on their trains. *Id.*; *see also* Joshua Hochman, Note, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 Yale L.J. 1676, 1690-96 (2024). Those regulations establish what the Ninth Circuit in *Wolford* termed "a historical tradition of prohibiting the carry of loaded firearms or the carry of firearms not properly stored" on passenger railroads. 116 F.4th at 1001; *see also Frey v. Nigrelli*, 661 F. Supp. 3d 176, 205-06 (S.D.N.Y. 2023) (upholding ban on firearms on public transit based on this history), *appeal docketed*, No. 23-365 (2d Cir.). The restriction challenged here falls easily within that tradition.

The practice began at least as early as 1875, when the North Pennsylvania Railroad Company — which served one of the country's largest metropolitan areas, Philadelphia — prohibited passengers from carrying "guns." Hochman, *supra*, at 1692-93. By 1882, the Central Pacific Railway Company — the fourth-largest

railroad in the country by ridership and third-largest by aggregate miles covered —
permitted passengers to carry firearms only "in cases and not loaded," and forbade
any firearms in checked baggage. *Id.* at 1693, 1697. Beginning no later than 1884,
the Union Pacific Railway Company, which ranked among the Nation's ten largest by
passenger revenue, required passengers to secure any firearms in cases or else check
them as baggage. *Id.* at 1694, 1697-98. By 1886, an important southwestern regional
railroad, the International & Great Northern Railroad Company, had established a
practice of barring passengers from carrying firearms on trains, requiring that guns
instead be checked as baggage. *Id.* at 1694-95. And by the late 1800s, the Albany
Railway — an important regional passenger trolley between Albany and New York
City — had a rule prohibiting "cumbersome or dangerous" goods that staff read to
ban firearms. *Id.* at 1695-96; *see Dowd v. Albany Ry.*, 62 N.Y.S. 179, 179-80 (App.
Div. 1900) (upholding rule as reasonable and concluding that firearms with bayonets
were "so obviously dangerous" as to fall under it).

These restrictions were not controversial. On the contrary, "[a]cross state
courts in the nineteenth century, it went unquestioned that railroads had the
authority to protect the safety of their passengers through regulation." Hochman,
*supra*, at 1690 & n.77 (collecting cases); *see, e.g.*, *Pa. R.R. Co. v. Langdon*, 92 Pa. 21,
27 (1879) ("The right of a railroad company to make reasonable rules for its own
protection, and for the safety and convenience of passengers, has been repeatedly
recognised."). This history makes clear that the Nation has an established tradition,

dating to the advent of rail technology, of prohibiting the carriage of loaded or unsecured firearms on passenger railroads.

**B.** **The public-transit restriction is consistent with this historical tradition of prohibiting railroad passengers from carrying loaded or unsecured firearms.**

This historical tradition squarely encompasses the public-transit restriction, which is "relevantly similar" to the historical railroad regulations in both "how and why [it] burden[s]" Second Amendment rights. *Bruen*, 597 U.S. at 29. Illinois's decision to restrict access to loaded or unsecured firearms on public transit is thus "constitutionally permissible," as the Ninth Circuit correctly reasoned. *Wolford*, 116 F.4th at 1002.

First, Illinois's public-transit restriction and the historical railroad regulations "impose a comparable burden on the right of armed self-defense." *Bruen*, 597 U.S. at 29. As discussed, *supra* pp. 19-21, the historical railroad regulations generally prohibited passengers from carrying accessible firearms in railroad cars, requiring them instead to check firearms as baggage or secure them in cases. Hochman, *supra*, at 1690-96. Under these regulations, in other words, although individuals were permitted to take their firearms on railroads in order to transport them, they were not allowed to access them while in transit, as plaintiffs here seek to do. As the Ninth Circuit explained, these historical regulations thus barred "the carry of loaded firearms or the carry of firearms not properly stored." *Wolford*, 116 F.4th at 1001. That is precisely what Illinois's public-transit restriction does: It prohibits a licenseholder from accessing a loaded or unsecured firearm but allows carriage of a

firearm if it is "unloaded and enclosed in a case, firearm carrying box, shipping box, or other container."  720 ILCS 5/24-1(a)(4)(iii), (10)(iii); *id.* § 5/24-1.6(c); *see supra* pp. 4-5.  Unlike the California law considered in *Wolford*, in other words, Illinois's public-transit restriction does not "effectively disarm[ ]" those who "cannot afford private transportation," 116 F.4th at 1001; to the contrary, it permits individuals to transport their firearms freely, as long as those firearms are unloaded and secured, just as its historical counterparts did.

Second, Illinois's public-transit restriction and the historical railroad rules are "comparably justified," *Bruen*, 597 U.S. at 29, in that each is motivated by a concern for passenger safety — a paramount consideration in regulating crowded spaces. State courts in the late 1800s repeatedly described railroad rules of the kind described above as motivated by a concern with passenger safety and public order. *See* Hochman, *supra*, at 1690 & n.77 ("Across state courts in the nineteenth century, it went unquestioned that railroads had the authority to protect the safety of their passengers through regulation."); *see, e.g.*, *Pa. R.R. Co.*, 92 Pa. at 27 (recognizing "[t]he right of a railroad company to make reasonable rules . . . for the safety and convenience of passengers"); *Poole v. N. Pac. R. Co.*, 19 P. 107, 108 (Or. 1888) ("For its own safety and convenience, and that of the public, a railroad company may make reasonable rules and regulations for the management of its business, and the conduct of its passengers.").

Illinois's decision to restrict access to loaded or unsecured firearms on public transit within the State is motivated by the same concerns.  Illinois has determined

that it will best protect the safety of all public-transit riders and employees in the State if individuals are not able to access loaded firearms while in transit. That conclusion accords with the historical principle described above, and with "common sense." *Rahimi*, 602 U.S. at 698. Over 600 million Illinois residents each year, including schoolchildren, rely on the public-transit systems that are governed by the challenged restriction. *Supra* p. 4. And the risks posed by firearms on public-transit systems can be significant: Train cars, subways, and buses are crowded spaces, subject to unpredictable movements, which increases the risk that a shot fired by a passenger, even at an assailant, could have unintended consequences, including injuries to bystanders or transit employees. Doc. 64-13 (expert report of James Yurgealitis) at 2-3. Expert testimony also established below that popular firearms can "easily penetrate glass vehicle windows and sheet aluminum," *id.* at 2, posing additional risks to the integrity of public-transit systems and their riders, including the possibility of derailment and large-scale casualties. The public-transit restriction, in other words, seeks to "regulate the possession and use of weapons for the safety and good order of society," *People v. Mosley*, 33 N.E.3d 137, 156 (Ill. 2015) (cleaned up), and in doing so matches the historical regulations in why, as well as how, it restricts access to firearms.

Because Illinois's public-transit restriction "fits neatly within the [historical] tradition" of prohibiting access to loaded or unsecured firearms in passenger rail cars, it is "consistent with the Second Amendment." *Rahimi*, 602 U.S. at 698, 702. Indeed, the Ninth Circuit held exactly that in *Wolford*, explaining that a hypothetical

23

statute functionally identical to the public-transit restriction "almost certainly would be constitutionally permissible."  116 F.4th at 1002.  That reasoning is correct, and this court should reach the same conclusion here.

### C.     The district court's and plaintiffs' reasons for disregarding this tradition are unpersuasive.

The district court declined to credit this historical tradition, but its reasoning is unpersuasive, as were the alternative arguments that plaintiffs advanced below.

1.     The district court's principal justification for disregarding the history of railroad regulations was that, because railroads in the 1800s were operated by private corporations, rather than the government, any restrictions imposed to govern them are not relevant to the Second Amendment analysis.  SA37.  That reasoning is wrong, as the Ninth Circuit held in *Wolford*, *see* 116 F.4th at 1001 ("[R]ules and regulations by private entities may inform the historical analysis . . . ."); *accord, e.g.*, *Frey*, 661 F. Supp. 3d at 205 (similar), and the court should reverse the district court's contrary determination.

Most fundamentally, the district court's analysis misunderstands the role and nature of railroads in the nineteenth century.  As the Supreme Court itself explained, railroads in this era were "quasi public corporation[s]," *Lake Shore & Mich. S. Ry. Co. v. Smith*, 173 U.S. 684, 690 (1899) (emphasis omitted), *overruled on other grounds by Pa. R.R. Co. v. Towers*, 245 U.S. 6 (1917), tasked by state legislatures to "serve the public" and "engage[ ] in a public employment affecting the public interest," and granted "extraordinary powers" in that enterprise, *Chi., Burlington, & Quincy R.R. Co. v. Iowa*, 94 U.S. 155, 161 (1876).  Railroads during this time could

exercise the power of eminent domain to obtain land and construct rail track, a power otherwise reserved for the State, and by virtue of their unique status were also subject to mandamus actions, "a remedy conventionally unavailable against private entities." Hochman, *supra*, at 1687; *see* 2 W.F. Bailey, *The Law of Jurisdiction* § 803, at 999 (1899) (describing railroads as "quasi-public corporations" (emphasis omitted)). In the Supreme Court's words, a railroad in this era undertook a duty that "was public, as much so as if it were to be constructed by the State." *Township of Pine Grove v. Talcott*, 86 U.S. (19 Wall.) 666, 676 (1874). As a historical matter, then, a railroad corporation in the 1800s, although technically a private enterprise, in fact operated "with quasi-public authority," Hochman, *supra*, at 1689, and so at minimum must be understood (in the Ninth Circuit's words) as a "mixed public-private entit[y]," *Wolford*, 116 F.4th at 1001, whose regulations bear directly on the historical understanding of the Second Amendment right.

That historical understanding accords with the nature of the inquiry under the Second Amendment and the Supreme Court's own practice in conducting that inquiry. Under *Bruen*, courts must assess the historical "public understanding of the right to keep and bear arms." 597 U.S. at 38. But widespread restrictions on access to firearms in a particular context, whether imposed by the government or by private parties, plainly would have shaped the public understanding of individual firearm rights. Indeed, widespread restrictions on firearm access on privately owned passenger trains must inform the historical analysis: As the Second Circuit explained in *Antonyuk*, "lawmakers are not often moved to forbid behavior that is governed by

custom, universal practice, or private warning."  120 F.4th at 970; *see Rahimi*, 602
U.S. at 739-40 (Barrett, J., concurring) (criticizing the "flawed" premise that
"founding-era legislatures maximally exercised their power to regulate").  "[A] town
with only a single daycare facility that privately bans firearms from its premises has
no need to pass a regulation prohibiting guns in daycare centers." *Antonyuk*, 120
F.4th at 970.  In the same way, States would have had no need to regulate the
possession of loaded or unsecured firearms on passenger trains in the nineteenth
century given the wide reach of private rules with the same effect.  Understanding
the relevant historical tradition thus requires considering private, as well as public,
regulations — especially given the quasi-public nature of the railroad corporations at
issue here.  *Supra* pp. 24-25; *see* Hochman, *supra*, at 1689-90 (explaining that
"[w]hen a railroad corporation enacted rules and regulations, it did so against the
backdrop of state oversight," thus giving those regulations "an explicitly public
quality").

　　　　Finally, the Supreme Court, too, has indicated that private regulations can
appropriately be considered in the historical analysis.  As discussed, *supra* p. 14, the
Court's conclusion in *Bruen* that schools qualify as "'sensitive places' where arms
carrying could be prohibited" rested on two secondary sources.  *Bruen*, 597 U.S. at 30
(citing Kopel & Greenlee, *supra*, at 229-36, 244-47; Independent Institute Brief,
*supra*, at 11-17).  Between them, those sources identified weapons restrictions at four
private institutions (the University of Nashville and Dickinson, La Grange, and
Waterville Colleges) and only two public ones (the Universities of North Carolina and

Virginia), as well as an 1878 Mississippi statute restricting concealed carry in schools. *See* Kopel & Greenlee, *supra*, at 250 & n.162; Independent Institute Brief, *supra*, at 14-15, 14 n.8. Far from rejecting the significance of rules imposed by private actors, in other words, the Supreme Court has treated them as relevant to the historical analysis. The district court therefore erred in summarily dismissing the relevance of the railroad regulations on the ground that they were imposed by private corporations, SA37, rather than asking whether they were evidence of historical "principles that underpin our regulatory tradition," *Rahimi*, 602 U.S. at 692. Had the district court considered them, it would have reached the same conclusion as Ninth Circuit — *i.e.*, that there is an established historical tradition of "prohibiting the carry of loaded firearms or the carry of firearms not properly stored" on railroads, from which the challenged restriction descends. *Wolford*, 116 F.4th at 1001; *supra* pp. 19-21.

The district court identified one other ground for disregarding the State's historical evidence, namely that the crowded-space statutes the State identified (as distinct from the railroad regulations) were not analogous to the public-transit restriction. SA30-32. But the district court's analysis is flawed, and conflicts with both *Wolford* and *Antonyuk*. The court reasoned that the Statute of Northampton and the Founding Era state rules that descended from it, *supra* pp. 16-18, prohibited only "arming oneself *to terrify others*," and therefore addressed a different problem from modern concealed-carry laws. SA31-32. But, even if that was true of the two statutes the district court examined, it was not the case for the other crowded-space

laws that the State identified, which the district court ignored:  None of the nineteenth-century laws discussed above included any terror requirement.  *See Antonyuk*, 120 F.4th at 1039; SA31-32 (not discussing these laws).  The district court thus erroneously "failed to consider that the tradition . . . evolved over the years between the Founding and Reconstruction . . . to prohibit firearms in quintessentially crowded places absolutely, without reference to behavior."  *Antonyuk*, 120 F.4th at 1039.  Properly read, this history shows a national "tradition of regulating firearms in quintessentially crowded social places," *id.* at 1037; *accord Wolford*, 116 F.4th at 986-89, that embraces both the historical railroad regulations and the public-transit restriction.

2.     Plaintiffs also advanced two other arguments below that they asserted undercut the relevance of the historical tradition described above.  *See* Doc. 87 at 36-37, 41-42.  Neither argument has merit, and the district court correctly declined to rely on either.

First, plaintiffs argued that the nineteenth-century railroad rules and other crowded-space laws appeared too late in the Nation's history to inform the analysis.  *Id.* at 36-37.  The district court "disagree[d]," SA30-31, 35, and with good reason.  The Supreme Court has repeatedly examined history from the Reconstruction Era when examining the validity of firearms regulations.  *Heller* relied on "'19th-century cases that interpreted the Second Amendment,'" "'discussion of the Second Amendment in Congress and in public discourse' after the Civil War," and "how post-Civil War commentators understood the right."  *Bruen*, 597 U.S. at 21 (quoting

*Heller*, 554 U.S. at 610, 614). *Bruen*, too, looked to Reconstruction Era cases and

statutes, *id.* at 51-57; surveyed "public discourse surrounding Reconstruction," *id.* at

60; and invoked Reconstruction Era evidence, in particular, in discussing restrictions

on where firearms could be carried, explaining that "18th- and 19th-century" laws

restricting the possession of guns in sensitive places satisfied its historical analysis,

*id.* at 30; *see supra* p. 14 & n.5.  Finally, *Rahimi* upheld the federal statute challenged

there in large part based on 10 surety laws passed by States between 1836 and 1868.

