**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

BENJAMIN SCHOENTHAL, et al.

Plaintiffs-Appellees,

v.

KWAME RAOUL, et al.

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division
No. 3:22-cv-50326
The Honorable Iain D. Johnston, Judge Presiding
————

**BRIEF AND SHORT APPENDIX OF DEFENDANT-APPELLANT**
**EILEEN O'NEILL BURKE**
————

EILEEN O'NEILL BURKE
State's Attorney of Cook County
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-4366
jonathon.byrer@cookcountysao.org

CATHY MCNEIL STEIN
Chief, Civil Actions Bureau
JESSICA M. SCHELLER
Deputy Bureau Chief, Civil Actions Bureau
JONATHON D. BYRER
Supervisor, Civil Appeals & Special Projects
PRATHIMA YEDDANAPUDI
Assistant State's Attorneys
*Of Counsel*

# TABLE OF CONTENTS

_____

JURISDICTIONAL STATEMENT ........................................................... 1

ISSUES PRESENTED ........................................................................... 2

STATEMENT OF THE CASE ................................................................. 2

I.   Public Transit In Cook County, Illinois. ................................... 2

II.  The Public Transit Statute & This Litigation. ........................... 4

SUMMARY OF ARGUMENT................................................................. 6

ARGUMENT ........................................................................................ 7

I.   Schoenthal Lacks Article III Standing To Seek A Declaration
     Regarding The Constitutionality Of The Public Transit Statute. ......... 7

II.  The Public Transit Statute Does Not Violate The
     Second Amendment. ........................................................... 22

     A. The Government Presumptively Possesses Broad Constitutional
        Authority to Regulate Its Proprietary Interests. ................... 22

     B. The Public Transit Statute Is A Valid Regulation Of A Public
        Benefit. .......................................................................... 31

     C. Bruen Did Not Reject the Government-Proprietor Principle. ........... 33

III. Government-Funded Public Transit Systems Are Sensitive
     Places. ............................................................................. 44

CONCLUSION .................................................................................. 52

SHORT APPENDIX ........................................................................... xi

TABLE OF CONTENTS OF SHORT APPENDIX............................... xii

CERTIFICATES OF COMPLIANCE & SERVICE ............................. xiii

# POINTS AND AUTHORITIES

---

## CASES

*Adderley v. Florida,*
    385 U.S. 39 (1966) ................................................................ 24

*Advantage Media, L.L.C. v. City of Eden Prairie,*
    456 F.3d 793, 801 (8th Cir. 2006) ...................................... 14

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013) ............................................................ 26

*Babbitt v. UFW Nat'l Union,*
    442 U.S. 289 (1979) ............................................................ 17

*Bill Johnson's Restaurants v. NLRB,*
    461 U.S. 731 (1983) ............................................................ 48

*Bishop v. Wood,*
    426 U.S. 341 (1976) ............................................................ 26

*Boelens v. Redman Homes, Inc.,*
    759 F.2d 504 (5th Cir. 1985) .............................................. 10

*Bonidy v. United States Postal Serv.,*
    790 F.3d 1121 (10th Cir. 2015) .......................................... 30

*Bosse v. Oklahoma,*
    580 U.S. 1 (2016) ................................................................ 43

*Bowman v. Korte,*
    962 F.3d 995 (7th Cir. 2020) .............................................. 32

*Bradley v. Vill. of Univ. Park,*
    59 F.4th 887 (7th Cir. 2023) ........................................ 32, 44

*Bucklew v. Precythe,*
    587 U.S. 119 (2019) ............................................................ 30

*Burson v. Freeman,*
    504 U.S. 191 (1992) ...................................................... 47, 49

*Cafeteria & Rest. Workers Union v. McElroy,*
    367 U.S. 886 (1961) ................................................................. 23

*Califano v. Torres,*
    435 U.S. 1 (1978) ...................................................................... 51

*California v. Texas,*
    593 U.S. 659 (2021) ............................................... 7, 8, 11, 19

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ...................................................................... 8

*Commonwealth v. Davis,*
    162 Mass. 510 (1895) ............................................................. 27

*Connick v. Myers,*
    461 U.S. 138 (1983) ................................................................. 26

*Cooper v. Lane,*
    969 F.2d 368 (7th Cir. 1992) ............................................... 32

*Copes v. Northeast Illinois Regional Commuter R.R. Corp.,*
    45 N.E.3d 1123 (Ill. App. 2015) ............................................ 4

*Davis v. Massachusetts.*
    167 U.S. 43 (1897) ............................................................. 27-29

*Diamond v. Charles,*
    476 U.S. 54 (1986) ...................................................................... 9

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ............................................................. 44-46

*eBay, Inc. v. MercExchange L.L.C.,*
    547 U.S. 388 (2006) ................................................................... 9

*Engquist v. Or. Dep't of Agric.,*
    553 U.S. 591 (2008) ............................................. 23, 26, 30, 39

*E.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961) ................................................................. 48

*E.T. v. Paxton,*
    41 F.4th 709 (5th Cir. 2022) ............................................... 20

*Fowler v. Rhode Island,*
    345 U.S. 67 (1953) ........................................................................ 24

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,*
    528 U.S. 167, 185 (1999) .................................................................. 8

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ...................................................................... 23

*Gasser v. Village of Pleasant Prairie,*
    No. 21-2270, 2022 U.S. App. LEXIS 8015 (7th Cir. Mar. 28, 2022) ................. 9

*Gilles v. Blanchard,*
    477 F.3d 466 (7th Cir. 2007) ............................................. 25, 36, 40-42

*Greer v. Spock,*
    424 U.S. 828 (1976) ...................................................................... 24

*Gte Sylvania v. Consumers Union,*
    445 U.S. 375 (1980) ...................................................................... 10

*Hague v. Committee For Indus. Org.,*
    307 U.S. 496 (1939) ............................................. 24, 27-28, 29, 36, 38

*Harp Adver. Illinois v. Vill. of Chicago Ridge,*
    9 F.3d 1290 (7th Cir. 1993) .......................................... 13, 15-17

*Hill v. State,*
    53 Ga. 472 (1874) ............................................................ 46, 48-49

*Hohn v. United States,*
    524 U.S. 236 (1998) ...................................................................... 28

*Illinois v. Lidster,*
    540 U.S. 419 (2004) .................................................................. 34, 35

*Int'l Outdoor, Inc. v. City of Southgate,*
    556 F. App'x 416 (6th Cir. 2014) ................................................ 15 fn. 2

*Int'l Society for Krishna Consciousness v. Lee,*
    505 U.S. 672 (1992) .................................................................. 24, 38

*Jamison v. Texas,*
    318 U.S. 413 (1943) ...................................................................... 28

*Jennings v. Stephens,*
   574 U.S. 271 (2015) ........................................................... 9

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.,*
   909 F.3d 446 (D.C. Cir. 2018) ........................................ 14

*Katz v. United States,*
   389 U.S. 347 (1967) .................................................... 37, 41

*KH Outdoor, L.L.C. v. Clay County,*
   482 F.3d 1299 (11th Cir. 2007) ...................................... 14

*KH Outdoor, L.L.C. v. Fulton County,*
   587 F. App'x 608 (11th Cir. 2014) ........................... 15 fn. 2

*Kipke v. Moore,*
   695 F. Supp. 3d 638 (D. Md. 2023) ............................... 49

*Koons v. Platkin,*
   673 F. Supp. 3d 515 (D.N.J. 2023) ............................... 42

*Koontz v. St. Johns River Water Mgmt. Dist.,*
   570 U.S. 595 (2013) ...................................................... 26

*Lehman v. Shaker Heights,*
   418 U.S. 298 (1974) ........................... 38, 39, 40, 42, 50

*Lewis v. Casey,*
   518 U.S. 343 (1996) ........................................................ 8

*Lugar v. Edmondson Oil Co.,*
   457 U.S. 922 (1982) ...................................................... 40

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992) ....................................... 7, 8, 19, 21

*Mahoney v. Sessions,*
   871 F.3d 873 (9th Cir. 2017) ........................................ 30

*Manhattan Cmty. Access Corp. v. Halleck,*
   587 U.S. 802 (2019) ...................................................... 21

*Martin v. Evans,*
241 F. Supp. 3d 276 (D. Mass. 2017) ............................................................ 16

*Maupin v. State,*
89 Tenn. 367 (1890) ........................................................................................ 47

*Maverick Media Group, Inc. v. Hillsborough County,*
528 F.3d 817 (11th Cir. 2008) ..................................................................15 fn. 2

*May v. Bonta,*
No. SACV 23-01696-CJC (ADSx), 2023 U.S. Dist. LEXIS 231208
(C.D. Cal. Dec. 20, 2023) ............................................................................... 42

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ........................................................................................ 29

*McMorris v. Alioto,*
567 F.2d 897 (9th Cir. 1978) .......................................................................... 37

*Medtronic, Inc. v. Mirowski Family Ventures, LLC,*
571 U. S. 191 (2014) ........................................................................................ 8

*Midwest Media Prop., LLC v. Symmes Twp.,*
503 F.3d 456 (6th Cir. 2007) .......................................................................... 13

*Miller v. Smith,*
No. 22-1482, 2023 U.S. App. LEXIS 1506 (7th Cir. Jan. 20, 2023) ...................
...................................................................................... 30, 32, 34, 40

*Moore v. Madigan,*
702 F.3d 933 (7th Cir. 2012) .......................................................................... 50

*NASA v. Nelson,*
562 U.S. 134 (2011) .................................................................................... 24, 30

*Nat'l Endowment for the Arts v. Finley,*
524 U.S. 569 (1998) ....................................................................................36 fn. 8

*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ....................................................................................29, passim

*New York v. Ferber,*
458 U.S. 747 (1982) ........................................................................................ 49

*Nordyke v. King*,
681 F.3d 1041 (9th Cir. 2012) ......................................................... 30

*O'Connor v. Ortega*,
480 U.S. 709 (1987) ......................................................................... 26

*Pace v. Regional Transportation Authority*,
803 N.E.2d 13 (Ill. App. 2003) .......................................................... 4

*Palmer v. Marion County*,
327 F.3d 588 (7th Cir. 2003) .............................................................. 9

*Pennhurst State School & Hospital v. Halderman*,
451 U.S. 1 (1981) ............................................................................. 25

*People v. Kraft*,
660 N.E.2d 114 (Ill. App. 1995) ....................................................... 18

*Pickering v. Bd. of Ed.*,
391 U.S. 563 (1968) ......................................................................... 26

*Planned Parenthood of Indiana, Inc. v. Comm'r*,
699 F.3d 962 (7th Cir. 2012) ........................................................... 25

*Reeves, Inc. v. Stake*,
447 U.S. 429 (1980) ......................................................................... 27

*Regan v. Taxation With Representation*,
461 U.S. 540 (1983) .................................................................. 25, 26

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982) ................................................................. 21 fn. 3

*Renne v. Geary*,
501 U.S. 312 (1991) ............................................ 7, 12-13, 15-16, 17

*Reynolds v. Sims*,
377 U.S. 533 (1964) ......................................................................... 48

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007) ......................................................................... 10

*Royal Canin U.S.A., Inc. v. Wullschleger*,

    No. 23-667, 2025 U.S. LEXIS 3652025 (U.S. Jan. 15, 2025) ........................... 10

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ................................................................. 26, 32

*Satanic Temple, Inc. v. Rokita*,
    No. 1:22-cv-01859-JMS-MG, 2023 U.S. Dist. LEXIS 191387
    (S.D. Ind. Oct. 25, 2023) ........................................................ 15 fn. 2

*Scott v. Dart*,
    108 F.4th 931 (7th Cir. 2024) ......................................................... 9

*Sheetz v. County of El Dorado*,
    601 U.S. 267 (2024) ..................................................................... 37

*Siegel v. Platkin*,
    653 F. Supp. 3d 136 (D.N.J. 2023) ................................................ 42

*Simic v. City of Chicago*,
    851 F.3d 734 (7th Cir. 2017) ......................................................... 17

*Solomon v. Cook County Bd. of Comm'rs*,
    559 F. Supp. 3d 675 (N.D. Ill. 2021) ............................................. 41

*St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*,
    919 F.3d 1003 (7th Cir. 2019) ................................................. 32, 40

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998) ................................................................... 9, 21

*Thornton v. M7 Aerospace LP*,
    796 F.3d 757 (7th Cir. 2015) ......................................................... 11

*United States v. American Railway Express Co.*,
    265 U. S. 425 (1924) ..................................................................... 10

*United States v. Ayala*,
    711 F. Supp. 3d 1333 (M.D. Fla. 2024) ...................................... 42, 43

*United States v. Hays*,
    515 U.S. 737 (1995) ..................................................................... 16

*United States v. Kokinda*,
    497 U.S. 720 (1990) ..................................................................... 23

*United States v. Rahimi,*
    602 U.S. 680 (2024) ........................................................29, 31 fn. 5, 37 fn. 8, 45

*United States v. Rahimi,*
    61 F.4th 443 (5th Cir. 2023) ........................................................... 29

*Valdez v. Grisham,*
    No. 22-2112, 2024 U.S. App. LEXIS 12374 (10th Cir. May 22, 2024) ........... 14

*Vt. Agency of Natural Res. v. United States,*
    529 U.S. 765 (2000) ........................................................... 9

*Weiland v. Loomis,*
    938 F.3d 917 (7th Cir. 2019) ........................................................... 46

*Wellness Community v. Wellness House,*
    70 F.3d 46 (7th Cir. 1995) ........................................................... 10

*White v. United States,*
    601 F.3d 545 (6th Cir. 2010) ........................................................... 14

*Wolford v. Lopez,*
    116 F.4th 959 (9th Cir. 2024) ...................................................25, 30, 42, fn. 9

*Wolford v. Lopez,*
    686 F. Supp. 3d 1034 (D. Haw. 2023) ........................................................... 42

## STATUTES

430 ILCS 66/1 ........................................................................... 4-5

70 ILCS 3605/1 ........................................................................... 3, 32, 39

70 ILCS 3615/1.01 ........................................................................... 3, 4, 32, 39

720 ILCS 5/21-3 ........................................................................... 18

720 ILCS 5/24-1 ........................................................................... 51

730 ILCS 5/5-4.5-55 ........................................................................... 5, 18

# OTHER AUTHORITIES

1 William Hawkins, A Treatise Of The Pleas Of The Crown (4th ed. 1762) .. 46, 47

Statute of Northampton, 2 Edw. 3, c. 3 (1328) ........................................................... 45

CTA Ord. No. 016-110 § 1(28) ...................................................................................... 12

Geoffrey R. Stone, et al., Constitutional Law (4th ed. 2001).................................. 36

Geoffrey Stone, *Fora Americana: Speech In Public Places*,
    1974 Sup. Ct. Rev. 233 ...................................................................................... 28

Harry Kalven, Jr., *The Concept of the Public Forum:* Cox v. Louisiana,
    1965 Sup. Ct. Rev. 1 ................................................................................... 28, 36

John Locke, *A Letter Concerning Toleration,*
    A Letter Concerning Toleration & Other Writings
    (Mark Goldie, ed., 2010)..................................................................................... 46

John Locke, Second Treatise Of Government (1690) ....................................... 45-46

Joseph Blocher, et al., *"A Map Is Not The Territory": The Theory & Future Of*
    *Sensitive Places Doctrine*, 98 N.Y.U.L. Rev. Online 438 (2023)..................... 30

Thomas Hobbes, Leviathan (1651) ............................................................................ 45

# JURISDICTIONAL STATEMENT

Plaintiffs-Appellees Benjamin Schoenthal, Mark Wroblewski, Joseph Vesel, and Douglas Winston (collectively, "Schoenthal") filed this action against Kwame Raoul, Rick Amato, Robert Berlin, Eric Rinhart, and Cook County State's Attorney Eileen O'Neill Burke under 42 U.S.C. § 1983, alleging violations of their Second Amendment rights, and requesting declaratory and injunctive relief. R. 1.[1] As explained in greater detail herein, *see, infra,* at 7-22, the district court lacked Article III jurisdiction to grant Schoenthal's request for declaratory relief. The district court had statutory jurisdiction pursuant to 28 U.S.C. § 1331.

On August 30, 2024, the district court dismissed the claims against Amato and Rhinehart without prejudice for lack of subject-matter jurisdiction, and granted summary judgment in part against Raoul, Berlin, and the State's Attorney, holding that Schoenthal abandoned his claim for injunctive relief, but that declaratory relief was appropriate. SA3-SA52. The court entered judgment the same day, R. 109 (original); SA1 (amended). On September 19, 2024, Raoul and Berlin filed a timely notice of appeal. R. 115. On September 20, 2024, the State's Attorney filed a timely notice of appeal. R. 117. This court consolidated these appeals for purposes of

---

[1] We cite the district court record as "R. ___", this court's record as "7R. ____," and our short appendix as "SA ___." While Schoenthal named former State's Attorney Kimberly Foxx as defendant in her official capacity, the current State's Attorney is Eileen O'Neill Burke, who was substituted pursuant to Fed. R. App. P. 43. 7R. 19. For simplicity, we use "State's Attorney" herein. *See* Fed. R. App. P. 43(c)(1).

briefing and disposition. R. 2. This court has jurisdiction over this consolidated appeal from a final judgment pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

───────

1.   Whether Schoenthal has Article III standing to seek a declaratory judgment regarding the constitutionality of the Public Transit Statute, where that injury is not redressable given that his desired conduct is independently prohibited by multiple transit carrier rules and ordinances unchallenged here.

2.   Whether the Public Transit Statute violates the Second Amendment as applied to two public transit systems created by the state and funded by public money, where it is undisputed that it satisfies the relaxed standard applicable to government decisions regarding proprietary matters such as public property and benefits.

## STATEMENT OF THE CASE

───────

### I.    Public Transit In Cook County, Illinois.

Modern public transit systems serve daily commuters and short distance travelers moving through an urban area quickly and frequently, and without carrying animals or freight. R.99-1 at 4. Public mass transportation did not exist at the time of this nation's founding. R.99-1 at 1. Instead, private transportation for profit was typical in founding-era America. R.99-1 at 2; R.66-7 at 24. Before the 1820s, no American city possessed a land-based mass transit system. R. 66-8 p. 6. Rather, early Americans' options for long distance travel included private

horseback, small private boat, stagecoach, walking, or privately owned wagons. R. 66-8 at 3, 6, 11.

In the 1840s, the United States entered its industrial railroad era, lasting until the 1920s. R. 88 ¶67. During this era, chartered railroad corporations collaborated with investors, states, and the federal government to construct a massive network of passenger and freight railroads. R. 88 ¶72. A few railroad companies established commuter rail service in and around America's largest cities during this era, including Chicago. R. 66-8 at 24. Such mass transit remained purely private at the start of the 20th Century. R. 66-8 at 39.

This all changed with the advent of the modern automobile. As the use of private automobiles proliferated, mass transit usage peaked in the 1920s before beginning to decline. R. 88 ¶84. Due to this decline, as well as the Great Depression, American governments de-privatized mass transit. R. 66-8 at 40. In Illinois, this was achieved via two statutes relevant here. The first was the Metropolitan Transit Authority Act of 1945, 70 ILCS 3605/1, et seq., which "created a political subdivision, body politic and municipal corporation under the name of Chicago Transit Authority," *id.* 3605/3, and vested in the Chicago Transit Authority the "power to acquire, construct, own, operate and maintain for public service a transportation system" in the Chicagoland area, *id.* 3605/6. The second was the Regional Transportation Authority Act of 1973, 70 ILCS 3615/1.01, et seq., which, in response to the "grave financial condition" of transportation options in northeastern Illinois, *id.* 3615/1.02, created the Regional Transportation Authority,

3

*id.* 3615/1.04 & 70 ILCS 3615/1.05, to serve as the "single authority" to provide public transportation throughout that region, *id.* 3615/1.02(d). That single authority comprises three separate "service boards" with the "responsibility for providing and operating their respective transportation systems." *Pace v. Regional Transportation Authority*, 803 N.E.2d 13, 17 (Ill. App. 2003). They are (1) the Board of the Commuter Rail Division of the Authority ("Metra"); (2) the Board of the Suburban Bus Division of the Authority ("Pace"); and (3) the Board of the Chicago Transit Authority. 70 ILCS 3615/1.03; *see Copes v. Northeast Illinois Regional Commuter R.R. Corp.*, 45 N.E.3d 1123, 1126 n.3 (Ill. App. 2015) ("Although not included anywhere in the language of the Act, the commuter rail division and the suburban bus division are commonly known as, respectively, "Metra" and "Pace."). These service boards are empowered to "provide public transportation" in three ways: (1) by purchasing such service from transportation agencies; (2) by grants to such agencies; or (3) by operating such services themselves. 70 ILCS 3615/2.01(a).

## II.    The Public Transit Statute & This Litigation.

In 2013, the Illinois legislature enacted the Firearm Concealed Carry Act, 430 ILCS 66/1, et seq., providing for the issuance of licenses to carry concealed weapons in Illinois, *id.* 66/10.  The Act also sets forth a number of places in which licensed firearms are prohibited, such as elementary schools, *id.* 66/65(a)(1), childcare facilities, *id.* 66/65(a)(2); judicial buildings, *id.* 66/65(a)(4); and prisons and jails, *id.* 66/65(a)(6). The Act also contains a provision providing that firearms may not be brought into "[a]ny bus, train, or form of transportation paid for in whole or

4

in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds." *Id.* 66/65(a)(8) (hereafter, the "Public Transit Statute"). Violations of the Public Transit Statute are misdemeanors, 430 ILCS 66/70(e), punishable by up to 364 days imprisonment and up to $2,500 in fines, 730 ILCS 5/5-4.5-55, as well as suspension or revocation of the violator's concealed carry license, 430 ILCS 66/70(e).

Nearly a decade later, in 2022, Schoenthal filed this suit, claiming that the Public Transit Statute violated his Second Amendment rights by prohibiting him from "carry[ing] loaded, operable handguns . . . while traveling on public transportation systems." R. 1 at 3 ¶6. According to Schoenthal, he would travel more frequently via public transit "if he were not forced to disarm" to do so. *Id.* at 10-11 ¶30. While Schoenthal admitted that the Second Amendment is not violated by prohibiting the carriage of weapons in a government building in which the government "provided security measures to ensure the physical protection" of those therein, he claimed that the only security measure sufficient to satisfy this standard in modern times would be "magnetometers." *Id.* at 17 ¶63.

Following discovery, the district court granted summary judgment for Schoenthal, granting him a declaratory judgment that the Public Transit Statute is unconstitutional as applied to his desired conduct. SA51-52. But because Schoenthal failed to explain why injunctive relief was appropriate, the court held that he had forfeited that issue. SA51. This appeal followed.

# SUMMARY OF ARGUMENT

The district court's judgment should be vacated, and this matter remanded with instructions to dismiss this case for lack of jurisdiction. It is undisputed that the public transit systems that Schoenthal hopes to use for travel all independently prohibit firearms on their property, so a declaration that the Public Transit Statute is unconstitutional will not redress his claimed constitutional injury in being unable to bring firearms on those systems. Because redressability is a mandatory component of Article III standing, the lack of redressability deprived the district court of subject-matter jurisdiction over Schoenthal's claims.

Even assuming the district court had jurisdiction, the Public Transit Statute is constitutional as applied here, for two reasons. First, Illinois has a proprietary interest in regulating access to the public transit systems it created by statute decades ago and funds with Illinois revenue, and that proprietary interest means the Public Transit Statute is subject only to a significantly reduced constitutional burden easily satisfied here. Second, public transportation created and funded by the government is a sensitive place for purposes of the Second Amendment, and the Supreme Court has made clear that regulation of firearms in sensitive places does not violate the Second Amendment.

# ARGUMENT

———————

## I. Schoenthal Lacks Article III Standing To Seek A Declaration Regarding The Constitutionality Of The Public Transit Statute.

While the district court erred when it issued Schoenthal a declaratory judgment regarding the constitutionality of the Public Transit Statute, this court lacks jurisdiction to reach that issue because Schoenthal lacked Article III standing to seek such a declaration in the first place, requiring dismissal. As the Supreme Court has explained, "just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement." *California v. Texas*, 593 U.S. 659, 672 (2021). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," and the "irreducible constitutional minimum of standing" comprises (1) an injury in fact, defined as an invasion of a legally protected interest which is both concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) causation, meaning the injury is fairly traceable to the defendant's challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) redressability, meaning it is likely, not merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61(1992).

Because a court must presume that it lacks jurisdiction absent affirmative record evidence to the contrary, *Renne v. Geary*, 501 U.S. 312, 316 (1991), the party invoking federal jurisdiction bears the burden of demonstrating standing "in the

same way as any other matter on which the plaintiff bears the burden of proof,"
*Lujan*, 504 U.S. at 561. When, as here, the plaintiff's claim reaches summary
judgment, the plaintiff cannot show standing by relying on the allegations in his
complaint, but must rather come forward with affidavits and evidence containing
"specific facts" that would show the existence of standing if taken as true. *Id.*
Moreover, because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S.
343, 358 n.6 (1996), the plaintiff "must demonstrate standing separately for each
form of relief sought," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S.
167, 185 (1999); *see, e.g., City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)
(plaintiff had standing to seek damages, but no standing to seek injunctive relief).
In the context of a declaratory action – which can never independently provide
federal jurisdiction – the court must apply these standards to the action as it would
stand "'in the absence of the declaratory judgment suit.'" *California*, 593 U.S. at 673
(quoting *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U. S. 191, 197
(2014)).

Under these standards, Schoenthal lacks standing because stripping away
his claim for declaratory relief leaves nothing on which federal jurisdiction may
rest. The only other relief Schoenthal identified below was (1) an award of "costs
and attorney fees and expenses," R. 1 at 21; and (2) an injunction against the Public
Transit Statute, *id.* at 20-21; *accord* R. 87 at 5, 7 (invoking only declaratory and
injunctive relief). The former does not suffice because the Supreme Court has made
clear that "an interest that is merely a 'byproduct' of the suit itself cannot give rise

to a cognizable injury in fact for Article III standing purposes." *Vt. Agency of Natural Res. v. United States*, 529 U.S. 765, 773 (2000); *accord Diamond v. Charles*, 476 U.S. 54, 70-71 (1986). Otherwise, "everyone would have standing to litigate about anything." *Scott v. Dart*, 108 F.4th 931, 932 (7th Cir. 2024) (Easterbrook, J., statement regarding rehearing). Under this rule, a desire for "reimbursement of the costs of litigation cannot alone support standing," *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 108 (1998), nor can an interest in attorney's fees, *Diamond*, 476 U.S. at 70-71.

That leaves only Schoenthal's request for injunctive relief, but the district court determined that Schoenthal abandoned that request by failing to explain why he was entitled to such relief in his summary judgment filings. SA51 (citing *eBay, Inc. v. MercExchange L.L.C.*, 547 U.S. 388, 391 (2006) (describing four-factor standard for injunctive relief)); *accord, e.g.*, *Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) (explaining that claim not delineated in "district court brief in opposition to summary judgment . . . is deemed abandoned"); *Gasser v. Village of Pleasant Prairie*, No. 21-2270, 2022 U.S. App. LEXIS 8015, at *5 (7th Cir. Mar. 28, 2022) (claim abandoned during summary judgment below "may not be raised for the first time on appeal"). Even assuming that Schoenthal disagrees with the district court's assessment of his claim for injunctive relief, he has not filed a cross-appeal challenging that ruling, and the Supreme Court has been clear that "an appellee who does not cross-appeal may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'" *Jennings v.*

*Stephens*, 574 U.S. 271, 276 (2015) (quoting *United States v. American Railway Express Co.*, 265 U. S. 425, 435 (1924)). Schoenthal is thus bound by the district court's abandonment ruling for purposes of this appeal.

Schoenthal's abandonment of his claim for injunctive relief is fatal to jurisdiction here. As the Supreme Court has explained, the abandonment of the basis for federal jurisdiction, whether that has been accomplished by amendment of a complaint or other action during litigation, such as a pretrial order, is fatal to federal jurisdiction unless the withdrawn matter is "replaced by others that establish jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007); *accord, e.g., Wellness Community v. Wellness House*, 70 F.3d 46, 50 (7th Cir. 1995) (reduction of damages in amended complaint defeated diversity jurisdiction shown by original complaint); *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985) ("abandonment of claims that would otherwise provide federal jurisdiction" defeats federal jurisdiction); *see also Royal Canin U.S.A., Inc. v. Wullschleger*, No. 23-667, 2025 U.S. LEXIS 3652025 at *17 (U.S. Jan. 15, 2025) (explaining, "changes in claims, effectively remake the suit. And that includes its jurisdictional basis . . . ."). This reflects that Article III's case-or-controversy requirement is designed to limit the business of the federal courts to questions presented via a "clash of adverse parties," *Gte Sylvania v. Consumers Union*, 445 U.S. 375, 382 (1980), and there is no such adversarial clash when, as here, a claim for injunctive relief is simply abandoned. Here, nothing was offered in place of Schoenthal's abandoned request for injunctive relief, leaving him with only his

request for a declaratory judgment as a possible basis for federal jurisdiction. But the Supreme Court has been quite clear that a request for "no more than a declaration that the statutory provision [the plaintiffs] attack is unconstitutional, *i.e.*, a declaratory judgment. . . . is the very kind of relief that cannot alone supply jurisdiction otherwise absent." *California*, 593 U.S. at 673.

Even had Schoenthal not abandoned his claim for injunctive relief at summary judgment, he failed to come forward with evidence that, if taken as true, would show that he has Article III standing to obtain an injunction against the enforcement of the Public Transit Statute. While the injury he identified below – "disarmament on public transportation in the face of a criminal penalty," R. 27 at 10 (cleaned up) – constitutes an injury-in-fact for purposes of Article III, he cannot show that the injunction he desires would redress that injury. That is because Schoenthal offered no evidence that an injunction against the Public Transit Statute would mean he no longer needs to be disarmed on public transportation. Indeed, he did not even name as defendants any of the transit systems on which he hopes to bring firearms, apparently assuming that they would all allow firearms on their property absent the Public Transit Statute. But "surviving summary judgment requires evidence, not assumptions," *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 768 (7th Cir. 2015), so this assumption is fatal to Schoenthal's Article III standing.

This assumption was also seriously misplaced, as a matter of fact. As the undisputed evidence in this record demonstrates, transit systems commonly prohibit weapons on their property, including on their buses and trains. The

Chicago Transit Authority, for example, specifically prohibits the carrying of weapons, including guns, on its property, including all of its trains and buses. CTA Ord. No. 016-110 § 1(28); R. 88 at 3 ¶9. Violation of that prohibition is punishable by a fine, *id.* § 2, and "suspension of riding privileges," *id.* § 3. Likewise, Pace has its own independent prohibition of firearms. R. 88 at 3 ¶10. Further, the BNSF Railway, the Canadian National Railway, and the Union Pacific Railroad, all on which Metra operates, each prohibit the carrying of firearms on their property. R. 88 at 4 ¶¶19-20. Despite having the burden to rebut the presumption against federal jurisdiction, Schoenthal offered *nothing* indicating that even a single public transit system in the entire Northern District of Illinois would allow him to enter its property, let alone board one of its trains or buses, without first "disarm[ing]" himself, regardless of whether Illinois law independently prohibits firearms on publicly funded transit systems. Rather, he declared that he will simply ignore those rules if he prevails in this litigation. R. 87 at 6.

The fact that Schoenthal has not shown that he would be able to engage in his desired conduct if he receives injunctive relief means that such relief would not redress his injuries, depriving him of Article III standing to seek such relief. The Supreme Court has long recognized that a plaintiff's failure to challenge the constitutionality of an independent prohibition on the same conduct regulated by the law the plaintiff does challenge gives "reason to doubt" that the plaintiff's injury "can be redressed by a declaration of [the latter law's] invalidity," particularly if those laws advance "differing" interests. *Renne*, 501 U.S. at 319.

Applying *Renne*, this court has squarely held that a plaintiff's failure to challenge an independent bar to desired conduct deprives it of Article III standing to challenge a separate law also prohibiting that conduct. In *Harp Advertising Illinois v. Vill. of Chicago Ridge*, the plaintiff brought a First Amendment challenge to certain provisions of the defendant's sign and zoning codes that prevented the plaintiff from erecting a billboard. 9 F.3d 1290, 1291 (7th Cir. 1993). But this court held that the plaintiff "lacks standing to challenge either the sign code or the zoning code, because it could not put up its sign even if it achieved total victory in this litigation." *Id.* (citing *Renne*, 501 U.S. at 317-21). As this court explained, the "proposed billboard would measure 20 by 60 feet. Yet [another village ordinance] provides that no sign may have a face exceeding 200 square feet." *Id.* Because the plaintiff did "not contest the validity of this ordinance; its proposed billboard . . . will never appear. This litigation is irrelevant." *Id.* "An injunction against the portions of the sign and zoning codes that [the plaintiff] has challenged would not let it erect the proposed sign; the village could block the sign simply by enforcing another, valid, ordinance already on the books." *Id.* at 1292. As a result, the plaintiff had failed to show Article III redressability – although the plaintiff "suffers an injury (it can't erect the proposed billboard)," the fact remained that "winning the case will not alter that situation." *Id.* The plaintiff "therefore lacks standing," requiring dismissal "for want of a case or controversy." *Id.* at 1293.

*Harp Advertising* does not stand alone. To the contrary, it is but one guidepost on "a path marked by several decisions from other circuits," *Midwest*

*Media Prop., LLC v. Symmes Twp.*, 503 F.3d 456, 462 (6th Cir. 2007), each of which has held that the federal courts lack jurisdiction to consider a challenge to a law prohibiting desired conduct that is also prohibited by another, unchallenged prohibition on that conduct, *id.* at 461-62. For example, in *Valdez v. Grisham*, the plaintiff lacked standing to challenge the defendant's vaccine policy because that defendant "was not the only source of a vaccination requirement," meaning that the plaintiff "would still face vaccine requirements that are outside the purview of this case" even were her desired relief granted. No. 22-2112, 2024 U.S. App. LEXIS 12374, at *10-*11 (10th Cir. May 22, 2024). And in *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, the plaintiff had a "serious standing problem" requiring dismissal because invalidation of a Department directive would still leave in place a regulation also prohibiting the plaintiff's desired conduct. 909 F.3d 446, 465 (D.C. Cir. 2018). Similarly, in *White v. United States*, the plaintiffs lacked standing to challenge a federal law regarding cockfighting because invalidating that law would not redress their injuries, given that "the states' prohibitions on cockfighting would remain in place." 601 F.3d 545, 552 (6th Cir. 2010). Again, in *KH Outdoor, L.L.C. v. Clay County*, the plaintiff failed to show redressability because the "injury [it] actually suffered from the billboard and offsite sign prohibition" that it challenged on constitutional grounds "is not redressible because the applications failed to meet the requirements of other statutes and regulations not challenged." 482 F.3d 1299, 1303 (11th Cir. 2007). Finally, in *Advantage Media, L.L.C. v. City of Eden Prairie*, redressability was lacking because "a favorable decision for [the

plaintiff] even with respect to those sign code provisions which were factors in the denial of its permit applications would not allow it to build its proposed signs, for these would still violate other unchallenged provisions of the sign code like the restrictions on size, height, location, and setback." 456 F.3d 793, 801 (8th Cir. 2006).[2]

The same result is appropriate here. Because even a successful challenge to the Public Transit Statute would leave in place the individual public transit systems' rules and regulations prohibiting firearms on their property, Schoenthal's desired declaratory relief would not redress his supposed injury in being "disarmed" on those buses and trains. In short, this litigation was practically "irrelevant" because even "total victory" on Schoenthal's claim for declaratory relief would leave his injury here – having to disarm himself before boarding public transit – wholly intact. *Harp Adver.*, 9 F.3d at 1291-92. That is particularly true because the Public

---

[2] To the extent that Schoenthal might try to distinguish the facts or claims at issue in these cases, they represent just a few applications of the fundamental Article III redressability principle. Indeed, cases applying that principle are numerous. *E.g.*, *KH Outdoor, L.L.C. v. Fulton County*, 587 F. App'x 608, 613 (11th Cir. 2014) (district court erred by failing to determine whether plaintiff's desired action would have been prohibited by other, unchallenged laws); *Int'l Outdoor, Inc. v. City of Southgate*, 556 F. App'x 416, 419 (6th Cir. 2014) ("plaintiffs lack a redressable injury and, therefore, Article III standing when they challenge only some of multiple provisions in a municipal ordinance or statute barring" their desired conduct); *Maverick Media Group, Inc. v. Hillsborough County*, 528 F.3d 817, 821 (11th Cir. 2008) (no redressability where unchallenged law "would have prohibited the [desired conduct] independently of" the law being challenged); *Satanic Temple, Inc. v. Rokita*, No. 1:22-cv-01859-JMS-MG, 2023 U.S. Dist. LEXIS 191387, at *29 (S.D. Ind. Oct. 25, 2023) (no standing to challenge state law where "other unchallenged . . . laws would each independently prohibit the Satanic Temple from lawfully operating its mail-order abortion service").

Transit Statute and the individual transit system rules advance differing interests. *Renne*, 501 U.S. at 319. The former advances Illinois's proprietary interest in the use of public transit system it funds, while the later advances the individual transit systems' proprietary interest in setting minimum safety standards for their property. This failure to show redressability deprives Schoenthal of Article III standing, requiring dismissal of his claims without prejudice for want of jurisdiction.

Notably, neither the district court nor Schoenthal even acknowledged *Renne*, *Harp Advertising*, or any of the other authority discussed above. Nor did either identify a single case, from any circuit, holding that an injury is redressable when a plaintiff's desired conduct would remain prohibited despite receipt of the full desired relief. Unsurprisingly, nothing they offered showed that Schoenthal's injuries are redressable here.

Despite the district court's obligation to carefully examine its own jurisdiction – particularly the existence of Article III standing that "is perhaps the most important of the jurisdictional doctrines," *United States v. Hays*, 515 U.S. 737, 742 (1995) (cleaned up) – the court ignored *Renne* and *Harp Advertising* and did not address the fundamental defect in Schoenthal's standing. Instead, the district court characterized the arguments regarding redressability as a complaint that the public transit systems "'could also enforce the statute being challenged'" here. SA13-SA14 (quoting *Martin v. Evans*, 241 F. Supp. 3d 276, 283 (D. Mass. 2017)). This misconstrues the State's Attorney's argument, which was that the transit systems

*independently* prohibit firearms on their property, regardless of the Public Transit Statute's validity or existence, not that they *also* enforce the Public Transit Statute.

The district court further erred by focusing on the "threat of enforcement" of the Public Transit Statute that the court could supposedly redress with a declaration. SA13. Yet the threat of enforcement of a challenged law was also present in *Renne*, *Harp Advertising*, and all the other cases discussed above, and that did not suffice to show redressability in any of those cases. As those cases teach, the injury being redressed is not the threat that a law will be enforced, but rather the inability to engage in certain desired *conduct*, supposedly protected by the constitution, because of that threat. *See, e.g.*, *Harp Adver.*, 9 F.3d at 1291. Indeed, this court has made clear that "[h]aving to defend oneself in a legal proceeding ordinarily does not give rise to a redressable injury." *Simic v. City of Chicago*, 851 F.3d 734, 739 (7th Cir. 2017). While the district court relied on *Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979), for a contrary rule, SA13, *Babbitt* says only that a "credible threat of prosecution" is necessary to make being unable "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" sufficiently non-speculative to satisfy Article III's injury-in-fact requirement. 442 U.S. at 298. Again, the core problem here is not that Schoenthal lacked a sufficiently definite injury, but that his injury is not redressable because of his strategic decision to simply ignore the independent firearm restrictions put in place by the transit systems he desires to utilize.

The district court's focus on the risk of prosecution, rather than the underlying desired conduct, is troubling because the court overlooked that Schoenthal's desired conduct still risks his prosecution. As noted above, it is undisputed that the public transit systems Schoenthal hopes to use all expressly prohibit individuals to ride their trains and buses while armed. As a result, even absent the Public Transit Statute, Schoenthal's desired conduct – entering transit system property with a loaded, accessible firearm – would expose him to prosecution for criminal trespass, which occurs under Illinois law if an individual "enters into the property of another knowing such entry is forbidden." *People v. Kraft*, 660 N.E.2d 114, 117 (Ill. App. 1995). Under Illinois law, criminal trespass is a Class B misdemeanor, 720 ILCS 5/21-3(h), punishable by up to 6 months imprisonment and a fine of up to $1,500, 730 ILCS 5/5-4.5-60. Repealing the Public Transit Statute would not save Schoenthal from criminal prosecution at all, but merely require that prosecution be pursuant to a different criminal law. Simply altering the basis for the feared prosecution of desired conduct does not redress the inability to engage in that conduct. Thus, even if the focus is on the potential for criminal prosecution, Schoenthal *still* would not have standing.

Schoenthal's arguments in favor of standing fare no better. According to Schoenthal, his injury is redressable because he plans to bring a gun on public transit if he prevails in this suit, "despite the transit operators' policies barring firearms," and threatens to "seek to enjoin" those policies if they are enforced against him when he tries to do so. R. 87 at 6. In other words, he intends to trespass

on the public transit systems' property against their express rules. This bizarre argument – in addition to calling into serious question whether Schoenthal can be a "law-abiding" person for purposes of the Second Amendment when he openly declares his intention to flaunt the law – only made Schoenthal's evidentiary burden heavier. By admitting that the transit systems still might enforce their individual rules against him despite the outcome of this litigation, thus requiring additional litigation against those transit systems, Schoenthal has effectively admitted that redressability here "depends on the unfettered choices made by independent actors not before the courts." *Lujan*, 504 U.S. at 562 (cleaned up). In such circumstances, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to . . . permit redressability." *Id.* But Schoenthal *has* no such evidence, as demonstrated by his own threats of future litigation if a transit carrier does not allow him to bring firearms on its property, which effectively shows that he can only speculate that success in this litigation will do anything to ultimately redress his injuries.

Schoenthal's threat to sue makes clear that he fundamentally misunderstands the redressability analysis. Proof of redressability required him to prove that the specific relief requested in *this* legal proceeding was likely to redress his injury in being unable to carry a firearm on the transit system. *See California*, 593 U.S. at 671 (explaining that redressability analysis requires court to "consider the relationship between the judicial relief requested and the injury suffered"). Thus, while Schoenthal apparently believes that the relief he desires here would

"clear the way" for him to seek *additional* relief via his threatened, as-yet-unfiled legal action against unnamed third parties, "that's not how redressability works." *E.T. v. Paxton*, 41 F.4th 709, 721 (5th Cir. 2022). Rather, as *E.T.* explains, it is simply "irrelevant" to Article III that plaintiffs' success in one suit "might clear the way for them to vindicate their rights against non-parties." *Id.* Reflecting this fact, the plaintiffs in several of the redressability case discussed above could have argued that success in their current suits would have cleared the way for future suits against third parties that also prohibited their conduct, yet that fact did not confer on them standing to litigate in federal court.

If anything, Schoenthal's reliance on the possibility of future suits against the transit systems only weakens his claim of redressability. By making his likelihood of redress contingent on the relief obtained in a separate, unfiled legal proceeding against third parties, Schoenthal has made the likelihood of redress more attenuated. His success would turn not solely on *this* proceeding, but also on his success in *other* proceedings against third parties. That opens the door to a host of questions about the as-yet-unfiled litigation against unknown defendants with unknown defenses. Those questions cast a particularly long shadow here, because at least one of the transit carriers at issue here – Union Pacific – is a private corporation, and private regulation of private property is not subject to the

Constitution's requirements at all. *See, e.g., Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 813 (2019).[3]

Schoenthal's remaining arguments below are easily disposed of. While Schoenthal made much of *Lujan*'s statement that a plaintiff targeted by government action, is "ordinarily" able to obtain redress by an order preventing that action, R. 87 at 5 (quoting *Lujan*, 504 U.S. at 561-62), that statement merely described an ordinary case lacking extraordinary circumstances that complicate the redressability analysis. Indeed, *Lujan* then went on explain that such an extraordinary circumstance arises when redress depends on decisions by third parties not before or bound by the court. *Id.* Those are the very same circumstance at issue here. Finally, Schoenthal's reliance on a misleading partial quotation from *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998), for support, R. 87 at 5-6, is perplexing, since the full passage from which it was shorn only reinforces his lack of standing here. As that passage explains:

> [A]lthough a suitor may derive great comfort and joy from the fact . . . that the nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury. Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.

---

[3] Trying to skirt this problem, Schoenthal argued below, offering no authority, that acceptance of public funds makes otherwise-private actors into state actors for purposes of the Constitution. R. 87 at 6-7. The Supreme Court has long rejected the notion that mere acceptance of public funds makes an otherwise-private entity a state actor. *E.g., Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982).

*Steel Co.*, 523 U.S. at 107 (citations omitted). That is also the essence of Schoenthal's redressability problem here – all his desired relief will afford him is the comfort that the Second Amendment is being faithfully enforced, but not any actual relief for his supposed injuries. That requires dismissal of his claim for lack of Article III jurisdiction.

## II. The Public Transit Statute Does Not Violate The Second Amendment.

If this court concludes that it has jurisdiction, it should reverse because Schoenthal's Second Amendment claim fails as a matter of law. The Public Transit Statute falls squarely within the government's broad constitutional authority to manage its own proprietary interests – authority that applies with equal force to claims under the Second Amendment. To be invalid under that authority, a regulation of the government's property must be either discriminatory or so wholly unreasonable as to offend due process. Schoenthal does not claim that the statute here is discriminatory, and any reasonable person could easily understand why governments would wish to restrict the carriage of firearms on public transit. We address these issues in turn.

### A. The Government Presumptively Possesses Broad Constitutional Authority To Regulate Its Proprietary Interests.

It should be beyond serious dispute by this point that the government presumptively possesses broad constitutional authority to regulate its internal affairs, including property it owns and benefits it provides or funds. The existence of this authority is well settled – the Supreme Court has "long held the view that there is a crucial difference, with respect to constitutional analysis, between the

government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.'" *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008) (quoting *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 896 (1961)); *accord United States v. Kokinda*, 497 U.S. 720, 725 (1990) (plurality) (describing this as "a long-settled principle"). Moreover, the Court's precedent makes clear that this government-proprietor principle applies in at least three contexts in which the government's proprietary interests are at their zenith.

*First*, in the context of "public employment," the Supreme Court has recognized that "government offices could not function if every employment decision became a constitutional matter," such that "constitutional review of government employment decisions must rest on different principles" than those governing "restraints imposed by the government as sovereign." *Engquist*, 553 U.S. at 599 (cleaned up). As a result, the Court has held that an entire category of constitutional claim – the so-called "class of one" equal protection claim – is unavailable in the public employment context because it "is simply a poor fit in the public employment context," *id.* at 605, and "contrary to the concept of at-will employment" that prevails even in the government sector, *id.* at 606. Similarly, the Court has recognized that a claim for First Amendment retaliation is not available when the speech at issue "owes its existence to a public employee's professional responsibilities." *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006). This is because the government's restriction of that speech "simply reflects the exercise of employer

control over what the employer itself has commissioned or created." *Id.* at 422. The Supreme Court has further recognized that a claim for violation of the constitutional right to information privacy is defeated by the government's proprietary employment interests, so long as it acts reasonably. *NASA v. Nelson*, 562 U.S. 134, 148 (2011) ("Time and again our cases have recognized that the Government has a much freer hand in dealing with citizen employees than it does when it brings its sovereign power to bear on citizens at large.").

*Second*, in the context of public property, the Supreme Court has made clear that government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated," *Adderley v. Florida*, 385 U.S. 39, 47 (1966), so its actions only need be "nondiscriminatory," *id.* at 48; *see Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953) (rejecting law under which "a religious service of Jehovah's Witnesses is treated differently than a religious service of other sects"), and reasonable, unless some historical exception like the public forum doctrine applies, *compare, e.g.*, *Hague v. Committee For Indus. Org.*, 307 U.S. 496, 515 (1939) (public parks and streets), *with Int'l Society for Krishna Consciousness v. Lee*, 505 U.S. 672, 679 (1992) (public airport); *Greer v. Spock*, 424 U.S. 828, 836 (1976) (military base); and *Adderley*, 385 U.S. at 41 (public jail). Applying these principles, this court has squarely recognized, "Public property is property, and the law of trespass protects public property, as it protects private property, from uninvited guests," and thus allows a public university to "bar access to [its] lawn to any outsider who wanted to use it for *any* purpose, just as it could

bar outsiders from its classrooms, libraries, dining halls, and dormitories." *Gilles v. Blanchard*, 477 F.3d 466, 470 (7th Cir. 2007) (emphasis added). This, *Gilles* explains, is because "[t]he difference between invited and uninvited visitors is fundamental to a system of property rights." *Id.*; *accord, e.g.*, *Wolford v. Lopez*, 116 F.4th 959, 970-71 (9th Cir. 2024) ("As the owner or operator of private property, a bank may prohibit firearms as a matter of the ordinary property-law right to exclude. And if a State operates a bank, the State, too, may exercise its proprietary right to exclude, just as a private property owner may.")

*Third*, in the context of government spending and benefits, the Court has "long recognized" that governments may set terms governing the receipt of public money or benefits, *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981), and has held "in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right," *Regan v. Taxation With Representation*, 461 U.S. 540, 549 (1983). As a result, restrictions on the receipt of government funds or benefits are subject only to the unconstitutional-conditions doctrine, under which the government denial of a benefit or participation in a government program does not violate the constitution so as long as the government does not act "for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise of a constitutional right," *Planned Parenthood of Indiana, Inc. v. Comm'r*, 699 F.3d 962, 986 (7th Cir. 2012). Put another way, when limitations on access to government benefits are at issue, the constitution is offended only if the government has effectively prohibited the

recipient of those benefits "from engaging in the protected conduct *outside* the scope of" the benefit program at issue. *Rust v. Sullivan*, 500 U.S. 173, 197 (1991); *accord Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013) ("the relevant distinction that has emerged from our cases is between conditions that define the limits of the government spending program" and "conditions that seek to leverage funding to regulate [constitutional activity] outside the contours of the program itself").

While the Supreme Court's limited forays into the Second Amendment have not addressed the applicability of the government-proprietor principle to the Second Amendment, there is no reason to believe that the Court intended – either implicitly or explicitly – to reject that time-honored principle in the Second Amendment context. To the contrary, the Court has made clear that the proprietary-interests principle is a foundational background principle that precedes *any* "constitutional analysis," *Engquist*, 553 U.S. at 598, rather than a principle applicable only to specific constitutional rights. Consequently, the Supreme Court has applied this principle to all manner of constitutional claims, whether they arise under the Fourth Amendment, *id.* at 599 (citing *O'Connor v. Ortega*, 480 U.S. 709, 721-722 (1987)); the Due Process Clause, *id.* (citing *Bishop v. Wood*, 426 U.S. 341, 350 (1976); the First Amendment, *id.* at 599-600 (citing *Connick v. Myers*, 461 U.S. 138, 150-151 (1983); *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968)); the Fifth Amendment's takings clause, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013); the Equal Protection Clause, *see Regan*, 461 U.S. at 549 (discussing

cases); or the dormant Commerce Clause, *Reeves, Inc. v. Stake*, 447 U.S. 429, 445-46 (1980). Most importantly, the Supreme Court long ago applied the proprietary-interest principle when upholding a regulation of the use of firearms on public property. In *Davis v. Massachusetts*, the Court rejected a constitutional challenge to a state law prohibiting, among other things, the discharge of firearms on public property, explaining that the due process clause of the Fourteenth Amendment "does not have the effect of creating a particular and personal right in the citizen to use public property in defiance of the constitution and laws of the State." 167 U.S. 43, 47-48 (1897); *accord Commonwealth v. Davis*, 162 Mass. 510 (1895) (Holmes, J.).[4]

Significantly, the Supreme Court has never overruled *Davis*. Despite later recognizing an exception to *Davis* under the First Amendment, for public property that also constitutes a historic public forum, the Supreme Court declined to overrule *Davis* because the statute at issue in that case could be distinguished on the ground that it "was not directed solely at the exercise of the right of speech and assembly." *Hague*, 307 U.S. at 515 (Roberts, J., plurality); *accord id.* at 532 (Hughes, C.J., concurring) (agreeing with plurality regarding merits); *see id.* at 533 (Butler, J., dissenting) (stating that *Davis* controlled case); (McReynolds, J., dissenting) (federal courts should not interfere with "the essential rights of the municipality to control

---

[4] Although the opinion in *Davis* does not identify the specific provision of the Fourteenth Amendment at issue, the procedural background explains that the defendant in *Davis* had requested a jury instruction that "set up alleged rights under the Constitution of the United States" – specifically that the law at issue violated "the first section of the Fourteenth Amendment." 167 U.S. at 46.

its own parks and streets"). In other words, the fact that the statute regulated the discharge of firearms on public property in addition to speech helped *save* the decision in *Davis*. That reflects that the *Hague* plurality was an "implicit *acceptance* of the underlying premise of [*Davis*] – that the public forum issue *must be defined in terms of the common law property rights of the state*." Geoffrey Stone, *Fora Americana: Speech In Public Places*, 1974 SUP. CT. REV. 233, 238 (emphases added). "Rather than challenging that premise head-on, [*Hague*] conveniently adapted it" by "predicating the public forum right upon established common law notions of adverse possession and public trust." *Id.*; *see also* Harry Kalven, Jr., *The Concept of the Public Forum:* Cox v. Louisiana, 1965 SUP. CT. REV. 1, 13 (famously describing public fora doctrine as "a kind of First-Amendment easement" over public property rights). Accordingly, when the Court ultimately adopted the *Hague* plurality as the law of the land, it *still* did not overrule *Davis*, but rather reinforced that *Hague* rejected only the notion that *Davis* gives the government "power absolutely to prohibit the use of the streets *for the communication of ideas*." *Jamison v. Texas*, 318 U.S. 413, 415 (1943) (emphasis added). Having never been overruled, only limited to activity that *expressly involved* firearms, *Davis* remains good law to this day. *Davis* is thus binding on this court, even if it believes – rightly or not – that the Supreme Court would today decide *Davis* differently. *E.g., Hohn v. United States*, 524 U.S. 236, 252-253 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.").

Even setting aside the decision in *Davis*, nothing in the Court's limited Second Amendment jurisprudence even hints that the government-proprietor principle applicable to every other constitutional right is somehow uniquely inapplicable to the Second Amendment. That would suggest that the Second Amendment is superior to every other Amendment, and subject to its own special rules. But the Supreme Court has repeatedly rejected the notion that the Second Amendment is "subject to an entirely different body of rules than the other Bill of Rights guarantees." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)).

This equality is reflected in the *Bruen* test itself. Some initially misunderstood *Bruen* as adopting a unique Second Amendment rule requiring that any law implicating the Second Amendment's text be justified by pointing to an identical, or near-identical, law in effect at the time of the founding. *See*, *e.g.*, *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023). However, the Supreme Court has since clarified that the inquiry is not about identifying historical *laws*, but underlying historical *legal principles* that can properly be understood to set the bounds of the historic right codified in the Second Amendment's text. *United States v. Rahimi,* 602 U.S. 680, 692 (2024). That is the exact inquiry already used in analyzing other constitutional rights. For example, the public forum doctrine in the First Amendment context is a legal principle derived from the fact that public fora "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between

citizens, and discussing public questions." *Hague*, 307 U.S. at 515. And in the context of the Eighth Amendment, historic legal principles help identify the bounds of the right against cruel and unusual punishment. *E.g.*, *Bucklew v. Precythe*, 587 U.S. 119, 130 (2019).

Reflecting the equal footing on which all Amendments stand, the courts of appeals have repeatedly recognized – before and after *Bruen* – that the government-proprietor principle is applicable to claims under the Second Amendment. *E.g.*, *Wolford*, 116 F.4th at 970-71; *Mahoney v. Sessions*, 871 F.3d 873, 880 (9th Cir. 2017); *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015); *Nordyke v. King*, 681 F.3d 1041, 1045 (9th Cir. 2012) (en banc); *see* Joseph Blocher, et al, *"A Map Is Not The Territory": The Theory & Future Of Sensitive Places Doctrine*, 98 N.Y.U.L. REV. ONLINE 438, 446-447 (2023) (noting that *Bonidy* was "protecting the government as proprietor"). Such consistency of reasoning before and after *Bruen* indicates that there is no reason to believe that *Bruen* exempted the Second Amendment from the government-proprietor principle applicable in every other context. Indeed, this court has already remanded one post-*Bruen* Second Amendment claim for further proceedings, with specific instructions that the district court consider the impact of the government's proprietary interests on the constitutional analysis – specifically, "the unconstitutional conditions doctrine, including but not limited to the employment context." *Miller v. Smith*, No. 22-1482, 2023 U.S. App. LEXIS 1506, *3 (7th Cir. Jan. 20, 2023) (citing *NASA*, 562 U.S. 134; *Engquist*, 553 U.S. 591).

Thus, it is beyond any reasonable dispute that Second Amendment claims are subject to the same government-proprietor principle as a host of other constitutional rights, depending on the nature of the regulation at issue. We turn now to the application of that principle to the Public Transit Statute.

**B.     The Public Transit Statute Is A Valid Regulation Of A Public Benefit.**

Having established that claims under the Second Amendment are, like every other constitutional right, subject to the government-proprietor principle, there is no room for doubt that the Public Transit Statute is constitutional. Most obviously, it is a regulation of the use of a public benefit – government-subsidized public transit systems – that does not offend the unconstitutional conditions doctrine. As noted above, the unconstitutional conditions doctrine is one variation on the government-proprietor principle applicable to government restrictions on the availability of public funds or other government benefits. Regarding that doctrine, it is important to note that the district court's declaratory judgment here reaches only the Chicago Transit Authority and Metra.  SA52.[5]  Both of those entities are creatures of Illinois law created for the purpose of providing public transit in Cook County and Chicago – the former was created by the Metropolitan Transit Authority Act of 1945, 70 ILCS 3605/1, et seq.; the latter is a "public corporation"

_____

[5]  We thus make no argument regarding the constitutionality of the Public Transit Statute as it might apply to other public transit systems in Illinois, except to note that its constitutionality as applied to the Chicago Transit Authority and Metra forecloses any future facial challenge.  *See Rahimi*, 602 U.S. at 693 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

that is a "separate operating unit" of the Regional Transportation Authority created by the Regional Transportation Authority Act of 1973, 70 ILCS 3615/2.20(a). This is significant because restrictions on the availability of the "state-subsidized benefit" of public transit are properly analyzed under the unconstitutional-conditions doctrine. *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1009 (7th Cir. 2019). And this court has previously recognized that the unconstitutional conditions doctrine applies to claims brought under the Second Amendment. *Miller*, 2023 U.S. App. LEXIS 1506, *3.

That leaves only the question whether the Public Transit Statute violates the unconstitutional conditions doctrine. That is, whether the government sought to regulate the conduct of the individuals outside the scope of the government-funded program, or merely regulated access to that program. *Rust*, 500 U.S. at 197; *accord Agency for Int'l Dev.*, 570 U.S. at 214-15. But this court need not consider that issue because Schoenthal forfeited it below, by offering no argument in the district court that the Public Transit Statute imposed an unconstitutional condition on access to the public transit system Illinois created. Instead, he argued only that the Second Amendment is wholly exempt from the legal principles that normally govern government regulations of its proprietary interests. R. 87 at 7-11. That is fatal, because an appellee waives arguments for affirmance that were not properly presented in the district court. *Bradley v. Vill. of Univ. Park*, 59 F.4th 887, 897 (7th Cir. 2023); *Bowman v. Korte*, 962 F.3d 995, 998 (7th Cir. 2020); *see also Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992) ("We have long refused to consider

32

arguments that were not presented to the district court in response to summary judgment motions.").

Even were this court to forgive that waiver, affirmance would still be necessary because the Public Transit Statute, as applied to the Chicago Transit System and Metra, regulates only the right to access a public benefit: namely, the two public transit systems that Illinois created by statute decades ago. Schoenthal remains just as free as he ever was to keep and bear any lawful arms he desires at his home and on his person, including while traveling about in his own personal vehicle or via private modes of transportation not funded by the government, and nothing in the Public Transit Statute penalizes him for doing so. Rather, all that statute does is prohibit him from availing himself of the government benefit of publicly funded transportation while armed. To paraphrase the Supreme Court, Schoenthal need comply with the Public Transit Statute only when he is taking advantage of public transit funded by Illinois taxpayers, but is free to disregard that statute altogether when he is traveling about on his "own dime." *Int'l Dev.*, 570 U.S. at 218. The Public Transit Statute is thus constitutional, at least as far as it concerns the Chicago Transit Authority and Metra, requiring judgment for the defendants on the merits.

## C.  *Bruen* Did Not Reject the Government-Proprietor Principle.

The district court's analysis rests on holding that *Bruen*'s rejection of interest-balancing analysis of the Second Amendment also "decisively" rejected the government-proprietor principle as well. SA18. This holding disregards this court's

decision in *Miller*, 2023 U.S. App. LEXIS 1506, *3, which made clear that the government-proprietor principle was not foreclosed by *Bruen*, but remained an open issue for consideration.[6] The district court also treated *Bruen* as having uniquely elevated the Second Amendment, when the Court has made clear that its goal was to make the Second Amendment *equal* to the other Amendments, *Bruen*, 597 U.S. at 70-71, not to lift one Amendment above all others. That is enough to conclusively refute the district court's Second-Amendment analysis.

Furthermore, the district court read the Supreme Court's Second Amendment precedent as dictating specific results, whereas the Court actually meant to leave initial analysis to the lower courts in the first instance. As the Supreme Court has explained, "general language" in its opinions must be read "as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." *Illinois v. Lidster*, 540 U.S. 419, 424 (2004). Yet, the district court consistently took the broadest possible reading of the Supreme Court's precedent. For example, the district court read *Bruen* to categorically reject the government-proprietor principle, SA18, despite the fact that *Bruen* did not involve any argument that a broad regulation of handgun licenses was an exercise of governmental proprietary authority. The Court had no occasion to consider the extent to which the right to

---

[6] To be clear, *Miller* did not dictate any particular *result* regarding the application of the government-proprietor principle to a particular regulation; it only made clear that this principle remains on the table post-*Bruen*.

bear arms overrides governmental proprietary interests, if at all, so its opinion cannot be read to say anything, decisive or otherwise, on that subject. *See Lidster*, 540 U.S. at 424. Elsewhere, the district court declared that *Bruen* "decisively . . . reject[ed] the relevance of place," when it stated that the Second Amendment's text does not draw "a home/public distinction with respect to the right to keep and bear arms." SA18 (quoting *Bruen*, 597 U.S. at 32). But *Bruen* said this only in the specific context of holding that the Second Amendment was not *limited* to the home, but applied in "public" as well. 597 U.S. at 32-33.

The district court never squarely addressed the State's Attorney's arguments regarding the unconstitutional-conditions doctrine. Rather, the court declared that any argument regarding that doctrine fails because the Second Amendment strips the government of broader constitutional authority even as to "property fully owned by the public." SA14 n.13.[7] According to the court, any contention that government regulation of its own property is subject to a lesser constitutional standard than more general regulation would supposedly undermine the First Amendment's public-forum doctrine. SA14-15; *accord* SA16-17 & n.17. But this forgets that the public-fora doctrine is a historical *exception*, specific to the First Amendment, to the general background rule that regulation of government property is subject to substantially lesser constitutional scrutiny. *E.g.*, Geoffrey R. Stone, et al.,

---

[7] The court also noted that precedent interpreting the Spending Clause was irrelevant here, SA14 n.13. However, the cited cases involving that Clause were offered only for their discussion of the unconstitutional-conditions doctrine, applicable to the federal and state governments alike. R. 68 at 10.

CONSTITUTIONAL LAW 1246 (4th ed. 2001) (noting separate "lines" of Supreme Court authority, "one governing streets and parks, the other governing all other publicly owned property"). The district court's reliance on *Hague* as an absolute rejection of the government-proprietor principle, SA17 n.17, is a fundamental misreading of the public-fora doctrine as an outright rejection of the government-proprietor principle. Again, *Hague*'s analysis ultimately rested on the historic "common law property rights of the state," *Fora Americana*, *supra*, at 238; *accord* Kalven, *supra*, at 13, and the district court erred in discarding those property rights as irrelevant.

In placing such myopic focus on the public-fora doctrine, the district court lost sight of the overarching background legal principle to which the First Amendment creates an *exception*. And, as explained at some length above, that background rule provides that governmental proprietary interests are normally governed only by the minimal requirements of due process rational-basis review, not by the heightened requirements of a particular constitutional amendment. *See*, *e.g.*, *Gilles*, 477 F.3d at 470 (explaining that government can restrict access to its property "for *any* purpose"); *accord* Kalven, supra, at 13 (explaining that *Hague* "does not tell us exactly when [citizens' constitutional] privileges may be curtailed" regarding "other uses of the street" than speech).[8]

---

[8] In this respect, the district court's error is akin to a conclusion that, because the First Amendment contains an overbreadth exception to the general background rule that statutes may not be struck down as facially constitutional unless they are unconstitutional in all possible circumstances, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 619 (1998), there must be no such background rule. Obviously, that is not the law. *E.g.*, *Rahimi*, 602 U.S. at 693.

Having failed to recognize that the First Amendment public-fora doctrine is but an exception to a background government-proprietor principle applicable to the Constitution as a whole, the district court then ascribed far too much weight to *Bruen*'s rejection of interest-balancing. SA20. *Bruen* made clear that interest-balancing is inappropriate when the Second Amendment applies with full force, because the Amendment itself reflects the Framer's dispositive weighing of those interests. 597 U.S. at 23. But the government-proprietor principle recognizes that the government generally has broader constitutional authority to regulate its own proprietary interests than it normally would when acting purely as a sovereign, except to the extent that the right enshrined by a particular Amendment creates an exception to that authority. For example, the unconstitutional conditions doctrine applies with less force in the context of permitting decisions, because the Fifth Amendment right against takings would still be offended if the government could force valuable property rights to be sacrificed merely to obtain a permit. *Sheetz v. County of El Dorado*, 601 U.S. 267, 275 (2024). And the Fourth Amendment right against unreasonable searches and seizures still applies with full force on government property, because the core privacy right enshrined in that Amendment "protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967); *see, e.g.*, *McMorris v. Alioto*, 567 F.2d 897, 899 (9th Cir. 1978) (Kennedy, J.) (explaining that Fourth Amendment still requires scrutiny of mandatory searches at public courthouses, though it also permits them). Again, the First Amendment still applies with full force to public property that also constitutes a public fora, because

37

the right to engage in speech in such places has been established since time immemorial. *Hague*, 307 U.S. at 515. But nothing about the Second Amendment right indicates that the Framers *ever* understood that right to apply with full force despite the existence of a government proprietary interest, whether in the context of public transit, or any other proprietary context.

The district court's fixation on the First Amendment's public-fora exception, rather than the background proprietary rule against which it operates, is flawed because that exception would not apply here even were this a First Amendment case. That exception is inapplicable absent either a longstanding historical tradition of opening public property for First Amendment activity or an intentional opening of the specific government property at issue for that purpose. *Lee*, 505 U.S. at 678-79; *accord Lehman v. Shaker Heights*, 418 U.S. 298, 302 (1974) (plurality) (explaining "that open spaces and public places differ very much in their character, and before you could say whether a certain thing could be done in a certain place you would have to know the history of the particular place"). Even generously assuming for sake of argument that a similar principle applies to Second Amendment activity, Schoenthal does not claim that there is a longstanding practice, known to the Framers, of allowing firearms on public transit, forfeiting any argument on that subject. Forfeiture aside, he could not plausibly make such a claim, for the simple reason that land-based mass transit systems did not exist before the 1820s, R. 68-6 at 6, and publicly funded mass transit did not even exist in Cook County until the 20th Century, 70 ILCS 3605/1, et seq.; 70 ILCS 3615/1.01, *et.*

*seq.* Indeed, the Supreme Court has made clear that public transit is not even a public forum for the narrow purposes of First Amendment activity, but is rather "commerce" that the government has broad authority to regulate in the manner it deems necessary to ensure "rapid, convenient, pleasant, and inexpensive service" to the public. *Lehman*, 418 U.S. at 303. As a result, the ordinary rule – that regulations of government property are subjected to ordinary rational-basis review – applies. That review is easily satisfied here, given the clear rationality of prohibiting firearms on crowded mass transit systems.

Nothing Schoenthal offered below on the subject of proprietary interests can overcome the district court's cascading legal errors. Schoenthal declared below that "there is no 'government proprietor' exception to the Second Amendment, or to any other constitutional right." R. 87 at 7. That contention is frivolous, as conclusively demonstrated by cases such as *Engquist*, which specifically held that an entire category of constitutional right – the class-of-one equal protection claim – is inapplicable in government employment because it is irreconcilable with the government's time-honored proprietary interest in managing its own operations. 553 U.S. at 605-06. Schoenthal then went on to misrepresent the State's Attorney to say that *every* constitutional right is conclusively overcome by the existence of a government proprietary interest, before laying into that straw man by arguing that government ownership of "sidewalks" and streets" cannot overcome the Second Amendment right. R. 87 at 7. But this case does not involve streets or sidewalks, but two public transit systems, which the Supreme Court has repeatedly made clear

are analytically distinct from streets and sidewalks for constitutional purposes. *Lee*, 505 U.S. at 679; *Lehman*, 418 U.S. at 302. And this court has already made clear that the unconstitutional-conditions doctrine applies to government regulation of public transit, *St. Joan Antida*, 919 F.3d at 1009, and to claims under the Second Amendment, *Miller*, 2023 U.S. App. LEXIS 1506 at *3.

Notably, Schoenthal ignored *St. Joan Antida*, *Gilles*, and *Miller*, so he never explained how they can be reconciled with his dismissive view of the government-proprietor principle. Nor did he have any real argument why Illinois' proprietary interests in controlling access to the public transit system it created by statute did not control in the Second Amendment context. Rather, he made the strange argument that even a "normal proprietor" does not have the authority to regulate "constitutional conduct," R. 87 at 8, but that is nonsense. It is a cornerstone principle of our Constitution that it does not apply to private actors, in order to protect "individual freedom by limiting the reach of federal law and federal judicial power." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982). Thus, if a private homeowner does not desire to allow someone on her property specifically because he is carrying a firearm, she has an *absolute* right to bar that person from her property, regardless of whether that conduct is constitutionally protected or not. That same right applies to government property as well, absent some historical indicia that the specific constitutional right at issue was intended to apply even on that property. *Gilles*, 477 F.3d at 470.

Next, Schoenthal noted that the Fourth Amendment would still apply to searches and seizures on public transit, R. 87 at 8, but that obviously says nothing about the Second Amendment since those Amendments protect wholly different interests that necessarily will interact differently with the government's background proprietary interests. If anything, that only reflects that the Fourth Amendment is designed to protect personal privacy interests that exist even while on government property. *Katz*, 389 U.S. at 351. Schoenthal also declared that government ownership of property was already "irrelevant" to the Second Amendment even before *Bruen*. R. 87 at 7-8. The nonprecedential authority he cited for that proposition did not address that issue at all, but rather applied the same interest-balancing Schoenthal and the district court so vociferously denounce. *Solomon v. Cook County Bd. of Comm'rs*, 559 F. Supp. 3d 675 (N.D. Ill. 2021) (declaring regulation of guns in parks "overbroad" under Second Amendment). Finally, Schoenthal declared that Illinois was neither a proprietor of the public transit systems to begin with, nor a "market participant" in public transit. R. 87 at 8. In making this declaration, Schoenthal overlooked that Illinois literally *created* the public transit systems he demands to use, thus giving it broad proprietary authority to control access to the public benefit it created. He also forgot that the Supreme Court has long recognized that regulations of access to public transit are part and parcel of the government's participation in the public transit market. *Lehman*, 418 U.S. at 303 (noting that government "engaged in commerce" via public transit system).

None of Schoenthal's authority is any help to him, either. While he offered a handful of district court opinions for the proposition that government proprietorship is irrelevant under the Second Amendment, none are precedential, and all are egregiously wrong. For example, one case declares that the government has broader regulatory authority only "when the government is acting *as an employer* to manage its internal affairs," *Koons v. Platkin*, 673 F. Supp. 3d 515, 602 (D.N.J. 2023), a position irreconcilable with this court's decision in *Gilles*, which focuses squarely on property rights and trespass, and had nothing to do with employment, 477 F.3d at 470. Equally irreconcilable with *Gilles* is the notion espoused by another district court case that there is "no support" for the proposition that the government has greater inherent authority to regulate its own property. *United States v. Ayala*, 711 F. Supp. 3d 1333, 1353 (M.D. Fla. 2024). Two other cases, *Wolford v. Lopez*, 686 F. Supp. 3d 1034 (D. Haw. 2023), and *May v. Bonta*, No. SACV 23-01696-CJC (ADSx), 2023 U.S. Dist. LEXIS 231208, (C.D. Cal. Dec. 20, 2023), have since been reversed in part by the Ninth Circuit, which emphasized – consistent with *Gilles* – that the government *can* prohibit firearms brought on its own property, just like any private property owner, *Wolford*, 116 F.4th at 970-71.[9] Another rests its rejection of the

---

[9] Although *Wolford* upheld a preliminary injunction against California's restriction on firearms on public transit, it did not address California's proprietary interest in public transit systems, despite recognizing that those systems "are State-owned," *Wolford*, 116 F.4th at 1001, and despite earlier recognizing that the government has a "proprietary right" to prohibit firearms on its own property, *id.* at 970-71. This apparent tension is explained by the fact that *Wolford* was a consolidated appeal regarding challenges to multiple States' laws.  The discussion of government property appears regarding a bank regulation enacted by Hawaii, which correctly observed that the government enjoys increased regulatory flexibility when it acts as

government-proprietor principle in the Second Amendment context on the fact that *Bruen* never "says that the analysis depends upon whether or not the State is the owner of the property." *Siegel v. Platkin*, 653 F. Supp. 3d 136, 155 (D.N.J. 2023). But that grossly misreads *Bruen* to impliedly overturn all preexisting doctrines not specifically endorsed, when the Court has made clear that its precedent should never be read so broadly. *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016).

Finally, and quite tellingly, some of Schoenthal's proffered authorities engage in their own stealth interest-balancing of policy interests, in almost the same breath they decry such balancing. For instance, one complains that the government should not, as a matter of policy, have freer hand to regulate its own property because the government owns so much property. *Ayala*, 711 F. Supp. 3d at 1354. That interest-balancing is misplaced – the government-proprietor principle is merely a background principle, a presumption in favor of government regulation when its proprietary interests are at issue. That this presumption cannot hold in respect to *all* government property or proprietary interests is beside the point – Schoenthal has never explained why that principle does not control in the specific context of a State's regulation of access to public transit systems created pursuant to that same State's law. It is far too late now to make up for that oversight on appeal. *See Bradley*, 59 F.4th at 897.

---

a proprietor rather than as sovereign. The regulation of public transit was enacted by California, which argued only that public transit is a sensitive place.

### III. Government-Funded Public Transit Systems Are Sensitive Places.

Even assuming, for sake of argument, that this case must be analyzed solely under *Heller* and *Bruen*, summary judgment is still appropriate because public transit is a "sensitive" place as those cases understood that term.[10]  As the Supreme Court has explained, "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), are "presumptively lawful" under the Second Amendment, *id.* at 627 n.26.  The court has not elaborated further on this statement, except to later say in *Bruen* that the court "assume[d] it settled that" legislative assemblies, polling places, and courthouses are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," 597 U.S. at 30 (citing Brief for Independent Institute as *Amicus Curiae* 11-17), and that modern sensitive places can be determined by analogy to those recognized at common law, *id.* at 30. And because public mass transit did not exist until the twentieth century, the issue of firearms on public mass transit requires what *Bruen* referred to as the "nuanced" approach, *id.* at 27. Under that approach, courts should evaluate not whether a modern regulation precisely matches a historic regulation, but "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

---

[10] The State's Attorney incorporates the brief of Raoul and Berlin regarding sensitive places, pursuant to Fed. R. App. P. 28(i); we offer this discussion only as a supplement to that argument.

Looking to history and precedent, a few of the principles regarding sensitive places can be discerned.[11] First, they tend to be government buildings, or places otherwise involved in performing government functions or the provision of government services. As to the latter, the Statute of Northampton specifically focused on the performance of government functions when it made it illegal "to come before the King's justices, or other of the King's ministers *doing their office*, with force and arms." 2 Edw. 3, c. 3 (1328) (emphasis added). Notably, despite limiting possession of firearms in other places, such as "fairs" or "markets," only in circumstances that would naturally cause terror to the people, *id.*, the Statute of Northampton categorically prohibited the possession of firearms where government officials were performing their offices. Put another way, while a courthouse is unquestionably a sensitive place, the same is true of a local law school when this court holds oral arguments there, allowing firearms to be prohibited there during that time even if such a restriction would not otherwise be appropriate.

As to the former, *Heller* identified "government buildings" as "sensitive places." 554 U.S. at 626. This reflects that the prevailing philosophy of the Founding era recognized that government has a general monopoly on the use of violence, *e.g.*, Thomas Hobbes, LEVIATHAN 92 (1651); John Locke, SECOND TREATISE OF GOVERNMENT §§ 87-88 (1690); John Locke, *A Letter Concerning Toleration,* A LETTER CONCERNING TOLERATION & OTHER WRITINGS 1, 19 (Mark Goldie, ed., 2010),

---

[11] We do not claim that this list is exhaustive, but merely reflects some noteworthy characteristics of the sensitive places that the Supreme Court itself has endorsed.

and this monopoly necessarily applies with particular force on the government's own property, in much the same way as a private property owner's right to self-defense applies with particular force in his own home via the castle doctrine. Along the same lines, it also reflects that a cornerstone of the ancient right of self-defense – inherent in its nature as an *exception* to the government monopoly on the use of force – was that the ability to exercise this right was dependent on "the Probability of getting Assistance" from the government. 1 William Hawkins, A TREATISE OF THE PLEAS OF THE CROWN 73 § 25 (4th ed. 1762). Inside a government building, the probability of getting government assistance is at its zenith – indeed, it rises to the level of an affirmative constitutional duty to protect if the government has denied occupants of that building the right to protect themselves, *Weiland v. Loomis*, 938 F.3d 917, 921 (7th Cir. 2019) – so the right to private self-defense is at its nadir, allowing correspondingly greater restriction of the right to bear arms of which the right to self-defense is "the *central component*." *Heller*, 554 U.S. at 599.

Second, sensitive places tend to be locations where the activity in question would be meaningfully interfered with by the presence of firearms, even those possessed for lawful, legitimate purposes. *E.g.*, *Hill v. State*, 53 Ga. 472, 478 (1874) (ability to vote or perform public duties would be "seriously interfered with" if individuals were to do so while armed). That is most obvious with arms at polling places, since a reasonable person seeking to vote would easily be deterred from casting a vote for his or her candidate of choice if armed supporters of a rival candidate are present at the polling place. That is not speculation – the Supreme

Court has noted that, historically, "[s]ham battles were frequently engaged in" at polling places "to keep away elderly and timid voters of the opposition." *Burson v. Freeman*, 504 U.S. 191, 202 (1992). That is not to mention the risk of actual armed conflict between supporters of rival candidates; as *Burson* explained, careful regulation of access to polling places was made necessary by the fact that polling places had become "scenes of battle, murder, and sudden death." *Id.* at 204 (cleaned up). A similar concern applies to courthouses, where firearms on the premises would pose an increased risk of intimidation and violence against witnesses, jurors, litigants, and judges, who all lack the protection of anonymity available to voters at the polling place.

Third, sensitive places tend to be confined places. As *Bruen* explained, larger, open places like cities, sidewalks, and parks cannot be considered sensitive places because it would effectively nullify the Second Amendment right to categorically exclude them from its coverage. 597 U.S. at 30-31. This, too, reflects that the right to self-defense central to the Second Amendment is dependent on the likelihood of protection, which is less likely to be available in open areas. *Hawkins*, *supra*, at 73 § 25 (noting that retreat is less necessary in open spaces).

Fourth, sensitive places tend to be locations where individuals are effectively a "captive" audience because of the nature of the activity conducted therein. *See Maupin v. State*, 89 Tenn. 367, 369 (1890) (affirming conviction under statute prohibiting arms at a mill because "[t]he mill was a public place, a place to which customers were constantly invited and daily expected to go"). Courthouses are the

most obvious example of this because a host of individuals who make use of courthouses are quite literally forced to be there – defendants haled into court to defend against civil or criminal charges, summoned jurors, subpoenaed witnesses, etc. – and thus are powerless to avoid individuals armed individuals in those locations. And while other parties might have a choice whether to initiate litigation in the first instance, they still have no choice but to do so in a courthouse, and thus would be practically unable to avoid armed individuals there. Indeed, historic regulations on firearms in courthouses were upheld on this precise ground that, absent those regulations, individuals making use of those places would be effectively "compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives." *Hill*, 53 Ga. at 478.

Fifth, sensitive places tend to involve the exercise of civic duties, if not express constitutional rights. Participation in court proceedings is an aspect of the First Amendment right to seek redress of grievances, *Bill Johnson's Restaurants v. NLRB*, 461 U.S. 731, 741 (1983), as is citizen participation in legislative sessions, *e.g.*, *E.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961). Voting is also a cornerstone constitutional right. *E.g.*, *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964). Restrictions on firearm possession where such rights are exercised reflects that forcing individuals to choose between avoiding armed individuals and exercising their constitutional rights is essentially equivalent to restricting the right itself. *Hill*, 53 Ga. at 478.

Sixth, sensitive places tend to serve vulnerable members of the population. *See Kipke v. Moore*, 695 F. Supp. 3d 638, 655 (D. Md. 2023) ("Like schools, mass transit facilities are crowded spaces that serve vulnerable populations, including children and disabled individuals."). This is most obvious in regard to schools or other places children frequent, since the Supreme Court has long upheld laws "protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *New York v. Ferber*, 458 U.S. 747, 757 (1982). The same is true of polling places, where the concern arises that violence there will "keep away elderly and timid" individuals. *Burson*, 504 U.S. at 202. Courthouses, too, often serve the needs of the most vulnerable among us – abused children and spouses, victims of violent crime, and the mentally ill – who could be deterred from utilizing the vital government services provided there if required to share the confines of the courthouse with armed individuals other than the law enforcement officers assigned to protect them.

Having identified some central characteristics of the sensitive places at which firearms were historically prohibited, it becomes immediately clear that the Public Transit Statute is analogous in both how and why it restricts the right to bear arms. Regarding the former, the Public Transit Statute restricts the right to bear arms in exactly the same way as the laws applicable to the places discussed above: it prohibits the carriage of firearms on specific government property, but allows undiminished exercise of that right elsewhere. *See Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) ("[W]hen a state bans guns merely in particular places, such as

schools, a person can preserve an undiminished right of self-defense by not entering those places."). And as to the latter, there is no room for doubt that public transit systems share all of the characteristics of sensitive places identified above. Public transit facilities are government buildings, as well as places in which government services are provided. Reflecting that fact, the government robustly exercises its monopoly power over the use of force in such places – CTA employs hundreds of security guards, as well as more than 33,000 security cameras, on its property, R. 64 at ¶44, and Metra employs over 140 sworn security officers on its property, *id* at ¶45.

The presence of firearms on public transit would also tend to interfere with the provision of those services. As the Supreme Court observed in *Lehman*, government-provided public transit is in the nature of a business and thus particularly susceptible to even minor interference such as political advertisements, 418 U.S. at 304. Public transit also necessarily operates in confined spaces such as buses or trains – the latter of which is especially confined when the train operates underground, like much of the CTA. *See* R. 66-6 at 3 (noting that train passengers "have little to no space in which to avoid gunfire"). Given the crowded nature and confined space within public transportation vehicles, there are few if any circumstances under which one could safely discharge a firearm without knowingly or unknowingly endangering the bodily safety of a third party. Thus, carrying a weapon on public transportation is patently incompatible with basic principles of moderate self-defense. Such conduct that endangers a third party also gives rise to

a separate criminal charge under Illinois law, 720 ILCS 5/24-11.5, particularly when a person "[d]ischarges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person," 720 ILCS 5/24-1.2. Moreover, the individuals who use public transit are often a captive audience, since many individuals have no practical choice but to use public transit to make their daily commute to and from work. Public transit also implicates a recognized constitutional right – the right to travel, *e.g.*, *Califano v. Torres*, 435 U.S. 1, 4 n.6 (1978) – that could be chilled by firearms on public transit. Finally, it is beyond dispute that public transit serves vulnerable populations including children – for whom public transit often serves as their sole means of transit to school, like a school bus – and the elderly, who would be more prone to avoid public transit if firearms are allowed there. The Public Transit Statute does not infringe on the right to carry arms for self-defense. Rather, it merely restricts the carry of firearms on government-funded property designed specifically to transport masses of people.

Because prohibiting firearms on public transit is analogous to the prohibitions on firearms in other recognized sensitive places, in both how and why it affects the right to armed self-defense, it passes muster under the Second Amendment, requiring the judgment below be set aside.

## CONCLUSION

The judgment of the district court should be vacated and remanded with instructions to dismiss for lack of jurisdiction. If not, the judgment should be reversed and remanded with instructions to enter judgment for the defendants.

Respectfully submitted,

EILEEN O'NEILL BURKE
State's Attorney of Cook County

BY:   /s Jonathon D. Byrer
Jonathon D. Byrer
Supervisor, Civil Appeals & Special Projects
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-4366
jonathon.byrer@cookcountysao.org

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

BENJAMIN SCHOENTHAL, et al.,

Plaintiffs-Appellees,

v.

KWAME RAOUL, et al.,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division
No. 3:22-cv-50326
The Honorable Iain D. Johnston, Judge Presiding
————

**SHORT APPENDIX**
————

EILEEN O'NEILL BURKE
State's Attorney of Cook County
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-4366
jonathon.byrer@cookcountysao.org

CATHY MCNEIL STEIN
Chief, Civil Actions Bureau
JESSICA M. SCHELLER
Division Chief, Civil Actions Bureau
JONATHON D. BYRER
Supervisor, Civil Appeals & Special Projects
PRATHIMA YEDDANAPUDI
Assistant State's Attorneys
*Of Counsel*

# TABLE OF CONTENTS OF SHORT APPENDIX

**Page**

Amended Judgment, *Schoenthal v. Raoul*, No. 3:22-cv-50326
(N.D. Ill. October 11, 2024) ............................................................................ SA1

Opinion and Order, *Schoenthal v. Raoul*, No. 3:22-cv-50326
(N.D. Ill. August 30, 2024) ............................................................................ SA3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

BENJAMIN SCHOENTHAL *et al.*,

*Plaintiffs*,

*v.*

KWAME RAOUL *et al.*,

*Defendants.*

No. 3:22-cv-50326

HON. IAIN D. JOHNSTON

### AMENDED JUDGMENT

Plaintiffs' request for injunctive relief is denied.

The Court enters judgment in favor of defendants Rick Amato and Eric Rinehart and the claims against them are dismissed without prejudice for lack of subject-matter jurisdiction. Rick Amato and Eric Rinehart are terminated from the case.

The Court enters judgment in favor of Benjamin Schoenthal, granting declaratory relief against Kwame Raoul, Kimberly Foxx, and Robert Berlin, in their official capacities, that the Firearm Concealed Carry Act's ban on carrying concealed firearms on public transportation, as defined in the statute, 430 ILCS 66/65(a)(8), violates the Second Amendment, as applied to Benjamin Schoenthal carrying a concealed firearm for self-defense on Metra, and on Metra's real property to the extent necessary to ride Metra.

The Court enters judgment in favor of plaintiffs Mark Wroblewski, Joseph Vesel, and Douglas Winston, granting declaratory relief against Kwame Raoul and Kimberly Foxx, in their official capacities, that the Firearm Concealed Carry Act's ban on carrying concealed firearms on public transportation, as defined in the statute, 430 ILCS 66/65(a)(8), violates the Second Amendment, as applied to (1) Mark Wroblewski carrying a concealed firearm for self-defense on Metra, and on Metra's real property to the extent necessary to ride Metra; (2) Joseph Vesel carrying a concealed firearm for self-defense on Metra and the CTA, and on Metra and the CTA's real property to the extent necessary to ride Metra and the CTA; and (3) Douglas

**SA1**

Winston carrying a concealed firearm for self-defense on Metra and the CTA, and on Metra and the CTA's real property to the extent necessary to ride Metra and the CTA.

Date: October 11, 2024

H ON. I AIN D. J OHNSTON
*United States District Judge*

**SA2**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

BENJAMIN SCHOENTHAL *et al.*,

                                        *Plaintiffs*,

                    *v.*

KWAME RAOUL *et al.*,

                                        *Defendants*.

No. 3:22-cv-50326

HON. IAIN D. JOHNSTON

## MEMORANDUM OPINION AND ORDER

The Illinois Firearm Concealed Carry Act bans carrying firearms on public trans-
portation, 430 ILCS 66/65(a)(8); to violate the ban is a misdemeanor, 430 ILCS
66/70(e). Plaintiffs Benjamin Schoenthal, Mark Wroblewski, Joseph Vesel, and Doug-
las Winston allege that the ban violates the Second Amendment[1] and bring this ac-
tion against several defendants with the power to enforce Illinois' criminal code: At-
torney General Kwame Raoul,[2] DeKalb County State's Attorney Rick Amato, DuPage
County State's Attorney Robert Berlin, Cook County State's Attorney Kimberly Foxx,
and Lake County State's Attorney Eric Rinehart. Plaintiffs ask for a declaratory judg-
ment that the ban is unconstitutional and seek to enjoin Defendants from enforcing
it against them. Before the Court are three motions for summary judgment—one from

---

[1] As it is incorporated by the Due Process Clause of the Fourteenth Amendment against
the states. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

[2] The Court is not so sure that the Illinois Attorney General has the authority to enforce
the criminal aspects of the ban, but he doesn't make that argument. So, the Court will assume
for purposes of these motions that the Illinois Attorney General can enforce the criminal
components of the ban.

SA3

Plaintiffs, one from Ms. Foxx,[3] and one from the remaining defendants ("State Defendants"). After an exhaustive review of the parties' filings and the historical record, as required by Supreme Court precedent, the Court finds that Defendants failed to meet their burden to show an American tradition of firearm regulation at the time of the Founding that would allow Illinois to prohibit Plaintiffs—who hold concealed-carry permits—from carrying concealed handguns for self-defense onto the CTA and Metra.[4] For the following reasons, Ms. Foxx's motion is denied, State Defendants' motion is denied, and Plaintiffs' motion is granted in part.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable factfinder could return a verdict for the nonmovant; it does not require that the dispute be resolved conclusively in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008).

---

[3] Ms. Foxx's briefs included a request for discovery sanctions, which the Court has already addressed. *Schoenthal v. Raoul*, No. 3:22-cv-50326, 2024 U.S. Dist. LEXIS 79497, at *5 (N.D. Ill. May 1, 2024).

[4] Keeping in mind Justice Gorsuch's explanation in his concurrence in *Rahimi*, this Court's ruling is specific to the facts presented. *See United States v. Rahimi*, 144 S. Ct. 1889, 1909-10 (2024) (Gorsuch, J., concurring). "Trump-appointed judge allows firearms on Illinois public transit" is a likely chyron for this decision. That's unfortunate. Federal judges—including those who will review this decision—engage in exacting, thoughtful, and careful analyses that are not results oriented or reducible to headlines and chyrons. We're doing the best we can.

Local Rule 56.1 statements of fact serve a valuable purpose in this process: they help the Court in "organizing the evidence and identifying disputed facts." *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). Each fact must be supported by evidentiary material. LR 56.1(d)(2); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities.").[5] Legal arguments aren't permitted in factual allegations or responses, and responses "may not set forth any new facts." LR 56.1(d)(4), (e)(2).[6] "District courts are 'entitled to expect strict compliance' with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 606-07 (N.D. Ill. 2011); *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 817 (7th Cir. 2004).

[5] In arguing that portions of Plaintiffs' LR 56.1 statement should be disregarded, Ms. Foxx contends that Plaintiffs' "self-serving" affidavits are improper. However, a "self-serving" affidavit should not be excluded just because it is self-serving. *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("As we have repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."). Nearly all litigants' statements are self-serving. And if a court could not consider self-serving affidavits during summary judgment, then no summary judgment motion could ever be granted, including Ms. Foxx's. The Court may ignore testimony from such affidavits if it contradicts previous sworn testimony from the declarant (also known as a "sham affidavit"), *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020), or if there are other evidentiary concerns, *see Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017), but the Court doesn't automatically strike any statement of fact that relies on a "self-serving" affidavit.

[6] Plaintiffs improperly open their response to Defendants' statement of facts with an argument for why they reserve analysis of the relevance and importance of asserted facts for their brief. Such an explanation is gratuitous—that is how the LR 56.1 statements are *supposed* to work. The lengthy responses where they reiterate the legal arguments in their brief, *e.g.*, Dkt. 88 at 10 ¶ 65, 16 ¶ 88, 19 ¶ 96, violate LR 56.1.

**SA5**

## BACKGROUND

In Illinois, openly carrying firearms is unlawful. 720 ILCS 5/24-1. Under the Firearm Concealed Carry Act, an individual with a concealed-carry license may generally carry a concealed handgun in public. 430 ILCS 66/10. This general permission, however, does not extend to a list of prohibited areas, including public transportation. Plaintiffs challenge this provision. The relevant part of the statute reads as follows:

> (a) A licensee under this Act shall not knowingly carry a firearm on or into:
>
> . . .
>
> (8) Any bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds.

430 ILCS 66/65(a).

Plaintiffs are licensed under Illinois law to carry a concealed handgun. Dkt. 71 ¶¶ 9, 17, 25, 33. They don't use public transportation as much as they would like because of the statute's threat of criminal prosecution for carrying a concealed firearm on public transportation. *Id.* ¶¶ 12-13, 20-21, 27, 38-39; Dkt. 66 ¶ 22. There are two specific transit systems that Plaintiffs declare they would use—the Chicago Transit Authority (CTA), which operates approximately 140 bus routes and 242 miles of rapid transit railroad track in the Chicago region, and the Metra commuter rail agency, which operates eleven lines serving the six-county Chicago region. Dkt. 64 ¶¶ 2-3; Dkt. 64-2 ¶ 7; Dkt. 64-3 ¶ 7; Dkt. 64-4 ¶ 11; Dkt. 64-5 ¶¶ 8-9.

Mr. Schoenthal, who resides in DeKalb County, Illinois, uses public transportation for both personal and work purposes—he currently uses Metra to travel to

Northwestern Medicine Delnor Hospital, DuPage County, and downtown Chicago. Dkt. 64 ¶ 6; Dkt. 66-27 at 20:10-20; Dkt. 71 ¶¶ 7, 11; Dkt. 88 at 5 ¶ 24. Mr. Wroblewski resides in DuPage County, specifically Woodridge, Illinois. Dkt. 64 ¶ 7; Dkt. 66 ¶ 33; Dkt. 71 ¶ 15. He uses Metra to visit Chicago. Dkt. 66 ¶ 37; Dkt. 71 ¶ 19. Mr. Vesel lives in La Grange, Illinois, located in Cook County. Dkt. 64 ¶ 8; Dkt. 66 ¶¶ 43-44; Dkt. 71 ¶ 23. He hasn't taken public transportation for at least two years despite living less than half a mile from a Metra stop, but he wishes to take the CTA and Metra more frequently. Dkt. 64-4 ¶¶ 8, 11; Dkt. 66 ¶¶ 45, 48, 50; Dkt. 71 ¶¶ 27-28. Mr. Winston lives in Waukegan, in Lake County, Illinois. Dkt. 64 ¶ 9; Dkt. 66 ¶¶ 51-52; Dkt. 71 ¶ 31. Mr. Winston asserts that he has taken Metra (from the Ogilvie station) to travel to St. Louis.[7] Other than this asserted trip, he rarely takes public transit but wishes to do so more often by taking the CTA and Metra to visit Evanston and Chicago. Dkt. 64-5 ¶¶ 8-9; Dkt. 66 ¶¶ 55-56; Dkt. 71 ¶ 38. All four plaintiffs would carry a handgun on public transportation if not for the Firearm Concealed Carry Act's ban. Dkt. 71 ¶¶ 12-13, 20-21, 27, 38-39.

## DISCUSSION

In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Supreme Court laid out the framework to be applied in analyzing regulations that restrict the bearing of arms. *Atkinson v. Garland*, 70 F.4th 1018, 1019-20 (7th Cir. 2023). Rejecting the two-step means-end approach that courts had employed after *District of Columbia v.*

---

[7] The Court notes that this assertion doesn't make much sense as Amtrak, which travels to St. Louis, leaves Union Station, not Ogilvie, and Metra sure doesn't travel to St. Louis.

*Heller*, 554 U.S. 570 (2008), the Court introduced a new and fundamentally different two-step test, holding that

> when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)); *see also Rahimi*, 144 S. Ct. at 1898 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.").[8] Although the test is grounded in history, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897-98. When analyzing "modern regulations that were unimaginable at the founding," the government has the burden to "identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30; *see also Rahimi*, 144 S. Ct. at 1897-98.

---

[8] The motions before the Court were briefed before *Rahimi* was decided. However, *Rahimi* had little, if any, impact on the issues in this case. Reiterating that analogical reasoning is appropriate under *Bruen*, *Rahimi*'s "clarification" of how *Bruen* operates was akin to an *Allen* charge. *See Rahimi*, 144 S. Ct. at 1897-98 ("[S]ome courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber."). It did not suggest the availability of any new arguments that could not have been made on the basis of *Bruen* alone.

**SA8**

At the outset, the Court notes that cross motions for summary judgment provided a confusing procedural posture (to put it lightly). The summary judgment standard is a different beast from assessing the substantive merits. *Cf. DR Distribs., LLC v. 21 Century Smoking, Inc.*, No. 3:12-cv-50324, 2024 U.S. Dist. LEXIS 99866, at *39-43 (describing six reasons why "equating the probable merits inquiry with the summary judgment inquiry" is "an uncomfortable fit"). With just one summary judgment motion, the Court construes the evidence in favor of the nonmovant. *Liberty Lobby*, 477 U.S. at 255. With cross motions, the Court must also switch back and forth between hats as it sifts through the facts presented before it. In this case, that is then exacerbated by the burden shifting imposed by *Bruen*.[9]

The main feature of this action is the as-applied claim under *Bruen*. But, like a movie theater with the inevitable slew of trailers preceding the feature film, the Court must first address several other issues raised by the parties.

## I.   Preliminary Matters

Before addressing the merits, the Court addresses two threshold issues—venue and standing. *See Spuhler v. State Collection Serv.*, 983 F.3d 282, 284 (7th Cir. 2020); *In re LimitNone, LLC*, 551 F.3d 572, 577-78 (7th Cir. 2008).

---

[9] In retrospect, entering a prompt trial date and holding a bench trial on the merits would have been a more satisfactory procedure. Alternatively, the Court could have cajoled the parties to have a "trial on the papers." *Cf. Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003); *see generally* Morton Denlow, *Trial on the Papers: An Alternative to Cross-Motions for Summary Judgment*, Fed. Law., Aug. 1999, at 30. That would have also been a better approach compared to summary judgment, though it would lack the benefit of a public trial on an important issue.

### A. Venue

In her summary judgment filings, Ms. Foxx challenges venue for the first time. But she failed to contest venue earlier, so the challenge is waived. Fed. R. Civ. P. 12(h).

### B. Standing

Next, the parties dispute whether Plaintiffs have standing. "To establish 'the irreducible constitutional minimum of standing,' the plaintiff must have suffered an injury in fact traceable to the defendant and capable of being redressed through a favorable judicial ruling." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). A plaintiff may bring a pre-enforcement challenge instead of breaking a law to challenge its legitimacy "so long as the threatened enforcement is 'sufficiently imminent.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). This requires the plaintiff to establish "both 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute,' and 'a credible threat of prosecution thereunder.'" *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

The undisputed facts show that each plaintiff would carry a concealed handgun on public transportation for the purpose of self-defense if not for the Firearm Concealed Carry Act's ban and its threat of arrest and prosecution. Dkt. 71 ¶¶ 12-13, 20-21, 27, 38-39. That proposed course of conduct is "arguably affected with a constitutional interest," *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbit*, 442 U.S. at 298)—indeed, as discussed later, it falls within the ambit of the Second Amendment's

**SA10**

right to armed self-defense. The conduct is also proscribed by the ban, as Plaintiffs assert they are concealed-carry licensees who will ride Metra and CTA, which receive public funding. *See* 70 ILCS 3615/1.03, 2.01(a). And finally, "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159; *Ezell v. City of Chicago*, 651 F.3d 684, 695-96 (7th Cir. 2011) ("The very 'existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as "injury" for the purpose of standing.'" (quoting *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010))). Defendants neither argue that the ban wouldn't reach Plaintiffs' proposed course of conduct nor disavow an intention to prosecute Plaintiffs under the ban. That satisfies the injury requirement for this pre-enforcement challenge.

However, each plaintiff's injury is limited to the specific proposed course of conduct in the record. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016); *Davis v. FEC*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (cleaned up)). The record shows that all four plaintiffs wish to carry concealed firearms aboard Metra trains, and that only Mr. Vesel and Mr. Winston wish to do so on CTA buses. Dkt. 64-2 ¶ 7; Dkt. 64-3 ¶ 7; Dkt. 64-4 ¶ 11; Dkt. 64-5 ¶ 8. Plaintiffs' injuries are also limited by where they intend to take public transit. Mr. Schoenthal takes Metra from the Elburn station (in Kane County) to Delnor Hospital (also in Kane County), "central DuPage," and Chicago (in Cook County), and he swears he would take public transit more often, absent the Firearm Concealed Carry

**SA11**

Act's prohibition. Dkt. 66 ¶ 24; Dkt. 88 at 5 ¶ 24.[10] The evidence for Mr. Wroblewski involves proposed trips to only Chicago. Dkt. 64-3 ¶ 7; Dkt. 66 ¶ 37. Mr. Vesel swears he would take trips to Chicago and Rosemont (also in Cook County). Dkt. 64-4 ¶¶ 9, 11. And Mr. Winston's testimony similarly includes locations in only Cook County— Chicago, Evanston, and the Ogilvie Metra station. Dkt. 64-5 ¶¶ 8-9.[11]

State Defendants challenge Plaintiffs' standing on the basis that Plaintiffs have failed to show an injury with respect to buildings, real property, and parking areas. But Plaintiffs all say they would take Metra more often if they could carry their hand-guns onto the train, and boarding a Metra train requires stepping foot on Metra's real property. *Cf. Nw. Mem'l Found. v. Johnson*, 490 N.E.2d 161, 164 (Ill. App. Ct. 1986) ("[T]his court takes judicial notice of the fact that the hospital complex is located in a densely populated urban area which necessitates the need for adequate employee parking."). So, they have standing with respect to Metra's real property, at least as far as needed to board a Metra train.

As for causation, Defendants, as the attorney general of Illinois and the state's attorneys of the Illinois counties relevant to Plaintiffs, enforce the statute. Dkt. 71

---

[10] Mr. Schoenthal's supplemental declaration indicates that he would like to use the DeKalb bus system to reach the Elburn Metra station. Dkt. 87-1 ¶ 2. There are two issues. First, this fact is presented without a citation to the statements of fact. *See* LR 56.1(g) ("When addressing facts, the memorandum must cite directly to specific paragraphs in the LR 56.1 statements or responses."). Second, this is an example of actual self-serving testimony that need not be accepted as true. *See James*, 959 F.3d at 316 ("[T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony."). As Ms. Foxx points out, during deposition, Mr. Schoenthal made no mention of the DeKalb bus system when naming all the forms of public transportation that he wanted to use. *See* Dkt. 66-27 at 20:10-28:17.

[11] Mr. Winston's use of public transit in St. Louis, Missouri, is irrelevant to this case.

SA12

¶¶ 1-6. But whether Plaintiffs' injuries can be traced to a particular defendant depends on where Plaintiffs use public transportation, based on the facts in the record. So for Mr. Schoenthal, his injuries can only be traced to Ms. Foxx (Cook County), Mr. Berlin (DuPage County), and Mr. Raoul.[12] And for Mr. Wroblewski, Mr. Vesel, and Mr. Winston—who specify only that they would take trips to locations in Cook County (Chicago, Evanston, Rosemont), but say nothing about their proposed points of departure—their injuries can be traced to only Ms. Foxx and Mr. Raoul. No plaintiff has standing against Mr. Amato (DeKalb County) or Mr. Rinehart (Lake County) absent evidence that a plaintiff would go to a Metra station located in Lake County. (There are no Metra stations in DeKalb County.)

Plaintiffs seek an injunction of the ban or a declaration that the ban is unconstitutional—either of which would redress Plaintiffs' injuries. But Ms. Foxx argues that this isn't enough because the public transit that Plaintiffs use have separate policies banning firearms. Plaintiffs' injuries to be redressed, however, aren't just that they can't carry their handguns on public transportation; after all, for a pre-enforcement challenge, there has to be a "credible threat of prosecution." *Babbitt*, 422 U.S. at 298. Plaintiffs' injuries trace back to the threat of enforcement from some of the defendants, so either an injunction or a declaration would redress that injury, regardless of potential injuries inflicted by nonparties. So, Plaintiffs have satisfied the redressability requirement of standing. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *see also Martin v. Evans*, 241 F. Supp. 3d 276, 283 (D. Mass. 2017) (finding that the

---

[12] Although Mr. Schoenthal rides Metra in Kane County (Elburn station, Delnor Hospital), Plaintiffs did not name the Kane County state's attorney as a defendant.

plaintiffs met the redressability requirement even though nonparty law enforcement officials, such as transit police, could also enforce the statute being challenged).

## II. *Bruen*-Avoidance Arguments

Not immediately conceding *Bruen*'s relevance, Ms. Foxx tries to borrow principles from other areas of law to defend the Firearm Concealed Carry Act's ban. Both her arguments fail.

### A. Government as a proprietor

Ms. Foxx first asserts that a "background principle[]" of constitutional law exempts the Firearm Concealed Carry Act's ban from the "strictures of the Second Amendment" and obviates the need to undertake the historical analysis called for by *Bruen*. Dkt. 68 at 3. Her argument—which is breathtaking, jawdropping, and eyepopping—is this: the ban applies only to property "funded in whole or in part" by Illinois, so Illinois has a proprietary interest in what it regulates. Because governments, like private property owners, enjoy "an absolute right to exclude others" from their property, Illinois may exclude whomever it wishes. *Id.* at 3-4. On her view, when the government regulates its own property, that regulation is exempt from the coverage of the Second Amendment, or any other constitutional guarantee of individual rights.[13]

―――――――――――

[13] She says that this logic extends to Illinois' "proprietor[ship] of government funds." Dkt. 68 at 5. If her contention is that by partially funding some property the government thereby acquires a plenary authority over it, that argument obviously fails. As discussed below, not even property fully owned by the public affords to government the sweeping powers over it claimed by Ms. Foxx; a fortiori the argument fails with respect to property partially owned or funded by the public.

To the extent she maintains that the government's disbursement of funds allows it to lay down rules governing the conduct of third parties who use what it funds in something other than its sovereign capacity, that argument likewise fails. In support of this argument, she draws on cases about Congress' ability to "fix the terms" on which public money is disbursed

(More on this later, but under Ms. Foxx's argument, demonstrators could be barred from the Daley Center Plaza, despite it being a quintessential public forum. *Pindak v. Dart*, 125 F. Supp. 2d 720, 746 (N.D. Ill. 2015); *Grutzmacher v. Pub. Bldg. Comm'n of Chi.*, 700 F. Supp. 1497, 1502 (N.D. Ill. 1988).)

Although the right to exclude—including the right to exclude those bearing arms—may be a fundamental aspect of private property ownership, likely undiminished by the Second Amendment*, see Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 (11th Cir. 2012), it doesn't necessarily follow that when a *government* like Illinois (through its transit agencies) act as a proprietor, the ban on arms bearing doesn't implicate Plaintiffs' rights under the Second Amendment. The constitutional protection afforded to other

under the Spending Clause. *E.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). But "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Id.* "Unlike ordinary legislation, which imposes congressional policy on regulated parties involuntarily, Spending Clause legislation operates based on consent . . . . For that reason, the legitimacy of Congress' power to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on whether the recipient voluntarily and knowingly accepts the terms of that contract." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (cleaned up). Thus, if Spending Clause jurisprudence is at all instructive here, it forecloses Ms. Foxx's argument: a contract between Illinois and those who receive its funds cannot govern the conduct of nonconsenting nonparties like Plaintiffs.

individual rights isn't nullified on public property; Ms. Foxx's proffered authority says nothing to the contrary.[14] She first cites several[15] First Amendment cases:

- *Gilles v. Blanchard*, 477 F.3d 466 (7th Cir. 2007)—which held that a public university's prohibition against uninvited visitors using its library lawn to speak was consistent with the First Amendment—for its assertion that "[p]ublic property is property, and the law of trespass protects public property, as it protects private property, from uninvited guests." *Id.* at 470.

- *Adderley v. Florida*, 385 U.S. 39 (1966)[16]—which held that the trespass convictions of protestors who blocked the entrance of a county jail did not violate the First Amendment in the absence of any evidence that the sheriff had a discriminatory, viewpoint-based purpose in invoking and enforcing the law—for its assertion that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* at 47.

- *International Society for Krishna Consciousness v. Lee*, 505 U.S. 672 (1992)—which held that a ban on solicitation in a government-owned airport terminal (a nonpublic forum) did not violate the First Amendment—for the proposition that actions taken by the government as a proprietor are reviewed only for reasonableness. *Id.* at 679.

Ms. Foxx's position—that government's powers over public property are equivalent to those of private owners of property—is untenable, and was rejected by the

---

[14] Her argument is an impressive bricolage, cobbling together broad statements of principle drawn from disparate areas of law. Of course, however, what is said in judicial opinions "must 'be taken in connection with the case in which those expressions are used,' *Cohens v. Virginia*, [19 U.S. (6 Wheat.)] 264, 399 (1821), and may not be 'stretch[ed] . . . beyond their context,' *Brown v. Davenport*, 596 U.S. 118, 141 (2022)." *Rahimi*, 144 S. Ct. at 1910 (Gorsuch, J., concurring) (second alteration in original).

[15] Ms. Foxx also cites *Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972), for its assertion that property does not "lose its private character merely because the public is generally invited to use it for designated purposes." Dkt. 68 at 4. But that case dealt with an alleged First Amendment right to distribute handbills in a private shopping mall against the wishes of the mall's owner. It is clear from its context that the quoted language refers only to private property, so it isn't relevant to her argument.

[16] The brief mistakenly asserts that the quote comes from *Greer v. Spock*, 424 U.S. 828, 836 (1976), rather than *Adderley*. In fairness, *Greer* also cites the same sentence from *Adderley* at the pincite given.

Supreme Court long ago.[17] The cited cases don't treat government ownership of property as a trump to the protection ordinarily due to an individual right. Although the government sometimes has greater power to regulate public property compared to elsewhere, otherwise protected conduct doesn't become categorically unprotected. If, as Ms. Foxx suggests, all speech on government property were exempt from First Amendment protection, the elaborate First Amendment doctrines of public forums and governmental motivations (and the different degrees of scrutiny applicable to each) would be utterly superfluous.

Ms. Foxx's other citations are equally unavailing. *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008)—which held that a public employee could not raise an equal protection claim for arbitrary treatment when not based on membership in any particular class—asserts that the Supreme Court has "long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.' *Id.* at 598 (quoting *Cafeteria & Rest. Workers Union, Loc. 473 v. McElroy,* 367 U.S. 886, 896 (1961)). In context, this refers only to the government's greater powers as an employer. But even if construed to refer to all proprietorship, it doesn't suggest that constitutional

---

[17] *Compare, e.g., Commonwealth v. Davis*, 39 N.E. 113, 113 (Mass. 1895) (Holmes, J., majority opinion) ("For the legislature absolutely or conditionally to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house."), *with Hague v. Comm. for Indus. Org.,* 307 U.S. 496, 515-16 (1939) ("The privilege of a citizen of the United States to use the [public] streets and parks for communication of views on national questions may be regulated in the interest of all; . . . but it must not, in the guise of regulation, be abridged or denied").

protections cease to be effective on public property. *Reeves, Inc. v. Stake*, 447 U.S. 429 (1980)—a case that applied the "market participant" exception to the Dormant Commerce Clause in allowing a state-owned enterprise to discriminate in favor of its own citizens—is inapposite. That a state-owned enterprise is exempt from limitations imposed by one part of the Constitution concerned with federalism says nothing about whether it is bound to respect individual rights.

Finally, and decisively, whatever is true elsewhere in the law, Ms. Foxx's proposed framework contradicts *Bruen*, which rejects the relevance of place to the threshold question of whether certain conduct is covered by the Second Amendment. *See Bruen,* 597 U.S. at 32 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."); *see also Oakland Tactical Supply, LLC v. Howell Township*, 103 F.4th 1186, 1201-02 (6th Cir. 2024) (Kethledge, J., dissenting) ("Thus—as described by the Court—the Second Amendment guarantees (1) to law-abiding citizens (2) a right to keep and bear arms (3) in common usage (4) for purposes of 'confrontation' (or 'self-defense').")). If the fact of government ownership is relevant to the constitutionality of the Firearm Concealed Carry Act's ban, it can only enter the calculus at *Bruen*'s second step.

*   *   *

Perhaps recognizing the futility of the first argument, Ms. Foxx purports to clarify (but in fact seems to change) her position in her reply brief.[18] She relies on the

---

[18] Waiting until the reply brief is reason enough to reject the argument. *See James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998). Because this is ostensibly part of the same argument Ms. Foxx presented in her opening brief, however, the Court still addresses it.

ambiguity of the word *proprietor*. Rather than founding the argument for rational basis review on the government's ownership of property simply, the reply brief stakes Ms. Foxx's case on the latitude afforded to the government when it acts as a "market participant"—that is, a proprietor in the sense of running an enterprise.

She disavows the notion, propounded by her opening brief, that "the government as proprietor argument" makes all "government-owned or controlled property 'exempt' from the Second Amendment." Dkt. 95 at 6; *compare id. with* Dkt. 68 at 3-4 ("One of the cornerstone principles of American law is that the owner or proprietor of private property has an absolute right to exclude others from that property. . . . That principle applies with equal force to the government . . . ."). Now, she says, only when the government is "acting as a market participant" and managing its internal operations does lesser scrutiny kick in. Thus, she no longer relies on a putative categorical exception from the Second Amendment's ambit, but an exception from *Bruen*'s framework of scrutiny within the Second Amendment's scope.

Although this is a slightly better argument than the last, it too must be rejected. The argument falters at its major premise: that the lax standard of review employed when the government exercises "managerial" authority[19]—for instance, in regulating nonpublic forums, making employment decisions, or prohibiting certain kinds of employee speech—applies in the Second Amendment context.

---

[19] *See* Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum*, 34 UCLA L. Rev. 1713, 1782 (1987).

In the wake of *Heller*, it is true, the scope of government's managerial power over the Second Amendment was unclear.[20] And though the Supreme Court has not yet explicitly addressed the issue, *Bruen* decisively rejected the means-end scrutiny characteristic of other areas of constitutional law, describing the Second Amendment as itself the product of a considered balancing "struck by the traditions of the American people" that "elevates above all other interests the right of law-abiding, responsible citizens" to use arms for self-defense. *Id.* at 26 (quoting *Heller*, 554 U.S. at 635). This is fatal to Ms. Foxx's argument. The justification of the lenient treatment afforded to exercises of managerial power is precisely that kind of interest balancing—namely, a concern for the government's interest in efficiently carrying out its mission. *See, e.g.*, *Engquist*, 553 U.S. at 598-600; *Lee*, 505 U.S. at 682-83; *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303-04 (1974).

*Bruen* maintains that freestanding policy considerations, no matter how weighty, cannot be invoked to defeat the right protected by the Second Amendment, strictly insisting that all the relevant interest balancing was done at the Second Amendment's ratification. 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). The right to bear arms may be regulated *only* in the name of an interest that finds at least analogical

---

[20] *See, e.g.,* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1533 (2009) ("Courts need to work out a government-as-proprietor doctrine for the right to bear arms much as they have done for the freedom of speech."). And some courts found that the fact of property ownership did afford the government greater regulatory power. *E.g.*, *Bonidy v. Postal Serv.*, 790 F.3d 1121, 1127 (10th Cir. 2015) (holding that government buildings were categorically exempt from Second Amendment scrutiny, and in the alternative, that the government's proprietary interest in a post office weighed heavily in favor of a ban on carrying guns there in upholding it under intermediate scrutiny).

support in the American tradition. *See Rahimi*, 144 S. Ct. at 1898 (describing how *Bruen* requires that regulations be "consistent with the principles that underpin our regulatory tradition" so that the "balance struck by the founding generation" is faithfully applied to "modern circumstances").[21] It would turn *Bruen* on its head to default to rational basis review when the government asserts an interest that it isn't required to demonstrate was part of the historical tradition of firearm regulation. Nearly[22] every district court to be confronted with similar arguments has rejected them.[23] This Court likewise rejects them.

---

[21] Whether this should be conceived of as a finding (1) that the conduct at issue was not part of the right to begin with, or (2) that the right was traditionally defeasible in the face of the asserted interest, is ultimately inconsequential here; either way, the only way to justify a regulation of conduct that falls *prima facie* within the Second Amendment is to point to an analogous interest embodied in the regulatory tradition.

[22] One district court refused to enjoin a ban on bearing arms in "mass transit facilities and in vehicles owned by the State [of Maryland]" on the ground that it constituted a permissible sensitive-place restriction, while leaving open the possibility that the regulation might also be justified by Maryland's status as a "market participant." *Kipke v. Moore*, 695 F. Supp. 3d 638, 655-56 (D. Md. 2023) (denying a motion for preliminary injunction); *Kipke v. Moore*, Nos. GLR-23-1293, GLR-23-1295, 2024 U.S. Dist. LEXIS 137003, at *15-16 (D. Md. Aug. 2, 2024) (adopting the analysis for denying a preliminary injunction to grant summary judgment). For this latter possibility, it relied on *Bldg. & Const. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993)—which held that a state's market activity was not preempted by the National Labor Relations Act as its regulatory activity in the same area would be—and its assertion that a State may "manage its own property when it pursues its purely proprietary interests . . . where analogous private conduct would be permitted." *Id.* at 231-32. Read in context, however, the court is not announcing a general principle, but only describing its statutory holding under the NLRA: that only state regulation, and not "proprietary conduct" lawful for an equivalent private party, was preempted by that federal statute. *Id.* at 232. So, *Building & Construction Trades Council* provides little support for a general market-participant exception to the recognition of individual rights.

[23] *Koons v. Platkin*, 673 F. Supp. 3d 515, 601 (D.N.J. 2023), *appeal docketed*, No. 23-2043 (3d Cir. Jan. 9, 2024) ("[T]he State is not *exempt* from recognizing the protections afforded to individuals by the Constitution simply because it acts on government property."); *id.* at 605 n.33 (rejecting the state's "market participant" theory); *Wolford v. Lopez*, 686 F. Supp. 3d 1034, 1062 (D. Haw. 2023), *appeal docketed*, No. 23-16164 (9th Cir. June 21, 2024) ("Whether the government acted as a proprietor may have been relevant when assessing Second

### B.    First Amendment intermediate scrutiny

Ms. Foxx also relies on *Heller*'s statement that the Second Amendment can protect modern forms of arms in the same way that the First Amendment protects modern forms of communication. *Heller*, 554 U.S. at 582. She cites examples of intermediate scrutiny applied to content-neutral "time, place, or manner" restrictions. Take, for example, Ms. Foxx's reliance on *Anderson v. Milwaukee County*, 433 F.3d 975 (7th Cir. 2006), in which the court found that the government's interest in protecting bus passengers (a captive audience) allowed it to restrict otherwise protected speech. 433 F.3d at 980. But the intermediate scrutiny standard applied to content-neutral "time, place, or manner" restrictions is what *Bruen* unambiguously rejected. *See Bruen*, 597 U.S. at 22-24 ("Not only did *Heller* decline to engage in means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test that respondents and the United States now urge us to adopt."). Ms. Foxx's attempt to apply intermediate scrutiny by treating the Firearm Concealed Carry Act's ban as a "time, place, or manner" restriction cannot succeed.

Amendment challenges under a means-end scrutiny test, but it has no place under the first step of the *Bruen* analysis."); *United States v. Ayala*, __ F. Supp. 3d __, No. 8:22-cr-369-KKM-AAS, 2024 U.S. Dist. LEXIS 7326, at *41-43 (M.D. Fla. Jan. 12, 2024), *appeal docketed*, No. 24-10462 (11th Cir. May 7, 2024) ("The United States must point to a historical tradition justifying any claimed power to regulate conduct protected by the Second Amendment's plain text, even as a proprietor."); *May v. Bonta*, __ F. Supp. 3d __, Nos. SACV 23-01696-CJC (ADSx), SACV 23-01798-CJC (ADSx), 2023 WL 8946212, at *17 (C.D. Cal. Dec. 20, 2023), *appeal argued*, No. 23-4356 (9th Cir. Apr. 11, 2024).

### III.    The Main Event (*Bruen* Analysis)

#### A.    A disclaimer about "historical evidence"

There's one more matter to address before reaching the substantive *Bruen* analysis. *Bruen* exemplifies the phrase "easier said than done." It certainly left open a plethora of procedural questions about how to conduct the historical inquiry. *See, e.g.*, *United States v. Daniels*, 77 F.4th 337, 359-60 (5th Cir. 2023), *vacated*, __ S. Ct. __, No. 23-376, 2024 U.S. LEXIS 2910 (July 2, 2024) (Higginson, J., concurring) ("More foundationally, courts are laboring to give meaning to the *Bruen* requirement of 'historical inquiry.'"); *Rahimi*, 144 S. Ct. at 1927 & n.1 (Jackson, J., concurring) (collecting cases). The Supreme Court has acknowledged the potential difficulty but provided little guidance: "To be sure, '[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.'" *Bruen*, 597 U.S. at 25 (alteration in original) (quoting *McDonald*, 561 U.S. at 803-04 (Scalia, J., concurring)). And multiple courts have expressed frustration at the process. *See, e.g.*, *Worth v. Harrington*, 666 F. Supp. 3d 902, 917 (D. Minn. 2023), *aff'd sub nom. Worth v. Jacobson*, 108 F.4th 677, (8th Cir. 2024); *United States v. Hill*, No. 3:23cr114, 2023 U.S. Dist. LEXIS 211689, at *28-41 (E.D. Va. Nov. 28, 2023), *appeal docketed*, No. 24-4194 (4th Cir. Apr. 8, 2024); *see also Vidal v. Elster*, 602 U.S. 286, 328 (2024) (Sotomayor, J., concurring) ("One need only read a handful of lower court decisions applying *Bruen* to appreciate the confusion this Court has caused."). Several data points support the notion that *Bruen*'s analysis can be complicated. Here are just a few: (1) four justices thought it was important to author concurring opinions in *Rahimi*, with a fifth justice

joining one of those concurrences; (2) Justice Thomas—the author of *Bruen*—dissented in *Rahimi*; and (3) eight justices reversed the Fifth Circuit's unanimous decision and had "no trouble," *Rahimi*, 144 S. Ct. at 1902, reaching the opposite conclusion of the judges on the Fifth Circuit under the same framework.

This case highlights one such question in the mix. The parties' disputes over how to proffer and use historical evidence exhibit the confusion occasioned by *Bruen*. Much ink has been spilled about the nature of the evidence the Court can consider in conducting the historical analysis required under *Bruen*, including what is an adjudicative fact and what is a legislative fact. The Court has spent a considerable amount of time considering the parties' arguments. In its discretion, this order is based upon what evidence the Court believes was properly proffered.

The Court has discretion in determining whether a party has failed to comply with Local Rule 56.1, but it must consider whether the party's submission has adequately complied with the purpose and intent of the rule or has impeded the rule's effectiveness. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *see also Ammons*, 368 F.3d at 817. In this case, because of the lack of clear guidance as to how to treat the historical evidence required by *Bruen*'s framework, the Court doesn't believe that Plaintiffs' noncompliance was an attempt to deceive Defendants or otherwise gain an unfair advantage. They didn't completely ignore Local Rule 56.1; Plaintiffs compiled a statement of facts related to each individual plaintiff's personal experience. Defendants have also responded to the historical matter presented by Plaintiffs directly in their briefs, so Plaintiffs' noncompliance doesn't appear to have

substantially changed Defendants' arguments. And as stated previously, the Court prefers to decide things based on evidence. *Schoenthal*, 2024 U.S. Dist. LEXIS 79497, at *5.[24]

Having said all that, this Court will adhere to Justice Kavanaugh's direction in his concurrence in *Rahimi*. *See Rahimi*, 144 S. Ct. at 1923-24 (Kavanaugh, J., concurring). This Court will quit its bellyaching and get on with it.

### B.   Plain text of the Second Amendment

The first step under *Bruen* is to determine whether the Second Amendment's "plain text"[25] covers the regulated conduct. *Bruen*, 597 U.S. at 17. Embedded within this step is first defining Plaintiffs' proposed course of conduct.

---

[24] The Court acknowledges that, even in considering the "full" record before it, historical inquiries reliant on party presentation (not to mention potentially evolving views of history) may lead to inconsistent results. Justice Scalia's discussion of a pitfall in analyzing legislative history rings true here:

But not the least of the defects of legislative history is its indeterminacy. If one were to search for an interpretive technique that, *on the whole*, was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history. And the present case nicely proves that point.

Judge Harold Leventhal used to describe the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends. If I may pursue that metaphor: The legislative history of [the statute at issue] contains a variety of diverse personages, a selected few of whom—its "friends"—the Court has introduced to us in support of its result. But there are many other faces in the crowd, most of which, I think, are set against today's result.

*Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring); *see also Vidal*, 602 U.S. at 327-28 (Sotomayor, J., concurring) (applying the comparison to "history-and-tradition inquir[ies]").

[25] The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

**SA25**

   1.   *Proposed course of conduct*

Plaintiffs' proposed course of conduct, which Defendants don't dispute, is the licensed concealed carrying of handguns for self-defense on public transportation and associated facilities. *See* Dkt. 71 ¶¶ 12-13, 20-21, 39.

Note that this proposed conduct necessitates treating Plaintiffs' challenge to the Firearm Concealed Carry Act's ban as an as-applied challenge, as they have not argued that *any* person who "knowingly carr[ies] a firearm" onto public transit (or associated real property), 430 ILCS 66/65(a), is presumptively protected by the plain text of the Second Amendment. For example, the Firearm Concealed Carry Act doesn't consider one's purpose in carrying a handgun on public transit, and so its prohibition on carrying a handgun for purposes other than lawful self-defense would not implicate the Second Amendment.[26] Because Plaintiffs have framed their

---

[26] And with even one constitutional application, a facial challenge to the statute fails. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs argue that *Salerno* doesn't apply to this case. But the Supreme Court recently reiterated the applicability of *Salerno* to a facial challenge under the Second Amendment. *Rahimi*, 144 S. Ct. at 1898 ("This is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" (quoting *Salerno*, 481 U.S. at 745)).

   Ms. Foxx also argues that Plaintiffs' facial challenge must fail because the Seventh Circuit, in *Bevis v. City of Naperville*, held that there is no Second Amendment protection for "weapons that may be reserved for military use." 85 F.4th 1175, 1194 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024). Plaintiffs point out that they wish to carry only handguns on public transit, but that misses the point of a facial challenge. Plaintiffs also respond that "the statute indisputabl[y] refers generally to 'firearms,' not specifically to the category of arms *Bevis* held are unprotected." Dkt. 87 at 12. This argument, as it is articulated by Plaintiffs, doesn't contend that "firearms" *excludes* military weapons. Nor does their reliance on *Heller*'s silence help; *Heller*'s silence is not equivalent to rejection. *See In re Deere & Co. Repair Serv. Antitrust Litig.*, __ F. Supp. 3d __, No. 3:22-cv-50188, 2023 U.S. Dist. LEXIS 210516, at *37 (N.D. Ill. Nov. 27, 2023) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952)); *cf. United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024). But reading the text of the Firearm Concealed Carry Act is helpful. Although the

challenge in terms of how the Firearm Concealed Carry Act *applies to them*, the Court proceeds accordingly. *See Doe v. Reed*, 561 U.S. 186, 194 (2010); *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2416 n.1 (2024) (Thomas, J., concurring) ("Federal courts are free to consider challenged statutes as applied to the plaintiff before them and limit any relief accordingly.").

> 2. *Text of the Second Amendment*

The Second Amendment guarantees the "right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. Naturally, Plaintiffs contend that their proposed conduct is covered by the Second Amendment's text. State Defendants appear to concede this point, but Ms. Foxx disagrees.

She first argues that the Firearm Concealed Carry Act's ban doesn't "infringe" on Plaintiffs' right to keep and bear arms, and so their proposed conduct and its violation of the ban don't fall under the Second Amendment's protection. She compares the definitions of "infringe" and "abridge" (from the First Amendment), relying on dictionary definitions from 1755 and 1773 to argue that "infringe" must denote a total destruction of a right—more than a mere "abridgement." But both of these words have multiple definitions, and Ms. Foxx cherry-picks the definitions to suit her argument. In particular, the second definition for "infringe" reads in full: "To destroy; to hinder." *Infringe, v.a. (1773)*, Samuel Johnson's Dictionary Online,

---

statute doesn't define "firearm" on its own, a "concealed firearm" is defined as a "loaded or unloaded handgun," and "handgun" is defined as a one-handed gun excluding stun guns or tasers, machine guns, short-barreled rifles or shotguns, and specific pneumatic guns, spring guns, paintball guns, and BB guns. 430 ILCS 66/5. This definition doesn't appear to allow for the military weapons contemplated by *Bevis*, so this is not a basis on which Plaintiffs' facial challenge fails.

https://johnsonsdictionaryonline.com/views/search.php?term=infringe (last visited Aug. 30, 2024). But she omits "to hinder"—which wouldn't require completely obstructing the right—without any explanation. Merriam-Webster's definition likewise doesn't require wholesale destruction—"to encroach upon in a way that violates law or the rights of another"—and it notes that "infringe" was first used with that meaning in 1513. *Infringe Definition & Meaning*, Merriam-Webster, https://www.merriam-webster.com/dictionary/infringe (last updated Aug. 20, 2024).

Other courts have agreed with this more modest—and plain—reading of "infringe." *See, e.g.*, *Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022) ("[The Second Amendment] also forbids lesser 'violat[ions]' that 'hinder' a person's ability to hold on to his guns." (citations omitted)); *Md. Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1044 n.8 (4th Cir. 2023), *reh'd en banc*, __ F.4th __, 2024 U.S. App. LEXIS 21378 (4th Cir. Aug. 23, 2024) ("[T]his stilted construction of the word 'infringed' lacks grounding in original meaning, history, and *Bruen* itself.").[27] And *Bruen* itself involved a regulation that didn't wholly ban individuals from possessing firearms—it was a licensing scheme. *Bruen*, 597 U.S. at 11-12. "Infringe" doesn't mean what Ms. Foxx says it means.

Ms. Foxx next argues that the Second Amendment doesn't cover Plaintiffs' proposed conduct because using a firearm on a crowded and confined public transit vehicle would result in more force than necessary for lawful self-defense, citing two

---

[27] The Fourth Circuit did not address this issue after the case was reheard *en banc*.

SA28

inapposite cases.[28] Even if the Second Amendment's reach were limited by that principle of self-defense,[29] Ms. Foxx fails to show how that limitation applies to the facts of this case beyond the unsubstantiated assertion that "there are few if any circumstances" where someone could discharge a firearm in a public transportation vehicle without endangering a third party. Dkt. 86 at 16.

### C. Potential historical analogues

Because Plaintiffs' proposed conduct falls under the plain text of the Second Amendment, the conduct is presumptively protected. *Bruen*, 597 U.S. at 17. The second step is determining whether the regulation is consistent with the historical tradition of firearm regulation in this country. *Id.* Defendants bear the burden in this regard. As to how they can meet that burden, *Bruen* examined historical regulations as potential analogues, focusing on *why* and *how* regulations burdened the right to armed self-defense. *See id.* at 29. In addition to engaging in that mode of analogical analysis, the parties argue for other approaches potentially left open by *Bruen*.

---

[28] Both cases assert that one may not use more force than necessary to repel an attacker. *Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554, at *34 (N.D. Ill. Mar. 19, 1993) ("Illinois law does not readily accept a claim of self-defense when the defendant provokes the incident, uses force greater than necessary to ward off the imminent danger, or uses force when he could have avoided the situation."); *People v. Morgan*, 719 N.E.2d 681, 700 (Ill. 1999) (requiring that a person "reasonably believe[]" that the force used "is necessary to prevent imminent death or great bodily harm"). But these cases plainly say nothing about Ms. Foxx's proposed principle—that one may not defend oneself if the force to be used would collaterally injure third parties.

[29] In *Heller*, the Supreme Court was careful to "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation," 554 U.S. at 594, but it offered no further guidance as to what confrontations don't count. *See Heller*, 554 U.S. at 720 (Breyer, J., dissenting). We do know, however, that the Second Amendment draws no location-based home–public distinction. *See Bruen*, 597 U.S. at 4; *see also Oakland Tactical Supply*, 103 F.4th at 1202-03 (Kethledge, J., dissenting).

The parties start by disagreeing over whether public transportation existed at the Founding. But whether there's anything from 1791 that might appropriately be labeled "public transportation" isn't a silver bullet that shortcuts *Bruen*'s framework. Even if there were something that could rightly be described as a *form of transportation funded by the public* at the time of the Second Amendment's ratification, how firearms were regulated there (if at all) wouldn't necessarily determine whether or how they can be regulated somewhere fitting that same description today. Regulation of today's public transportation may implicate different justifications or impose different burdens on the Second Amendment right based on public transportation's role in society. In other words, the *how* and *why* of such a regulation might be very different. Metra trains and CTA buses obviously didn't exist then, so resolving the permissibility of Illinois' law requires some degree of analogical reasoning. *See Bruen*, 597 U.S. at 27-28.[30]

So as to not bury the lede, the Court finds that Defendants have failed to meet their burden. That failure is dispositive. Still, mindful of the Seventh Circuit's directive to develop a full record in the trial court, the Court will address the parties' many arguments relating to historical analogues and other possible approaches to analyze the constitutionality of the Firearm Concealed Carry Act's prohibition against carrying concealed firearms on public transportation.

---

[30] The parties (and some courts) have labeled this the "nuanced" historical approach, based on *Bruen*'s language that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 28. Like Modell in *Diner*, the Court isn't comfortable with the word "nuance." Nevertheless, rather than transform an adjective into its own doctrine, this Court sees the "nuanced" approach as a difference in degree as to how much analogizing must be done.

**SA30**

*1. Historical regulations*

The approach demonstrated by *Bruen* (and by *Rahimi*) for assessing the constitutionality of a challenged regulation is to compare it with historical regulations. The Court understands this process involves several discrete steps. First, there is the factual question of whether the historical regulation exists. Next, the Court must determine how much weight, if at all, the historical regulation has in this inquiry. *See Bruen*, 597 U.S. at 34 ("We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal."). If the vetted historical regulations disclose some principle underpinning the tradition of firearm regulation in this country, then the Court can compare the challenged regulation in this case to the historical regulations. *See id.* at 29-30; *see also Rahimi*, 144 S. Ct. at 1898. In determining whether the regulations are "relevantly similar," "how and why the regulations burden a law-abiding citizen's right to armed self-defense" are "*central*" considerations. *Bruen*, 597 U.S. at 29; *Rahimi*, 144 S. Ct. at 1898.

*a. Regulation of crowded spaces (Statute of Northampton)*

Defendants cite the Statute of Northampton 1328, 2 Edw. 3 c. 3 (Gr. Brit.), and similar state laws patterned after it. *Bruen* rejected the Statute of Northampton as an analogue justifying a general ban on public carry. *See* 597 U.S. at 40-41. State Defendants, relying on *Antonyuk v. Chiumento*, 89 F.4th 271, 357 n.74 (2d Cir. 2023), *vacated sub nom. Antonyuk v. James*, __ S. Ct. __, No. 23-910, 2024 U.S. LEXIS 2929 (2024),[31] argue that the statute, accompanied by the similar state statutes, provides

---

[31] *Antonyuk* was vacated "for further consideration in light of *United States v. Rahimi*, 602 U.S. __ (2024)." 2024 U.S. LEXIS 2929, at *1.

support for the narrower proposition that bearing arms may be restricted in crowded places like fairs and markets.

Plaintiffs' response to this argument draws on two reasons that *Bruen* deemed the Statute of Northampton to not be probative in that case. First, they argue that the Statute of Northampton is too old and should therefore be afforded no weight in ascertaining an *American* tradition. *Bruen*, 597 U.S. at 41 ("[T]he Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791."). State Defendants address this issue by citing the later state statutes that were based on the Statute of Northampton. This includes two commonwealth/state statutes from the Founding era: one from Virginia and one from North Carolina.[32]

Defendants also present Reconstruction-era statutes from three states—Tennessee, Texas, and Missouri—and two territories—Oklahoma, and Arizona.[33] Plaintiffs' response to these statutes amounts to "too little, too late"—they argue that they are outliers and not old enough to be probative of the meaning of the Second Amendment. But *Bruen* didn't foreclose using such later-in-time laws to show the continuation of

---

[32] Act of Oct. 16, 1786, ch. 49, 1786 Va. Acts 35 (forbidding and punishing affrays); *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* 60-61 (François-Xavier Martin ed., 1792). Plaintiffs argue that the North Carolina law was never in force. This doesn't affect the Court's analysis, so there is no need to address this factual dispute now.

[33] Act of June 11, 1870, ch. 13, 1870 Tenn. Pub. Acts 28 (preserving the peace and preventing homicide); Act of Aug. 12, 1870, ch. 49, 1870 Tex. Gen. Laws 63 (regulating the right to keep and bear arms); Act of Mar. 5, 1883, sec. 1, § 1274, 1883 Mo. Laws 76; *Acts, Resolutions and Memorials of the Fifteenth Legislative Assembly of the Territory of Arizona* 30-31 (Prescott 1889) (defining and punishing certain offenses against the public peace); *The Statutes of Oklahoma, 1890*, at 495 (Will T. Little et al. ed., Guthrie, The State Capital Printing Co. 1891) (Territory of Oklahoma Penal Code, article 47).

a tradition from before the Founding. *See Bruen*, 597 U.S. at 65-68 (rejecting postbellum and territorial laws because they "contradict[] the overwhelming weight of other evidence"). Defendants present these statutes in that light: to show a " 'long, unbroken line,' beginning from medieval England and extending beyond Reconstruction," of the regulation of firearms in crowded public forums. *Antonyuk*, 89 F.4th at 358 (quoting *Bruen* 142 S. Ct. at 2136).

Even granting the existence of such a longstanding tradition, however, that doesn't address Plaintiffs' second response to these laws—that they aren't appropriate analogues because *why* they burdened the right to armed self-defense is not sufficiently similar.[34] *Bruen* found that the Statute of Northampton wasn't a general ban on bearing weapons; instead, the offense was arming oneself *to terrify others*. *Bruen*, 597 U.S. at 43-44.[35] This language is also reflected in the corresponding state

---

[34] The Court acknowledges that it is using a double negative. But the Court is using the double negative because describing the *why* as "different" doesn't seem quite right. *See* Susan Thurman, *The Only Grammar Book You'll Ever Need* 93-94 (2003) ("One exception to the rule of avoiding double negatives is when you intend a positive or lukewarm meaning."). And, at the risk of sending grammar geeks into a tither (or a dither), not all double negatives create a positive. *See Flores v. Minnesota*, 906 F.2d 1300, 1302 (8th Cir. 1990) ("The instruction states that there is '*no* presumption' an intoxicated person was '*in*capable' of premeditation . . . . The double negative here does not create a positive. The instruction simply tells the jury not to rule out the possibility of premeditation merely because Flores had been drinking: they should still consider whether or not he was capable of premeditation, and whether he in fact premeditated the killing.").

[35] *Rahimi* implies the same requirement of an intent to terrify others (and potentially other elements, like using dangerous or unusual weapons). *See Rahimi*, 144 S. Ct. at 1901 ("Whether classified as an affray law or a distinct prohibition, the going armed laws prohibited riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land. Such conduct disrupted the public order and led almost necessarily to actual violence." (cleaned up) (citations omitted)).

On the other hand, one of Defendants' experts, Dr. Brennan Rivas, notes that some scholars have found that these laws didn't require an intent element to terrorize others, and that carrying deadly weapons was inherently terrifying. Dkt. 64-11 at 20 n.57. Although this is at

statutes. For example, the Virginia statute states that nobody shall "ride armed by night nor by day, in fairs or markets, or in other places, *in terror of the county*." Ch. 49, 1786 Va. Acts 35; *see also Rahimi*, 144 S. Ct. at 1901. Plaintiffs wish to carry *concealed* arms in self-defense, so the Firearm Concealed Carry Act's ban burdens Plaintiffs' Second Amendment right for a wholly different reason than the Statute of Northampton and similar state statutes did. The *why* is different. A concealed arm doesn't terrorize; it's concealed. Consequently, these historical laws do not serve as an appropriate historical analogue.

> b.  *The Black Act*

Ms. Foxx also attempts to find a historical analogue in the Black Act 1723, 9 Geo. 1 c. 22 (Gr. Brit.), which prohibited the carrying of weapons in forests and on roads if the bearer's face was disguised. But Ms. Foxx doesn't present any evidence that the attitudes reflected in the Black Act carried over into "*this* Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17 (emphasis added). Without some evidence the Black Act reflects American attitudes at the time the Second Amendment was adopted, it cannot support the Firearm Concealed Carry Act's ban. *See id.* at 34-35, 39 (noting that it's less helpful "to rely on an 'ancient' practice that had become 'obsolete in England at the time of the adoption of the Constitution' and never 'was

---

odds with *Bruen*'s interpretation, *Bruen* had a different record before it. *See Bruen*, 597 U.S. at 45 ("Respondents do not offer any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun would terrify people."). Although reliance on party presentation in compiling a historical record would seem to allow for evolving understandings of history, Defendants don't offer evidence that the act of carrying a concealed handgun in public was alone sufficient to be considered terrifying, so the Court accepts *Bruen*'s understanding of these statutes.

acted upon or accepted in the colonies.'" (quoting *Dimick v. Schiedt*, 293 U.S. 474, 477 (1935))).[36]

### c. Concealed-carry laws

Ms. Foxx then argues that 19th century laws from Tennessee, Texas, and Arkansas[37] show a tradition of regulating concealed firearms.[38] Plaintiffs' individual responses to the Tennessee and Arkansas statutes are that the statutes support Plaintiffs' position because of an exception for travelers. The Court sets that aside for now, as the exception matters only if the laws establish a historical tradition of banning concealed firearms in the first place.

---

[36] Even if the Black Act were to disclose some tradition, it's not "relevantly similar" to the ban, both in *why* and *how* the right to armed self-defense is burdened. The Black Act was enacted to prosecute gangs (seemingly inspired by Robin Hood) that operated from nearby forests (and roads). L. Radzinowicz, *The Waltham Black Act: A Study of the Legislative Attitude Towards Crime in the Eighteenth Century*, 9 Cambridge L.J. 56, 56-58 (1945); Pat Rogers, *The Waltham Blacks and the Black Act*, 17 Hist. J. 465, 467 (1974). The act's name shows that it was primarily concerned with *who* rather than *where*—the gang members were known as the "Blacks" because of how they obscured ("blackened") their faces. *See* Rogers, *supra*, at 468-69. At a very high level of generality, perhaps the two acts are similar in their motivation to keep public order. But though the Black Act contains a place restriction, it's inextricably coupled with the condition that one has disguised their face, because it was targeted at a specific group of people known to have an unlawful purpose in carrying weapons. The justification behind the Black Act is different from the Firearm Concealed Carry Act's ban, and the Black Act forbade people from carrying guns on roads only *if* they were masked, a condition not present in Illinois' ban. So, again, the *how* and *why* are different.

[37] Act of Apr. 12, 1871, ch. 34, 1871 Tex. Gen. Laws 25 (regulating the keeping and bearing of deadly weapons); Act of Oct. 19, 1821, ch. 13, 1821 Tenn. Pub. Acts 15 (preventing the wearing of dangerous and unlawful weapons); *Revised Statutes of the State of Arkansas Adopted at the October Session of the General Assembly of Said State, A.D. 1837*, at 280 (William McK. Ball & Sam. C. Roane, eds., Boston, Weeks, Jordan and Company 1838).

[38] Ms. Foxx lists a Louisiana statute in her statement of facts, but she doesn't reference it in her memorandum of law supporting her motion for summary judgment. Because it's not mentioned in her legal argument, the Court doesn't consider the Louisiana law in its analysis. *See generally* LR 56.1(a); *Bruen*, 597 U.S. at 25 n.6. In addition, Ms. Foxx says in her reply that she also cites Alabama law, but the only reference to Alabama law in her opening memorandum concerns the meaning of "journey" underlying the traveler exception, rather than the statute itself.

**SA35**

Plaintiffs rely on *Bruen* to discount the relevance of the Texas statute in establishing a historical tradition. *Bruen* examined an 1871 Texas law that required "reasonable grounds for fearing an unlawful attack on his person" to carry a pistol, and it deemed the statute (along with two Texas Supreme Court cases analyzing the constitutionality of the statute) to be outliers, "provid[ing] little insight into how postbellum courts viewed the right to carry protected arms in public." *Bruen*, 497 U.S. at 64-65. Ms. Foxx's only counter in her reply brief is that the New York law in *Bruen* had broader restrictions than the Firearm Concealed Carry Act's ban. Although it's true that this case involves looking for different analogues than *Bruen* did, that doesn't provide a reason to challenge *Bruen*'s finding that 1870s Texas was an outlier in its view of the right to bear arms.

Plaintiffs also respond with two general arguments concerning the Texas and Arkansas statutes: (1) the laws are too recent, and (2) the laws aren't sufficiently widespread.[39] As for the first argument—that 19th century laws cannot independently demonstrate the scope of the Second Amendment—*Bruen* shied away from any definitive statement on the matter. *Id.* at 37-38 ("We also acknowledge that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal

---

[39] Plaintiffs grouped the statutes by time period in their response, so the 1821 Tennessee statute was sorted into the Founding era bucket—separate from the mid to late 19th century bucket where Plaintiffs addressed the Texas and Arkansas statutes. The Court isn't sure what cutoff Plaintiffs have created to deny Arkansas' 1837 law the "Founding era" label and instead count it as "mid"-19th century.

Government). We need not address this issue today . . . ." (citations omitted)). *Rahimi* similarly sidestepped the issue. *See Rahimi*, 144 S. Ct. at 1898 n.1; *id.* at 1929 n.4 (Jackson, J., concurring); *id.* at 1933 n.2 (Thomas, J., dissenting). Contrary to Plaintiffs' characterization, lower courts still must deal with the ambiguity.

As a result, this Court disagrees with Plaintiffs that *Bruen* mandates automatically writing off any law from the Reconstruction era. *Bruen* may have cautioned "against giving postenactment history more weight than it can rightly bear," but it also recognized that evidence of how the Second Amendment was interpreted "through the end of the 19th century" can be a "critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 35-36 (quoting *Heller*, 554 U.S. at 605). The potential relevance of evidence through the late 19th century is underscored by the fact that this case concerns determining the historical view of public carry—after all, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 38.

That leaves Plaintiffs' argument that the statutes aren't sufficiently widespread.[40] As discussed above, *Bruen* disregarded the Texas statute as an outlier, and Ms. Foxx provides nothing to the contrary. This Court follows Supreme Court precedent. Left with only the Tennessee and Arkansas statutes, Defendants have failed to meet their burden of showing a national tradition. *Bruen* suggests that only two or three regulations often won't be sufficient—it discounted Texas as an outlier despite West

---

[40] Although Plaintiffs' brief was organized such that this response wasn't directed at the Tennessee statute, the Court finds it more sensible to include Tennessee in this part of the discussion. To artificially separate similar laws and then attack a subset as not sufficiently widespread isn't a logical way to approach the argument.

Virginia's similar provision, and it "doubt[ed] that *three* colonial regulations could suffice to show a tradition of public-carry regulation." *Id.* at 46, 65. This isn't to say that simply looking at the number of states is enough to exclusively conclude that there wasn't a tradition, as Plaintiffs seem to imply,[41] but Defendants have failed to meet their burden under the facts of this case. With that, there's no need to discuss the so-called "traveler exception" in the context of Ms. Foxx's motion for summary judgment.

### d. Railroads

State Defendants present restrictions by railroad companies across the country in the late 19th century.[42] Some of these restrictions merely required that passengers keep their firearms unloaded and in their bags, while others barred firearms completely. Plaintiffs respond that these railroad companies were private entities and so

---

[41] Regarding what's a widespread tradition versus just a few outliers, Plaintiffs don't do much to actually apply the reasoning in *Bruen* to the facts in this case, but the Court can certainly imagine some relevant factors that might have been helpful to this analysis, such as the geographic regions represented by the state regulations or the impact of migration patterns on cultural norms. One might even consider when the particular states joined the Union, although the emphasis on Founding-era statutes may already take that into account by proxy, as it consequently puts more focus, to some extent, on the original thirteen states. *Bruen*'s discussion of sensitive places and the lack of historical evidence suggests that there are times when only two or three regulations might be sufficient, but it's unclear if *Bruen* meant for that logic to apply beyond the "sensitive places" inquiry (nor does Ms. Foxx argue this as a reason for construing only a few state statutes as a widespread tradition).

[42] They argue that these railroad restrictions are a continuation of the tradition of regulating public forums and crowded places, as established by the Statute of Northampton and similar state statutes. However, as explained above, the tradition of regulation established by that line of statutes addressed public carry for the purpose of terrorizing others. So if the railroad restrictions are a continuation of this tradition, then they also cannot be an appropriate analogue for this case. But the railroad restrictions don't have the same wording about inflicting terror, so the Court treats these as a separate source for a potential analogue.

**SA38**

the restrictions aren't relevant under *Bruen*, that the restrictions aren't old enough, and that the restrictions aren't sufficiently widespread.

The Court agrees that the private nature of these restrictions defeats State Defendants' attempt to show a national tradition that would support the Concealed Carry Act's prohibition. The Second Amendment protects against governmental—not private—intrusion on rights and liberties. *See Rahimi*, 144 S. Ct. at 1897.[43]

    2.   *Sensitive places*

Defendants also levy arguments under *Bruen*'s directive that analogies to "sensitive places" can establish whether laws are constitutionally permissible. The discussion of sensitive places starts with this language in *Heller*:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626-27. *Heller* also added in a footnote: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to

---

[43] The Court sees the opening that State Defendants have identified. *Heller* and *Bruen* both included the assurance that schools could still constitutionally restrict firearms as sensitive places, considering that there were no public schools at the Founding. However, it's above this Court's pay grade to infer from the Supreme Court's silence that private restrictions alone can establish a historical tradition of regulation. Neither *Heller* nor *Bruen* explained why restrictions in schools are constitutional. *See Heller*, 554 U.S. at 626-27; *Bruen*, 597 U.S. at 30. The Court has enough trouble applying what the Supreme Court did say in *Heller* and *Bruen*; it's loath to attempt to apply the Supreme Court's silence. What's more, it certainly can't infer the Supreme Court's silence in favor of Defendants when they bear the burden.

be exhaustive." *Id.* at 627 n.26. *Bruen* then turned this unremarkable use of the word "sensitive" into its own vehicle of analogical reasoning:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U. S. at 626. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229-236, 244-247 (2018); see also Brief for Independent Institute as *Amicus Curiae* 11-17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

*Bruen*, 597 U.S. at 30. This Court views the "sensitive places" doctrine as but one method for demonstrating a historical analogue. Earlier, the Court analyzed the parties' arguments regarding whether a historical tradition existed and whether the historical regulations part of that tradition were analogous to the Firearm Concealed Carry Act's ban today. The "sensitive places" doctrine merely provides a shortcut for the former because the Supreme Court has stated there to be a longstanding tradition of prohibiting firearms in sensitive places.[44]

*Bruen* offers no insight as to what common thread might tie these sensitive places together, assuming a common thread is needed among these to support an analogy.

---

[44] Some courts have characterized it as an exception to the general *Bruen* framework. *See, e.g.*, *Wolford*, 686 F. Supp. 3d at 1049. Courts often refer to different analyses as "exceptions" even though they really aren't. *See In re Deere*, 2023 U.S. Dist. LEXIS 210516, at *32 n.12 (citing *Paper Sys. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002)). This Court might disagree on the label, but the approach is still substantively the same.

*See, e.g.*, *Bruen*, 597 U.S. at 114 (Breyer, J., dissenting) (noting the ambiguity and wondering where "the many locations in a modern city with no obvious 18th- or 19th-century analogue" such as "subways, nightclubs, movie theaters, and sports stadiums" fall); *see also, e.g.*, *Heller*, 554 U.S. at 721 (Breyer, J., dissenting) ("Why these?"). Courts are left to guess if the location is sensitive because of what occurs at the location, who is present at the location, how many people are present at the location, or some other consideration. The only hint that *Bruen* provides is that Manhattan is *not* a "sensitive place":

> Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." Brief for Respondents 34. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. See Part III-B, *infra*. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

*Bruen*, 597 U.S. at 30-31.

The task before this Court is to decipher whether public transit can be analogous to schools or government buildings (including legislative assemblies, polling places, and courthouses), or to some other sensitive place if Defendants are able to identify

one.[45] The Court found only a handful of other courts that have considered the issue of how to analogize to the established "sensitive places" (and none that have explicitly extended the list of sensitive places). For example, some courts concluded that playgrounds and other adjoining school grounds are analogous to schools—a seemingly straightforward analysis. *Siegel v. Platkin*, 653 F. Supp. 3d 136, 151 (D.N.J. 2023);[46] *Kipke*, 695 F. Supp. 3d at 650; *Kipke*, 2024 U.S. Dist. LEXIS 137003, at *15-16; *Springer*, 2023 U.S. Dist. LEXIS 217447, at *23-24; *We The Patriots, Inc. v. Grisham*, 697 F. Supp. 3d 1222, 1237 (D.N.M. 2023), *appeal docketed*, No. 23-2166 (10th Cir. Mar. 11, 2024). In a similar vein, childcare facilities have also been deemed "sensitive." *Md. Shall Issue*, 680 F. Supp. 3d at 584.[47]

---

[45] Plaintiffs insist that *Bruen* didn't endorse "government buildings" generally or "schools" as sensitive places, but that is based on a strained reading of *Bruen*'s language. *See also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) (quoting *Heller* to emphasize that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations"). Other district courts also disagree with Plaintiffs, either implicitly by analogizing to schools or explicitly rejecting the argument. *E.g.*, *Kipke*, 695 F. Supp. 3d at 650; *United States v. Robertson*, No. 22-po-867-GLS, 2023 U.S. Dist. LEXIS 4998, at *12-13 (D. Md. Jan. 9, 2023); *Md. Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 584 (D. Md. 2023), *appeal docketed*, No. 23-1719 (4th Cir. Feb. 22, 2024); *Springer v. Grisham*, __ F. Supp. 3d __, No. 1:23-cv-00781 KWR/LF, 2023 U.S. Dist. LEXIS 217447, at *23-24 (D.N.M. Dec. 5, 2023), *appeal docketed*, No. 23-2194 (10th Cir. Mar. 25, 2024). Only one district court takes such a narrow reading of *Bruen*, arguing that *Bruen*'s "these locations" refers only to legislative assemblies, polling places, and courthouses based on the grammatical rule that pronouns "generally" refer back to the nearest antecedent. *Ayala*, 2024 U.S. Dist. LEXIS 7326, at *36. But that logic breaks down in *Bruen*'s next sentence. *Bruen* instructs courts to analogize to "those historical regulations of 'sensitive places' "—and "those" modifies "regulations" not "sensitive places," so it refers back to "such prohibitions," which in turn refers back to the "longstanding" laws discussed by *Heller*. *See Bruen*, 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626). This is a convoluted and pedantic way of saying that the Court finds it appropriate to analogize to government buildings and schools.

[46] In a subsequent ruling (that is on appeal), the court maintained its position regarding school playgrounds. *Koons*, 673 F. Supp. 3d at 639.

[47] The use of a public space for educating children may be seen as analogous to schools, even if the space isn't exclusively for children. *Lafave v. County of Fairfax*, No. 1:23-cv-1605

Courts have also considered whether buffer zones (e.g., a 1000-foot radius) around sensitive places are susceptible of the same treatment as the sensitive places themselves. One court found so. *United States v. Walter*, No. 3:20-cr-0039, 2023 U.S. Dist. LEXIS 69163, at *21-23 (D.V.I. Apr. 20, 2023). Another found the opposite, because the buffer zone around a school zone contained non-school property. *United States v. Allam*, 677 F. Supp. 3d 545, 560-62 (E.D. Tex. 2023). Yet another court specified that only the public locations within a buffer zone were sensitive and that private property within a buffer zone wasn't a sensitive location. *United States v. Metcalf*, No. CR 23-103-BLG-SPW, 2024 U.S. Dist. LEXIS 17275, at *21-23 (D. Mont. Jan. 31, 2024).

Defendants in this case offer various theories as to what makes a place "sensitive." The Court finds none of them convincing.

### a. *Publicly owned or operated, publicly accessible, and crowded*

State Defendants argue that modern public transit systems are sensitive places because they are crowded spaces that are publicly accessible and publicly owned or operated.[48] Based on *Bruen*'s admonition that Manhattan isn't a sensitive place just

_____

(WBP), 2024 U.S. Dist. LEXIS 152000, at *37-38 (E.D. Va. Aug. 23, 2024) (finding Fairfax County's parks to be sensitive places because children attend summer camps at the parks and the county operates three preschools there). But merely having children or students present isn't enough—one court reasonably declined to declare the New York subway system a sensitive place "just by virtue of its connection with the school system." *Frey v. Nigrelli*, 661 F. Supp. 3d 176, 206-07 (S.D.N.Y. 2023), *appeal docketed*, No. 23-365 (2d Cir. Jan. 10, 2024).

[48] The Court found no examples of this precise combination of factors considered by other courts—the closest was courts that have decided how broadly to construe "government buildings." Some courts have taken "government buildings" to mean any building owned by the government, rejecting the notion that there must be some kind of core government function associated with the building. *Kipke*, 695 F. Supp. 3d at 655-56 (analogizing mass transit facilities to both schools and government buildings); *Kipke*, 2024 U.S. Dist. LEXIS 137003, at *15-16; *Md. Shall Issue*, 680 F. Supp. 3d at 588 (finding public libraries to be sensitive places); *We The Patriots*, 2023 U.S. Dist. LEXIS 183043, at *31-32; *Robertson*, 2023 U.S. Dist. LEXIS

**SA43**

because it is crowded and generally protected by law enforcement, crowdedness alone is insufficient to qualify a location as sensitive. State Defendants' theory adds two more conditions—so it's not directly contrary to *Bruen*'s rejection of crowded and generally protected places—but those two added conditions still "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 597 U.S. at 31. After all, the streets of Manhattan—or Chicago, to pick an example closer to home—are crowded, publicly accessible, and publicly owned. State Defendants contend that "only a small slice of modern cities would be sensitive" under their test, Dkt. 94 at 15, but they don't explain how the additional two conditions would exclude most modern cities.

4998, at *12-14, 19-22 (finding the National Institutes of Health to be a sensitive place); *United States v. Power*, No. 20-po-331-GLS, 2023 U.S. Dist. LEXIS 4226, at *9-16, 19-21 (D. Md. Jan. 9, 2023) (same); *United States v. Marique*, No. 22-00467-PJM, 2023 U.S. Dist. LEXIS 145677, at *12-14 (D. Md. Aug. 17, 2023), *appeal docketed*, No. 23-4576 (4th Cir. Oct. 23, 2023) (same); *United States v. Tallion*, No. 8:22-po-01758-AAQ, 2022 U.S. Dist. LEXIS 225175, at *20-22, 25 (D. Md. Dec. 12, 2022) (same). Other courts have taken a narrower approach. *Ayala*, 2024 U.S. Dist. LEXIS 7326, at *36 (finding that post offices aren't "government buildings" under *Bruen*); *United States v. Gearheart*, No. 6:23-po-00079-HBK-1, 2024 U.S. Dist. LEXIS 71033, at *27-28 (E.D. Cal. Apr. 18, 2024) (declining to find Yosemite National Park in its entirety to be a sensitive place, with the caveat that specific buildings in the park might be sensitive places); *United States v. Tolmosoff*, No. 6:23-po-00187-HBK-1, 2024 U.S. Dist. LEXIS 66920, at *26-27 (E.D. Cal. Apr. 11, 2024) (same). Absent further guidance, this Court is disinclined to construe "government buildings" so broadly because the examples of government buildings provided by *Bruen* all bear some relation to the processes of our democratic government, though the Court would also not go as far as to reject post offices as government buildings. Even if it were to construe "government buildings" broadly, that still wouldn't fully support State Defendants' theory, as they construe "buildings" even more broadly so as to include public transportation vehicles.

### b. *Regulation of historical sensitive places*

State Defendants also compare the Firearm Concealed Carry Act's ban to historical regulation of legislative assemblies and polling places.[49] But this argument fails on account of the purposes of the regulations. State Defendants ask the Court to find the regulations to be relevantly similar because of the shared purpose of protecting the public order, but treating any place where the government would want to protect public order and safety as a sensitive place casts too wide a net—this would seem to justify almost any gun restriction.

### c. *Enclosed, moving vehicles with no escape*

Ms. Foxx doesn't offer a comprehensive theory for defining "sensitive places," but she argues that public transit (specifically the trains and buses) are sensitive places because they are enclosed, moving vehicles with no escape. But Ms. Foxx neither analogizes to the enumerated sensitive places nor provides any evidence to support the creation of a new "sensitive place" category, so this argument fails.

### 3. *Plaintiffs' arguments*

As stated, because Defendants bear the burden to justify the ban as consistent with the American tradition of firearm regulation, Plaintiffs don't need to independently prove that the ban is inconsistent with the American tradition. But, for the sake of developing a full record, the Court addresses Plaintiffs' arguments. Plaintiffs' arguments are based on the faulty premise that by simply citing colonial statutes

---

[49] This mode of analysis is more akin to the analysis comparing the Firearm Concealed Carry Act's ban to various historical regulations, but State Defendants frame it as part of their "sensitive places" argument.

regarding firearm possession, without considering the historical context, these statutes alone foreclose any firearm regulation today. But that's not what *Bruen* requires.

   a.   *"Public transportation"*

Plaintiffs argue that the lack of firearm regulation for "public transportation" at the Founding renders the Firearm Concealed Carry Act's ban necessarily unconstitutional. Plaintiffs detail two types of transportation that they allege are analogous: stagecoaches (including horse-drawn omnibuses) and ferries. But even if such transportation at the Founding was "public,"[50] that isn't an independent basis upon which to grant Plaintiffs summary judgment. As explained, *Bruen* doesn't say that a lack of regulation in a place or situation that happens to fit some modern label is dispositive. *Cf. Antonyuk*, 89 F.4th at 301-02 ("[T]he absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much."). Instead, in contemplating how a lack of regulation might be relevant, *Bruen* offers few suggestions of what might show that a challenged regulation is inconsistent with the Second Amendment. The only one potentially applicable to the record before the Court—and the only one that the parties argue—is to examine if the challenged regulation "addresses a general societal problem that has persisted since the 18th century" and there is no "distinctly similar" historical regulation. *Bruen*, 597 U.S. at 26-27.

---

[50] Plaintiffs discuss stagecoaches, but their evidence doesn't support the notion that stagecoach services were provided by public entities. *See also, e.g.*, Dkt. 72 Ex. 2 at 182 (discussing a waterman's displeasure after the introduction of "private coaches"). In addition, State Defendants, relying on their experts' reports, disputed whether ferries were actually publicly operated. *See* Dkt. 83 at 9 ¶¶ 47-49.

For the societal problem that the Firearm Concealed Carry Act addresses, State Defendants assert that the goal of the statute is to protect public order and safety from the dangers posed by concealed carry, which Plaintiffs don't challenge. In support of this assertion, State Defendants cite the statute's language that a concealed-carry permit is issued only to an individual who "does not pose a danger to himself, herself, or others, or a threat to public safety." 430 ILCS 66/10(a)(4). The source of danger (i.e., the societal problem) that the modern law addresses is the risk posed by the person with the firearm. By contrast, the lack of firearm restrictions for stage-coaches and ferries (and, indeed, sometimes the explicit permission to carry firearms) was tied to a different societal problem: dangers from the outside, such as wildlife. Dkt. 83 at 8 ¶ 45. Thus, the evidence about stagecoaches and ferries, as presented, isn't probative.[51] In other words, the *why* is not sufficiently similar to foreclose the possibility of Defendants putting forth a relevantly similar regulation to justify the ban.

### b. Places that required firearms

Plaintiffs also argue that there is no way to show a tradition of restricting firearms in crowded locations because of statutes that *required* people to bear arms at places

---

[51] In their reply brief, Plaintiffs try to go the opposite direction, starting with the motivation of the historical statutes and arguing that similar, external dangers on public transportation necessarily permits them to carry guns today. But this argument is logically flawed because it again ignores the different social contexts and different regulatory justifications in its attempt to draw an equivalence between "public transit" then and "public transit" now. In addition, "[a]rguments raised for the first time in a reply brief are waived." *James*, 137 F.3d at 1008.

of worship and public meetings.[52] However, Plaintiffs fail to logically connect the existence of those statutes to the proposition that there can *never* be a restriction of a firearm on public transit.

Plaintiffs also cite 17th century colonial laws—from Massachusetts, Maryland, Virginia, and Rhode Island[53]—requiring that arms be borne when traveling more than one mile (Massachusetts), two miles (Rhode Island), "any considerable distance" (Maryland), or "abroad" (Virginia). But Plaintiffs treat these laws as if they're "trapped in amber." *Rahimi*, 144 S. Ct. at 1897-98. Just as "public transit" then isn't necessarily equivalent to "public transit" now, requiring firearms on a two-mile trip in the 17th century doesn't necessarily mean one has the same right today. Plaintiffs fail to contend with the different context of such trips when the laws were enacted.

### c. *Sensitive places*

As for their theory of "sensitive places," Plaintiffs argue that the key characteristic shared by legislative assemblies, polling places, and courthouses is the security

---

[52] 19 *The Colonial Records of the State of Georgia*, pt. 1, at 137-39 (Allen D. Candler ed., 1911) (1770 law); *Archives of Maryland: Proceedings of the Council of Maryland 1636–1667*, at 103 (William Hand Browne ed., Baltimore, Maryland Historical Society 1885); 1 *The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature in the Year 1619*, at 174, 263 (William Waller Hening ed., New York, R. & W. & G. Bartow 1823) (1631 and 1642 laws); *The Public Records of the Colony of Connecticut* 95 (J. Hammond Trumbull ed., Hartford, Brown & Parsons 1850); 1 *Records of the Colony of Rhode Island and Providence Plantations* 94 (John Russell Bartlett ed., Providence, A. Crawford Greene and Brother 1856) (1639 law). Two notes about this list of statutes: first, Plaintiffs cited one more law from Virginia that allegedly required men to bear arms at church, but the Court was unable to find it in Plaintiffs' cited material; second, Plaintiffs included Massachusetts in their list of states that required going armed to public meetings, but they cited no Massachusetts statute.

[53] 1 *Records of the Governor and Company of the Massachusetts Bay in New England* 190 (Nathaniel B. Shurtleff ed., Boston, William White 1853) (1636 law); *Archives of Maryland*, *supra*, at 103 (1642 law); 1 *The Statutes at Large*, *supra*, at 127 (1631 Virginia law); 1 *Records of the Colony of Rhode Island and Providence Plantations*, *supra*, at 94 (1639 law).

provided by the government at these locations. In support, Plaintiffs cite a few sources. First, they cite David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018), specifically where authors argue that the presence of security indicates the government's assessment of whether that location is sensitive.[54] Next, Plaintiffs cite two amicus briefs—one before the Second Circuit and one before the Third Circuit—both of which rely on Mr. Kopel and Mr. Greenlee's argument that sensitive places were about protecting government deliberation from violent interference. Although the Third Circuit has yet to decide its case, the Second Circuit didn't adopt the argument from the amicus brief. *See Antonyuk*, 89 F.4th 271.[55]

The Court found only two courts that have addressed this question head-on. In the case now on appeal before the Third Circuit, the district court, relying solely on the arguments in Kopel and Greenlee's article, agreed with Plaintiffs' "security" theory. *Koons*, 673 F. Supp. 3d at 635. Another court unhesitatingly rejected the theory, calling it "baseless," but it offered little explanation. *Kipke*, 695 F. Supp. 3d at 650. *Bruen*'s only discussion of a location's security in relation to its status as a sensitive place was its rejection of Manhattan as a sensitive place even though it is crowded

---

[54] Although *Bruen* cited Mr. Kopel and Mr. Greenlee's article, it did so for only the narrow proposition that legislative assemblies, polling places, and courthouses are examples of sensitive places from the 18th and 19th centuries. *See Bruen*, 597 U.S. at 30. This Court doesn't see this as a wholesale endorsement of Mr. Kopel and Mr. Greenlee's theories for what makes a place sensitive, especially as *Bruen* disclaimed that it wasn't defining "sensitive places." To be clear, the Court is not discrediting (or crediting) Mr. Kopel and Mr. Greenlee's conclusions. The Court seeks to differentiate between academic research and legal precedent only as it pertains to what is binding on this Court.

[55] Although the statute in that case had its own list of "sensitive places," *Antonyuk* didn't frame its analysis with reference to "sensitive places" as the term is used by *Bruen*.

and has general protection provided by the city. *Bruen*, 597 U.S. at 30-31. Based on that, general protection alone should also be insufficient.

Plaintiffs' theory, however, differs in its formulation: they argue that a sensitive place must have "comprehensive" security, a presumably higher level of security that doesn't run afoul of *Bruen*'s rejection of Manhattan as a sensitive place. According to Plaintiffs, the closest modern equivalent to the "comprehensive" security at the Founding are the armed guards and metal detectors found at courthouses and airports.[56] There are at least two reasons why this makes little sense. First, that only courthouses and airports have modern security measures that meet Plaintiffs' definition of "comprehensive" doesn't explain why prohibitions at polling places and legislative assemblies are permissible. Polling places and legislative assemblies lack such security, but the Supreme Court has nevertheless deemed them to be sensitive places. Second, Plaintiffs fail to establish why "comprehensive" security is the right threshold. Their examples from the Founding era consist of laws that required and/or paid law enforcement to be present at legislatures, courthouses, and polling places, and Plaintiffs offer no explanation for how or why that translates to metal detectors in today's social context. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .").

---

[56] If the Court accepted Plaintiffs' theory, that would also doom Plaintiffs' facial challenge—Plaintiffs acknowledge in their reply brief that "[i]f Illinois were to install TSA-like security for its subways, buses, or trains, then it could constitutionally ban firearms at those locations." Dkt. 92 at 8 n.2.

## CONCLUSION

This action has been properly brought before this Court—despite the disputes over venue and standing, the parties can't escape the Court. The parties also can't escape that this case requires navigating the murky waters of *Bruen*. Plaintiffs' proposed conduct—carrying concealed handguns on public transit for self-defense—falls within the presumptive ambit of the Second Amendment, shifting the burden to Defendants to show that the Firearm Concealed Carry Act's ban falls within the historical tradition of firearm regulation in this country. On the record before the Court in this case, Defendants have failed to meet their burden.

As for injunctive relief, Plaintiffs have made no argument regarding why they're entitled to injunctive relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Because they've forfeited the argument, they haven't established their entitlement to an injunction.

The claims against Rick Amato and Eric Rinehart are dismissed without prejudice for lack of subject-matter jurisdiction. Rick Amato and Eric Rinehart are terminated from the case. The remaining State Defendants' motion for summary judgment is denied. Kimberly Foxx's motion for summary judgment is denied.

Plaintiffs' motion for summary judgment is granted in part. The Court grants declaratory relief against Kwame Raoul, Kimberly Foxx, and Robert Berlin, in their official capacities, that the Firearm Concealed Carry Act's ban on carrying concealed firearms on public transportation, as defined in the statute, 430 ILCS 66/65(a)(8), violates the Second Amendment, as applied to:

**SA51**

- Benjamin Schoenthal carrying a concealed firearm for self-defense on Metra, and on Metra's real property to the extent necessary to ride Metra.

The Court grants declaratory relief against Kwame Raoul and Kimberly Foxx, in their official capacities, that the Firearm Concealed Carry Act's ban on carrying concealed firearms on public transportation, as defined in the statute, 430 ILCS 66/65(a)(8), violates the Second Amendment, as applied to:

- Mark Wroblewski carrying a concealed firearm for self-defense on Metra, and on Metra's real property to the extent necessary to ride Metra;
- Joseph Vesel carrying a concealed firearm for self-defense on Metra and the CTA, and on Metra and the CTA's real property to the extent necessary to ride Metra and the CTA; and
- Douglas Winston carrying a concealed firearm for self-defense on Metra and the CTA, and on Metra and the CTA's real property to the extent necessary to ride Metra and the CTA.

Date: August 30, 2024

HON. IAIN D. JOHNSTON
*United States District Judge*

**SA52**

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

In accordance with Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,815 words, beginning with the words "Jurisdictional Statement" on page 1 and ending with the words "Respectfully submitted" on page 52. In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was Microsoft Word.

s/ Jonathon D. Byrer
Jonathon D. Byrer, Attorney

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

In accordance with Circuit Rule 30(d), I certify that the short appendix to this brief contains all of the materials required by Circuit Rule 30(a), and that all materials required by Circuit Rule 30(b) are contained in a separate appendix.

s/ Jonathon D. Byrer
Jonathon D. Byrer, Attorney

## CERTIFICATE OF SERVICE

I certify that on January 15, 2025, I electronically filed the attached Brief and Short Appendix of Defendant-Appellant Eileen O'Neill Burke with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jonathon D. Byrer
Jonathon D. Byrer, Attorney