No. 24-2643, 24-2644

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

BENJAMIN SCHOENTHAL, et al.,
PLAINTIFFS-APPELLEES,
V.
KWAME RAOUL, et al.,
DEFENDANTS-APPELLANTS.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
No. 3:22-cv-50326

**BRIEF FOR THE DISTRICT OF COLUMBIA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAII, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, AND VERMONT AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**

BRIAN L. SCHWALB
District of Columbia Attorney
General

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ANNE A. DENG
Assistant Attorney General

Office of the Attorney General for
the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI CURIAE ..................................... 1

SUMMARY OF ARGUMENT ................................................................. 2

ARGUMENT .................................................................................. 4

I.  The Second Amendment Allows States To Implement Reasonable Firearm Regulations To Promote Gun Safety And Protect Against Gun Violence ................................................................................ 4

II.  Consistent With Regulations Adopted By Other States, Illinois's Designation Of Public Transportation As A Sensitive Place Protects Uniquely Vulnerable Locations And Populations .......................... 8

    A.  Firearms pose special risks in crowded gathering spots ...................... 9

    B.  Restricting firearms in sensitive places protects vulnerable populations ......................................................................... 15

CONCLUSION ............................................................................... 18

# TABLE OF AUTHORITIES

*Cases*

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) ........................................................ 9, 17

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) .............................................................. 8

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) .............................................................. 8

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................................ 1, 4, 5, 6, 7, 8

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ................................................................... 4, 5, 6

*Medtronic Inc. v. Lohr*,
518 U.S. 470 (1996) .......................................................................... 4

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) .......................................................... 1, 4, 6, 7, 8

*Schoenthal v. Raoul*,
2024 WL 4007792 (N.D. Ill. Aug. 30, 2024) ....................................... 3

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019) ....................................................... 8, 17

*United States v. Morrison*,
529 U.S. 598 (2000) .......................................................................... 4

*United States v. Rahimi*,
144 S. Ct. 1889 (2024) .................................................................... 4, 6

*Voisine v. United States*,
579 U.S. 686 (2016) .......................................................................... 9

*Statutes and Regulations*

Ala. Code § 13A-11-61.2 ................................................................. 13

Alaska Stat. § 11.61.220 ............................................................... 12

Ark. Code Ann. § 5-73-122 .......................................................... 17

Cal. Penal Code § 26230 ......................................................... 12, 17

Colo. Rev. Stat. § 18-9-118 .......................................................... 13

D.C. Code § 7-2509.07 ............................................................ 13, 14

D.C. Code § 22-4502.01 ............................................................... 17

Fla. Stat. § 790.06 ...................................................................... 12

Ga. Code Ann. § 16-11-127.1 ........................................................ 17

Haw. Rev. Stat. § 134-9.1 ............................................................ 13

430 ILCS 66/65 .................................................................. 2, 12, 17

720 ILCS 5/24-1 ........................................................................... 2

80 Ind. Admin. Code 11-2-2 .......................................................... 13

Ky. Rev. Stat. § 244.125 ............................................................... 12

La. Rev. Stat. § 40:1379.3 ............................................................ 13

Minn. Stat. § 97A.091 .................................................................. 12

Miss. Code Ann. § 45-9-101 .......................................................... 12

Mo. Rev. Stat. § 70.441 ............................................................... 13

Mo. Rev. Stat. § 571.107 ......................................................... 12, 17

Mont. Code § 87-5-401 ................................................................ 12

N.C. Gen Stat. § 14-277.2 ............................................................ 13

N.D. Cent. Code § 62.1-02-05 ................................................................ 17

N.J. Stat. Ann. § 2C:58-4.6 ................................................................... 13

N.M. Stat. Ann. § 30-7-13 ..................................................................... 13

N.Y. Penal Law § 265.01-e .............................................. 12, 13, 14, 17

Neb. Rev. Stat. § 28-1202.01 ................................................................ 12

Okla. Stat. Ann. tit. 21, § 1272.1 ......................................................... 12

18 Pa. Cons. Stat. Ann. § 912 ............................................................... 17

S.C. Code Ann. § 58-23-1830 ............................................................... 13

Tex. Penal Code § 46.03 ...................................................... 12, 13, 17

13 Vt. Stat. Ann. § 4023 ........................................................................ 18

W. Va. Code Ann. § 61-7-11a ............................................................... 17

Wyo. Stat. Ann. § 6-8-104 .................................................................... 17

*Other*

Alaska Railroad, *Baggage Policy* ......................................................... 13

Alejandro Tirachini et al., *Crowding in Public Transport Systems: Effects on Users, Operation, & Implications for the Estimation of Demand*, 53 Transp. Res. Part A Policy & Prac. 36 (2013) ............................ 11

Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727 (2018) ..................................... 11

*Brooklyn Subway Shooting: Police Search for Gunman in Attack on Brooklyn Subway*, N.Y. Times (Apr. 12, 2022) ................................................. 10

*Bruen and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. Rev. E. Supp. I.-60 (2022) ........................................................................................ 9

Carlie Porterfield, *10 Injured in Stampede at New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022) .............................. 10

Erik Bascome, *Numerous MTA subway service disruptions due to Brooklyn shooting*, SILIVE (Apr. 12, 2022) ..................................................... 11

FBI, *Uniform Crime Reporting Statistics: Their Proper Use* (May 2017) ............. 7

Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139 (2021) ....................................................... 12

Heather A. Turner et al., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881 (2019)...... 16

Justin Tyndall, *Waiting for the R Train: Public Transportation & Employment*, 54 J. Urban Studies 520 (2015) ................................... 14

Kessler Found., *National Employment and Disability Survey 2015: Executive Summary* ........................................................................... 16

Kristin Blagg et al., *The Extra Mile: Time to School and Student Outcomes in Washington, DC*, Urban Inst. 3 (Sept. 2018)..................................... 15

Mary Wisniewski, *For CTA's youngest riders, a course on the fourth R – riding the 'L' and bus*, Chi. Tribune (Feb. 26, 2018) ........................ 15

Mass. Bay Transp. Auth., *Rider Rules and Regulations* .................................. 13, 14

Md. Dep't of Transp., *Mobility/Paratransit Services Ride Guide*........................... 7

Michael Elsen-Rooney & Chalkbeat, *Student OMNY Cards Boost Public Transit Use*, The City (Oct. 6, 2024) ................................................ 16

Robyn R.M. Gershon, *Public Transportation: Advantages and Challenges*, 82 J. Urban Health 7 (2005)................................................. 14, 15, 16

San Diego Metro. Transit Sys., *Rules for Riding*.................................... 13

*Shooting shuts down West Oakland BART, causing systemwide delays*, CBS News (Jun. 15, 2022)................................................... 11

v

Sophie Reardon, *2 Arrested in "Targeted Shooting" Outside Pittsburgh Church During Funeral*, CBS News (Oct. 28, 2022)........................................ 10

*Transit System*, Ill. Dep't of Transp....................................................... 10

U.S. Census Bureau, *Commuting by Public Transportation in the United States: 2019* (Apr. 2021)...................................................................... 7

Valerie Bonk, *Shooting on Metro Red Line causes service delays,* WTOP News (Dec. 15, 2020)............................................................ 12

Veronica Canales, *Man arrested after firing round that ricocheted off L'Enfant Plaza station platform, striking woman*, WTOP News (Sept. 2, 2022) ..................................................................................... 10

*When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139 (2021) .............................. 12

**INTRODUCTION AND INTEREST OF AMICI CURIAE**

Amici the District of Columbia, California, Colorado, Connecticut, Delaware, Hawaii, Maine, Maryland, Massachusetts, Michigan, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Vermont (collectively, "Amici States") submit this brief in support of defendants-appellants under Federal Rule of Appellate Procedure 29(a)(2).

Amici States have a responsibility to protect the health, safety, and welfare of their communities, which includes protecting their residents from the harmful effects of gun violence and promoting the safe and responsible use of firearms. Amici States have historically fulfilled this responsibility by exercising their police powers to implement reasonable measures to regulate firearms, including by imposing location-based restrictions on carrying guns. Such regulation does not conflict with the Second Amendment. As the Supreme Court has consistently recognized, the Second Amendment does not encompass the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," leaving states with the flexibility they need to protect their communities. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008)).

Indeed, the Second Amendment "leaves [jurisdictions with] a variety of tools for combating [the] problem" of gun violence. *Heller*, 554 U.S. at 636. This

flexibility is an essential element of our federalist system, and it ensures that firearm regulations appropriately and effectively address the specific concerns in each locality. Although Amici States have taken different approaches to regulating firearms, they share an interest in addressing gun violence in ways that are tailored to the needs of their residents. Amici States seek to maintain their authority to address firearm-related issues through legislation that is consistent with historical tradition and responsive to the unique circumstances in their communities.

## SUMMARY OF ARGUMENT

In Illinois, individuals are prohibited under the Firearm Concealed Carry Act ("Act") from knowingly carrying loaded and accessible firearms on public transportation, which includes "[a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds." 430 ILCS 66/65(a)(8). Concealed carry licenseholders may, however, transport firearms on public transit if the firearms are unloaded and safely stored. *See* 720 ILCS 5/24-1(a)(4)(i)-(iii), (a)(10)(i)-(iii). In September 2022, four individuals who wish to carry concealed handguns onto public buses and trains filed suit in district court challenging the constitutionality of the Act and seeking equitable relief. At summary judgment, the district court ruled in relevant part for the plaintiffs and declared the Act unconstitutional, finding that the government failed to meet its

burden to show that the public-transit ban fell within this nation's historical tradition of firearm regulation. Short Appendix 49 (Memorandum Opinion and Order). Defendants appealed.

Amici States agree with Illinois that the district court's decision should be reversed. In particular, the challenged provision does not violate the Second Amendment because it fits squarely within a long tradition of constitutionally acceptable regulations that states and localities have adopted to protect their residents—and that railroads historically adopted to protect their passengers. Additionally, the sensitive place at issue in this case—public transportation—is consistent with the types of locations that other states have designated as sensitive: designations that limit firearm possession in crowded places and around vulnerable populations. As in other states, Illinois's sensitive-place designation protects the public from the heightened risk of gun violence in such locations. States and localities invest significant resources to ensure the safety and accessibility of their public transit systems. Requiring states to allow firearms on these systems would jeopardize their effective operation and cause significant social and economic harm to the communities they serve.

**ARGUMENT**

I. **The Second Amendment Allows States To Implement Reasonable Firearm Regulations To Promote Gun Safety And Protect Against Gun Violence.**

Since the Founding, states have enacted restrictions on who may bear arms, where arms may be brought, and the manner in which arms may be carried. *See United States v. Rahimi*, 144 S. Ct. 1889, 1899-901 (2024); *Bruen*, 142 S. Ct. at 2145; *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010); *Heller*, 554 U.S. at 626-27. The Act is one in a long line of state and local regulations designed to make gun possession and use safer for the public.

States and their subdivisions have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation marks omitted). Enacting measures to promote public safety—particularly those that are tailored to local circumstances—falls squarely within the reasonable exercise of state and local police powers. Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

The Supreme Court has repeatedly affirmed state and local authority in this area, even as it has defined the scope and import of the rights conferred by the

Second Amendment.  In each of its major Second Amendment opinions—*Heller*, *McDonald*, *Bruen*, and *Rahimi*—the Court expressly acknowledged the important role states and local governments play in setting their own policies to minimize the risk of gun violence, consistent with our Nation's historical tradition.

In *Heller*, the Court made clear that the right to keep and bear arms is "not unlimited."  554 U.S. at 626.  Although states may not ban the possession of handguns by responsible, law-abiding individuals or impose similarly severe burdens, they still possess "a variety of tools" to combat the problem of gun violence in a way that is responsive to the needs of their communities.  *Id.* at 636.  The Court reiterated this point in *McDonald*, emphasizing that the Second Amendment "by no means eliminates" a state's "ability to devise solutions to social problems that suit local needs and values."  561 U.S. at 785; *see id.* at 802 (Scalia, J., concurring) ("No fundamental right—not even the First Amendment—is absolute.").  Recognizing that "conditions and problems differ from locality to locality," *id.* at 783, the Court made clear that "state and local experimentation with reasonable firearms regulations" could and should continue "under the Second Amendment," *id*. at 785 (brackets and internal quotation marks omitted).

*Bruen* confirmed these principles.  There, the Court explicitly stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of provisions "designed to ensure only that those bearing arms . . . are, in fact, 'law-

abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). And, building on *Heller*, the Court "assume[d] it settled" that prohibiting firearms in sensitive locations—including "schools and government buildings," "legislative assemblies, polling places, and courthouses," and "new and analogous sensitive places"—is constitutional. *Id*. at 2133 (emphasis omitted).

Most recently, in *Rahimi*, the Court again explained that "the right secured by the Second Amendment is not unlimited" and should not be understood to protect the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 144 S. Ct. at 1897 (quoting *Heller*, 554 U.S. at 626-27). Indeed, the Court elaborated, "[a]t the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers" to "ban[s] [on] the carrying of dangerous and unusual weapons . . . [and] concealed firearms." *Id.* (internal quotation marks omitted).

These decisions make clear that states retain wide power to enact laws to protect their residents. Those laws need not be uniform: each jurisdiction is free to select "solutions to social problems that suit local needs and values," ensuring that firearm regulations appropriately and effectively address their constituency's specific needs. *McDonald*, 561 U.S. at 785. As the Court emphasized in *Bruen*, the Second Amendment is not a "regulatory straightjacket." 142 S. Ct. at 2133. Rather,

states are permitted to enact a wide range of firearm regulations. *See id.* at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)). For instance, the list of locations designated as sensitive may vary from state to state, reflecting both the need to tailor such designations to the specific characteristics of each community and a shared concern with minimizing the risk of gun violence. *See* FBI, *Uniform Crime Reporting Statistics: Their Proper Use* 1 (May 2017), https://tinyurl.com/yzh8v8up (noting that a wide variety of factors "affect the volume and type of crime occurring from place to place," including population density, the size of the youth population, poverty level, job availability, modes of transportation, climate, and cultural characteristics).

The need for locally tailored firearm regulations is especially pronounced in the context of public transportation, which varies substantially across different regions both in ridership and the type of public transportation used by commuters. U.S. Census Bureau, *Commuting by Public Transportation in the United States: 2019*, at 3-5 (Apr. 2021), https://tinyurl.com/59euk9mw. For instance, California, Massachusetts, and Washington State have robust ferry networks. And Maryland's MobilityLink paratransit system provides transportation to people with disabilities in certain locations. *See* Md. Dep't of Transp., *Mobility/Paratransit Services Ride Guide* at 1, https://tinyurl.com/3ffefaye. Given the variability in public transit

infrastructure, regulatory flexibility allows states to respond to local needs and protect their citizens from harm.

In short, "[t]he [Second] Amendment has not disabled the ability of representative democracy to respond to an urgent public safety crisis." *Bianchi v. Brown*, 111 F.4th 438, 472 (4th Cir. 2024) (en banc). "[S]ince the Founding[,] there has been an unbroken tradition of regulating weapons" to "protect public health, safety, and welfare." *Bevis v. City of Naperville*, 85 F.4th 1175, 1200 (7th Cir. 2023). States and local governments retain not only the freedom, but also the fundamental responsibility, to implement reasonable measures designed to respond to the needs of their communities and to protect their residents from the harms associated with gun violence.

## II. Consistent With Regulations Adopted By Other States, Illinois's Designation Of Public Transportation As A Sensitive Place Protects Uniquely Vulnerable Locations And Populations.

As the Supreme Court has consistently recognized, the right to "bear" firearms in public has long been understood to permit restrictions on bearing arms in "sensitive places." *Heller*, 554 U.S. at 626; *see Bruen*, 142 S. Ct. at 2133 (reaffirming that in sensitive places, "arms carrying [can] be prohibited consistent with the Second Amendment"). Because people "can preserve an undiminished right of self-defense by not entering [such] places" or by "taking an alternate route," *United States v. Class*, 930 F.3d 460, 465-66 (D.C. Cir. 2019) (internal quotation

marks omitted), laws restricting firearms in places identified as sensitive "neither prohibit nor broadly frustrate any individual from generally exercising his right to bear arms," *Voisine v. United States*, 579 U.S. 686, 714 (2016) (Thomas, J., dissenting).

Illinois's designation of public transit as sensitive places is a reasonable and appropriate response to the heightened risk associated with the presence of firearms in such locations. Without the power to institute such restrictions, Illinois and other jurisdictions would be left unable to effectively prevent gun violence in particularly dangerous places and around vulnerable populations, putting the public at risk.

### A.     Firearms pose special risks in crowded gathering spots.

To start, states frequently restrict the use of firearms in certain dangerous places where volatile conditions create special risks to health and safety. Designating areas as sensitive places helps to preserve order and diminish the risk of panic in gathering locations and other crowded spaces. *See* Carina Bentata Gryting & Mark Frassetto, NYRSPA v. Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. Rev. E. Supp. I.-60, I.-68 (2022) ("The number of potential targets . . . and the increased risk of conflict all seem to be relevant in the historical determination that an area constitutes a sensitive place."); *see also Antonyuk v. James*, 120 F.4th 941, 1027 (2d Cir. 2024) (finding that "a high population density in discrete, confined spaces, such

as quintessential public squares, has historically justified firearm restrictions"). Governments may therefore choose to restrict the use of firearms in places where the presence of large numbers of people in confined spaces creates risks to health and safety, like in buses or trains. Indeed, the public transit system covered by the Act transports millions of riders—across hundreds of millions of rides—a year. *See Transit System*, Ill. Dep't of Transp., https://tinyurl.com/b893mc7d (last visited Jan. 22, 2025).

In such busy locations, firearm use is likely to end in tragedy—not only for those who may be shot, but also for others who may be injured attempting to escape alongside a panicked crowd. *See, e.g.*, *Brooklyn Subway Shooting: Police Search for Gunman in Attack on Brooklyn Subway*, N.Y. Times (Apr. 12, 2022), http://tinyurl.com/4tdteru9 (10 shot and another 13 injured from smoke inhalation, falls, or panic attacks); Carlie Porterfield, *10 Injured in Stampede at New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022), https://tinyurl.com/2xeuc7fj; Sophie Reardon, *2 Arrested in "Targeted Shooting" Outside Pittsburgh Church During Funeral*, CBS News (Oct. 28, 2022), https://tinyurl.com/5434vek3 (individual injured while trying to escape the scene of a church shooting). In addition, the presence of firearms in particularly confined spaces, such as trains and buses, amplifies the risk of injury and death from stray bullets and accidental discharge. *See, e.g.*, Veronica Canales, *Man arrested after*

*firing round that ricocheted off L'Enfant Plaza station platform, striking woman*, WTOP News (Sept. 2, 2022), https://tinyurl.com/ybuhddbp.

Moreover, crowded and confined spaces—like public transportation or public-transit stations—heighten perceptions of threats to personal safety and security and increase the risk of violent confrontations. *See* Alejandro Tirachini et al., *Crowding in Public Transport Systems: Effects on Users, Operation, & Implications for the Estimation of Demand*, 53 Transp. Res. Part A Policy & Prac. 36 (2013), https://tinyurl.com/26zawcf8 (summarizing empirical studies finding that crowding on public transit led to increased anxiety, stress, and exhaustion). The presence of weapons in this context increases the likelihood of violence, as research has found that the mere presence of a gun primes individuals to think and act more aggressively, known as the "weapons effect." *See* Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727, 730-31 (2018), https://tinyurl.com/34cnpvmd.

Firearms can also inhibit the safe and effective operation of locations where large numbers of people gather. For example, the discharge of a firearm may cause a disruptive and inconvenient shut-down. *See, e.g.*, Erik Bascome, *Numerous MTA subway service disruptions due to Brooklyn shooting*, SILIVE (Apr. 12, 2022), https://tinyurl.com/2x7dh9yd; *Shooting shuts down West Oakland BART, causing*

11

*systemwide delays*, CBS News (Jun. 15, 2022), https://tinyurl.com/5ycfsdcx; Valerie Bonk, *Shooting on Metro Red Line causes service delays,* WTOP News (Dec. 15, 2020), https://tinyurl.com/4aws49zd.  And even the perceived risk of gun violence can cause repercussions, as individuals may be discouraged from visiting crowded locations where they know others may be armed.  *See* Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139, 141 (2021) ("Gun laws protect people's freedom and confidence to participate in every domain of our shared life, from attending school to shopping, going to concerts, gathering for prayer, voting, assembling in peaceable debate, counting electoral votes, and participating in the inauguration of a President.").

Recognizing these dangers, many states, like Illinois, have chosen to restrict carrying firearms in crowded places.  For example, some limit open or concealed carry of firearms in public and state parks.  *See, e.g.*, Cal. Penal Code § 26230(a)(12); Minn. Stat. § 97A.091, subd.1(1); Mont. Code § 87-5-401(1); N.Y. Penal Law § 265.01-e(2)(d); 430 ILCS 66/65(a)(13).  Many prohibit firearms in bars.  *See, e.g.*, Alaska Stat. § 11.61.220(a)(2); Fla. Stat. § 790.06(12)(a)(12); Ky. Rev. Stat. § 244.125(1); Miss. Code Ann. § 45-9-101(13); Mo. Rev. Stat. § 571.107(7); Neb. Rev. Stat. § 28-1202.01(3); Okla. Stat. Ann. tit. 21, § 1272.1; Tex. Penal Code § 46.03(a)(7).  Still others limit firearms at locations that host large gatherings and

events, like stadiums, fairgrounds, and parade routes. *See, e.g.*, Ala. Code § 13A-11-61.2(a)(5), (6) (school and professional athletic events); 80 Ind. Admin. Code 11-2-2(b) (fairgrounds); La. Rev. Stat. § 40:1379.3(N)(9) (parades); N.C. Gen Stat. § 14-277.2(a) (parades, picket lines, funeral processions); Tex. Penal Code § 46.03(a)(4), (13) (racetracks and amusement parks).

Directly relevant here, many states prohibit firearms in public-transit facilities or vehicles. *See, e.g.*, Colo. Rev. Stat. § 18-9-118; D.C. Code § 7-2509.07(a)(6); Haw. Rev. Stat. § 134-9.1(a)(13); Mo. Rev. Stat. § 70.441(11); N.J. Stat. Ann. § 2C:58-4.6(a)(20); N.M. Stat. Ann. § 30-7-13; N.Y. Penal Law § 265.01-e(2)(n); S.C. Code Ann. § 58-23-1830(a)(3). Beyond restrictions at the state level, there are additional local- and system-level prohibitions of firearms on public transportation. For example, although Oregon itself does not regulate firearms on public transportation, its largest public-transit system, TriMet, prohibits bringing firearms and other weapons on its vehicles. TriMet Code § 28.15(D)(2); *see also, e.g.*, Alaska Railroad, *Baggage Policy*, https://tinyurl.com/38urrpdj (last visited Jan. 22, 2025) ("Concealed weapons are not allowed onboard any trains or in any depot."); San Diego Metro. Transit Sys., *Rules for Riding*, https://tinyurl.com/yc5xtut7 (last visited Jan. 22, 2025) ("Firearms are not allowed on any bus or Trolley."); Mass. Bay Transp. Auth., *Rider Rules and Regulations*, https://tinyurl.com/mry3a58k (last visited Jan. 22, 2025) (prohibiting firearms in vehicles and stations). In fact, the top

three rail rapid transit systems in the United States by ridership, excluding Chicago's "L"—the New York City subway, the Washington, D.C. Metro, and "the T" in Massachusetts—all prohibit firearms under a state, local, or system rule. *See* N.Y. Penal Law § 265.01-e(2)(n); D.C. Code § 7-2509.07(a)(6); Mass. Bay Transp. Auth., *Rider Rules*, *supra.*

These commonplace restrictions are unsurprising because in many regions, public transportation services are essential to economic prosperity and social well-being. The United States' mass transit network, one of the world's largest, serves tens of millions of riders on an average weekday. Robyn R.M. Gershon, *Public Transportation: Advantages and Challenges*, 82 J. Urban Health 7, 7 (2005), https://tinyurl.com/yc2w9zbe. This transportation infrastructure decreases automobile congestion, lessens the adverse health effects associated with environmental emissions, and provides workers with access to more employment opportunities while also giving employers a greater pool of potential employees. *Id.* (explaining that mass transit "provides employees with a means to get to work," "provides for workforce accessibility," and "reduces the reliance on unemployment assistance, as workers are more likely to stay employed if they have easy and affordable means of getting to work"); *see also* Justin Tyndall, *Waiting for the R Train: Public Transportation & Employment*, 54 J. Urban Studies 520, 535 (2015)

(finding that "public transportation access plays a meaningful role in setting the level of local unemployment").

Gun violence and the threat thereof jeopardizes the ability of mass transit systems to serve these crucial functions. Shootings on subways and buses can cause massive disruptions to service when they occur. *See supra* at 11-12. Even the perceived risk of gun violence on public transit discourages ridership. For example, crime in New York City subways was a major deterrent to potential riders in the 1970s and 1980s, but increased safety through policing activities helped to boost ridership in the following decades. *See* Gershon, *supra* at 8. Requiring states and localities to allow firearms on public transit would amplify safety concerns and could make individuals less willing to use trains and buses.

## B. Restricting firearms in sensitive places protects vulnerable populations.

The Act's restriction on carrying firearms on public transportation also helps to protect the particularly vulnerable populations that frequent these locations, such as children and their caregivers, elderly individuals, and persons with disabilities. Daily riders on public transportation in Chicago can include more than a hundred thousand children, who depend on public transit to get to and from school. *See* Mary Wisniewski, *For CTA's youngest riders, a course on the fourth R – riding the 'L' and bus*, Chi. Tribune (Feb. 26, 2018), https://tinyurl.com/3kujjtt4 (135,000 children use Chicago's CTA trains and buses on schooldays); *see also* Kristin Blagg et al.,

*The Extra Mile: Time to School and Student Outcomes in Washington, DC*, Urban Inst. 3 (Sept. 2018), https://tinyurl.com/tc26cfjf (nearly a quarter of students in the District of Columbia use public transit to get to school); Michael Elsen-Rooney & Chalkbeat, *Student OMNY Cards Boost Public Transit Use*, The City (Oct. 6, 2024), https://tinyurl.com/4mkwknc5 (NYC students took 2.5 million public transit trips in just the first month of school). Public transportation also serves "community members that depend on it as their sole source of transportation, such as the elderly, disabled, low income, young adults, and others." *See* Gershon, *supra* at 7. And access to transportation can be a vital component of fostering an inclusive community; a 2015 national survey found that more than a quarter of non-working job seekers with disabilities reported a lack of transportation as a main barrier to finding a job. Kessler Found., *National Employment and Disability Survey 2015: Executive Summary*, https://tinyurl.com/mve77nhv.

While all of the factors above make firearms on public transit dangerous for the average rider, the risks are amplified for the many riders who are members of vulnerable groups. These individuals cannot easily defend themselves or escape a violent attack, should one occur. And even if they are not physically harmed by firearms, exposure to such violence can cause psychological harm. *See* Heather A. Turner et al., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881, 888 (2019), https://tinyurl.com/2vwsed8n

(indirect exposure to gun violence, including witnessing violence or hearing gunshots, can be traumatic to children).

Courts have recognized that the regular presence of vulnerable people (such as children, the sick, and the elderly) in a particular location is a strong indication that the location is properly deemed sensitive for Second Amendment purposes. *See, e.g.*, *Antonyuk*, 120 F.4th at 1012 (finding a historical "tradition of prohibiting firearms in locations where vulnerable populations congregate"); *Class*, 930 F.3d at 465 (places are designated as sensitive "because of the people found there" (internal quotation marks omitted)).

Indeed, many states, like Illinois, exclude firearms from places that welcome vulnerable segments of the population. In addition to restricting firearms on public transit, *see supra* at 13-14, some states also prohibit firearms at playgrounds and youth centers. *See, e.g.*, Cal. Penal Code § 26230(a)(11); 430 ILCS 66/65(a)(12); N.Y. Penal Law § 265.01-e(2)(d). Other states bar firearms in and around schools, *see, e.g.*, Ark. Code Ann. § 5-73-122(a)(3)(D)(ii); D.C. Code § 22-4502.01(a); 18 Pa. Cons. Stat. Ann. § 912(b); Wyo. Stat. Ann. § 6-8-104(t)(ix), and at school functions, *see, e.g.*, Ga. Code Ann. § 16-11-127.1(b)(1); N.D. Cent. Code § 62.1-02-05(1)(a); W. Va. Code Ann. § 61-7-11a(b)(1)(C). And many states prohibit firearms at hospitals, nursing homes, or other healthcare facilities. *See, e.g.*, 430 ILCS 66/65(a)(7); Mo. Rev. Stat. § 571.107(17); N.Y. Penal Law § 265.01-e(2)(b); Tex.

Penal Code § 46.03(a)(11); 13 Vt. Stat. Ann. § 4023(a).  Like Illinois, these states have acted to protect vulnerable populations by designating the spaces where they congregate as sensitive places where carrying firearms is prohibited.

## CONCLUSION

The Court should reverse the decision below.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for
the District of Columbia

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ANNE A. DENG
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

January 2025

ROB BONTA
*Attorney General*
State of California

PHILIP J. WEISER
*Attorney General*
State of Colorado

WILLIAM TONG
*Attorney General*
State of Connecticut

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

ANNE E. LOPEZ
*Attorney General*
State of Hawaii

AARON M. FREY
*Attorney General*
State of Maine

ANTHONY G. BROWN
*Attorney General*
State of Maryland

ANDREA J. CAMPBELL
*Attorney General*
Commonwealth of Massachusetts

DANA NESSEL
*Attorney General*
State of Michigan

MATTHEW J. PLATKIN
*Attorney General*
State of New Jersey

RAÚL TORREZ
*Attorney General*
State of New Mexico

LETITIA JAMES
*Attorney General*
State of New York

DAN RAYFIELD
*Attorney General*
State of Oregon

PETER F. NERONHA
*Attorney General*
State of Rhode Island

CHARITY R. CLARK
*Attorney General*
State of Vermont

# CERTIFICATE OF COMPLIANCE

I certify that:

1. This brief complies with the type-volume limitations of Circuit Rule 29 because the brief contains 3,897 words, excluding exempted parts.

2. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on January 22, 2025, an electronic copy of the foregoing was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE