No. 24-2643, 24-2644 (consol.)

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

BENJAMIN SCHOENTHAL et al.,

*Plaintiffs-Appellees,*

vs.

KWAME RAOUL et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN
DIVISION
No. 3:22-cv-50326
The Honorable Iain D. Johnston

# BRIEF OF BRADY CENTER TO PREVENT GUN
# VIOLENCE AND GIFFORDS LAW CENTER TO
# PREVENT GUN VIOLENCE AS *AMICI CURIAE* IN
# SUPPORT OF DEFENDANTS-APPELLANTS

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
Brady Center to Prevent Gun
Violence
840 First Street NE
Suite 400
Washington, D.C. 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org
tfardon@bradyunited.org

*Counsel for Amicus Curiae Brady
Center to Prevent Gun Violence*

Esther Sanchez-Gomez
Giffords Law Center to Prevent
Gun Violence
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org

William T. Clark
Giffords Law Center to Prevent
Gun Violence
244 Madison Ave, Suite 147
New York, NY 10016
(415) 433-2062
wclark@giffords.org

*Counsel for Amicus Curiae
Giffords Law Center to Prevent
Gun Violence*

Charles Rothfeld
*Counsel of Record*
Charley B. Lanter
Mayer Brown LLP
1999 K Street, Northwest
Washington, DC 20006-1101
(202) 263-3000
crothfeld@mayerbrown.com
clanter@mayerbrown.com

Mark G. Hanchet
Robert W. Hamburg
Noelle A. Jolin
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020-1001
(212) 506-2500
mhanchet@mayerbrown.com
rhamburg@mayerbrown.com
njolin@mayerbrown.com

*Counsel for Amici Curiae Brady
Center to Prevent Gun Violence
and Giffords Law Center to
Prevent Gun Violence*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-2643, 24-2644</u>

Short Caption: <u>Schoenthal v. Raoul</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Brady Center to Prevent Gun Violence</u>

    <u>Giffords Law Center to Prevent Gun Violence</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Mayer Brown LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Charles Rothfeld</u>    Date: <u>January 22, 2025</u>

Attorney's Printed Name:  <u>Charles Rothfeld</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✔]  **No** [ ]

Address:  <u>1999 K Street, Northwest</u>

    <u>Washington, DC 20006-1101</u>

Phone Number: <u>(202) 263-3000</u>    Fax Number:  <u>(202) 263-3300</u>

E-Mail Address: <u>crothfeld@mayerbrown.com</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-2643, 24-2644</u>

Short Caption: <u>Schoenthal v. Raoul</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Brady Center to Prevent Gun Violence

    Giffords Law Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Mayer Brown LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Mark G. Hanchet    Date: January 22, 2025

Attorney's Printed Name:  Mark G. Hanchet

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address:  1221 Avenue of the Americas

    New York, NY 10020-1001

Phone Number:  (212) 506-2500    Fax Number:  (212) 262-1910

E-Mail Address: mhanchet@mayerbrown.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-2643, 24-2644</u>

Short Caption: <u>Schoenthal v. Raoul</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

| | **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.** |
|---|---|

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Brady Center to Prevent Gun Violence

    Giffords Law Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Mayer Brown LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: <u>/s/ Robert W. Hamburg</u>      Date: <u>January 22, 2025</u>

Attorney's Printed Name: <u>Robert W. Hamburg</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [✔]

Address: <u>1221 Avenue of the Americas</u>

       <u>New York, NY 10020-1001</u>

Phone Number: <u>(212) 506-2500</u>      Fax Number: <u>(212) 262-1910</u>

E-Mail Address: <u>rhamburg@mayerbrown.com</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-2643, 24-2644</u>

Short Caption: <u>Schoenthal v. Raoul</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Brady Center to Prevent Gun Violence

    Giffords Law Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Mayer Brown LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: <u>/s/ Noelle A. Jolin</u>    Date: <u>January 22, 2025</u>

Attorney's Printed Name: <u>Noelle A. Jolin</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☒

Address: <u>1221 Avenue of the Americas</u>

    <u>New York, NY 10020-1001</u>

Phone Number: <u>(212) 506-2500</u>    Fax Number: <u>(212) 262-1910</u>

E-Mail Address: <u>njolin@mayerbrown.com</u>

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-2643, 24-2644</u>

Short Caption: <u>Schoenthal v. Raoul</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Brady Center to Prevent Gun Violence</u>

<u>Giffords Law Center to Prevent Gun Violence</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Mayer Brown LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Charley B. Lanter</u>    Date: <u>January 22, 2025</u>

Attorney's Printed Name: <u>Charley B. Lanter</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** [ ] **No** [✔]

Address: <u>1999 K Street, Northwest</u>

<u>Washington, DC 20006-1101</u>

Phone Number: <u>(202) 263-3000</u>    Fax Number: <u>(202) 263-3300</u>

E-Mail Address: <u>clanter@mayerbrown.com</u>

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-2643, 24-2644

Short Caption: Schoenthal v. Raoul

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Brady Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Mayer Brown LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

      N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Douglas N. Letter      Date: January 22, 2025

Attorney's Printed Name: Douglas N. Letter

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: 840 First Street NE, Suite 400

Washington, DC 20002

Phone Number: (202) 370-8100       Fax Number: N/A

E-Mail Address: dletter@bradyunited.org

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-2643, 24-2644

Short Caption: Schoenthal v. Raoul

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Brady Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Mayer Brown LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Shira L. Feldman    Date: January 22, 2025

Attorney's Printed Name: Shira L. Feldman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 840 First Street NE, Suite 400

Washington, DC 20002

Phone Number: (202) 370-8100    Fax Number: N/A

E-Mail Address: sfeldman@bradyunited.org

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-2643, 24-2644</u>

Short Caption: <u>Schoenthal v. Raoul</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Brady Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Mayer Brown LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: <u>/s/ Tess M. Fardon</u>    Date: <u>January 22, 2025</u>

Attorney's Printed Name: <u>Tess M. Fardon</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address: <u>840 First Street NE, Suite 400</u>

    <u>Washington, DC 20002</u>

Phone Number: <u>(202) 370-8100</u>    Fax Number: <u>N/A</u>

E-Mail Address: <u>tfardon@bradyunited.org</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-2643, 24-2644</u>

Short Caption: <u>Schoenthal v. Raoul</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Giffords Law Center to Prevent Gun Violence</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Mayer Brown LLP</u>

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Esther Sanchez-Gomez</u>    Date: <u>January 22, 2025</u>

Attorney's Printed Name:  <u>Esther Sanchez-Gomez</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** [ ]  **No** [✔]

Address:  <u>268 Bush St. #555</u>

    <u>San Francisco, CA 94104</u>

Phone Number: <u>(415) 433-2062</u>    Fax Number: <u>N/A</u>

E-Mail Address: <u>esanchezgomez@giffords.org</u>

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-2643, 24-2644</u>

Short Caption: <u>Schoenthal v. Raoul</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Giffords Law Center to Prevent Gun Violence</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Mayer Brown LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

   <u>N/A</u>

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   <u>N/A</u>

Attorney's Signature: <u>/s/ William T. Clark</u>    Date: <u>January 22, 2025</u>

Attorney's Printed Name: <u>William T. Clark</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: <u>244 Madison Ave, Suite 147</u>

   <u>New York, NY 10016</u>

Phone Number: <u>(415) 433-2062</u>    Fax Number: <u>N/A</u>

E-Mail Address: <u>wclark@giffords.org</u>

rev. 12/19 AK

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Brady Center to Prevent Gun Violence and Giffords Law Center to Prevent Gun Violence each hereby disclose that: neither organization has a parent corporation. Neither organization has stock, and therefore no publicly held company owns 10% or more of their stock.

Dated: New York, New York
     January 22, 2025

Respectfully submitted,

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
Brady Center to Prevent Gun Violence
840 First Street NE
Suite 400
Washington, D.C. 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org
tfardon@bradyunited.org

*Counsel for Amicus Curiae Brady Center to Prevent Gun Violence*

Esther Sanchez-Gomez
Giffords Law Center to Prevent Gun Violence
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org

*/s/ Charles Rothfeld*
Charles Rothfeld
*Counsel of Record*
Charley B. Lanter
Mayer Brown LLP
1999 K Street, Northwest
Washington, DC 20006-1101
(202) 263-3000
crothfeld@mayerbrown.com
clanter@mayerbrown.com

William T. Clark
Giffords Law Center to Prevent
Gun Violence
244 Madison Ave, Suite 147
New York, NY 10016
(415) 433-2062
wclark@giffords.org

*Counsel for Amicus Curiae Giffords Law Center to Prevent Gun Violence*

Mark G. Hanchet
Robert W. Hamburg
Noelle A. Jolin
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020-1001
(212) 506-2500
mhanchet@mayerbrown.com
rhamburg@mayerbrown.com
njolin@mayerbrown.com

*Counsel for Amici Curiae Brady Center to Prevent Gun Violence and Giffords Law Center to Prevent Gun Violence*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT...........................................i

TABLE OF AUTHORITIES.................................................................v

INTERESTS OF *AMICI CURIAE* .......................................................... 1

INTRODUCTION.............................................................................. 3

ARGUMENT ...................................................................................... 5

I.    The Act is constitutional under *Bruen*. ........................................ 8

    A.    The Act's restriction on firearms is analogous to restrictions imposed on longstanding sensitive places. ........ 8

        1.    Courts have long upheld bans on firearms in sensitive places like schools, polling stations, legislative assemblies, courthouses, and government buildings. .................................................. 9

        2.    The characteristics of public transit compel a finding that it is an analogous sensitive place. .......... 13

            a.    Public transit is a tight, crowded space, moving numerous people at high speeds........... 13

            b.    Public transit serves many vulnerable people, including children, the elderly, and the disabled. ....................................................... 19

            c.    Public transit is vulnerable to disruptions that threaten the public order. .......................... 21

    B.    Other historical analogues also support Illinois's firearm restriction................................................. 24

    C.    The only circuit court to consider this issue post-*Bruen* found that firearm restrictions on public transit are constitutional........................................................ 29

II.    Illinois is also entitled to regulate firearms on public transit because it is a proprietor of the Illinois public transit system..... 30

CONCLUSION .................................................................................... 32

CERTIFICATE OF COMPLIANCE...................................................... 34

# TABLE OF CONTENTS
(continued)

**Page**

CERTIFICATE OF SERVICE.................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antonyuk v. Hochul,*
   639 F. Supp. 3d 232 (N.D.N.Y. 2022) .................................................. 30

*Antonyuk v. James,*
   120 F.4th 941 (2d Cir. 2024)....................................................... *passim*

*Bonidy v. U.S. Postal Serv.,*
   790 F.3d 1121 (10th Cir. 2015) ........................................................... 14

*In re Debs,*
   158 U.S. 564 (1895).......................................................................... 25

*District of Columbia v. Heller,*
   554 U.S. 570 (2008)............................................................. 2, 8, 12, 24

*Hall v. Garcia,*
   2011 WL 995933 (N.D. Cal. Mar. 17, 2011) ........................................ 9

*Kipke v. Moore,*
   695 F. Supp. 3d 638 (D. Md. 2023) .................................. 13, 26, 30, 31

*Koons v. Platkin,*
   673 F. Supp. 3d 515 (D.N.J. 2023)..................................................... 30

*MacWade v. Kelly,*
   460 F.3d 260 (2d Cir. 2006) .............................................................. 16

*Maupin v. State,*
   17 S.W. 1038 (Tenn. 1890)................................................................ 27

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010).......................................................................... 2

*New York State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022)....................................................................... *passim*

*Rocky Mountain Gun Owners v. Polis,*
  121 F.4th 96 (10th Cir. 2024) ............................................ 6

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt.*
  *Auth.,*
  550 U.S. 330 (2007) ...................................................... 31

*United States v. Allam,*
  677 F. Supp. 3d 545 (E.D. Tex. 2023) ............................... 11

*United States v. Benson,*
  704 F. Supp. 3d 616 (E.D. Pa. 2023) ....................... 9, 10, 15

*United States v. Hayes,*
  555 U.S. 415 (2009) ........................................................ 2

*United States v. Rahimi,*
  602 U.S. 680 (2024) ............................................... *passim*

*United States v. Walter,*
  2023 WL 3020321 (D.V.I. Apr. 20, 2023) ........................ 11

*Wolford v. Lopez,*
  116 F.4th 959 (9th Cir. 2024) ................................. *passim*

**Statutes and Rules**

430 ILCS 66 ........................................................... *passim*

1786 Va. Acts 35 ............................................................ 26

1870 S.C. Laws 403 ....................................................... 28

1889 Ariz. Sess. Laws 16 ............................................... 27

1878-79 Ga. Laws 421 ................................................... 27

1795 Mass. Acts 436 ..................................................... 27

1841 Me. Laws 709 ....................................................... 28

**Page(s)**

1883 Mo. Laws 76 .................................................................27

1903 Mont. Laws 49 .............................................................27

1890 Okla. Sess. Laws 495 ...................................................27

1869-79 Tenn. Pub. Acts 23 ...........................................26, 27

1870 Tex. Gen. Laws 63 .......................................................26

1786 Va. Acts ch. 21 ............................................................27

Fed. R. App. P. 29 ..................................................................3

## Other Authorities

Adam Mintzer, *Police: Man carrying gun near Memphis school did nothing illegal*, WKRN (Nov. 28, 2023, 11:08 PM), https://www.wkrn.com/news/tennessee-politics/police-man-carrying-gun-near-memphis-school-did-nothing-illegal-how-did-tn-get-here/ ...........................10

Alexandra Filindra & Noah Kaplan, *The "Chilling Effects" of Gun Carry in Public Places*, UNIV. ILL. INST. GOV'T & PUB. AFF. (2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5032271 .........28

Arlin J. Benjamin Jr., et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 PERSONALITY & SOC. PSYCH. REV. 347 (2018) ...................................................18

*Brooklyn subway gunman shot 10 people in 2022 attack sentenced to life in prison*, PBS (Oct. 5, 2023, 8:00 PM), https://www.pbs.org/newshour/nation/brooklyn-subway-gunman-who-shot-10-people-in-2022-attack-sentenced-to-life-in-prison ...................................................16

Carina Bentata Gryting & Mark Anthony Frassetto,
*NYSRPA v.* Bruen *and the Future of the Sensitive Places
Doctrine: Rejecting the Ahistorical Government Security
Approach*, 63 B.C. L. REV. 60 (2022) .................................................... 9

*Chaos breaks out at subway station after 4 shot when NYPD
opens fire in Brooklyn*, ABC (Sept. 17, 2024),
https://abc7ny.com/post/brooklyn-subway-shooting-chaos-
breaks-station-after-4-shot-when-nypd-opens-fire-
brownsville/15310417/ ........................................................................ 18

CHICAGO METRO. AGENCY FOR PLANNING,
https://cmap.illinois.gov/regional-
plan/goals/recommendation/leverage-the-transportation-
network-to-promote-inclusive-growth/ ............................................... 20

CHICAGO TRANSIT AUTHORITY,
https://www.transitchicago.com/ ........................................... 14, 20, 22

Cindy Dampier, CHICAGO TRIBUNE (Dec. 13, 2018, 1:55 AM),
https://www.chicagotribune.com/2018/08/27/chicagos-kids-
often-commute-alone-heres-what-parents-need-to-know/ ................. 19

Collection of Statutes (F. Martin ed. 1792) ............................................. 26

Darrell A. H. Miller, *Constitutional Conflict and Sensitive
Places*, 28 WM. & MARY BILL RTS. J. 459 (2019) ................................ 21

David Lasse, *Metra project underway to increase speeds on
Electric District*, TRAINS (Feb. 28, 2024),
https://www.trains.com/trn/news-reviews/news-
wire/metra-project-underway-to-increase-speeds-on-
electric-district/#:~:text=%E2%80%9CWe
%20operate%20at%2065%20miles,save%20for%20one%20
private%20crossing .............................................................................. 15

Dep't of Homeland Sec., *Biennial National Strategy for
Transportation Security* (Apr. 18, 2023) ........................................... 16

*Firearm Violence in the United States*, THE JOHNS HOPKINS
BLOOMBERG SCH. OF PUB. HEALTH,
https://publichealth.jhu.edu/center-for-gun-violence-
solutions/research-reports/firearm-violence-in-the-united-
states#:~:text=Carrying
%20firearms%20in%20public%20also,increases%20aggres
sive%20thoughts%20and%20actions ................................................ 18

Hurubie Meko, Lola Fadula, & Maria Cramer, *Man Charged
in Broad Daylight Shooting That Had Ripple Effect on
Subway*, N.Y. TIMES (Nov. 7, 2024),
https://www.nytimes.com/2024/11/07/nyregion/nyc-
shooting-subway-delays.html .............................................................. 23

Joseph Blocher & Reva B. Siegel, *Guided by History:
Protecting the Public Sphere from Weapons Threats Under
Bruen*, 98 N.Y.U. L. REV. 1795 (2023) ...................................... 6, 10, 11

Joseph Blocher & Reva B. Siegel, *When Guns Threaten the
Public Sphere: A New Account of Public Safety Regulation
Under Heller*, 116 NW. U. L. REV. 139 (2021) .................................... 21

Joshua Hochman, Note, *The Second Amendment on Board:
Public and Private Historical Traditions of Firearm
Regulation*, 133 YALE L.J. 1676 (2024) ........................................ 15, 25

Larry Buchanan & Lauren Weatherby, *Who Stops a 'Bad
Guy With a Gun'?*, N.Y. TIMES (June 22, 2022),
https://www.nytimes.com/interactive/2022/06/22/us/shooti
ngs-police-response-uvalde-buffalo.html ............................................ 17

METRA, https://metra.com/fares ............................................................. 20

Michael Gold, *Panic in Brooklyn Subway: Police Hunt
Gunman Who Shot 10*, N.Y. TIMES (Apr. 12, 2022)
https://www.nytimes.com /2022/04/12/nyregion/shooting-
subway-sunset-park.html .................................................................... 22

Office of the U.S. Surgeon Gen., *Firearm Violence: A Public Health Crisis in America*, U.S. SURGEON GENERAL'S ADVISORY 5 (2024), https://www.hhs.gov/sites/default/files/firearm-violence-advisory.pdf ..................................................................................5

Peter N. Salib & Guha Krishnamurthi, *Will* Bruen *Kill Cops?*, 93 FORDHAM L. REV. ONLINE 11 (2024) ................................... 11

Phillip A. Hummel, *Next Stop—A Cleaner and Healthier Environment: Global Strategies to Promote Public Transit*, 35 TRANSP. L.J. 263 (2008) ............................................................... 20

Ravi Baichwal, *14 injured in crash involving CTA bus on South Side, Chicago fire officials say*, ABC (Nov. 21, 2024), https://abc7chicago.com/post/chicago-crash14-injured-crash-involving-cta-bus-west-60th-street-south-state-side-fire-officials-say/15566204/ ............................................... 15

U.S. Const. amend II .................................................................. 2, 4, 7, 31

U.S. Const. amend XIV .................................................................... 7, 26

*Witnesses of Brooklyn subway shooting recall "smoke and blood and people screaming*," CBS NEWS (Apr. 12, 2022, 7:02 PM), https://www.cbsnews.com/news/brooklyn-subway-shooting-witnesses-smoke-blood-new-york-city/ .................. 16

Originally founded in 1974, **Brady Center to Prevent Gun Violence** ("Brady") is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live, and to protect the authority of democratically elected officials to address the nation's gun violence epidemic. Brady works to free America from gun violence by passing and defending gun violence prevention laws, reforming the gun industry, and educating the public about responsible gun ownership. Brady leads a number of initiatives aimed at combating gun violence, including Veterans for Gun Reform, the End Family Fire Program, and #ShowYourSafety.

Formed in 1993 by a group of attorneys after a gun massacre at a San Francisco law firm, **Giffords Law Center to Prevent Gun Violence** ("Giffords Law Center") is a nonprofit organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve community safety. The organization was renamed the Giffords Law Center in 2017 after

joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence. Together with its partner organization, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.

*Amici's* experience and expertise in advocating on gun violence prevention issues is longstanding and includes filing *amicus* briefs in major Second Amendment cases, such as *United States v. Rahimi*, 602 U.S. 680 (2024); *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *United States v. Hayes*, 555 U.S. 415 (2009); and *District of Columbia v. Heller*, 554 U.S. 570 (2008).

*Amici curiae* have a strong interest in this case and support Illinois's and Cook County's appeal of the district court's decision finding

that the Illinois Firearm Concealed Carry Act is unconstitutional so far as it prohibits guns on public transit.[1]

## INTRODUCTION

The Illinois Firearm Concealed Carry Act ("Act"), which merely bans loaded guns on public transit while permitting properly stored guns, fits squarely within this country's historical tradition of firearm regulation. Indeed, states have long enjoyed the ability to regulate guns in crowded places like public transit. And that tradition "confirm[s] what common sense suggests": guns may be regulated on public transit, which is a critical public service essential to the daily life of millions—including some of society's most vulnerable—and presents conditions susceptible to violence, including gun crime, mass shootings, or terrorism. *See United States v. Rahimi*, 602 U.S. 680, 682 (2024). Far from being a sweeping ban on guns, the Act is historically grounded, limited in duration, and designed to protect riders and maintain public order.

---

[1] Under Fed. R. App. P. 29(a), all of the parties have consented to the filing of this brief. Under Fed. R. App. P. 29(a)(4)(E), *amici* state that no party or counsel to any party in this matter authored this brief in part or in whole, no party or counsel to any party contributed money to fund the preparation or submission of this brief, and no person other than *amici* contributed money to fund the preparation or submission of this brief.

In its effort to apply the Supreme Court's ruling in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the district court lost its way. In *Bruen*, the Supreme Court held that, to comport with the Second Amendment, gun restrictions that implicate the plain text of the Second Amendment must be consistent with the country's historical tradition of regulating firearms. *Id.* at 17. But the Supreme Court recently instructed against applying *Bruen* more broadly than the Court intended. *See Rahimi*, 602 U.S. at 691.

As *Bruen* and *Rahimi* make clear, courts need not identify a "historical twin" among old statutes in order to uphold a modern gun regulation, 597 U.S. at 30; 602 U.S. at 691, and the district court erred in requiring one here. The Framers of the Constitution could not have envisioned the technology and scale of ridership associated with modern public transit, moving millions of people every day around the nation at breakneck speeds on electrified tracks and in large articulated or single coach buses. Nor could they have imagined the technology and scale associated with modern firearms, the ready availability of those firearms

to the general public, or a world in which the Surgeon General declares gun violence "a public health crisis."[2]

Illinois's common-sense public safety regulation is entirely consistent with historical regulation of firearms in sensitive places like public transit, which is all that *Bruen* requires. And that law strikes an appropriate balance—imposing a limited restriction on gun carriage for a short duration to protect hundreds of thousands of people who rely on public transit every day to commute within Illinois to school, work, medical appointments, and other essential engagements. Public transit is an essential element of our economic and cultural life, and Illinois is well within the bounds of its longstanding authority (and responsibility) to ensure that public transit is safe, efficient, and orderly. The district court's decision should be reversed.

## ARGUMENT

Under *Bruen*, when a firearm regulation implicates the Second Amendment's plain text, the law is constitutional if it comports with the country's historical tradition of firearm regulations. *Bruen*, 597 U.S. at

---

[2] Office of the U.S. Surgeon Gen., *Firearm Violence: A Public Health Crisis in America*, U.S. SURGEON GENERAL'S ADVISORY 5 (2024), https://www.hhs.gov/sites/default/files/firearm-violence-advisory.pdf.

30. There are two ways to make this showing in the context of the Act. First, the state can show that the modern restriction is analogous to the gun restrictions at longstanding "sensitive places," like schools, government buildings, legislative assemblies, polling places, and courthouses.[3] *Id.* Second, the state can show that the modern restriction is analogous to other historical regulations. *Id.*

When using analogical reasoning, courts focus on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The "how" is the manner in which firearms are restricted, and the "why" is the interest or policy driving the restriction. *Id.* at 29-30. "For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Rahimi*, 602 U.S. at 692.

Moreover, when, like here, the case implicates "unprecedented societal concerns or dramatic technological changes," the analysis requires "a more nuanced approach." *Bruen*, 597 U.S. at 27. The state

---

[3] Indeed, some courts have held that such "presumptively lawful" regulatory measures do not implicate the Second Amendment's plain text at all, upholding modern laws that fall within these regulatory traditions at *Bruen*'s first step. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 119-20 (10th Cir. 2024).

need only point to historical analogues that are "relevantly similar." *Id.* at 28-29. To that end, courts should focus on whether the new law is consistent with the "principles" that underpin historic regulations, but need not identify a "dead ringer." *Rahimi*, 602 U.S. at 692.

When considering historical analogues, there are at least two relevant time periods: those of ratification of the Second and Fourteenth Amendments in 1791 and 1868, respectively. *Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024); *Antonyuk v. James*, 120 F.4th 941, 973 (2d Cir. 2024). Later history that reflects how the Second Amendment was interpreted may also be considered, as well as "a regular course of practice," which can "liquidate" and "settle" constitutional meaning. *See Bruen*, 597 U.S. at 35-36; *Antonyuk*, 120 F.4th at 968.

Finally, the state may also regulate firearms in locations where it acts as or like a proprietor of government property. *See Wolford*, 116 F.4th at 970-71. That provides a separate and independent basis supporting firearm restrictions.

Here, the Act is constitutional for at least three independent reasons. First, public transit constitutes a "sensitive place" like schools and other government facilities, and the restrictions here are motivated

by concerns similar to those supporting firearm restrictions in those places. Second, other historical analogues are also relevantly similar and support the constitutionality of the Act. Third, Illinois acts as a proprietor of its public transit system, which gives the State independent authority to restrict guns on the transit system.

## I. The Act is constitutional under *Bruen*.

### A. The Act's restriction on firearms is analogous to restrictions imposed on longstanding sensitive places.

In *District of Columbia v. Heller* and *Bruen*, the Court identified several examples of "longstanding" sensitive places—schools, government buildings, legislative assemblies, polling places, and courthouses—and explained that "courts can use analogies to . . . historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30; *Heller*, 554 U.S. 570, 626-27 (2008). As *Bruen* instructs, courts must examine the "how and why" behind restrictions at paradigmatic sensitive places, which when analogized to public transit, shows that public transit is an equally compelling sensitive place.

1. **Courts have long upheld bans on firearms in sensitive places like schools, polling stations, legislative assemblies, courthouses, and government buildings.**

Starting with schools, the historical record reveals that complete bans of guns on or around school premises have long been upheld. Carina Bentata Gryting & Mark Anthony Frassetto, *NYSRPA v.* Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. REV. 60, 63-65 (2022).

The rationale for these restrictions reveals several important interests. First, guns have been prohibited at schools and other "spaces that provide educational opportunities" to ensure freedom from violence and to protect the sanctity of "educational and scientific opportunities." *See Antonyuk*, 120 F.4th at 1027. Second, schools "are crowded indoor spaces where even an accidental discharge could strike and kill a child or teacher." *United States v. Benson*, 704 F. Supp. 3d 616, 624 (E.D. Pa. 2023). Moreover, given the "large numbers of children either at school or traveling to and from it," guns can create "danger and disruption." *Hall v. Garcia*, 2011 WL 995933, at *4 (N.D. Cal. Mar. 17, 2011). Third, even if not fired, "bringing a gun onto a school's grounds can cause panic and traumatize those who might have to shelter in place while the situation

is resolved." *Benson*, 704 F. Supp. at 624. Indeed, even when a law-abiding citizen walks into a school or crowd with a gun, chaos often ensues.[4] Finally, schools contain children who are "vulnerable" and do not have the means for self-defense. *Antonyuk*, 120 F.4th at 1011.

As for polling stations, legislative assemblies, courthouses, and other government buildings, "how" restrictions were implemented often reflected a total ban on weapons in these locations, or at minimum a complete restriction during certain times, such as at polling stations on election days or legislative assemblies when in session. Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under* Bruen, 98 N.Y.U. L. REV. 1795, 1805 (2023). Notably, these are the times at which these places are most likely to be crowded.

The "why" of the limitations also reflected multiple important interests. Gun restrictions at polling stations, for example, were designed to allay voter intimidation, threats, disruption, and other security

---

[4] *E.g.*, Adam Mintzer, *Police: Man carrying gun near Memphis school did nothing illegal*, WKRN (Nov. 28, 2023, 11:08 PM), https://www.wkrn.com/news/tennessee-politics/police-man-carrying-gun-near-memphis-school-did-nothing-illegal-how-did-tn-get-here/ (man carrying rifle legally "sent a preschool and elementary school into lockdown").

concerns. *United States v. Allam*, 677 F. Supp. 3d 545, 579 (E.D. Tex. 2023) (threats), *appeal filed*, No. 24-40065 (5th Cir. 2024); *United States v. Walter*, 2023 WL 3020321, at *6 (D.V.I. Apr. 20, 2023) (armed intimidation); Blocher & Siegel, *Guided by History*, 98 N.Y.U. L. Rev. at 1805 (security concerns). Similarly, gun restrictions at legislative assemblies, courthouses, and government buildings were designed to protect the democratic process, government functioning, and civic activities, as well as security for government employees and the general public entering these facilities. *See* Blocher & Siegel, *Guided by History*, 98 N.Y.U. L. Rev. at 1804.

Firearm restrictions at government facilities are also designed to prevent certain risks that are inherent to these types of locations, such as politically motivated violence at demonstrations. *See* Peter N. Salib & Guha Krishnamurthi, *Will* Bruen *Kill Cops?*, 93 Fordham L. Rev. Online 11, 24 (2024) ("Government buildings are at elevated risk for at least certain kinds of political violence."); *Allam*, 677 F. Supp. 3d at 561 (courthouses, legislatures, and polling places "can generate passionately angry emotions" and people in government buildings may be "at acute personal risk of being targets of assassination" (quotation omitted)).

Putting these historical justifications for firearm restrictions in sensitive places together, several common-sense principles emerge. *See Rahimi*, 602 U.S. at 698 (concluding history and "common sense" show that taking guns away from people who threaten harm to others is constitutional); *Heller*, 554 U.S. at 626-27 (similar). First, the government may restrict guns to ensure that schools, educational facilities, and similar locations that provide education are free from violence. Second, the government may also restrict firearms at locations that carry inherent risk for violence, such as government buildings, polling stations, courthouses, or legislative assemblies, all of which a gunman may target to intimidate, make a political statement, or disrupt. Third, the government may restrict firearms at locations where it is imperative to maintain public order, including schools (where guns may trigger panic and lockdowns), legislative assemblies (where guns may disrupt lawmaking), and polling stations and government buildings (where guns may impede citizens from exercising their right to vote or participate in civic duties). Finally, the state may restrict firearms to protect vulnerable people, whether they are vulnerable by nature (children) or vulnerable because of their location (crowded school rooms,

government buildings, polling stations, or legislative assemblies).

As discussed further below, these important principles apply with equal force to restrictions on firearms on modern public transit.

### 2. The characteristics of public transit compel a finding that it is an analogous sensitive place.

Analogizing the "how and why" of public transit regulations to longstanding sensitive place regulations shows that public transit is sufficiently comparable to justify firearm restrictions. To accomplish this task, courts may consider the characteristics of public transit—such as physical characteristics, ridership, geographic network, and other inherent traits—that prompt firearm regulations. Courts then may see how those characteristics relate to the rationale behind restricting firearms at other sensitive places. In so doing, courts must be mindful that "[h]istorical regulations reveal a principle, not a mold." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring).

### a. Public transit is a tight, crowded space, moving numerous people at high speeds.

Like schools, public transit is a crowded space where gun violence poses an elevated threat to public safety; thus, the same "how and why" that supports firearm restrictions in schools, supports firearm restrictions in public transit. *See Kipke v. Moore*, 695 F. Supp. 3d 638,

13

655 (D. Md. 2023) (finding "mass transit facilities are crowded spaces" sufficiently analogous to schools), *appeal filed*, No. 24-1834 (4th Cir. 2024); *cf. Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1137-40 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part) (finding that firearm regulations in post offices were valid because they are an "enclosed space" that requires interactions in "close quarters" and "even a lawful use" of arms in that space would pose "greater risks to innocent bystanders").

To start, the physical structure of public transit is often uncomfortably tight—passengers squeeze into train cars, buses, or ferries with minimal seating, frequently leaving passengers standing in the aisle, tripping over each other, with little or no room to move, especially during rush hours.[5] In large metropolitan areas like Chicago, hundreds of thousands of commuters ride on public transit each day.[6] And the trains and buses travel at high speeds. The Metra, for example,

---

[5] *See, e.g.*, CHICAGO TRANSIT AUTHORITY, https://www.transitchicago.com/coronavirus/dashboard/ (warning that "you may encounter crowdedness on your preferred bus route or rail line").

[6] CHICAGO TRANSIT AUTHORITY, https://www.transitchicago.com/facts/ (average ridership in 2022 was 762,564 people per weekday).

travels up to 65 mph (with planning underway to increase speed).[7] Thus, even without guns in the mix, passengers are vulnerable to injuries, accidents, and other mishaps that can happen in crowded, fast-moving vehicles.[8]

Bringing guns on board amplifies these dangers, even when done without criminal intent. As is the case in schools, an "accidental discharge," for example, can strike and kill multiple passengers, the conductor, or bystanders waiting on the platform. *Compare Benson*, 704 F. Supp. 3d 624 (risk of accidental discharge in schools), *with* Joshua Hochman, Note, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 Yale L.J. 1676, 1718 (2024) (risk of accidental discharge on trains). Even more alarming, gunfire on public transit can leave passengers trapped in unsafe conditions, such as that caused by smoke or fire, with nowhere to seek

    [7] David Lasse, *Metra project underway to increase speeds on Electric District*, Trains (Feb. 28, 2024), https://www.trains.com/trn/news-reviews/news-wire/metra-project-underway-to-increase-speeds-on-electric-district/#:~:text=%E2%80%9CWe%20operate%20at%2065%20miles,save%20for%20one%20private%20crossing.

    [8] *See, e.g.*, Ravi Baichwal, *14 injured in crash involving CTA bus on South Side, Chicago fire officials say*, ABC (Nov. 21, 2024), https://abc7chicago.com/post/chicago-crash14-injured-crash-involving-cta-bus-west-60th-street-south-state-side-fire-officials-say/15566204/ (reporting on bus crash).

refuge.[9] And if a shooter with mal-intent steps on board, the crowded conditions with no immediate means of escape ensure maximum carnage.[10]

For these reasons, public transit is, tragically, a top target for terrorism and political violence. *See* Dep't of Homeland Sec., *Biennial National Strategy for Transportation Security* 3 (Apr. 18, 2023) (noting that passenger rail systems "remain accessible targets for domestic threat actors and internationally");[11] *see also MacWade v. Kelly*, 460 F.3d 260, 264 (2d Cir. 2006) ("Given the subway's enclosed spaces, extraordinary passenger volume, and cultural and economic importance, it is unsurprising—and undisputed—that terrorists view it as a prime target."). Allowing passengers to bring guns into the transit system compounds the problem, making it difficult, if not virtually impossible,

---

[9] *Witnesses of Brooklyn subway shooting recall "smoke and blood and people screaming,"* CBS News (Apr. 12, 2022, 7:02 PM), https://www.cbsnews.com/news/brooklyn-subway-shooting-witnesses-smoke-blood-new-york-city/ (reporting that passengers were trapped in a train car filled with smoke after shooting).

[10] *Brooklyn subway gunman shot 10 people in 2022 attack sentenced to life in prison*, PBS (Oct. 5, 2023, 8:00 PM), https://www.pbs.org/newshour/nation/brooklyn-subway-gunman-who-shot-10-people-in-2022-attack-sentenced-to-life-in-prison (reporting that Brooklyn subway shooter "waited until the train was between stations, denying his targets a chance to flee").

[11] *Available at* https://www.tsa.gov/sites/default/files/tsa_biennial_nsts_20230418_signed_508c.pdf.

for law enforcement to distinguish between those who carry guns for self-defense and those who carry guns to inflict carnage. "In fact, having more than one armed person at the scene who is not a member of law enforcement can create confusion and carry dire risks."[12] For example, an "armed bystander who shot and killed an attacker in 2021 in Arvada, Colo., was himself shot and killed by the police, who mistook him for the gunman."[13] If passengers are allowed to bring loaded guns on public transit, law enforcement will struggle to discern whether they pose a security threat.

To be sure, the Plaintiffs in this case would likely argue that law-abiding citizens should be permitted to bring guns on board for self-defense for these very reasons. But the strength of that argument dissipates in light of the physics of shootings in enclosed spaces.

For example, when the police recently shot at a man wielding a knife on the New York City subway, the bullets "flew inside the car and onto the platform," striking not only the suspect, but also two passengers

---

[12] Larry Buchanan & Lauren Weatherby, *Who Stops a 'Bad Guy With a Gun'?*, N.Y. TIMES (June 22, 2022), https://www.nytimes.com/interactive/2022/06/22/us/shootings-police-response-uvalde-buffalo.html.

[13] *Id.*

and the police officer.[14] The harm caused by an untrained, civilian shooter would likely be much worse. Thus, even if a passenger discharges a firearm in response to a perceived threat, many bystanders would likely get caught in the crossfire as bullets can ricochet off bodies or metal walls, travel to the next passenger car, or strike those standing on the platform. Put simply, discharging a firearm on public transit for any reason jeopardizes other lives.

Moreover, studies show that when individuals carry guns in self-defense, they are more likely to get into a heated exchange with others, an all-too-common occurrence when people are packed into tight quarters.[15] Thus, far from ensuring self-defense and protection, guns on

---

[14] *Chaos breaks out at subway station after 4 shot when NYPD opens fire in Brooklyn*, ABC (Sept. 17, 2024), https://abc7ny.com/post/brooklyn-subway-shooting-chaos-breaks-station-after-4-shot-when-nypd-opens-fire-brownsville/15310417/.

[15] *See Firearm Violence in the United States*, THE JOHNS HOPKINS BLOOMBERG SCH. OF PUB. HEALTH, https://publichealth.jhu.edu/center-for-gun-violence-solutions/research-reports/firearm-violence-in-the-united-states#:~:text=Carrying %20firearms%20in%20public%20also,increases%20aggressive%20thoughts%20and %20actions ("Carrying firearms in public also increases the risk for violence by escalating minor arguments and increasing the chances that a confrontation will become lethal. Research has found that even the mere presence of a firearm increases aggressive thoughts and actions."); Arlin J. Benjamin Jr., et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 PERSONALITY & SOC. PSYCH. REV. 347, 359 (2018) (study found that "merely seeing a weapon can increase aggressive thoughts, hostile appraisals, and aggressive behavior").

board increase the risk of violent confrontations.

In sum, the same rationale behind gun restrictions in schools—to protect children in crowded spaces—is at least as compelling in the public transit context.

**b.    Public transit serves many vulnerable people, including children, the elderly, and the disabled.**

Public transit, like schools, serves vulnerable people; thus, the "how and why" supporting gun restrictions in schools also supports gun restrictions on public transit. *See Antonyuk*, 120 F.4th at 1010-11 (recognizing "tradition of firearm regulation in locations where vulnerable populations are present" and upholding firearm restriction in behavioral health facilities that aims to protect "vulnerable or impaired people"). Many children, for example, travel on Illinois's public transit. The *Chicago Tribune* reported that in 2018, "Chicago's public transit system provide[d] more than 130,000 rides per school day to [the] City's schoolchildren. And many of those children—some as young as 7—[ride] without a parent."[16] The Chicago Transit Authority (CTA) and Metra also

---

[16]    Cindy Dampier, CHICAGO TRIBUNE (Dec. 13, 2018, 1:55 AM), https://www.chicagotribune.com/2018/08/27/chicagos-kids-often-commute-alone-heres-what-parents-need-to-know/.

offer free or reduced fares for young children or students.[17] Just as gun regulations in schools have been designed to protect children and preserve the safety of education, *Antonyuk*, 120 F.4th at 1027, gun regulations on public transit are needed to ensure that children and other students can safety commute to school to pursue education.

Other vulnerable groups also depend on Illinois's public transit system, including senior citizens and those with disabilities. As with children, the CTA and Metra offer free or reduced fares for senior citizens and those with disabilities.[18] Moreover, this important public service offers convenience, obviates the need for private automobile parking, and limits the environmental impacts of commuting.[19]

Thus, because public transit serves many vulnerable populations

---

[17] CHICAGO TRANSIT AUTHORITY, https://www.transitchicago.com/for-parents-with-children/ (children under seven ride for free, and children under twelve or students qualify for reduced fares); METRA, https://metra.com/fares (same).

[18] CHICAGO TRANSIT AUTHORITY, https://www.transitchicago.com/reduced-fare-programs/ (seniors and those with disabilities ride for free); Metra, https://metra.com/fares (seniors and those with disabilities eligible for reduced fares).

[19] *See* CHICAGO METRO. AGENCY FOR PLANNING, https://cmap.illinois.gov/regional-plan/goals/recommendation/leverage-the-transportation-network-to-promote-inclusive-growth/ (explaining that those with disabilities "have an unemployment rate that is twice that of those without disabilities," which is compounded by "lack of transportation"); Phillip A. Hummel, *Next Stop—A Cleaner and Healthier Environment: Global Strategies to Promote Public Transit*, 35 TRANSP. L.J. 263, 264 (2008) (discussing environmental benefits of public transit).

and is essential for their participation in public life and education, the same "how" and "why" that support firearm restrictions in schools support the firearm restrictions here.

### c. Public transit is vulnerable to disruptions that threaten the public order.

Protecting the public order is foundational to the "how" and "why" underlying firearm restrictions at government buildings, courthouses, legislative assemblies, and polling stations—and applies with equal force to public transit. *See* Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 WM. & MARY BILL RTS. J. 459, 473 (2019) (historical firearm restrictions at polling stations designed to protect public order); Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 NW. U. L. REV. 139, 164 (2021) ("In the Anglo-American tradition, governments have regulated guns to preserve public peace and public order, not only to prevent violence and save lives.").

In Illinois and elsewhere, public transit is vital for Americans traveling to work, school, medical appointments, jury duty, major sports and concert venues, and a plethora of other places, reflecting our personal obligations, civic duties, and leisure activities. The sheer number of

people traveling on the CTA, as an example, reflects our collective dependence on public transit.[20] And when public transit is disrupted because of gun violence or the threat of gun violence, the resulting chaos can bring a city to its knees.

Some recent real-world examples illustrate this point. After a gunman shot 10 and injured 23 on the subway in Brooklyn, "the shooting caused major disruptions" and panic across the city.[21] "The M.T.A., which operates the subway, suspended some service because of the police investigation, with delays stretching into the evening commute."[22] "Schools near the scene of the shooting along subway lines were locked down."[23] Local residents "said the chaos spilled out from the subway system and into their neighborhood."[24]

Similarly, even a shooting in proximity to public transit can cause massive disruption when the gunman absconds on public transit. After a

---

[20] *See supra*, note 6 (average ridership on CTA in 2022 was 762,564 people per weekday).

[21] Michael Gold, *Panic in Brooklyn Subway: Police Hunt Gunman Who Shot 10*, N.Y. TIMES (Apr. 12, 2022) https://www.nytimes.com/2022/04/12/nyregion/shooting-subway-sunset-park.html.

[22] *Id.*

[23] *Id.*

[24] *Id.*

gunman shot and killed "another man in broad daylight on a Manhattan street," there was "a ripple effect on transit service after the gunman fled into a nearby subway station."[25] "The police then shut off electrical power to the station as their search proceeded so that no one would be electrocuted or struck by a moving train."[26] "As the police searched for the gunman, riders throughout the trains were told to get down and shelter in place without being fully aware of what was happening around them."[27] "Some New Yorkers reported being stuck on trains for more than an hour."[28] As a result, "service was suspended in both directions" and "there were other delays reported throughout the system."[29] Had the shooting occurred on the subway, the impact would have been worse.

As these examples show, firearm regulations in sensitive places like polling stations and government buildings that were designed to preserve public order are analogous to the restrictions on public transit, which are

---

[25] Hurubie Meko, Lola Fadula, & Maria Cramer, *Man Charged in Broad Daylight Shooting That Had Ripple Effect on Subway*, N.Y. TIMES (Nov. 7, 2024), https://www.nytimes.com/2024/11/07/nyregion/nyc-shooting-subway-delays.html.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

necessary to preserve public order, prevent traffic gridlock, and ensure that riders can commute safely and without significant disruption.

## B. Other historical analogues also support Illinois's firearm restriction.

Under *Heller* and *Bruen*, a modern regulation is constitutionally permissible if sufficiently analogous to the regulations of longstanding sensitive places. *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 30. Thus, because the Act covers venues analogous to schools, government buildings, legislative assemblies, polling places, and courthouses, that is enough to show that it is constitutionally permissible. *See Bruen*, 597 U.S. at 30. But even if similarity to longstanding sensitive places were not enough, numerous other historical analogues support firearm restrictions on public transit, which provides an additional basis to show that the Illinois restriction is consistent with the "historical tradition of firearm regulation." *Id.* at 34. *Amici* highlight some of these historical analogues below, although this list is not exhaustive.

***Railroads.*** As courts have recognized, there is a longstanding tradition of regulating firearms on railroads. *Wolford*, 116 F.4th at 1001 ("We conclude from our examination of the 19th century railroad rules that Defendant likely has proved a historical tradition of prohibiting the

carry of loaded firearms or the carry of firearms not properly stored."). The restrictions on railroads share obvious similarities with the restrictions here—to protect passengers from guns discharging on fast-moving vehicles. *See* Joshua Hochman, Note, 133 YALE L.J. at 1690 ("Across state courts in the nineteenth century, it went unquestioned that railroads had the authority to protect the safety of their passengers through regulation.").

Without analysis, the district court dismissed these analogues because the railroad companies were "private entities." SA36-37. But as the Ninth Circuit has explained, "in examining historical evidence, rules and regulations by private entities may inform the historical analysis, particularly where, as with train companies operating on the public right of way, the 'private' entities were providing essentially a public service and were more properly characterized as mixed public-private entities." *Wolford*, 116 F.4th at 1001; *see also In re Debs*, 158 U.S. 564, 581-82 (1895) (upholding federal court order enjoining railroad strike against private railroad companies because they were performing a public service—transporting mail). Gun restrictions on 19th century railroads plainly support Illinois's similar restriction on public transit.

***Parks.*** There is also a longstanding tradition of banning guns in crowded spaces where children are frequently present in large numbers, such as parks. *Antonyuk*, 120 F.4th at 1019 (discussing national tradition of regulating guns in "quintessentially crowded areas" such as "urban parks"); *Kipke v. Moore*, 695 F. Supp. 3d at 654-55 (discussing gun restrictions in parks after ratification of the Fourteenth Amendment in New York City, Philadelphia, Chicago, St. Louis, and Boston). The rationale behind these restrictions—to protect children and others in crowds—is entirely consistent with Illinois's restriction to protect passengers, including children, in crowded trains and buses.

***Fairs and markets.*** Similarly, many historical regulations banned guns in other types of crowded spaces, such as fairs and markets. For example, as *Bruen* recognized, the Statute of Northampton prohibited guns at fairs and markets in England. 597 U.S. at 40. Virginia and North Carolina followed suit, also banning guns at fairs or markets during the founding era. 1786 Va. Acts 35, ch. 49; Collection of Statutes, pp. 60-61, ch. 3 (F. Martin ed. 1792); 1869-79 Tenn. Pub. Acts 23 (prohibiting firearms in any "fair, race course, or other public assembly of the people"); 1870 Tex. Gen. Laws 63 (prohibiting firearms in any

ballroom, social party, or other social gathering); 1883 Mo. Laws 76 (similar); 1889 Ariz. Sess. Laws 16 (similar); 1890 Okla. Sess. Laws 495 (similar); 1903 Mont. Laws 49 (similar); *see* 1878-79 Ga. Laws 421 (prohibiting firearms in places of "public gathering" or "assembly"); 1889 Idaho Sess. Laws 23 (same); *Maupin v. State*, 17 S.W. 1038, 1039 (Tenn. 1890) ("The mill was a public place—a place to which customers were constantly invited and daily expected to go. In such a place a man, though he be the proprietor, may not lawfully carry pistols concealed about his person."). Similar to parks, this historic tradition of regulating guns in crowded spaces where important commerce is underway supports Illinois's restriction on public transit.

**Public terror laws.** As the Supreme Court has recognized, there is also a tradition dating back to the Statute of Northampton of restricting guns to prevent public terror, known as surety or affray laws. *Rahimi*, 602 U.S. at 697. These laws broadly prevented people from carrying weapons in a manner that would terrify or alarm others. *E.g.*, 1786 Va. Acts ch. 21 (no one shall "ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country"); 1795 Mass. Acts 436, ch. 2 (permitting arrest of those who "shall ride or go armed

offensively, to the fear or terror of the good citizens"); 1841 Me. Laws 709, ch. 169 § 16 (prohibiting firearms "on complaint of any person having reasonable cause to fear an injury or breach of the peace"); 1870 S.C. Laws 403, no. 288 § 4 (permitting arrest of "all who go armed offensively, to the terror of the people"); Michael Dalton, The Country Justice 37 (John Walthoe 1715) (English surety law permitting weapons to be stripped from disturbers of the peace).

As a recent survey concluded, the very presence of guns on public transit makes riders feel less safe, which may lead to a decrease in the use of public transit.[30] The Act addresses this concern and is therefore similar to historical analogues designed to prevent public terror.

In sum, numerous historical analogues show that the country has a longstanding tradition of restricting guns to protect children, crowds, and the public peace, just like the Illinois restriction does, all of which shows that it complies with the historical tradition of firearm regulations.

---

[30] Alexandra Filindra & Noah Kaplan, *The "Chilling Effects" of Gun Carry in Public Places*, UNIV. ILL. INST. GOV'T & PUB. AFF. (2024), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5032271.

**C. The only circuit court to consider this issue post-*Bruen* found that firearm restrictions on public transit are constitutional.**

Although few courts have addressed public transit post-*Bruen*, the only circuit court to do so supports the position of Illinois in this case. In *Wolford*, the Ninth Circuit concluded, based on similar historical restrictions on 19th century railroads, that the state had likely proven at the preliminary injunction stage "a historical tradition of prohibiting the carry of loaded firearms or the carry of firearms not properly stored." 116 F.4th at 1001. Although the court ultimately held that the California restriction on guns carried in public transit was not *Bruen*-compliant because it did not provide an exception for properly stored weapons, *id.*, *Wolford* clearly supports the restriction here, which *does* provide such an exception. Specifically, the Act permits carriage of firearms that are unloaded and properly stored in a case, firearm-carrying box, shipping box, or other container. Ill. App. Br. 21-22. Moreover, the Ninth Circuit did not have occasion to address the more robust historical record, which includes analysis of longstanding sensitive places and other historical analogues, developed in this case.

At least one district court has reached the same conclusion. In *Kipke v. Moore*, the court considered a firearm restriction on Maryland public transit. 695 F. Supp. 3d at 655. The court concluded that public transit is a "sensitive place" akin to "schools and government buildings" because they are "crowded spaces that serve vulnerable populations like children and disabled people."[31] *Id.* In short, the existing post-*Bruen* case law on public transit shows that the Act fits well within the *Bruen* test.

## II. Illinois is also entitled to regulate firearms on public transit because it is a proprietor of the Illinois public transit system.

Even if there were not ample historical analogues that support Illinois's firearm restriction on public transit (which there are), there is a separate and independent basis that supports the restriction: Illinois

---

[31] To be sure, two district courts have reached a somewhat contrary conclusion, but the facts in each are easily distinguishable. In *Antonyuk v. Hochul*, the court held that plaintiffs were likely to succeed in their challenge to a New York firearm restriction on buses and vans, but only because it implicated private church vans used to take people to church. 639 F. Supp. 3d 232, 331 (N.D.N.Y. 2022) (subsequent history omitted). In *Koons v. Platkin*, the court held that plaintiffs were likely to succeed on their challenge to a New Jersey firearm restriction at airports, but only because it did not provide an exception for properly stored firearms checked as baggage. 673 F. Supp. 3d 515, 649-50 (D.N.J. 2023). These cases provide no support to Plaintiffs in this case because the Act does not implicate church vans and provides an exception for properly stored weapons. Ill. App. Br. 21-22. Moreover, *Koons* is currently on appeal. No. 23-1900 (3d Cir. 2023).

may regulate firearms because it acts as the proprietor of the Illinois public transit system.

As courts have recognized, the Second Amendment does not apply to private property. *E.g.*, *Kipke*, 695 F. Supp. 3d at 653. And when the state steps into the shoes of a proprietor operating a business, many courts have recognized that it may restrict guns, just like a private property owner would be able to do. *See Wolford*, 116 F.4th at 1000 (explaining that privately owned or state-run medical facilities or banks may restrict firearms under government-as-proprietor theory). So too here. Because Illinois acts as the proprietor of the Illinois transit system, it may lawfully restrict firearms. *Cf. United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 334, 342 (2007) (waste-processing facilities operated by "state-created public benefit corporation" not subject to dormant Commerce Clause because state "is vested with the responsibility of protecting the health, safety, and welfare of its citizens").

Illinois's firearm restriction on public transit is compliant with *Bruen*. The restriction is similar to those imposed on sensitive places, such as schools and government facilities, and other historical laws,

reflecting the state's historical authority to regulate firearms in crowded places that serve vulnerable people, places inherently susceptible to political violence and attack, and locations where the state must maintain public order. The restriction also comports with common sense—loaded guns on fast-moving transit jeopardize the safety of hundreds of thousands of commuters.

## **CONCLUSION**

This Court should reverse the judgment of the district court.

Dated:     January 22, 2025
           New York, New York

                              Respectfully submitted,

Douglas N. Letter              */s/ Charles Rothfeld*
Shira Lauren Feldman           Charles Rothfeld
Tess M. Fardon                 *Counsel of Record*
Brady Center to Prevent Gun    Charley B. Lanter
Violence                       Mayer Brown LLP
840 First Street NE            1999 K Street, Northwest
Suite 400                      Washington, DC 20006-1101
Washington, D.C. 20002         (202) 263-3000
(202) 370-8100                 crothfeld@mayerbrown.com
dletter@bradyunited.org        clanter@mayerbrown.com
sfeldman@bradyunited.org
tfardon@bradyunited.org

*Counsel for Amicus Curiae Brady*
*Center to Prevent Gun Violence*

Esther Sanchez-Gomez
Giffords Law Center to Prevent
Gun Violence
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org

William T. Clark
Giffords Law Center to Prevent
Gun Violence
244 Madison Ave, Suite 147
New York, NY 10016
(415) 433-2062
wclark@giffords.org

*Counsel for Amicus Curiae
Giffords Law Center to Prevent
Gun Violence*

Mark G. Hanchet
Robert W. Hamburg
Noelle A. Jolin
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020-1001
(212) 506-2500
mhanchet@mayerbrown.com
rhamburg@mayerbrown.com
njolin@mayerbrown.com

*Counsel for Amici Curiae Brady
Center to Prevent Gun Violence
and Giffords Law Center to
Prevent Gun Violence*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 7th Cir. R. 29 because it contains 6,259 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Date: January 22, 2025

*/s/ Charles Rothfeld*
Charles Rothfeld

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Charles Rothfeld*
Charles Rothfeld