*See* 602 U.S. at 696 (relying on Mass. Rev. Stat. ch. 134, § 16 (1836)); *see also id.*

(citing *Bruen*'s reference, 597 U.S. at 56 & n.23, to nine other state laws dating from

1838 to 1868).  Far from casting doubt on the relevance of nineteenth-century

history, in other words, the Supreme Court's Second Amendment caselaw confirms

the importance of such evidence, and of that period of our Nation's history more

generally.[10]

Indeed, since *Bruen*, multiple courts of appeals have held that nineteenth-

century historical evidence is relevant to the Second Amendment analysis, especially

when such evidence helps elaborate on a longstanding historical tradition.  Both the

Second Circuit in *Antonyuk* and the Ninth Circuit in *Wolford* relied on 1800s-era

evidence alongside Founding Era evidence in evaluating the constitutionality of the

sensitive-places regulations at issue in those cases.  *See Antonyuk*, 120 F.4th at 988

---

[10]  *Accord Rahimi*, 602 U.S. at 725 (Kavanaugh, J., concurring) (explaining that the
Framers "expect[ed] and intend[ed] that post-ratification history would be a proper
and important tool" of constitutional analysis); *id.* at 738 (Barrett, J., concurring)
(reasoning that "postenactment history can be an important tool," including for the
purpose of "liquidat[ing] ambiguous constitutional provisions" (cleaned up)).

n.36 (holding that "evidence from the Reconstruction Era regarding the scope of the right to bear arms . . . is at least as relevant as evidence from the Founding Era"); *Wolford*, 116 F.4th at 980 (looking "to the understanding of the right to bear arms *both* at the time of the ratification of the Second Amendment in 1791 *and* at the time of the ratification of the Fourteenth Amendment in 1868"). This court did the same in *Bevis v. City of Naperville*, looking to historical laws from the nineteenth century alongside those from the Founding. *See* 85 F.4th at 1201-02. Plaintiffs were thus wrong to suggest below that evidence from the nineteenth century could not be considered, especially since, as discussed, *supra* pp. 16-21, that evidence built on a historical tradition of crowded-space laws dating back to medieval England, and so is relevant at least as "persuasive evidence of the original meaning" of the Second Amendment. *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring).

Plaintiffs also erred in arguing below that the railroad and crowded-space regulations were insufficiently widespread. *E.g.*, Doc. 87 at 37, 41-42. The Second and Ninth Circuits both reached the opposite conclusion with respect to the crowded-space laws. *See Antonyuk*, 120 F.4th at 1021; *Wolford*, 116 F.4th at 986-89. And the only circuit to address the railroad regulations, the Ninth, found that they establish a relevant "historical tradition." *Wolford*, 116 F.4th at 1001. Unsurprisingly so, since the regulations came from some of the largest, most important railroads of the time, and there was no apparent controversy over their lawfulness. *See* Hochman, *supra*, at 1690-96; *supra* pp. 19-21.

Indeed, the Supreme Court has not hesitated to approve location-specific firearm restrictions based on a smaller number of historical regulations than support the public-transit restriction here. In *Bruen*, the Court recognized courthouses, legislative assemblies, and polling places as "'sensitive places' where arms carrying c[an] be prohibited" based on just one or two historical regulations for each location. *See Bruen*, 597 U.S. at 30; *Antonyuk*, 120 F.4th at 972 & n.15 (discussing the record in *Bruen*); *Wolford*, 116 F.4th at 979-80 (same). The more robust record here firmly establishes a historical tradition that encompasses the public-transit restriction.

**IV. The public-transit restriction is consistent with the Nation's historical tradition of regulating firearms in sensitive places.**

The public-transit restriction is constitutional for an additional, independent reason: Public transit is analogous to the historical sensitive places identified by the Supreme Court as constitutional — courthouses, government buildings, legislative assemblies, polling places, and schools. *See Bruen*, 597 U.S. at 30 ("[C]ourts can use analogies to [these] historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." (emphasis omitted)). The public-transit restriction is consistent with the "principles underlying" these regulations in both how and why it burdens the right to armed self-defense. *Rahimi*, 602 U.S. at 692. With respect to *how*, the modern statute imposes, if anything, less of a burden than did its historical analogues because it restricts less conduct — requiring merely that firearms be unloaded and secured, rather than prohibiting all firearms whatsoever — in discrete government-owned and -operated spaces, and it imposes similar penalties

31

on violators.  *See id.* at 698-99 (comparing statutory scopes and penalties to assess

relative burdensomeness).  And with respect to *why*, the public-transit restriction

matches historical regulations not only in its purpose (protecting public safety and

order) but also in the characteristics of the regulated space that make that purpose

particularly pressing, including the need to protect government operations, the

presence of vulnerable populations, and the likelihood of crowding in a confined area.

*See id.* at 698 (noting common purpose of modern and historical laws).[11]  The district

court's slippery-slope argument against this conclusion lacks merit, as do the other

arguments advanced below by plaintiffs but not adopted by the court.

### A.     The public-transit restriction and historical sensitive-place regulations impose comparable burdens.

To start, the burden imposed by the public-transit restriction is comparable to

the burdens imposed by historical sensitive-place regulations that the Supreme Court

has repeatedly stated are consistent with the Second Amendment.  *See supra* pp. 13-

15; *Bruen*, 597 U.S. at 30.  Like these regulations, the challenged statute limits access

to firearms only in discrete and enclosed spaces that are owned and operated by the

government; within those spaces, it imposes a lesser burden on Second Amendment

rights than did the relevant historical restrictions by prohibiting only loaded or

unsecured firearms; and the penalties under Illinois's law match those imposed by

---

[11]  Since these characteristics alone make public transit a sensitive place analogous to those identified in *Bruen* and *Heller*, resolving this case does not require the court "to comprehensively define 'sensitive places.'"  *Bruen*, 597 U.S. at 30.  In another case, other characteristics might be relevant.

historical regulations.  The result is a modest burden that falls comfortably within our Nation's tradition of regulating the possession of firearms in sensitive places.

First, like the sensitive places described in *Bruen* and *Heller*, public-transit systems are discrete and enclosed spaces, and the public-transit restriction (like its historical analogues) accordingly leaves Illinois residents free to exercise their Second Amendment rights outside those spaces.  *Cf. Rahimi*, 602 U.S. at 699 (comparing temporal scope of modern and historical firearm regulations).  The sensitive-place regulations identified by the Supreme Court each applied to discrete and enclosed spaces, such as courthouses or polling places.  *See Bruen*, 597 U.S. at 30; *see also Antonyuk*, 120 F.4th at 1038 (observing that many historical statutes similarly regulated "physically delineated or enclosed spaces").  Although the spaces regulated by these laws were important to civic life, as public transit is today, the limited nature of the regulations left individuals free to bear arms in most aspects of their day-to-day lives.  The public-transit restriction operates in the same way; indeed, the trains and buses that plaintiffs seek to ride are, if anything, more confined than historical sensitive places.  Similarly, both the historical sensitive places identified as constitutional by the Supreme Court and contemporary public-transit systems are "State-owned."  *Wolford*, 116 F.4th at 1001.  That common feature ensures that the public-transit restriction, like historical sensitive-place regulations, does not burden the right to bear arms in public streets or on private property, where "the need for defense of self, family, and property is most acute."  *Heller*, 554 U.S. at 628; *see Bruen*, 597 U.S. at 33.

Furthermore, within its limited geographic domain, the public-transit restriction prohibits a narrower class of conduct than did historical sensitive-place regulations. As the Supreme Court has observed, the historical regulations "altogether prohibited" firearms in the relevant spaces. *Bruen*, 597 U.S. at 30; *see, e.g.*, Del. Const. of 1776, art. 28 (Doc. 64-16) (prohibiting "com[ing] armed" to "any" election); 1647 Md. Laws 215, 216 (Doc. 64-18) (prohibiting "any weapon" in legislative assembly). Under Illinois law, by contrast, any concealed-carry licenseholder — indeed, any Illinois resident with a FOID card — can transport an unloaded, secured handgun on public transit. *Supra* pp. 4-5. That distinction not only allows a concealed-carry licenseholder to retain possession of a handgun during her time on public transit but also facilitates carry more broadly, since the licenseholder can generally carry a concealed handgun both before and after her journey on transit. *Cf. Wolford*, 116 F.4th at 1001 (noting that a complete ban on firearms on public transit would "effectively disarm[ ] [travelers] entirely when they leave home"). The public-transit restriction's focus on loaded or unsecured handguns thus makes the statutory provision less burdensome than historical sensitive-place regulations.

"Finally, the penalty — another relevant aspect of the burden — also fits within the regulatory tradition." *Rahimi*, 602 U.S. at 699. Violation of the public-transit restriction is a misdemeanor, with a potential penalty for a first violation of not more than six months' imprisonment and a fine of up to $1,500. *See* 430 ILCS

66/70(e); 730 ILCS 5/5-4.5-60(a), (e).[12]  Those possible sanctions align with the penalties set out in historical sensitive-place regulations, which often included imprisonment or fines.  *See, e.g.*, 1787 N.Y. Laws 344, 345, ch. 1 (Doc. 64-17) (providing for "fine and imprisonment" for bearing arms at polling place); 1786 Va. Acts 35, 35, ch. 49 (Doc. 64-40) (providing for imprisonment for bringing arms to courthouse); *cf. Rahimi*, 602 U.S. at 699 (examining whether historical rules "provided for imprisonment").

        In short, the public-transit restriction imposes, if anything, less of a burden on the exercise of Second Amendment rights than did the historical sensitive-place regulations whose constitutionality the Supreme Court has deemed "settled." *Bruen*, 597 U.S. at 30.

> **B.    The public-transit restriction and historical sensitive-place regulations are comparably justified.**

        The public-transit restriction and historical sensitive-place laws are also "comparably justified" — that is, the contemporary law shares a common purpose with the historical laws.  *Bruen*, 597 U.S. at 29; *accord Rahimi*, 602 U.S. at 698 (looking to "why" a statute "burdens the Second Amendment right").  That is so for multiple reasons.  Most basically, Illinois's law and the historical regulations share a common purpose of protecting public safety and order.  That alone renders them "comparably justified" for purposes of the *Bruen* analysis, *Bevis*, 85 F.4th at 1200, but the modern and historical laws also align in the "principles that underpin" and

---

[12] Second or subsequent offenses may result in imprisonment for less than a year and a fine of up to $2,500.  *See* 430 ILCS 66/70(e); 730 ILCS 5/5-4.5-55(a), (e).

explain that purpose, *Rahimi*, 602 U.S. at 692.  In particular, the public-transit restriction, like the historical sensitive-place regulations, mitigates the risks of gun violence in spaces that are owned and operated by the government, are frequented by vulnerable populations, and tend to be crowded or confined.

Most basically, like the public-transit restriction, historical sensitive-place regulations, including those relied on in *Bruen*, aimed to protect public safety and order.  *See supra* pp. 21-22 (discussing the purpose of the public-transit restriction).  For example, a 1650 statute prohibited firearms in the Maryland legislature "for the better ordering of Both Howses."  1650 Md. Laws 273, 273 (Doc. 64-19); *see* Independent Institute Brief, *supra*, at 11-12.  The 1776 Delaware Constitution forbade weapons at polling places "[t]o prevent any violence or force being used." Del. Const. of 1776, art. 28 (Doc. 64-16); *see* Independent Institute Brief, *supra*, at 13. And Virginia barred firearms in courthouses to "forbid[ ] . . . [a]ffrays."  1786 Va. Acts 35, 35, ch. 49 (Doc. 64-40); *see* Independent Institute Brief, *supra*, at 12.  That common purpose establishes that the modern and historical regulations are "comparably justified."  *Bruen*, 597 U.S. at 29.  As this court explained in *Bevis*, a shared purpose to "[p]rotect . . . [c]ommunities" or "protect public health, safety, and welfare" can render laws relevantly similar for purposes of *Bruen*'s "'why' question." 85 F.4th at 1200.  Here, the goal of protecting public safety and order served by both the public-transit restriction and historical sensitive-place regulations places the modern law within the Nation's historical tradition.

Although that shared purpose is enough to satisfy the *Bruen* standard, the resemblance between the public-transit restriction and the historical sensitive-place regulations runs deeper. The modern statute is consistent with not only the overall purpose of historical sensitive-place regulations but also "the principles underlying" that purpose. *Rahimi*, 602 U.S. at 692. Modern public transit shares at least three characteristics with the sensitive places identified in *Bruen* and *Heller* that explain why legislatures past and present have chosen to impose special firearm restrictions in these areas: Public transit (1) is owned and operated by the government, (2) is frequented by vulnerable populations, and (3) tends to attract crowds into confined spaces. Other circuits have treated each of these characteristics as independently sufficient to justify location-based firearm restrictions. *See Antonyuk*, 120 F.4th at 1010-12 (protection of vulnerable populations); *id.* at 1019-24 (crowding in confined space); *Wolford*, 116 F.4th at 970-71 (reasoning that a state-operated business could "prohibit firearms as a matter of the ordinary property-law right to exclude"). Collectively, these characteristics confirm that the public-transit restriction falls well within the Nation's historical tradition.

First, both the modern and the historical regulations restrict conduct within government-owned and -operated spaces in which the State has a proprietary need to maintain order. By treating a broad array of government-owned and -operated spaces — including the broad category of "'government buildings'" — as sensitive places, historical measures establish the commonsense principle that the government has broader latitude to regulate the possession and use of firearms in spaces in which

it has a proprietary interest. *Bruen*, 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626); *see Wolford*, 116 F.4th at 970-71 ("[I]f a State operates a bank, the State, too, may exercise its proprietary right to exclude [firearms], just as a private property owner may."); *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) (concluding that a government-owned parking lot was a sensitive place because "the government — like private property owners — has the power to regulate conduct on its property"), *abrogated on other grounds by Bruen*, 597 U.S. 1. Public transit is such a space: in operating transit systems, the government "is engaged in commerce," *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974) (plurality opinion), and, in doing so, has greater latitude in regulating firearms to maintain order on its own property and avoid the liability that might flow from violence on state grounds. Indeed, a federal district court in Maryland relied on this principle in upholding that State's public-transit regulation, reasoning that because the State was operating there as "a market participant," it had more authority "to exclude firearms on its property, just as a private entity engaged in transportation services could." *Kipke v. Moore*, 695 F. Supp. 3d 638, 655 (D. Md. 2023), *appeal docketed*, No. 24-1799 (4th Cir.).

Second, the public-transit restriction, like historical sensitive-place regulations governing schools, protects a vulnerable population: children. As the Second Circuit explained, historical restrictions prohibiting firearms in schools establish that States may restrict access to firearms "for the protection of vulnerable populations," including children, in areas "frequented by" those populations, *Antonyuk*, 120 F.4th at 1012; *see, e.g.*, 1870 Tex. Gen. Laws 63, 63, ch. 46, § 1 (Doc. 64-43) (prohibiting

firearms in schools).  Courts have relied upon that principle to uphold firearms bans in other locations frequented by vulnerable populations:  The Second Circuit upheld a statute prohibiting the possession of firearms in behavioral and substance-abuse treatment centers, *Antonyuk*, 120 F.4th at 1008-13, and a Maryland district court upheld that State's statute prohibiting the possession of firearms in museums and public-transit systems, *Kipke*, 695 F. Supp. 3d at 652-53, 655-56.  As plaintiffs agreed below, Illinois's many public-transit systems, like schools, serve children:  All Chicago public schools, and many non-public schools, distribute public-transit fare cards to students, and the CTA encourages elementary- and high-school students to use public transit for travel.  Doc. 88 at 31-32; *accord, e.g.*, *Wolford*, 116 F.4th at 1001 (acknowledging that public transit serves "vulnerable populations"); *Kipke*, 695 F. Supp. 3d at 655 (same).  The challenged provision thus comports with "the principles underlying" historical firearm regulations in schools by restricting access to firearms to protect this vulnerable population.  *Rahimi*, 602 U.S. at 692.

Finally, both the modern and the historical regulations address the heightened danger created by gunfire in crowded, confined spaces.  The sensitive-place regulations "reveal a principle," *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring), that "a high population density in discrete, confined spaces . . . has historically justified firearm restrictions," *Antonyuk*, 120 F.4th at 1027.  That common attribute unites schools, polling places, legislative assemblies, and courthouses — all enclosed spaces where individuals congregate in large numbers for a common purpose.  The same is true here.  As the Ninth Circuit observed in *Wolford*, public-transit systems,

39

like "other sensitive places," are "often crowded."  116 F.4th at 1001.  As discussed,

*supra* pp. 22-23, the record here makes that clear:  As one expert witness explained,

"[e]xchanges of gunfire in confined spaces are inherently problematic," as they create

"significant added risk to innocent bystanders" who "have little or no space in which

to avoid gunfire."  Doc. 64-13 at 3.  In limiting access to firearms in a crowded,

confined area, the public-transit restriction thus accords not only with "common

sense," *Rahimi*, 602 U.S. at 698, but also with the history of regulation in sensitive

places.

Because Illinois's public-transit restriction "fits neatly within the tradition"

established by historical sensitive-place regulations in both how and why it burdens

the right to armed self-defense, it is consistent with, and does not contravene, the

Second Amendment.  *Id.*

## C.  The district court's and plaintiffs' counterarguments lack merit.

The district court rejected the State's analogy to historical sensitive-place

restrictions below on the sole basis that the argument might permit other, overly

broad firearm restrictions.  SA42.  That reasoning is flawed — as are the other

arguments advanced by plaintiffs below that the district court declined to accept.

1.     As noted, the district court rejected the State's analogical argument on

the sole basis that it was too broad, reasoning that the argument "would in effect

exempt cities from the Second Amendment," SA42 (quoting *Bruen*, 597 U.S. at 31),

or require "treating any place where the government would want to protect public

order and safety as a sensitive place," SA43.  But that concern does not justify the

district court's wholesale refusal to consider whether public transit is analogous to the sensitive places the Supreme Court identified in *Bruen* and *Heller* — a task the Court expressly instructed courts to undertake. *See Bruen*, 597 U.S. at 30 ("[C]ourts can use analogies to . . . historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." (emphasis in original)). To be sure, as the district court observed, SA37 n.43, 41-42, 41 n.48, *Bruen* did not elaborate on the characteristics that might render a modern sensitive-place statute analogous to a historical statute. But that has not stopped other courts from attempting to identify the relevant principles and to engage in the task of analogical reasoning, just as *Bruen* anticipated. *See Antonyuk*, 120 F.4th at 971-72; *Wolford*, 116 F.4th at 978-81. The district court erred at the outset by declining to undertake that task here.

Regardless, the court erred in rejecting the State's analogical argument as overbroad. As discussed, *supra* pp. 32-40, Illinois's public-transit restriction is like the historical sensitive-place regulations discussed in *Bruen* in multiple respects: It imposes a burden on public carriage that is in many ways less than the burden that the historical regulations imposed, and it is motivated by many of the same principles — the protection of public order in spaces that are owned and operated by the government, are frequented by vulnerable populations, and tend to be crowded and confined. Despite the district court's concerns, accepting that argument would not allow a State to, for instance, "exempt cities from the Second Amendment," SA42 (cleaned up), or designate any space that it wishes a "sensitive" one, SA43. The

challenged statute, for instance, like the historical regulations identified in *Bruen*, applies only to a "discrete[,] . . . physically delineated [and] enclosed space[ ]," *Antonyuk*, 120 F.4th at 1038, and so upholding it would not authorize a State to bar firearms from "the streets of Manhattan," SA42.  And the public-transit restriction and historical sensitive-place regulations share not only a common goal of preserving public safety and order, but also common reasons why that purpose is particularly important in the area in question, *supra* pp. 35-40 — a common thread that would not permit a State to indiscriminately designate spaces across its jurisdiction as "sensitive."

In the end, the district court erred in declaring the public-transit restriction unconstitutional based on "speculat[ion] about 'hypothetical' or 'imaginary' cases" in which the State's arguments might sweep too far.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).  The public-transit restriction is similar to the historical sensitive-place regulations set out in *Bruen*, and is not the start of a slippery slope.  The district court erred in concluding otherwise.

2.      Below, plaintiffs identified several other arguments that, in their view, undermined the State's analogies.  The district court correctly declined to adopt these meritless arguments, SA40 n.45, 46-48, and this court should do the same.

Most fundamentally, plaintiffs argued below that the discussion of sensitive places in *Bruen* and *Heller* is *dictum*, contending among other things that schools are not sensitive places from which courts can properly analogize in considering a Second Amendment claim.  *E.g.*, Doc. 87 at 18-20.  The district court correctly rejected this

"strained" reading of *Bruen*.  SA40 n.45.  As discussed, *supra* pp. 13-15, the Supreme

Court has repeatedly and consistently described historical sensitive-place regulations

as constitutional, including by describing their constitutional status (in *Bruen*) as

"settled."  597 U.S. at 30; *accord McDonald*, 561 U.S. at 786 (plurality opinion);

*Heller*, 554 U.S. at 626; *see also Rahimi*, 602 U.S. at 699 (reaffirming *Heller*'s

discussion of "presumptively lawful" firearm restrictions).  To be sure, the

constitutionality of sensitive-place rules was not before the Court in those cases.  But

the Court's repeated affirmation of the sensitive-place doctrine in these cases "is the

sort of message that . . . a [lower court] must respect."  *United States v. Skoien*, 614

F.3d 638, 641 (7th Cir. 2010) (*en banc*).  Indeed, *Bruen* explicitly directed lower

courts to "use analogies to . . . historical regulations of 'sensitive places' to determine

that modern regulations prohibiting the carry of firearms in new and analogous

sensitive places are constitutionally permissible."  597 U.S. at 30 (emphasis omitted).

And both the Second and Ninth Circuits — the only circuits to have addressed

sensitive-place laws since *Bruen* — have complied with that instruction by treating

the Court's discussion of sensitive places as binding.  *See, e.g.*, *Antonyuk*, 120 F.4th at

971-72; *Wolford*, 116 F.4th at 978-81.  And, to state defendants' knowledge, no court

of appeals has ever held that sensitive places do not exist or that a State might violate

the Second Amendment by restricting firearms in schools.  Plaintiffs' novel argument

is untenable.

Plaintiffs also erred below in asserting that the Supreme Court's discussion of

sensitive-place regulations did not rest on historical analysis.  *E.g.*, Doc. 87 at 18-19.

*Bruen* said just the opposite: The Court described "the historical record" concerning sensitive-place restrictions, observed that there was apparently "no dispute[ ] regarding the lawfulness of such prohibitions," and cited two sources that collected historical authorities. 597 U.S. at 30 (citing Kopel & Greenlee, *supra*, at 229-36, 244-47; Independent Institute Brief, *supra*, at 11-17); *see Antonyuk*, 120 F.4th at 972 (explaining that *Bruen* found sensitive-place laws "supported by the historical record" after "examin[ing] [historical] prohibitions in context"). Plaintiffs may not agree with the result of the Court's historical analysis, but they cannot deny that the Court conducted that analysis.

Finally, the district court also correctly rejected plaintiffs' theory that only locations with "comprehensive, government-provided security" qualify as sensitive places. Doc. 70 at 20; *see* SA46-48 (rejecting this argument). As the Ninth Circuit explained, plaintiffs' "assertion flatly contradicts *Bruen*," since "[m]any schools and polling places have few security measures — now or in the past — yet the Supreme Court listed those places as conclusively sensitive." *Wolford*, 116 F.4th at 981 (citing *Bruen*, 597 U.S. at 30). Moreover, were security the sole necessary and sufficient feature, the Court would presumably have referred to "secured" places, rather than "sensitive" ones, and would have had little difficulty "comprehensively defin[ing] 'sensitive places.'" *Bruen*, 597 U.S. at 30. Plaintiffs' security theory, to the extent they renew it, thus does not withstand scrutiny.

## CONCLUSION

For these reasons, state defendants respectfully request that this court reverse the decision below and remand with instructions to enter judgment in favor of defendants.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

/s/ Alex Hemmer                    **JANE ELINOR NOTZ**
**ALEX HEMMER**                    Solicitor General
Deputy Solicitor General
**R. SAM HORAN**                   115 South LaSalle Street
Assistant Attorney General        Chicago, Illinois 60603
115 South LaSalle Street          (312) 814-3312
Chicago, Illinois 60603
(312) 814-5526                     Attorneys for Defendants-Appellants
Alex.Hemmer@ilag.gov              Kwame Raoul and Robert Berlin

January 15, 2025

45

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(A) and Circuit Rule 32(c) because it contains 11,246 words (excluding the parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)).  This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(a) because it has been prepared in a proportionally spaced typeface (12-point Century Schoolbook BT) using Microsoft Word.

<u>/s/ Alex Hemmer</u>
ALEX HEMMER

January 15, 2025

### CERTIFICATE OF RULE 30 COMPLIANCE

In accordance with this court's Rule 30(d), I certify that all materials required

by this court's Rules 30(a) and (b) are included in the short appendix to the brief.

/s/ Alex Hemmer
ALEX HEMMER

January 15, 2025

**SHORT APPENDIX**

# TABLE OF CONTENTS

Page

Memorandum Opinion and Order
    August 30, 2024 (Doc. 108) ................................................................. SA1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

BENJAMIN SCHOENTHAL *et al.*,

*Plaintiffs,*

*v.*

KWAME RAOUL *et al.*,

*Defendants.*

No. 3:22-cv-50326

HON. IAIN D. JOHNSTON

---

## MEMORANDUM OPINION AND ORDER

The Illinois Firearm Concealed Carry Act bans carrying firearms on public transportation, 430 ILCS 66/65(a)(8); to violate the ban is a misdemeanor, 430 ILCS 66/70(e). Plaintiffs Benjamin Schoenthal, Mark Wroblewski, Joseph Vesel, and Douglas Winston allege that the ban violates the Second Amendment[1] and bring this action against several defendants with the power to enforce Illinois' criminal code: Attorney General Kwame Raoul,[2] DeKalb County State's Attorney Rick Amato, DuPage County State's Attorney Robert Berlin, Cook County State's Attorney Kimberly Foxx, and Lake County State's Attorney Eric Rinehart. Plaintiffs ask for a declaratory judgment that the ban is unconstitutional and seek to enjoin Defendants from enforcing it against them. Before the Court are three motions for summary judgment—one from

---

[1] As it is incorporated by the Due Process Clause of the Fourteenth Amendment against the states. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

[2] The Court is not so sure that the Illinois Attorney General has the authority to enforce the criminal aspects of the ban, but he doesn't make that argument. So, the Court will assume for purposes of these motions that the Illinois Attorney General can enforce the criminal components of the ban.

Plaintiffs, one from Ms. Foxx,[3] and one from the remaining defendants ("State Defendants"). After an exhaustive review of the parties' filings and the historical record, as required by Supreme Court precedent, the Court finds that Defendants failed to meet their burden to show an American tradition of firearm regulation at the time of the Founding that would allow Illinois to prohibit Plaintiffs—who hold concealed-carry permits—from carrying concealed handguns for self-defense onto the CTA and Metra.[4] For the following reasons, Ms. Foxx's motion is denied, State Defendants' motion is denied, and Plaintiffs' motion is granted in part.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable factfinder could return a verdict for the nonmovant; it does not require that the dispute be resolved conclusively in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008).

---

[3] Ms. Foxx's briefs included a request for discovery sanctions, which the Court has already addressed. *Schoenthal v. Raoul*, No. 3:22-cv-50326, 2024 U.S. Dist. LEXIS 79497, at *5 (N.D. Ill. May 1, 2024).

[4] Keeping in mind Justice Gorsuch's explanation in his concurrence in *Rahimi*, this Court's ruling is specific to the facts presented. *See United States v. Rahimi*, 144 S. Ct. 1889, 1909-10 (2024) (Gorsuch, J., concurring). "Trump-appointed judge allows firearms on Illinois public transit" is a likely chyron for this decision. That's unfortunate. Federal judges—including those who will review this decision—engage in exacting, thoughtful, and careful analyses that are not results oriented or reducible to headlines and chyrons. We're doing the best we can.

Local Rule 56.1 statements of fact serve a valuable purpose in this process: they help the Court in "organizing the evidence and identifying disputed facts." *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). Each fact must be supported by evidentiary material. LR 56.1(d)(2); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities.").[5] Legal arguments aren't permitted in factual allegations or responses, and responses "may not set forth any new facts." LR 56.1(d)(4), (e)(2).[6] "District courts are 'entitled to expect strict compliance' with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 606-07 (N.D. Ill. 2011); *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 817 (7th Cir. 2004).

---

[5] In arguing that portions of Plaintiffs' LR 56.1 statement should be disregarded, Ms. Foxx contends that Plaintiffs' "self-serving" affidavits are improper. However, a "self-serving" affidavit should not be excluded just because it is self-serving. *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("As we have repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."). Nearly all litigants' statements are self-serving. And if a court could not consider self-serving affidavits during summary judgment, then no summary judgment motion could ever be granted, including Ms. Foxx's. The Court may ignore testimony from such affidavits if it contradicts previous sworn testimony from the declarant (also known as a "sham affidavit"), *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020), or if there are other evidentiary concerns, *see Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017), but the Court doesn't automatically strike any statement of fact that relies on a "self-serving" affidavit.

[6] Plaintiffs improperly open their response to Defendants' statement of facts with an argument for why they reserve analysis of the relevance and importance of asserted facts for their brief. Such an explanation is gratuitous—that is how the LR 56.1 statements are *supposed* to work. The lengthy responses where they reiterate the legal arguments in their brief, *e.g.*, Dkt. 88 at 10 ¶ 65, 16 ¶ 88, 19 ¶ 96, violate LR 56.1.

## BACKGROUND

In Illinois, openly carrying firearms is unlawful. 720 ILCS 5/24-1. Under the Firearm Concealed Carry Act, an individual with a concealed-carry license may generally carry a concealed handgun in public. 430 ILCS 66/10. This general permission, however, does not extend to a list of prohibited areas, including public transportation. Plaintiffs challenge this provision. The relevant part of the statute reads as follows:

(a) A licensee under this Act shall not knowingly carry a firearm on or into:

. . .

(8) Any bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds.

430 ILCS 66/65(a).

Plaintiffs are licensed under Illinois law to carry a concealed handgun. Dkt. 71 ¶¶ 9, 17, 25, 33. They don't use public transportation as much as they would like because of the statute's threat of criminal prosecution for carrying a concealed firearm on public transportation. *Id.* ¶¶ 12-13, 20-21, 27, 38-39; Dkt. 66 ¶ 22. There are two specific transit systems that Plaintiffs declare they would use—the Chicago Transit Authority (CTA), which operates approximately 140 bus routes and 242 miles of rapid transit railroad track in the Chicago region, and the Metra commuter rail agency, which operates eleven lines serving the six-county Chicago region. Dkt. 64 ¶¶ 2-3; Dkt. 64-2 ¶ 7; Dkt. 64-3 ¶ 7; Dkt. 64-4 ¶ 11; Dkt. 64-5 ¶¶ 8-9.

Mr. Schoenthal, who resides in DeKalb County, Illinois, uses public transportation for both personal and work purposes—he currently uses Metra to travel to

Northwestern Medicine Delnor Hospital, DuPage County, and downtown Chicago. Dkt. 64 ¶ 6; Dkt. 66-27 at 20:10-20; Dkt. 71 ¶¶ 7, 11; Dkt. 88 at 5 ¶ 24. Mr. Wroblewski resides in DuPage County, specifically Woodridge, Illinois. Dkt. 64 ¶ 7; Dkt. 66 ¶ 33; Dkt. 71 ¶ 15. He uses Metra to visit Chicago. Dkt. 66 ¶ 37; Dkt. 71 ¶ 19. Mr. Vesel lives in La Grange, Illinois, located in Cook County. Dkt. 64 ¶ 8; Dkt. 66 ¶¶ 43-44; Dkt. 71 ¶ 23. He hasn't taken public transportation for at least two years despite living less than half a mile from a Metra stop, but he wishes to take the CTA and Metra more frequently. Dkt. 64-4 ¶¶ 8, 11; Dkt. 66 ¶¶ 45, 48, 50; Dkt. 71 ¶¶ 27-28. Mr. Winston lives in Waukegan, in Lake County, Illinois. Dkt. 64 ¶ 9; Dkt. 66 ¶¶ 51-52; Dkt. 71 ¶ 31. Mr. Winston asserts that he has taken Metra (from the Ogilvie station) to travel to St. Louis.[7] Other than this asserted trip, he rarely takes public transit but wishes to do so more often by taking the CTA and Metra to visit Evanston and Chicago. Dkt. 64-5 ¶¶ 8-9; Dkt. 66 ¶¶ 55-56; Dkt. 71 ¶ 38. All four plaintiffs would carry a handgun on public transportation if not for the Firearm Concealed Carry Act's ban. Dkt. 71 ¶¶ 12-13, 20-21, 27, 38-39.

## DISCUSSION

In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Supreme Court laid out the framework to be applied in analyzing regulations that restrict the bearing of arms. *Atkinson v. Garland*, 70 F.4th 1018, 1019-20 (7th Cir. 2023). Rejecting the two-step means-end approach that courts had employed after *District of Columbia v.*

---

[7] The Court notes that this assertion doesn't make much sense as Amtrak, which travels to St. Louis, leaves Union Station, not Ogilvie, and Metra sure doesn't travel to St. Louis.

*Heller*, 554 U.S. 570 (2008), the Court introduced a new and fundamentally different two-step test, holding that

> when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)); *see also Rahimi*, 144 S. Ct. at 1898 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.").[8] Although the test is grounded in history, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897-98. When analyzing "modern regulations that were unimaginable at the founding," the government has the burden to "identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30; *see also Rahimi*, 144 S. Ct. at 1897-98.

---

[8] The motions before the Court were briefed before *Rahimi* was decided. However, *Rahimi* had little, if any, impact on the issues in this case. Reiterating that analogical reasoning is appropriate under *Bruen*, *Rahimi*'s "clarification" of how *Bruen* operates was akin to an *Allen* charge. *See Rahimi*, 144 S. Ct. at 1897-98 ("[S]ome courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber."). It did not suggest the availability of any new arguments that could not have been made on the basis of *Bruen* alone.

6

**SA6**

At the outset, the Court notes that cross motions for summary judgment provided a confusing procedural posture (to put it lightly). The summary judgment standard is a different beast from assessing the substantive merits. *Cf. DR Distribs., LLC v. 21 Century Smoking, Inc.*, No. 3:12-cv-50324, 2024 U.S. Dist. LEXIS 99866, at *39-43 (describing six reasons why "equating the probable merits inquiry with the summary judgment inquiry" is "an uncomfortable fit"). With just one summary judgment motion, the Court construes the evidence in favor of the nonmovant. *Liberty Lobby*, 477 U.S. at 255. With cross motions, the Court must also switch back and forth between hats as it sifts through the facts presented before it. In this case, that is then exacerbated by the burden shifting imposed by *Bruen*.[9]

The main feature of this action is the as-applied claim under *Bruen*. But, like a movie theater with the inevitable slew of trailers preceding the feature film, the Court must first address several other issues raised by the parties.

## I.    Preliminary Matters

Before addressing the merits, the Court addresses two threshold issues—venue and standing. *See Spuhler v. State Collection Serv.*, 983 F.3d 282, 284 (7th Cir. 2020); *In re LimitNone, LLC*, 551 F.3d 572, 577-78 (7th Cir. 2008).

---

[9] In retrospect, entering a prompt trial date and holding a bench trial on the merits would have been a more satisfactory procedure. Alternatively, the Court could have cajoled the parties to have a "trial on the papers." *Cf. Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003); *see generally* Morton Denlow, *Trial on the Papers: An Alternative to Cross-Motions for Summary Judgment*, Fed. Law., Aug. 1999, at 30. That would have also been a better approach compared to summary judgment, though it would lack the benefit of a public trial on an important issue.

### A.    Venue

In her summary judgment filings, Ms. Foxx challenges venue for the first time. But she failed to contest venue earlier, so the challenge is waived. Fed. R. Civ. P. 12(h).

### B.    Standing

Next, the parties dispute whether Plaintiffs have standing. "To establish 'the ir-reducible constitutional minimum of standing,' the plaintiff must have suffered an injury in fact traceable to the defendant and capable of being redressed through a favorable judicial ruling." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (quot-ing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). A plaintiff may bring a pre-enforcement challenge instead of breaking a law to challenge its legitimacy "so long as the threatened enforcement is 'sufficiently imminent.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). This requires the plaintiff to establish "both 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute,' and 'a credible threat of prose-cution thereunder.'" *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

The undisputed facts show that each plaintiff would carry a concealed handgun on public transportation for the purpose of self-defense if not for the Firearm Con-cealed Carry Act's ban and its threat of arrest and prosecution. Dkt. 71 ¶¶ 12-13, 20-21, 27, 38-39. That proposed course of conduct is "arguably affected with a constitu-tional interest," *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbit*, 442 U.S. at 298)—indeed, as discussed later, it falls within the ambit of the Second Amendment's

right to armed self-defense. The conduct is also proscribed by the ban, as Plaintiffs assert they are concealed-carry licensees who will ride Metra and CTA, which receive public funding. *See* 70 ILCS 3615/1.03, 2.01(a). And finally, "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159; *Ezell v. City of Chicago*, 651 F.3d 684, 695-96 (7th Cir. 2011) ("The very 'existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as "injury" for the purpose of standing.'" (quoting *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010))). Defendants neither argue that the ban wouldn't reach Plaintiffs' proposed course of conduct nor disavow an intention to prosecute Plaintiffs under the ban. That satisfies the injury requirement for this pre-enforcement challenge.

However, each plaintiff's injury is limited to the specific proposed course of conduct in the record. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016); *Davis v. FEC*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (cleaned up)). The record shows that all four plaintiffs wish to carry concealed firearms aboard Metra trains, and that only Mr. Vesel and Mr. Winston wish to do so on CTA buses. Dkt. 64-2 ¶ 7; Dkt. 64-3 ¶ 7; Dkt. 64-4 ¶ 11; Dkt. 64-5 ¶ 8. Plaintiffs' injuries are also limited by where they intend to take public transit. Mr. Schoenthal takes Metra from the Elburn station (in Kane County) to Delnor Hospital (also in Kane County), "central DuPage," and Chicago (in Cook County), and he swears he would take public transit more often, absent the Firearm Concealed Carry

Act's prohibition. Dkt. 66 ¶ 24; Dkt. 88 at 5 ¶ 24.[10] The evidence for Mr. Wroblewski involves proposed trips to only Chicago. Dkt. 64-3 ¶ 7; Dkt. 66 ¶ 37. Mr. Vesel swears he would take trips to Chicago and Rosemont (also in Cook County). Dkt. 64-4 ¶¶ 9, 11. And Mr. Winston's testimony similarly includes locations in only Cook County—Chicago, Evanston, and the Ogilvie Metra station. Dkt. 64-5 ¶¶ 8-9.[11]

State Defendants challenge Plaintiffs' standing on the basis that Plaintiffs have failed to show an injury with respect to buildings, real property, and parking areas. But Plaintiffs all say they would take Metra more often if they could carry their handguns onto the train, and boarding a Metra train requires stepping foot on Metra's real property. *Cf. Nw. Mem'l Found. v. Johnson*, 490 N.E.2d 161, 164 (Ill. App. Ct. 1986) ("[T]his court takes judicial notice of the fact that the hospital complex is located in a densely populated urban area which necessitates the need for adequate employee parking."). So, they have standing with respect to Metra's real property, at least as far as needed to board a Metra train.

As for causation, Defendants, as the attorney general of Illinois and the state's attorneys of the Illinois counties relevant to Plaintiffs, enforce the statute. Dkt. 71

---

[10] Mr. Schoenthal's supplemental declaration indicates that he would like to use the DeKalb bus system to reach the Elburn Metra station. Dkt. 87-1 ¶ 2. There are two issues. First, this fact is presented without a citation to the statements of fact. *See* LR 56.1(g) ("When addressing facts, the memorandum must cite directly to specific paragraphs in the LR 56.1 statements or responses."). Second, this is an example of actual self-serving testimony that need not be accepted as true. *See James*, 959 F.3d at 316 ("[T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony."). As Ms. Foxx points out, during deposition, Mr. Schoenthal made no mention of the DeKalb bus system when naming all the forms of public transportation that he wanted to use. *See* Dkt. 66-27 at 20:10-28:17.

[11] Mr. Winston's use of public transit in St. Louis, Missouri, is irrelevant to this case.

¶¶ 1-6. But whether Plaintiffs' injuries can be traced to a particular defendant depends on where Plaintiffs use public transportation, based on the facts in the record. So for Mr. Schoenthal, his injuries can only be traced to Ms. Foxx (Cook County), Mr. Berlin (DuPage County), and Mr. Raoul.[12] And for Mr. Wroblewski, Mr. Vesel, and Mr. Winston—who specify only that they would take trips to locations in Cook County (Chicago, Evanston, Rosemont), but say nothing about their proposed points of departure—their injuries can be traced to only Ms. Foxx and Mr. Raoul. No plaintiff has standing against Mr. Amato (DeKalb County) or Mr. Rinehart (Lake County) absent evidence that a plaintiff would go to a Metra station located in Lake County. (There are no Metra stations in DeKalb County.)

Plaintiffs seek an injunction of the ban or a declaration that the ban is unconstitutional—either of which would redress Plaintiffs' injuries. But Ms. Foxx argues that this isn't enough because the public transit that Plaintiffs use have separate policies banning firearms. Plaintiffs' injuries to be redressed, however, aren't just that they can't carry their handguns on public transportation; after all, for a pre-enforcement challenge, there has to be a "credible threat of prosecution." *Babbitt*, 422 U.S. at 298. Plaintiffs' injuries trace back to the threat of enforcement from some of the defendants, so either an injunction or a declaration would redress that injury, regardless of potential injuries inflicted by nonparties. So, Plaintiffs have satisfied the redressability requirement of standing. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *see also Martin v. Evans*, 241 F. Supp. 3d 276, 283 (D. Mass. 2017) (finding that the

---

[12] Although Mr. Schoenthal rides Metra in Kane County (Elburn station, Delnor Hospital), Plaintiffs did not name the Kane County state's attorney as a defendant.

plaintiffs met the redressability requirement even though nonparty law enforcement officials, such as transit police, could also enforce the statute being challenged).

## II.   *Bruen*-Avoidance Arguments

Not immediately conceding *Bruen*'s relevance, Ms. Foxx tries to borrow principles from other areas of law to defend the Firearm Concealed Carry Act's ban. Both her arguments fail.

### A.   Government as a proprietor

Ms. Foxx first asserts that a "background principle[]" of constitutional law exempts the Firearm Concealed Carry Act's ban from the "strictures of the Second Amendment" and obviates the need to undertake the historical analysis called for by *Bruen*. Dkt. 68 at 3. Her argument—which is breathtaking, jawdropping, and eyepopping—is this: the ban applies only to property "funded in whole or in part" by Illinois, so Illinois has a proprietary interest in what it regulates. Because governments, like private property owners, enjoy "an absolute right to exclude others" from their property, Illinois may exclude whomever it wishes. *Id.* at 3-4. On her view, when the government regulates its own property, that regulation is exempt from the coverage of the Second Amendment, or any other constitutional guarantee of individual rights.[13]

---

[13] She says that this logic extends to Illinois' "proprietor[ship] of government funds." Dkt. 68 at 5. If her contention is that by partially funding some property the government thereby acquires a plenary authority over it, that argument obviously fails. As discussed below, not even property fully owned by the public affords to government the sweeping powers over it claimed by Ms. Foxx; a fortiori the argument fails with respect to property partially owned or funded by the public.

To the extent she maintains that the government's disbursement of funds allows it to lay down rules governing the conduct of third parties who use what it funds in something other than its sovereign capacity, that argument likewise fails. In support of this argument, she draws on cases about Congress' ability to "fix the terms" on which public money is disbursed

(More on this later, but under Ms. Foxx's argument, demonstrators could be barred from the Daley Center Plaza, despite it being a quintessential public forum. *Pindak v. Dart*, 125 F. Supp. 2d 720, 746 (N.D. Ill. 2015); *Grutzmacher v. Pub. Bldg. Comm'n of Chi.*, 700 F. Supp. 1497, 1502 (N.D. Ill. 1988).)

Although the right to exclude—including the right to exclude those bearing arms—may be a fundamental aspect of private property ownership, likely undiminished by the Second Amendment*, see Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012), it doesn't necessarily follow that when a *government* like Illinois (through its transit agencies) act as a proprietor, the ban on arms bearing doesn't implicate Plaintiffs' rights under the Second Amendment. The constitutional protection afforded to other

---

under the Spending Clause. *E.g., Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). But "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Id.* "Unlike ordinary legislation, which imposes congressional policy on regulated parties involuntarily, Spending Clause legislation operates based on consent . . . . For that reason, the legitimacy of Congress' power to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on whether the recipient voluntarily and knowingly accepts the terms of that contract." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (cleaned up). Thus, if Spending Clause jurisprudence is at all instructive here, it forecloses Ms. Foxx's argument: a contract between Illinois and those who receive its funds cannot govern the conduct of nonconsenting nonparties like Plaintiffs.

individual rights isn't nullified on public property; Ms. Foxx's proffered authority says

nothing to the contrary.[14] She first cites several[15] First Amendment cases:

- *Gilles v. Blanchard*, 477 F.3d 466 (7th Cir. 2007)—which held that a public university's prohibition against uninvited visitors using its library lawn to speak was consistent with the First Amendment—for its assertion that "[p]ublic property is property, and the law of trespass protects public property, as it protects private property, from uninvited guests." *Id.* at 470.
- *Adderley v. Florida*, 385 U.S. 39 (1966)[16]—which held that the trespass convictions of protestors who blocked the entrance of a county jail did not violate the First Amendment in the absence of any evidence that the sheriff had a discriminatory, viewpoint-based purpose in invoking and enforcing the law—for its assertion that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* at 47.
- *International Society for Krishna Consciousness v. Lee*, 505 U.S. 672 (1992)—which held that a ban on solicitation in a government-owned airport terminal (a nonpublic forum) did not violate the First Amendment—for the proposition that actions taken by the government as a proprietor are reviewed only for reasonableness. *Id.* at 679.

Ms. Foxx's position—that government's powers over public property are equivalent to those of private owners of property—is untenable, and was rejected by the

---

[14] Her argument is an impressive bricolage, cobbling together broad statements of principle drawn from disparate areas of law. Of course, however, what is said in judicial opinions "must 'be taken in connection with the case in which those expressions are used,' *Cohens v. Virginia*, [19 U.S. (6 Wheat.)] 264, 399 (1821), and may not be 'stretch[ed] . . . beyond their context,' *Brown v. Davenport*, 596 U.S. 118, 141 (2022)." *Rahimi*, 144 S. Ct. at 1910 (Gorsuch, J., concurring) (second alteration in original).

[15] Ms. Foxx also cites *Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972), for its assertion that property does not "lose its private character merely because the public is generally invited to use it for designated purposes." Dkt. 68 at 4. But that case dealt with an alleged First Amendment right to distribute handbills in a private shopping mall against the wishes of the mall's owner. It is clear from its context that the quoted language refers only to private property, so it isn't relevant to her argument.

[16] The brief mistakenly asserts that the quote comes from *Greer v. Spock*, 424 U.S. 828, 836 (1976), rather than *Adderley*. In fairness, *Greer* also cites the same sentence from *Adderley* at the pincite given.

Supreme Court long ago.[17] The cited cases don't treat government ownership of property as a trump to the protection ordinarily due to an individual right. Although the government sometimes has greater power to regulate public property compared to elsewhere, otherwise protected conduct doesn't become categorically unprotected. If, as Ms. Foxx suggests, all speech on government property were exempt from First Amendment protection, the elaborate First Amendment doctrines of public forums and governmental motivations (and the different degrees of scrutiny applicable to each) would be utterly superfluous.

Ms. Foxx's other citations are equally unavailing. *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008)—which held that a public employee could not raise an equal protection claim for arbitrary treatment when not based on membership in any particular class—asserts that the Supreme Court has "long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.' *Id.* at 598 (quoting *Cafeteria & Rest. Workers Union, Loc. 473 v. McElroy,* 367 U.S. 886, 896 (1961)). In context, this refers only to the government's greater powers as an employer. But even if construed to refer to all proprietorship, it doesn't suggest that constitutional

---

[17] *Compare, e.g., Commonwealth v. Davis*, 39 N.E. 113, 113 (Mass. 1895) (Holmes, J., majority opinion) ("For the legislature absolutely or conditionally to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house."), *with Hague v. Comm. for Indus. Org.,* 307 U.S. 496, 515-16 (1939) ("The privilege of a citizen of the United States to use the [public] streets and parks for communication of views on national questions may be regulated in the interest of all; . . . but it must not, in the guise of regulation, be abridged or denied").

protections cease to be effective on public property. *Reeves, Inc. v. Stake*, 447 U.S. 429 (1980)—a case that applied the "market participant" exception to the Dormant Commerce Clause in allowing a state-owned enterprise to discriminate in favor of its own citizens—is inapposite. That a state-owned enterprise is exempt from limitations imposed by one part of the Constitution concerned with federalism says nothing about whether it is bound to respect individual rights.

Finally, and decisively, whatever is true elsewhere in the law, Ms. Foxx's proposed framework contradicts *Bruen*, which rejects the relevance of place to the threshold question of whether certain conduct is covered by the Second Amendment. *See Bruen,* 597 U.S. at 32 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."); *see also Oakland Tactical Supply, LLC v. Howell Township*, 103 F.4th 1186, 1201-02 (6th Cir. 2024) (Kethledge, J., dissenting) ("Thus—as described by the Court—the Second Amendment guarantees (1) to law-abiding citizens (2) a right to keep and bear arms (3) in common usage (4) for purposes of 'confrontation' (or 'self-defense')."). If the fact of government ownership is relevant to the constitutionality of the Firearm Concealed Carry Act's ban, it can only enter the calculus at *Bruen*'s second step.

*  *  *

Perhaps recognizing the futility of the first argument, Ms. Foxx purports to clarify (but in fact seems to change) her position in her reply brief.[18] She relies on the

---

[18] Waiting until the reply brief is reason enough to reject the argument. *See James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998). Because this is ostensibly part of the same argument Ms. Foxx presented in her opening brief, however, the Court still addresses it.

ambiguity of the word *proprietor*. Rather than founding the argument for rational basis review on the government's ownership of property simply, the reply brief stakes Ms. Foxx's case on the latitude afforded to the government when it acts as a "market participant"—that is, a proprietor in the sense of running an enterprise.

She disavows the notion, propounded by her opening brief, that "the government as proprietor argument" makes all "government-owned or controlled property 'exempt' from the Second Amendment." Dkt. 95 at 6; *compare id. with* Dkt. 68 at 3-4 ("One of the cornerstone principles of American law is that the owner or proprietor of private property has an absolute right to exclude others from that property. . . . That principle applies with equal force to the government . . . ."). Now, she says, only when the government is "acting as a market participant" and managing its internal operations does lesser scrutiny kick in. Thus, she no longer relies on a putative categorical exception from the Second Amendment's ambit, but an exception from *Bruen*'s framework of scrutiny within the Second Amendment's scope.

Although this is a slightly better argument than the last, it too must be rejected. The argument falters at its major premise: that the lax standard of review employed when the government exercises "managerial" authority[19]—for instance, in regulating nonpublic forums, making employment decisions, or prohibiting certain kinds of employee speech—applies in the Second Amendment context.

---

[19] *See* Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum*, 34 UCLA L. Rev. 1713, 1782 (1987).

In the wake of *Heller*, it is true, the scope of government's managerial power over the Second Amendment was unclear.[20] And though the Supreme Court has not yet explicitly addressed the issue, *Bruen* decisively rejected the means-end scrutiny characteristic of other areas of constitutional law, describing the Second Amendment as itself the product of a considered balancing "struck by the traditions of the American people" that "elevates above all other interests the right of law-abiding, responsible citizens" to use arms for self-defense. *Id.* at 26 (quoting *Heller*, 554 U.S. at 635). This is fatal to Ms. Foxx's argument. The justification of the lenient treatment afforded to exercises of managerial power is precisely that kind of interest balancing—namely, a concern for the government's interest in efficiently carrying out its mission. *See, e.g.*, *Engquist*, 553 U.S. at 598-600; *Lee*, 505 U.S. at 682-83; *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303-04 (1974).

*Bruen* maintains that freestanding policy considerations, no matter how weighty, cannot be invoked to defeat the right protected by the Second Amendment, strictly insisting that all the relevant interest balancing was done at the Second Amendment's ratification. 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). The right to bear arms may be regulated *only* in the name of an interest that finds at least analogical

---

[20] *See, e.g.,* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1533 (2009) ("Courts need to work out a government-as-proprietor doctrine for the right to bear arms much as they have done for the freedom of speech."). And some courts found that the fact of property ownership did afford the government greater regulatory power. *E.g.*, *Bonidy v. Postal Serv.*, 790 F.3d 1121, 1127 (10th Cir. 2015) (holding that government buildings were categorically exempt from Second Amendment scrutiny, and in the alternative, that the government's proprietary interest in a post office weighed heavily in favor of a ban on carrying guns there in upholding it under intermediate scrutiny).

support in the American tradition. *See Rahimi*, 144 S. Ct. at 1898 (describing how *Bruen* requires that regulations be "consistent with the principles that underpin our regulatory tradition" so that the "balance struck by the founding generation" is faithfully applied to "modern circumstances").[21] It would turn *Bruen* on its head to default to rational basis review when the government asserts an interest that it isn't required to demonstrate was part of the historical tradition of firearm regulation. Nearly[22] every district court to be confronted with similar arguments has rejected them.[23] This Court likewise rejects them.

---

[21] Whether this should be conceived of as a finding (1) that the conduct at issue was not part of the right to begin with, or (2) that the right was traditionally defeasible in the face of the asserted interest, is ultimately inconsequential here; either way, the only way to justify a regulation of conduct that falls *prima facie* within the Second Amendment is to point to an analogous interest embodied in the regulatory tradition.

[22] One district court refused to enjoin a ban on bearing arms in "mass transit facilities and in vehicles owned by the State [of Maryland]" on the ground that it constituted a permissible sensitive-place restriction, while leaving open the possibility that the regulation might also be justified by Maryland's status as a "market participant." *Kipke v. Moore*, 695 F. Supp. 3d 638, 655-56 (D. Md. 2023) (denying a motion for preliminary injunction); *Kipke v. Moore*, Nos. GLR-23-1293, GLR-23-1295, 2024 U.S. Dist. LEXIS 137003, at *15-16 (D. Md. Aug. 2, 2024) (adopting the analysis for denying a preliminary injunction to grant summary judgment). For this latter possibility, it relied on *Bldg. & Const. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993)—which held that a state's market activity was not preempted by the National Labor Relations Act as its regulatory activity in the same area would be—and its assertion that a State may "manage its own property when it pursues its purely proprietary interests . . . where analogous private conduct would be permitted." *Id.* at 231-32. Read in context, however, the court is not announcing a general principle, but only describing its statutory holding under the NLRA: that only state regulation, and not "proprietary conduct" lawful for an equivalent private party, was preempted by that federal statute. *Id.* at 232. So, *Building & Construction Trades Council* provides little support for a general market-participant exception to the recognition of individual rights.

[23] *Koons v. Platkin*, 673 F. Supp. 3d 515, 601 (D.N.J. 2023), *appeal docketed*, No. 23-2043 (3d Cir. Jan. 9, 2024) ("[T]he State is not *exempt* from recognizing the protections afforded to individuals by the Constitution simply because it acts on government property."); *id.* at 605 n.33 (rejecting the state's "market participant" theory); *Wolford v. Lopez*, 686 F. Supp. 3d 1034, 1062 (D. Haw. 2023), *appeal docketed*, No. 23-16164 (9th Cir. June 21, 2024) ("Whether the government acted as a proprietor may have been relevant when assessing Second

### B.    First Amendment intermediate scrutiny

Ms. Foxx also relies on *Heller*'s statement that the Second Amendment can protect modern forms of arms in the same way that the First Amendment protects modern forms of communication. *Heller*, 554 U.S. at 582. She cites examples of intermediate scrutiny applied to content-neutral "time, place, or manner" restrictions. Take, for example, Ms. Foxx's reliance on *Anderson v. Milwaukee County*, 433 F.3d 975 (7th Cir. 2006), in which the court found that the government's interest in protecting bus passengers (a captive audience) allowed it to restrict otherwise protected speech. 433 F.3d at 980. But the intermediate scrutiny standard applied to content-neutral "time, place, or manner" restrictions is what *Bruen* unambiguously rejected. *See Bruen*, 597 U.S. at 22-24 ("Not only did *Heller* decline to engage in means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test that respondents and the United States now urge us to adopt."). Ms. Foxx's attempt to apply intermediate scrutiny by treating the Firearm Concealed Carry Act's ban as a "time, place, or manner" restriction cannot succeed.

---

Amendment challenges under a means-end scrutiny test, but it has no place under the first step of the *Bruen* analysis."); *United States v. Ayala*, __ F. Supp. 3d __, No. 8:22-cr-369-KKM-AAS, 2024 U.S. Dist. LEXIS 7326, at *41-43 (M.D. Fla. Jan. 12, 2024), *appeal docketed*, No. 24-10462 (11th Cir. May 7, 2024) ("The United States must point to a historical tradition justifying any claimed power to regulate conduct protected by the Second Amendment's plain text, even as a proprietor."); *May v. Bonta*, __ F. Supp. 3d __, Nos. SACV 23-01696-CJC (ADSx), SACV 23-01798-CJC (ADSx), 2023 WL 8946212, at *17 (C.D. Cal. Dec. 20, 2023), *appeal argued*, No. 23-4356 (9th Cir. Apr. 11, 2024).

### III.    The Main Event (*Bruen* Analysis)

#### A.    A disclaimer about "historical evidence"

There's one more matter to address before reaching the substantive *Bruen* analysis. *Bruen* exemplifies the phrase "easier said than done." It certainly left open a plethora of procedural questions about how to conduct the historical inquiry. *See, e.g.*, *United States v. Daniels*, 77 F.4th 337, 359-60 (5th Cir. 2023), *vacated*, __ S. Ct. __, No. 23-376, 2024 U.S. LEXIS 2910 (July 2, 2024) (Higginson, J., concurring) ("More foundationally, courts are laboring to give meaning to the *Bruen* requirement of 'historical inquiry.'"); *Rahimi*, 144 S. Ct. at 1927 & n.1 (Jackson, J., concurring) (collecting cases). The Supreme Court has acknowledged the potential difficulty but provided little guidance: "To be sure, '[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.'" *Bruen*, 597 U.S. at 25 (alteration in original) (quoting *McDonald*, 561 U.S. at 803-04 (Scalia, J., concurring)). And multiple courts have expressed frustration at the process. *See, e.g.*, *Worth v. Harrington*, 666 F. Supp. 3d 902, 917 (D. Minn. 2023), *aff'd sub nom. Worth v. Jacobson*, 108 F.4th 677, (8th Cir. 2024); *United States v. Hill*, No. 3:23cr114, 2023 U.S. Dist. LEXIS 211689, at *28-41 (E.D. Va. Nov. 28, 2023), *appeal docketed*, No. 24-4194 (4th Cir. Apr. 8, 2024); *see also Vidal v. Elster*, 602 U.S. 286, 328 (2024) (Sotomayor, J., concurring) ("One need only read a handful of lower court decisions applying *Bruen* to appreciate the confusion this Court has caused."). Several data points support the notion that *Bruen*'s analysis can be complicated. Here are just a few: (1) four justices thought it was important to author concurring opinions in *Rahimi*, with a fifth justice

joining one of those concurrences; (2) Justice Thomas—the author of *Bruen*—dissented in *Rahimi*; and (3) eight justices reversed the Fifth Circuit's unanimous decision and had "no trouble," *Rahimi*, 144 S. Ct. at 1902, reaching the opposite conclusion of the judges on the Fifth Circuit under the same framework.

This case highlights one such question in the mix. The parties' disputes over how to proffer and use historical evidence exhibit the confusion occasioned by *Bruen*. Much ink has been spilled about the nature of the evidence the Court can consider in conducting the historical analysis required under *Bruen*, including what is an adjudicative fact and what is a legislative fact. The Court has spent a considerable amount of time considering the parties' arguments. In its discretion, this order is based upon what evidence the Court believes was properly proffered.

The Court has discretion in determining whether a party has failed to comply with Local Rule 56.1, but it must consider whether the party's submission has adequately complied with the purpose and intent of the rule or has impeded the rule's effectiveness. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *see also Ammons*, 368 F.3d at 817. In this case, because of the lack of clear guidance as to how to treat the historical evidence required by *Bruen*'s framework, the Court doesn't believe that Plaintiffs' noncompliance was an attempt to deceive Defendants or otherwise gain an unfair advantage. They didn't completely ignore Local Rule 56.1; Plaintiffs compiled a statement of facts related to each individual plaintiff's personal experience. Defendants have also responded to the historical matter presented by Plaintiffs directly in their briefs, so Plaintiffs' noncompliance doesn't appear to have

substantially changed Defendants' arguments. And as stated previously, the Court

prefers to decide things based on evidence. *Schoenthal*, 2024 U.S. Dist. LEXIS 79497,

at *5.[24]

Having said all that, this Court will adhere to Justice Kavanaugh's direction in

his concurrence in *Rahimi*. *See Rahimi*, 144 S. Ct. at 1923-24 (Kavanaugh, J., con-

curring). This Court will quit its bellyaching and get on with it.

### B.    Plain text of the Second Amendment

The first step under *Bruen* is to determine whether the Second Amendment's

"plain text"[25] covers the regulated conduct. *Bruen*, 597 U.S. at 17. Embedded within

this step is first defining Plaintiffs' proposed course of conduct.

---

[24] The Court acknowledges that, even in considering the "full" record before it, historical inquiries reliant on party presentation (not to mention potentially evolving views of history) may lead to inconsistent results. Justice Scalia's discussion of a pitfall in analyzing legislative history rings true here:

> But not the least of the defects of legislative history is its indeterminacy. If one were to search for an interpretive technique that, *on the whole*, was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history. And the present case nicely proves that point.

> Judge Harold Leventhal used to describe the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends. If I may pursue that metaphor: The legislative history of [the statute at issue] contains a variety of diverse personages, a selected few of whom—its "friends"—the Court has introduced to us in support of its result. But there are many other faces in the crowd, most of which, I think, are set against today's result.

*Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring); *see also Vidal*, 602 U.S. at 327-28 (Sotomayor, J., concurring) (applying the comparison to "history-and-tradition inquir[ies]").

[25] The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

###### 1.    *Proposed course of conduct*

Plaintiffs' proposed course of conduct, which Defendants don't dispute, is the licensed concealed carrying of handguns for self-defense on public transportation and associated facilities. *See* Dkt. 71 ¶¶ 12-13, 20-21, 39.

Note that this proposed conduct necessitates treating Plaintiffs' challenge to the Firearm Concealed Carry Act's ban as an as-applied challenge, as they have not argued that *any* person who "knowingly carr[ies] a firearm" onto public transit (or associated real property), 430 ILCS 66/65(a), is presumptively protected by the plain text of the Second Amendment. For example, the Firearm Concealed Carry Act doesn't consider one's purpose in carrying a handgun on public transit, and so its prohibition on carrying a handgun for purposes other than lawful self-defense would not implicate the Second Amendment.[26] Because Plaintiffs have framed their

---

[26] And with even one constitutional application, a facial challenge to the statute fails. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs argue that *Salerno* doesn't apply to this case. But the Supreme Court recently reiterated the applicability of *Salerno* to a facial challenge under the Second Amendment. *Rahimi*, 144 S. Ct. at 1898 ("This is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" (quoting *Salerno*, 481 U.S. at 745)).

Ms. Foxx also argues that Plaintiffs' facial challenge must fail because the Seventh Circuit, in *Bevis v. City of Naperville*, held that there is no Second Amendment protection for "weapons that may be reserved for military use." 85 F.4th 1175, 1194 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024). Plaintiffs point out that they wish to carry only handguns on public transit, but that misses the point of a facial challenge. Plaintiffs also respond that "the statute indisputabl[y] refers generally to 'firearms,' not specifically to the category of arms *Bevis* held are unprotected." Dkt. 87 at 12. This argument, as it is articulated by Plaintiffs, doesn't contend that "firearms" *excludes* military weapons. Nor does their reliance on *Heller*'s silence help; *Heller*'s silence is not equivalent to rejection. *See In re Deere & Co. Repair Serv. Antitrust Litig.*, __ F. Supp. 3d __, No. 3:22-cv-50188, 2023 U.S. Dist. LEXIS 210516, at *37 (N.D. Ill. Nov. 27, 2023) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952)); *cf. United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024). But reading the text of the Firearm Concealed Carry Act is helpful. Although the

challenge in terms of how the Firearm Concealed Carry Act *applies to them*, the Court proceeds accordingly. *See Doe v. Reed*, 561 U.S. 186, 194 (2010); *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2416 n.1 (2024) (Thomas, J., concurring) ("Federal courts are free to consider challenged statutes as applied to the plaintiff before them and limit any relief accordingly.").

###### 2.    Text of the Second Amendment

The Second Amendment guarantees the "right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. Naturally, Plaintiffs contend that their proposed conduct is covered by the Second Amendment's text. State Defendants appear to concede this point, but Ms. Foxx disagrees.

She first argues that the Firearm Concealed Carry Act's ban doesn't "infringe" on Plaintiffs' right to keep and bear arms, and so their proposed conduct and its violation of the ban don't fall under the Second Amendment's protection. She compares the definitions of "infringe" and "abridge" (from the First Amendment), relying on dictionary definitions from 1755 and 1773 to argue that "infringe" must denote a total destruction of a right—more than a mere "abridgement." But both of these words have multiple definitions, and Ms. Foxx cherry-picks the definitions to suit her argument. In particular, the second definition for "infringe" reads in full: "To destroy; to hinder." *Infringe,    v.a.    (1773),*    Samuel    Johnson's    Dictionary    Online,

---

statute doesn't define "firearm" on its own, a "concealed firearm" is defined as a "loaded or unloaded handgun," and "handgun" is defined as a one-handed gun excluding stun guns or tasers, machine guns, short-barreled rifles or shotguns, and specific pneumatic guns, spring guns, paintball guns, and BB guns. 430 ILCS 66/5. This definition doesn't appear to allow for the military weapons contemplated by *Bevis*, so this is not a basis on which Plaintiffs' facial challenge fails.

https://johnsonsdictionaryonline.com/views/search.php?term=infringe (last visited Aug. 30, 2024). But she omits "to hinder"—which wouldn't require completely obstructing the right—without any explanation. Merriam-Webster's definition likewise doesn't require wholesale destruction—"to encroach upon in a way that violates law or the rights of another"—and it notes that "infringe" was first used with that meaning in 1513. *Infringe Definition & Meaning*, Merriam-Webster, https://www.merriam-webster.com/dictionary/infringe (last updated Aug. 20, 2024).

Other courts have agreed with this more modest—and plain—reading of "infringe." *See, e.g.*, *Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022) ("[The Second Amendment] also forbids lesser 'violat[ions]' that 'hinder' a person's ability to hold on to his guns." (citations omitted)); *Md. Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1044 n.8 (4th Cir. 2023), *reh'd en banc*, __ F.4th __, 2024 U.S. App. LEXIS 21378 (4th Cir. Aug. 23, 2024) ("[T]his stilted construction of the word 'infringed' lacks grounding in original meaning, history, and *Bruen* itself.").[27] And *Bruen* itself involved a regulation that didn't wholly ban individuals from possessing firearms—it was a licensing scheme. *Bruen*, 597 U.S. at 11-12. "Infringe" doesn't mean what Ms. Foxx says it means.

Ms. Foxx next argues that the Second Amendment doesn't cover Plaintiffs' proposed conduct because using a firearm on a crowded and confined public transit vehicle would result in more force than necessary for lawful self-defense, citing two

---

[27] The Fourth Circuit did not address this issue after the case was reheard *en banc*.

inapposite cases.[28] Even if the Second Amendment's reach were limited by that principle of self-defense,[29] Ms. Foxx fails to show how that limitation applies to the facts of this case beyond the unsubstantiated assertion that "there are few if any circumstances" where someone could discharge a firearm in a public transportation vehicle without endangering a third party. Dkt. 86 at 16.

## C.    Potential historical analogues

Because Plaintiffs' proposed conduct falls under the plain text of the Second Amendment, the conduct is presumptively protected. *Bruen*, 597 U.S. at 17. The second step is determining whether the regulation is consistent with the historical tradition of firearm regulation in this country. *Id.* Defendants bear the burden in this regard. As to how they can meet that burden, *Bruen* examined historical regulations as potential analogues, focusing on *why* and *how* regulations burdened the right to armed self-defense. *See id.* at 29. In addition to engaging in that mode of analogical analysis, the parties argue for other approaches potentially left open by *Bruen*.

---

[28] Both cases assert that one may not use more force than necessary to repel an attacker. *Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554, at *34 (N.D. Ill. Mar. 19, 1993) ("Illinois law does not readily accept a claim of self-defense when the defendant provokes the incident, uses force greater than necessary to ward off the imminent danger, or uses force when he could have avoided the situation."); *People v. Morgan*, 719 N.E.2d 681, 700 (Ill. 1999) (requiring that a person "reasonably believe[]" that the force used "is necessary to prevent imminent death or great bodily harm"). But these cases plainly say nothing about Ms. Foxx's proposed principle—that one may not defend oneself if the force to be used would collaterally injure third parties.

[29] In *Heller*, the Supreme Court was careful to "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation," 554 U.S. at 594, but it offered no further guidance as to what confrontations don't count. *See Heller*, 554 U.S. at 720 (Breyer, J., dissenting). We do know, however, that the Second Amendment draws no location-based home–public distinction. *See Bruen*, 597 U.S. at 4; *see also Oakland Tactical Supply*, 103 F.4th at 1202-03 (Kethledge, J., dissenting).

The parties start by disagreeing over whether public transportation existed at the Founding. But whether there's anything from 1791 that might appropriately be labeled "public transportation" isn't a silver bullet that shortcuts *Bruen*'s framework. Even if there were something that could rightly be described as a *form of transportation funded by the public* at the time of the Second Amendment's ratification, how firearms were regulated there (if at all) wouldn't necessarily determine whether or how they can be regulated somewhere fitting that same description today. Regulation of today's public transportation may implicate different justifications or impose different burdens on the Second Amendment right based on public transportation's role in society. In other words, the *how* and *why* of such a regulation might be very different. Metra trains and CTA buses obviously didn't exist then, so resolving the permissibility of Illinois' law requires some degree of analogical reasoning. *See Bruen*, 597 U.S. at 27-28.[30]

So as to not bury the lede, the Court finds that Defendants have failed to meet their burden. That failure is dispositive. Still, mindful of the Seventh Circuit's directive to develop a full record in the trial court, the Court will address the parties' many arguments relating to historical analogues and other possible approaches to analyze the constitutionality of the Firearm Concealed Carry Act's prohibition against carrying concealed firearms on public transportation.

---

[30] The parties (and some courts) have labeled this the "nuanced" historical approach, based on *Bruen*'s language that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 28. Like Modell in *Diner*, the Court isn't comfortable with the word "nuance." Nevertheless, rather than transform an adjective into its own doctrine, this Court sees the "nuanced" approach as a difference in degree as to how much analogizing must be done.

28

**SA28**

     *1.   Historical regulations*

The approach demonstrated by *Bruen* (and by *Rahimi*) for assessing the constitutionality of a challenged regulation is to compare it with historical regulations. The Court understands this process involves several discrete steps. First, there is the factual question of whether the historical regulation exists. Next, the Court must determine how much weight, if at all, the historical regulation has in this inquiry. *See Bruen*, 597 U.S. at 34 ("We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal."). If the vetted historical regulations disclose some principle underpinning the tradition of firearm regulation in this country, then the Court can compare the challenged regulation in this case to the historical regulations. *See id.* at 29-30; *see also Rahimi*, 144 S. Ct. at 1898. In determining whether the regulations are "relevantly similar," "how and why the regulations burden a law-abiding citizen's right to armed self-defense" are "*central*" considerations. *Bruen*, 597 U.S. at 29; *Rahimi*, 144 S. Ct. at 1898.

     *a.   Regulation of crowded spaces (Statute of Northampton)*

Defendants cite the Statute of Northampton 1328, 2 Edw. 3 c. 3 (Gr. Brit.), and similar state laws patterned after it. *Bruen* rejected the Statute of Northampton as an analogue justifying a general ban on public carry. *See* 597 U.S. at 40-41. State Defendants, relying on *Antonyuk v. Chiumento*, 89 F.4th 271, 357 n.74 (2d Cir. 2023), *vacated sub nom. Antonyuk v. James*, __ S. Ct. __, No. 23-910, 2024 U.S. LEXIS 2929 (2024),[31] argue that the statute, accompanied by the similar state statutes, provides

---

[31] *Antonyuk* was vacated "for further consideration in light of *United States v. Rahimi*, 602 U.S. __ (2024)." 2024 U.S. LEXIS 2929, at *1.

support for the narrower proposition that bearing arms may be restricted in crowded places like fairs and markets.

Plaintiffs' response to this argument draws on two reasons that *Bruen* deemed the Statute of Northampton to not be probative in that case. First, they argue that the Statute of Northampton is too old and should therefore be afforded no weight in ascertaining an *American* tradition. *Bruen*, 597 U.S. at 41 ("[T]he Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791."). State Defendants address this issue by citing the later state statutes that were based on the Statute of Northampton. This includes two commonwealth/state statutes from the Founding era: one from Virginia and one from North Carolina.[32]

Defendants also present Reconstruction-era statutes from three states—Tennessee, Texas, and Missouri—and two territories—Oklahoma, and Arizona.[33] Plaintiffs' response to these statutes amounts to "too little, too late"—they argue that they are outliers and not old enough to be probative of the meaning of the Second Amendment. But *Bruen* didn't foreclose using such later-in-time laws to show the continuation of

---

[32] Act of Oct. 16, 1786, ch. 49, 1786 Va. Acts 35 (forbidding and punishing affrays); *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* 60-61 (François-Xavier Martin ed., 1792). Plaintiffs argue that the North Carolina law was never in force. This doesn't affect the Court's analysis, so there is no need to address this factual dispute now.

[33] Act of June 11, 1870, ch. 13, 1870 Tenn. Pub. Acts 28 (preserving the peace and preventing homicide); Act of Aug. 12, 1870, ch. 49, 1870 Tex. Gen. Laws 63 (regulating the right to keep and bear arms); Act of Mar. 5, 1883, sec. 1, § 1274, 1883 Mo. Laws 76; *Acts, Resolutions and Memorials of the Fifteenth Legislative Assembly of the Territory of Arizona* 30-31 (Prescott 1889) (defining and punishing certain offenses against the public peace); *The Statutes of Oklahoma, 1890*, at 495 (Will T. Little et al. ed., Guthrie, The State Capital Printing Co. 1891) (Territory of Oklahoma Penal Code, article 47).

a tradition from before the Founding. *See Bruen*, 597 U.S. at 65-68 (rejecting postbellum and territorial laws because they "contradict[] the overwhelming weight of other evidence"). Defendants present these statutes in that light: to show a "'long, unbroken line,' beginning from medieval England and extending beyond Reconstruction," of the regulation of firearms in crowded public forums. *Antonyuk*, 89 F.4th at 358 (quoting *Bruen* 142 S. Ct. at 2136).

Even granting the existence of such a longstanding tradition, however, that doesn't address Plaintiffs' second response to these laws—that they aren't appropriate analogues because *why* they burdened the right to armed self-defense is not sufficiently similar.[34] *Bruen* found that the Statute of Northampton wasn't a general ban on bearing weapons; instead, the offense was arming oneself *to terrify others*. *Bruen*, 597 U.S. at 43-44.[35] This language is also reflected in the corresponding state

---

[34] The Court acknowledges that it is using a double negative. But the Court is using the double negative because describing the *why* as "different" doesn't seem quite right. *See* Susan Thurman, *The Only Grammar Book You'll Ever Need* 93-94 (2003) ("One exception to the rule of avoiding double negatives is when you intend a positive or lukewarm meaning."). And, at the risk of sending grammar geeks into a tither (or a dither), not all double negatives create a positive. *See Flores v. Minnesota*, 906 F.2d 1300, 1302 (8th Cir. 1990) ("The instruction states that there is '*no* presumption' an intoxicated person was '*in*capable' of premeditation . . . . The double negative here does not create a positive. The instruction simply tells the jury not to rule out the possibility of premeditation merely because Flores had been drinking: they should still consider whether or not he was capable of premeditation, and whether he in fact premeditated the killing.").

[35] *Rahimi* implies the same requirement of an intent to terrify others (and potentially other elements, like using dangerous or unusual weapons). *See Rahimi*, 144 S. Ct. at 1901 ("Whether classified as an affray law or a distinct prohibition, the going armed laws prohibited riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land. Such conduct disrupted the public order and led almost necessarily to actual violence." (cleaned up) (citations omitted)).

On the other hand, one of Defendants' experts, Dr. Brennan Rivas, notes that some scholars have found that these laws didn't require an intent element to terrorize others, and that carrying deadly weapons was inherently terrifying. Dkt. 64-11 at 20 n.57. Although this is at

statutes. For example, the Virginia statute states that nobody shall "ride armed by night nor by day, in fairs or markets, or in other places, *in terror of the county*." Ch. 49, 1786 Va. Acts 35; *see also Rahimi*, 144 S. Ct. at 1901. Plaintiffs wish to carry *concealed* arms in self-defense, so the Firearm Concealed Carry Act's ban burdens Plaintiffs' Second Amendment right for a wholly different reason than the Statute of Northampton and similar state statutes did. The *why* is different. A concealed arm doesn't terrorize; it's concealed. Consequently, these historical laws do not serve as an appropriate historical analogue.

### b.   *The Black Act*

Ms. Foxx also attempts to find a historical analogue in the Black Act 1723, 9 Geo. 1 c. 22 (Gr. Brit.), which prohibited the carrying of weapons in forests and on roads if the bearer's face was disguised. But Ms. Foxx doesn't present any evidence that the attitudes reflected in the Black Act carried over into "*this* Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17 (emphasis added). Without some evidence the Black Act reflects American attitudes at the time the Second Amendment was adopted, it cannot support the Firearm Concealed Carry Act's ban. *See id.* at 34-35, 39 (noting that it's less helpful "to rely on an 'ancient' practice that had become 'obsolete in England at the time of the adoption of the Constitution' and never 'was

---

odds with *Bruen*'s interpretation, *Bruen* had a different record before it. *See Bruen*, 597 U.S. at 45 ("Respondents do not offer any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun would terrify people."). Although reliance on party presentation in compiling a historical record would seem to allow for evolving understandings of history, Defendants don't offer evidence that the act of carrying a concealed handgun in public was alone sufficient to be considered terrifying, so the Court accepts *Bruen*'s understanding of these statutes.

acted upon or accepted in the colonies.'" (quoting *Dimick v. Schiedt*, 293 U.S. 474, 477 (1935))).[36]

### c. Concealed-carry laws

Ms. Foxx then argues that 19th century laws from Tennessee, Texas, and Arkansas[37] show a tradition of regulating concealed firearms.[38] Plaintiffs' individual responses to the Tennessee and Arkansas statutes are that the statutes support Plaintiffs' position because of an exception for travelers. The Court sets that aside for now, as the exception matters only if the laws establish a historical tradition of banning concealed firearms in the first place.

---

[36] Even if the Black Act were to disclose some tradition, it's not "relevantly similar" to the ban, both in *why* and *how* the right to armed self-defense is burdened. The Black Act was enacted to prosecute gangs (seemingly inspired by Robin Hood) that operated from nearby forests (and roads). L. Radzinowicz, *The Waltham Black Act: A Study of the Legislative Attitude Towards Crime in the Eighteenth Century*, 9 Cambridge L.J. 56, 56-58 (1945); Pat Rogers, *The Waltham Blacks and the Black Act*, 17 Hist. J. 465, 467 (1974). The act's name shows that it was primarily concerned with *who* rather than *where*—the gang members were known as the "Blacks" because of how they obscured ("blackened") their faces. *See* Rogers, *supra*, at 468-69. At a very high level of generality, perhaps the two acts are similar in their motivation to keep public order. But though the Black Act contains a place restriction, it's inextricably coupled with the condition that one has disguised their face, because it was targeted at a specific group of people known to have an unlawful purpose in carrying weapons. The justification behind the Black Act is different from the Firearm Concealed Carry Act's ban, and the Black Act forbade people from carrying guns on roads only *if* they were masked, a condition not present in Illinois' ban. So, again, the *how* and *why* are different.

[37] Act of Apr. 12, 1871, ch. 34, 1871 Tex. Gen. Laws 25 (regulating the keeping and bearing of deadly weapons); Act of Oct. 19, 1821, ch. 13, 1821 Tenn. Pub. Acts 15 (preventing the wearing of dangerous and unlawful weapons); *Revised Statutes of the State of Arkansas Adopted at the October Session of the General Assembly of Said State, A.D. 1837*, at 280 (William McK. Ball & Sam. C. Roane, eds., Boston, Weeks, Jordan and Company 1838).

[38] Ms. Foxx lists a Louisiana statute in her statement of facts, but she doesn't reference it in her memorandum of law supporting her motion for summary judgment. Because it's not mentioned in her legal argument, the Court doesn't consider the Louisiana law in its analysis. *See generally* LR 56.1(a); *Bruen*, 597 U.S. at 25 n.6. In addition, Ms. Foxx says in her reply that she also cites Alabama law, but the only reference to Alabama law in her opening memorandum concerns the meaning of "journey" underlying the traveler exception, rather than the statute itself.

Plaintiffs rely on *Bruen* to discount the relevance of the Texas statute in establishing a historical tradition. *Bruen* examined an 1871 Texas law that required "reasonable grounds for fearing an unlawful attack on his person" to carry a pistol, and it deemed the statute (along with two Texas Supreme Court cases analyzing the constitutionality of the statute) to be outliers, "provid[ing] little insight into how postbellum courts viewed the right to carry protected arms in public." *Bruen*, 497 U.S. at 64-65. Ms. Foxx's only counter in her reply brief is that the New York law in *Bruen* had broader restrictions than the Firearm Concealed Carry Act's ban. Although it's true that this case involves looking for different analogues than *Bruen* did, that doesn't provide a reason to challenge *Bruen*'s finding that 1870s Texas was an outlier in its view of the right to bear arms.

Plaintiffs also respond with two general arguments concerning the Texas and Arkansas statutes: (1) the laws are too recent, and (2) the laws aren't sufficiently widespread.[39] As for the first argument—that 19th century laws cannot independently demonstrate the scope of the Second Amendment—*Bruen* shied away from any definitive statement on the matter. *Id.* at 37-38 ("We also acknowledge that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal

---

[39] Plaintiffs grouped the statutes by time period in their response, so the 1821 Tennessee statute was sorted into the Founding era bucket—separate from the mid to late 19th century bucket where Plaintiffs addressed the Texas and Arkansas statutes. The Court isn't sure what cutoff Plaintiffs have created to deny Arkansas' 1837 law the "Founding era" label and instead count it as "mid"-19th century.

Government). We need not address this issue today . . . ." (citations omitted)). *Rahimi* similarly sidestepped the issue. *See Rahimi*, 144 S. Ct. at 1898 n.1; *id.* at 1929 n.4 (Jackson, J., concurring); *id.* at 1933 n.2 (Thomas, J., dissenting). Contrary to Plaintiffs' characterization, lower courts still must deal with the ambiguity.

As a result, this Court disagrees with Plaintiffs that *Bruen* mandates automatically writing off any law from the Reconstruction era. *Bruen* may have cautioned "against giving postenactment history more weight than it can rightly bear," but it also recognized that evidence of how the Second Amendment was interpreted "through the end of the 19th century" can be a "critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 35-36 (quoting *Heller*, 554 U.S. at 605). The potential relevance of evidence through the late 19th century is underscored by the fact that this case concerns determining the historical view of public carry—after all, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 38.

That leaves Plaintiffs' argument that the statutes aren't sufficiently widespread.[40] As discussed above, *Bruen* disregarded the Texas statute as an outlier, and Ms. Foxx provides nothing to the contrary. This Court follows Supreme Court precedent. Left with only the Tennessee and Arkansas statutes, Defendants have failed to meet their burden of showing a national tradition. *Bruen* suggests that only two or three regulations often won't be sufficient—it discounted Texas as an outlier despite West

---

[40] Although Plaintiffs' brief was organized such that this response wasn't directed at the Tennessee statute, the Court finds it more sensible to include Tennessee in this part of the discussion. To artificially separate similar laws and then attack a subset as not sufficiently widespread isn't a logical way to approach the argument.

Virginia's similar provision, and it "doubt[ed] that *three* colonial regulations could suffice to show a tradition of public-carry regulation." *Id.* at 46, 65. This isn't to say that simply looking at the number of states is enough to exclusively conclude that there wasn't a tradition, as Plaintiffs seem to imply,[41] but Defendants have failed to meet their burden under the facts of this case. With that, there's no need to discuss the so-called "traveler exception" in the context of Ms. Foxx's motion for summary judgment.

### d.  Railroads

State Defendants present restrictions by railroad companies across the country in the late 19th century.[42] Some of these restrictions merely required that passengers keep their firearms unloaded and in their bags, while others barred firearms completely. Plaintiffs respond that these railroad companies were private entities and so

---

[41] Regarding what's a widespread tradition versus just a few outliers, Plaintiffs don't do much to actually apply the reasoning in *Bruen* to the facts in this case, but the Court can certainly imagine some relevant factors that might have been helpful to this analysis, such as the geographic regions represented by the state regulations or the impact of migration patterns on cultural norms. One might even consider when the particular states joined the Union, although the emphasis on Founding-era statutes may already take that into account by proxy, as it consequently puts more focus, to some extent, on the original thirteen states. *Bruen*'s discussion of sensitive places and the lack of historical evidence suggests that there are times when only two or three regulations might be sufficient, but it's unclear if *Bruen* meant for that logic to apply beyond the "sensitive places" inquiry (nor does Ms. Foxx argue this as a reason for construing only a few state statutes as a widespread tradition).

[42] They argue that these railroad restrictions are a continuation of the tradition of regulating public forums and crowded places, as established by the Statute of Northampton and similar state statutes. However, as explained above, the tradition of regulation established by that line of statutes addressed public carry for the purpose of terrorizing others. So if the railroad restrictions are a continuation of this tradition, then they also cannot be an appropriate analogue for this case. But the railroad restrictions don't have the same wording about inflicting terror, so the Court treats these as a separate source for a potential analogue.

the restrictions aren't relevant under *Bruen*, that the restrictions aren't old enough, and that the restrictions aren't sufficiently widespread.

The Court agrees that the private nature of these restrictions defeats State Defendants' attempt to show a national tradition that would support the Concealed Carry Act's prohibition. The Second Amendment protects against governmental—not private—intrusion on rights and liberties. *See Rahimi*, 144 S. Ct. at 1897.[43]

    2.    *Sensitive places*

Defendants also levy arguments under *Bruen*'s directive that analogies to "sensitive places" can establish whether laws are constitutionally permissible. The discussion of sensitive places starts with this language in *Heller*:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626-27. *Heller* also added in a footnote: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to

---

[43] The Court sees the opening that State Defendants have identified. *Heller* and *Bruen* both included the assurance that schools could still constitutionally restrict firearms as sensitive places, considering that there were no public schools at the Founding. However, it's above this Court's pay grade to infer from the Supreme Court's silence that private restrictions alone can establish a historical tradition of regulation. Neither *Heller* nor *Bruen* explained why restrictions in schools are constitutional. *See Heller*, 554 U.S. at 626-27; *Bruen*, 597 U.S. at 30. The Court has enough trouble applying what the Supreme Court did say in *Heller* and *Bruen*; it's loath to attempt to apply the Supreme Court's silence. What's more, it certainly can't infer the Supreme Court's silence in favor of Defendants when they bear the burden.

be exhaustive." *Id.* at 627 n.26. *Bruen* then turned this unremarkable use of the word "sensitive" into its own vehicle of analogical reasoning:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U. S. at 626. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229-236, 244-247 (2018); see also Brief for Independent Institute as *Amicus Curiae* 11-17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

*Bruen*, 597 U.S. at 30. This Court views the "sensitive places" doctrine as but one method for demonstrating a historical analogue. Earlier, the Court analyzed the parties' arguments regarding whether a historical tradition existed and whether the historical regulations part of that tradition were analogous to the Firearm Concealed Carry Act's ban today. The "sensitive places" doctrine merely provides a shortcut for the former because the Supreme Court has stated there to be a longstanding tradition of prohibiting firearms in sensitive places.[44]

*Bruen* offers no insight as to what common thread might tie these sensitive places together, assuming a common thread is needed among these to support an analogy.

---

[44] Some courts have characterized it as an exception to the general *Bruen* framework. *See, e.g.*, *Wolford*, 686 F. Supp. 3d at 1049. Courts often refer to different analyses as "exceptions" even though they really aren't. *See In re Deere*, 2023 U.S. Dist. LEXIS 210516, at *32 n.12 (citing *Paper Sys. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002)). This Court might disagree on the label, but the approach is still substantively the same.

*See, e.g.*, *Bruen*, 597 U.S. at 114 (Breyer, J., dissenting) (noting the ambiguity and wondering where "the many locations in a modern city with no obvious 18th- or 19th-century analogue" such as "subways, nightclubs, movie theaters, and sports stadiums" fall); *see also, e.g.*, *Heller*, 554 U.S. at 721 (Breyer, J., dissenting) ("Why these?"). Courts are left to guess if the location is sensitive because of what occurs at the location, who is present at the location, how many people are present at the location, or some other consideration. The only hint that *Bruen* provides is that Manhattan is *not* a "sensitive place":

> Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." Brief for Respondents 34. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. See Part III-B, *infra*. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

*Bruen*, 597 U.S. at 30-31.

The task before this Court is to decipher whether public transit can be analogous to schools or government buildings (including legislative assemblies, polling places, and courthouses), or to some other sensitive place if Defendants are able to identify

one.[45] The Court found only a handful of other courts that have considered the issue of how to analogize to the established "sensitive places" (and none that have explicitly extended the list of sensitive places). For example, some courts concluded that playgrounds and other adjoining school grounds are analogous to schools—a seemingly straightforward analysis. *Siegel v. Platkin*, 653 F. Supp. 3d 136, 151 (D.N.J. 2023);[46] *Kipke*, 695 F. Supp. 3d at 650; *Kipke*, 2024 U.S. Dist. LEXIS 137003, at *15-16; *Springer*, 2023 U.S. Dist. LEXIS 217447, at *23-24; *We The Patriots, Inc. v. Grisham*, 697 F. Supp. 3d 1222, 1237 (D.N.M. 2023), *appeal docketed*, No. 23-2166 (10th Cir. Mar. 11, 2024). In a similar vein, childcare facilities have also been deemed "sensitive." *Md. Shall Issue*, 680 F. Supp. 3d at 584.[47]

---

[45] Plaintiffs insist that *Bruen* didn't endorse "government buildings" generally or "schools" as sensitive places, but that is based on a strained reading of *Bruen*'s language. *See also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) (quoting *Heller* to emphasize that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations"). Other district courts also disagree with Plaintiffs, either implicitly by analogizing to schools or explicitly rejecting the argument. *E.g.*, *Kipke*, 695 F. Supp. 3d at 650; *United States v. Robertson*, No. 22-po-867-GLS, 2023 U.S. Dist. LEXIS 4998, at *12-13 (D. Md. Jan. 9, 2023); *Md. Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 584 (D. Md. 2023), *appeal docketed*, No. 23-1719 (4th Cir. Feb. 22, 2024); *Springer v. Grisham*, __ F. Supp. 3d __, No. 1:23-cv-00781 KWR/LF, 2023 U.S. Dist. LEXIS 217447, at *23-24 (D.N.M. Dec. 5, 2023), *appeal docketed*, No. 23-2194 (10th Cir. Mar. 25, 2024). Only one district court takes such a narrow reading of *Bruen*, arguing that *Bruen*'s "these locations" refers only to legislative assemblies, polling places, and courthouses based on the grammatical rule that pronouns "generally" refer back to the nearest antecedent. *Ayala*, 2024 U.S. Dist. LEXIS 7326, at *36. But that logic breaks down in *Bruen*'s next sentence. *Bruen* instructs courts to analogize to "those historical regulations of 'sensitive places'"—and "those" modifies "regulations" not "sensitive places," so it refers back to "such prohibitions," which in turn refers back to the "longstanding" laws discussed by *Heller*. *See Bruen*, 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626). This is a convoluted and pedantic way of saying that the Court finds it appropriate to analogize to government buildings and schools.

[46] In a subsequent ruling (that is on appeal), the court maintained its position regarding school playgrounds. *Koons*, 673 F. Supp. 3d at 639.

[47] The use of a public space for educating children may be seen as analogous to schools, even if the space isn't exclusively for children. *Lafave v. County of Fairfax*, No. 1:23-cv-1605

Courts have also considered whether buffer zones (e.g., a 1000-foot radius) around sensitive places are susceptible of the same treatment as the sensitive places themselves. One court found so. *United States v. Walter*, No. 3:20-cr-0039, 2023 U.S. Dist. LEXIS 69163, at *21-23 (D.V.I. Apr. 20, 2023). Another found the opposite, because the buffer zone around a school zone contained non-school property. *United States v. Allam*, 677 F. Supp. 3d 545, 560-62 (E.D. Tex. 2023). Yet another court specified that only the public locations within a buffer zone were sensitive and that private property within a buffer zone wasn't a sensitive location. *United States v. Metcalf*, No. CR 23-103-BLG-SPW, 2024 U.S. Dist. LEXIS 17275, at *21-23 (D. Mont. Jan. 31, 2024).

Defendants in this case offer various theories as to what makes a place "sensitive." The Court finds none of them convincing.

### a. *Publicly owned or operated, publicly accessible, and crowded*

State Defendants argue that modern public transit systems are sensitive places because they are crowded spaces that are publicly accessible and publicly owned or operated.[48] Based on *Bruen*'s admonition that Manhattan isn't a sensitive place just

---

(WBP), 2024 U.S. Dist. LEXIS 152000, at *37-38 (E.D. Va. Aug. 23, 2024) (finding Fairfax County's parks to be sensitive places because children attend summer camps at the parks and the county operates three preschools there). But merely having children or students present isn't enough—one court reasonably declined to declare the New York subway system a sensitive place "just by virtue of its connection with the school system." *Frey v. Nigrelli*, 661 F. Supp. 3d 176, 206-07 (S.D.N.Y. 2023), *appeal docketed*, No. 23-365 (2d Cir. Jan. 10, 2024).

[48] The Court found no examples of this precise combination of factors considered by other courts—the closest were courts that have decided how broadly to construe "government buildings." Some courts have taken "government buildings" to mean any building owned by the government, rejecting the notion that there must be some kind of core government function associated with the building. *Kipke*, 695 F. Supp. 3d at 655-56 (analogizing mass transit facilities to both schools and government buildings); *Kipke*, 2024 U.S. Dist. LEXIS 137003, at *15-16; *Md. Shall Issue*, 680 F. Supp. 3d at 588 (finding public libraries to be sensitive places); *We The Patriots*, 2023 U.S. Dist. LEXIS 183043, at *31-32; *Robertson*, 2023 U.S. Dist. LEXIS

because it is crowded and generally protected by law enforcement, crowdedness alone is insufficient to qualify a location as sensitive. State Defendants' theory adds two more conditions—so it's not directly contrary to *Bruen*'s rejection of crowded and generally protected places—but those two added conditions still "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 597 U.S. at 31. After all, the streets of Manhattan—or Chicago, to pick an example closer to home—are crowded, publicly accessible, and publicly owned. State Defendants contend that "only a small slice of modern cities would be sensitive" under their test, Dkt. 94 at 15, but they don't explain how the additional two conditions would exclude most modern cities.

---

4998, at *12-14, 19-22 (finding the National Institutes of Health to be a sensitive place); *United States v. Power*, No. 20-po-331-GLS, 2023 U.S. Dist. LEXIS 4226, at *9-16, 19-21 (D. Md. Jan. 9, 2023) (same); *United States v. Marique*, No. 22-00467-PJM, 2023 U.S. Dist. LEXIS 145677, at *12-14 (D. Md. Aug. 17, 2023), *appeal docketed*, No. 23-4576 (4th Cir. Oct. 23, 2023) (same); *United States v. Tallion*, No. 8:22-po-01758-AAQ, 2022 U.S. Dist. LEXIS 225175, at *20-22, 25 (D. Md. Dec. 12, 2022) (same). Other courts have taken a narrower approach. *Ayala*, 2024 U.S. Dist. LEXIS 7326, at *36 (finding that post offices aren't "government buildings" under *Bruen*); *United States v. Gearheart*, No. 6:23-po-00079-HBK-1, 2024 U.S. Dist. LEXIS 71033, at *27-28 (E.D. Cal. Apr. 18, 2024) (declining to find Yosemite National Park in its entirety to be a sensitive place, with the caveat that specific buildings in the park might be sensitive places); *United States v. Tolmosoff*, No. 6:23-po-00187-HBK-1, 2024 U.S. Dist. LEXIS 66920, at *26-27 (E.D. Cal. Apr. 11, 2024) (same). Absent further guidance, this Court is disinclined to construe "government buildings" so broadly because the examples of government buildings provided by *Bruen* all bear some relation to the processes of our democratic government, though the Court would also not go as far as to reject post offices as government buildings. Even if it were to construe "government buildings" broadly, that still wouldn't fully support State Defendants' theory, as they construe "buildings" even more broadly so as to include public transportation vehicles.

### b.  *Regulation of historical sensitive places*

State Defendants also compare the Firearm Concealed Carry Act's ban to histori-cal regulation of legislative assemblies and polling places.[49] But this argument fails on account of the purposes of the regulations. State Defendants ask the Court to find the regulations to be relevantly similar because of the shared purpose of protecting the public order, but treating any place where the government would want to protect public order and safety as a sensitive place casts too wide a net—this would seem to justify almost any gun restriction.

### c.  *Enclosed, moving vehicles with no escape*

Ms. Foxx doesn't offer a comprehensive theory for defining "sensitive places," but she argues that public transit (specifically the trains and buses) are sensitive places because they are enclosed, moving vehicles with no escape. But Ms. Foxx neither analogizes to the enumerated sensitive places nor provides any evidence to support the creation of a new "sensitive place" category, so this argument fails.

### 3.  *Plaintiffs' arguments*

As stated, because Defendants bear the burden to justify the ban as consistent with the American tradition of firearm regulation, Plaintiffs don't need to inde-pendently prove that the ban is inconsistent with the American tradition. But, for the sake of developing a full record, the Court addresses Plaintiffs' arguments. Plaintiffs' arguments are based on the faulty premise that by simply citing colonial statutes

---

[49] This mode of analysis is more akin to the analysis comparing the Firearm Concealed Carry Act's ban to various historical regulations, but State Defendants frame it as part of their "sensitive places" argument.

regarding firearm possession, without considering the historical context, these statutes alone foreclose any firearm regulation today. But that's not what *Bruen* requires.

a. *"Public transportation"*

Plaintiffs argue that the lack of firearm regulation for "public transportation" at the Founding renders the Firearm Concealed Carry Act's ban necessarily unconstitutional. Plaintiffs detail two types of transportation that they allege are analogous: stagecoaches (including horse-drawn omnibuses) and ferries. But even if such transportation at the Founding was "public,"[50] that isn't an independent basis upon which to grant Plaintiffs summary judgment. As explained, *Bruen* doesn't say that a lack of regulation in a place or situation that happens to fit some modern label is dispositive. *Cf. Antonyuk*, 89 F.4th at 301-02 ("[T]he absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much."). Instead, in contemplating how a lack of regulation might be relevant, *Bruen* offers few suggestions of what might show that a challenged regulation is inconsistent with the Second Amendment. The only one potentially applicable to the record before the Court—and the only one that the parties argue—is to examine if the challenged regulation "addresses a general societal problem that has persisted since the 18th century" and there is no "distinctly similar" historical regulation. *Bruen*, 597 U.S. at 26-27.

---

[50] Plaintiffs discuss stagecoaches, but their evidence doesn't support the notion that stagecoach services were provided by public entities. *See also, e.g.*, Dkt. 72 Ex. 2 at 182 (discussing a waterman's displeasure after the introduction of "private coaches"). In addition, State Defendants, relying on their experts' reports, disputed whether ferries were actually publicly operated. *See* Dkt. 83 at 9 ¶¶ 47-49.

**SA44**

For the societal problem that the Firearm Concealed Carry Act addresses, State Defendants assert that the goal of the statute is to protect public order and safety from the dangers posed by concealed carry, which Plaintiffs don't challenge. In support of this assertion, State Defendants cite the statute's language that a concealed-carry permit is issued only to an individual who "does not pose a danger to himself, herself, or others, or a threat to public safety." 430 ILCS 66/10(a)(4). The source of danger (i.e., the societal problem) that the modern law addresses is the risk posed by the person with the firearm. By contrast, the lack of firearm restrictions for stage-coaches and ferries (and, indeed, sometimes the explicit permission to carry firearms) was tied to a different societal problem: dangers from the outside, such as wildlife. Dkt. 83 at 8 ¶ 45. Thus, the evidence about stagecoaches and ferries, as presented, isn't probative.[51] In other words, the *why* is not sufficiently similar to foreclose the possibility of Defendants putting forth a relevantly similar regulation to justify the ban.

### b. *Places that required firearms*

Plaintiffs also argue that there is no way to show a tradition of restricting firearms in crowded locations because of statutes that *required* people to bear arms at places

---

[51] In their reply brief, Plaintiffs try to go the opposite direction, starting with the motivation of the historical statutes and arguing that similar, external dangers on public transportation necessarily permits them to carry guns today. But this argument is logically flawed because it again ignores the different social contexts and different regulatory justifications in its attempt to draw an equivalence between "public transit" then and "public transit" now. In addition, "[a]rguments raised for the first time in a reply brief are waived." *James*, 137 F.3d at 1008.

of worship and public meetings.[52] However, Plaintiffs fail to logically connect the existence of those statutes to the proposition that there can *never* be a restriction of a firearm on public transit.

Plaintiffs also cite 17th century colonial laws—from Massachusetts, Maryland, Virginia, and Rhode Island[53]—requiring that arms be borne when traveling more than one mile (Massachusetts), two miles (Rhode Island), "any considerable distance" (Maryland), or "abroad" (Virginia). But Plaintiffs treat these laws as if they're "trapped in amber." *Rahimi*, 144 S. Ct. at 1897-98. Just as "public transit" then isn't necessarily equivalent to "public transit" now, requiring firearms on a two-mile trip in the 17th century doesn't necessarily mean one has the same right today. Plaintiffs fail to contend with the different context of such trips when the laws were enacted.

    *c.   Sensitive places*

As for their theory of "sensitive places," Plaintiffs argue that the key characteristic shared by legislative assemblies, polling places, and courthouses is the security

---

[52] 19 *The Colonial Records of the State of Georgia*, pt. 1, at 137-39 (Allen D. Candler ed., 1911) (1770 law); *Archives of Maryland: Proceedings of the Council of Maryland 1636–1667*, at 103 (William Hand Browne ed., Baltimore, Maryland Historical Society 1885); 1 *The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature in the Year 1619*, at 174, 263 (William Waller Hening ed., New York, R. & W. & G. Bartow 1823) (1631 and 1642 laws); *The Public Records of the Colony of Connecticut* 95 (J. Hammond Trumbull ed., Hartford, Brown & Parsons 1850); 1 *Records of the Colony of Rhode Island and Providence Plantations* 94 (John Russell Bartlett ed., Providence, A. Crawford Greene and Brother 1856) (1639 law). Two notes about this list of statutes: first, Plaintiffs cited one more law from Virginia that allegedly required men to bear arms at church, but the Court was unable to find it in Plaintiffs' cited material; second, Plaintiffs included Massachusetts in their list of states that required going armed to public meetings, but they cited no Massachusetts statute.

[53] 1 *Records of the Governor and Company of the Massachusetts Bay in New England* 190 (Nathaniel B. Shurtleff ed., Boston, William White 1853) (1636 law); *Archives of Maryland*, *supra*, at 103 (1642 law); 1 *The Statutes at Large*, *supra*, at 127 (1631 Virginia law); 1 *Records of the Colony of Rhode Island and Providence Plantations*, *supra*, at 94 (1639 law).

provided by the government at these locations. In support, Plaintiffs cite a few sources. First, they cite David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018), specifically where authors argue that the presence of security indicates the government's assessment of whether that location is sensitive.[54] Next, Plaintiffs cite two amicus briefs—one before the Second Circuit and one before the Third Circuit—both of which rely on Mr. Kopel and Mr. Greenlee's argument that sensitive places were about protecting government deliberation from violent interference. Although the Third Circuit has yet to decide its case, the Second Circuit didn't adopt the argument from the amicus brief. *See Antonyuk*, 89 F.4th 271.[55]

The Court found only two courts that have addressed this question head-on. In the case now on appeal before the Third Circuit, the district court, relying solely on the arguments in Kopel and Greenlee's article, agreed with Plaintiffs' "security" theory. *Koons*, 673 F. Supp. 3d at 635. Another court unhesitatingly rejected the theory, calling it "baseless," but it offered little explanation. *Kipke*, 695 F. Supp. 3d at 650. *Bruen*'s only discussion of a location's security in relation to its status as a sensitive place was its rejection of Manhattan as a sensitive place even though it is crowded

---

[54] Although *Bruen* cited Mr. Kopel and Mr. Greenlee's article, it did so for only the narrow proposition that legislative assemblies, polling places, and courthouses are examples of sensitive places from the 18th and 19th centuries. *See Bruen*, 597 U.S. at 30. This Court doesn't see this as a wholesale endorsement of Mr. Kopel and Mr. Greenlee's theories for what makes a place sensitive, especially as *Bruen* disclaimed that it wasn't defining "sensitive places." To be clear, the Court is not discrediting (or crediting) Mr. Kopel and Mr. Greenlee's conclusions. The Court seeks to differentiate between academic research and legal precedent only as it pertains to what is binding on this Court.

[55] Although the statute in that case had its own list of "sensitive places," *Antonyuk* didn't frame its analysis with reference to "sensitive places" as the term is used by *Bruen*.

and has general protection provided by the city. *Bruen*, 597 U.S. at 30-31. Based on that, general protection alone should also be insufficient.

Plaintiffs' theory, however, differs in its formulation: they argue that a sensitive place must have "comprehensive" security, a presumably higher level of security that doesn't run afoul of *Bruen*'s rejection of Manhattan as a sensitive place. According to Plaintiffs, the closest modern equivalent to the "comprehensive" security at the Founding are the armed guards and metal detectors found at courthouses and airports.[56] There are at least two reasons why this makes little sense. First, that only courthouses and airports have modern security measures that meet Plaintiffs' definition of "comprehensive" doesn't explain why prohibitions at polling places and legislative assemblies are permissible. Polling places and legislative assemblies lack such security, but the Supreme Court has nevertheless deemed them to be sensitive places. Second, Plaintiffs fail to establish why "comprehensive" security is the right threshold. Their examples from the Founding era consist of laws that required and/or paid law enforcement to be present at legislatures, courthouses, and polling places, and Plaintiffs offer no explanation for how or why that translates to metal detectors in today's social context. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .").

---

[56] If the Court accepted Plaintiffs' theory, that would also doom Plaintiffs' facial challenge—Plaintiffs acknowledge in their reply brief that "[i]f Illinois were to install TSA-like security for its subways, buses, or trains, then it could constitutionally ban firearms at those locations." Dkt. 92 at 8 n.2.

**CONCLUSION**

This action has been properly brought before this Court—despite the disputes over venue and standing, the parties can't escape the Court. The parties also can't escape that this case requires navigating the murky waters of *Bruen.* Plaintiffs' proposed conduct—carrying concealed handguns on public transit for self-defense—falls within the presumptive ambit of the Second Amendment, shifting the burden to Defendants to show that the Firearm Concealed Carry Act's ban falls within the historical tradition of firearm regulation in this country. On the record before the Court in this case, Defendants have failed to meet their burden.

As for injunctive relief, Plaintiffs have made no argument regarding why they're entitled to injunctive relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Because they've forfeited the argument, they haven't established their entitlement to an injunction.

The claims against Rick Amato and Eric Rinehart are dismissed without prejudice for lack of subject-matter jurisdiction. Rick Amato and Eric Rinehart are terminated from the case. The remaining State Defendants' motion for summary judgment is denied. Kimberly Foxx's motion for summary judgment is denied.

Plaintiffs' motion for summary judgment is granted in part. The Court grants declaratory relief against Kwame Raoul, Kimberly Foxx, and Robert Berlin, in their official capacities, that the Firearm Concealed Carry Act's ban on carrying concealed firearms on public transportation, as defined in the statute, 430 ILCS 66/65(a)(8), violates the Second Amendment, as applied to:

49

**SA49**

- Benjamin Schoenthal carrying a concealed firearm for self-defense on Metra, and on Metra's real property to the extent necessary to ride Metra.

The Court grants declaratory relief against Kwame Raoul and Kimberly Foxx, in their official capacities, that the Firearm Concealed Carry Act's ban on carrying concealed firearms on public transportation, as defined in the statute, 430 ILCS 66/65(a)(8), violates the Second Amendment, as applied to:

- Mark Wroblewski carrying a concealed firearm for self-defense on Metra, and on Metra's real property to the extent necessary to ride Metra;
- Joseph Vesel carrying a concealed firearm for self-defense on Metra and the CTA, and on Metra and the CTA's real property to the extent necessary to ride Metra and the CTA; and
- Douglas Winston carrying a concealed firearm for self-defense on Metra and the CTA, and on Metra and the CTA's real property to the extent necessary to ride Metra and the CTA.

Date: August 30, 2024

HON. IAIN D. JOHNSTON
*United States District Judge*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on January 15, 2025, I electronically filed this brief and short appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.

All participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER