Nos. 24-2643, 24-2644 (consol.)

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————————

BENJAMIN SCHOENTHAL, ET AL.,

*Plaintiffs-Appellees*,

v.

KWAME RAOUL, ET AL.,

*Defendants-Appellants.*

———————————————

On Appeal from the United States District Court
for the Northern District of Illinois
(No. 3:22-cv-50326) (Hon. Iain D. Johnston)

———————————————

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF
DEFENDANTS-APPELLANTS AND REVERSAL**

———————————————

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163

Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, DC 20044
smesiya@everytown.org
(202) 517-6620

January 22, 2025

Save As        Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2643, 24-2644 (consol.)

Short Caption: Schoenthal v. Raoul

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund)

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Everytown Law

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Sana S. Mesiya     Date: January 22, 2025

Attorney's Printed Name: Sana S. Mesiya

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address: P.O. Box 14780, Washington, DC 20044

Phone Number: 202-517-6620     Fax Number:

E-Mail Address: smesiya@everytown.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-2643, 24-2644</u> (consol.)

Short Caption: <u>Schoenthal v. Raoul</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Everytown for Gun Safety</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Everytown Law</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>n/a</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>n/a</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>n/a</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>n/a</u>

Attorney's Signature: <u>/s/ Janet Carter</u>      Date: <u>01/23/2025</u>

Attorney's Printed Name: <u>Janet Carter</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: <u>Everytown Law, 450 Lexington Avenue, P.O. Box 4184, New York, NY 10163</u>

Phone Number: <u>(646) 324-8174</u>      Fax Number: _____

E-Mail Address: <u>jcarter@everytown.org</u>

rev. 12/19 AK

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-2643, 24-2644</u> (consol.)

Short Caption: <u>Schoenthal v. Raoul</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
     <u>Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund)</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
     <u>Everytown Law</u>

(3)     If the party, amicus or intervenor is a corporation:

     i)     Identify all its parent corporations, if any; and

          <u>N/A</u>

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          <u>N/A</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

     <u>N/A</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

     <u>N/A</u>

Attorney's Signature: <u>s/ William J. Taylor, Jr.</u>     Date: <u>January 23, 2025</u>

Attorney's Printed Name:  <u>William J. Taylor, Jr.</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** [ ]    **No** [✔]

Address:  <u>Everytown Law, 450 Lexington Avenue, P.O. Box 4184, New York, NY 10163</u>

Phone Number: <u>(646) 324-8215</u>     Fax Number:  <u>(917) 410-6932</u>

E-Mail Address: <u>wtaylor@everytown.org</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-2643, 24-2644</u> (consol.)

Short Caption: <u>Schoenthal v. Raoul</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

        <u>Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund)</u>

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

        <u>Everytown Law</u>

(3)      If the party, amicus or intervenor is a corporation:

        i)        Identify all its parent corporations, if any; and

            <u>N/A</u>

        ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

            <u>N/A</u>

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

        <u>N/A</u>

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

        <u>N/A</u>

Attorney's Signature: <u>s/ Priyanka Gupta Sen</u>      Date: <u>January 23, 2025</u>

Attorney's Printed Name:  <u>Priyanka Gupta Sen</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address:  <u>Everytown Law, 450 Lexington Avenue, P.O. Box 4184, New York, NY 10163</u>

Phone Number: <u>(646) 324-8179</u>      Fax Number:  <u>(917) 410-6932</u>

E-Mail Address: <u>psen@everytown.org</u>

rev. 12/19 AK

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 1

ARGUMENT .......................................................................... 3

   I.   Reconstruction-Era and Later Historical Evidence Is a Crucial Part of the *Bruen-Rahimi* Analysis ................................................. 3

      A.  Reconstruction-Era and Later Evidence Is Critically Important to the Historical Inquiry, Regardless of Which Era Is the Primary Focus ................................................................. 4

      B.  If This Court Chooses To Resolve the Time-Period Question, the Proper Focus Is the Reconstruction Era, Not the Founding Era ... 10

   II.  Sensitive Places Are Not Defined By Government-Provided Security ............................................................................... 18

      A.  Schools and government buildings. ................................. 19

      B.  Legislative buildings, polling places, and courthouses. .................. 20

CONCLUSION ........................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024)................................................................*passim*

*Atkinson v. Garland*,
70 F.4th 1018 (7th Cir. 2023) ...........................................................6

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2491
(2024) ..........................................................................................2, 5, 8, 13

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) (en banc), *petition for cert. filed sub nom.
Snope v. Brown*, No. 24-203 (U.S. Aug. 21, 2024) ..........................6

*Bonidy v. U.S. Postal Serv.*,
790 F.3d 1121 (10th Cir. 2015).......................................................20

*Burson v. Freeman*,
504 U.S. 191 (1992) ........................................................................21

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ..........................................................4, 7, 10, 19

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ..........................................................................9

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011).........................................................11

*Frey v. Nigrelli*,
661 F. Supp. 3d 176 (S.D.N.Y. 2023), *appeal docketed*, No. 23-365 (2d Cir.
Mar. 13, 2023) ................................................................................7

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) .........................................................11

*Kipke v. Moore*,
695 F. Supp. 3d 638 (D. Md. 2023)..........................................18, 19

*LaFave v. County of Fairfax*,
No. 1:23-cv-01605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024), *appeal
docketed*, No. 24-1886 (4th Cir. Sept. 16, 2024).................12, 18, 20

*Lara v. Comm'r Pennsylvania State Police*,
--- F.4th ----, 2025 WL 86539 (3d Cir. Jan. 13, 2025) ....................13

*Mahanoy Area Sch. Dist. v. B. L.*,
  594 U.S. 180 (2021) ...................................................................... 14

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ................................................................ 10, 11

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) ...................................................................... 15

*Md. Shall Issue, Inc. v. Montgomery County*,
  680 F. Supp. 3d 567 (D. Md. 2023), *appeal docketed*, No. 23-1719 (4th Cir.
  July 10, 2023) .............................................................................. 12

*Moore v. Madigan*,
  702 F.3d 933 (7th Cir. 2012) ........................................................ 11

*Nat'l Rifle Ass'n v. Bondi*,
  61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th
  1346 (11th Cir. 2023) ........................................................ 12, 13, 14

*Nev. Comm'n on Ethics v. Carrigan*,
  564 U.S. 117 (2011) ........................................................................ 8

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ................................................................... *passim*

*Ocean State Tactical, LLC v. Rhode Island*,
  95 F.4th 38 (1st Cir. 2024), *petition for cert. filed*, No. 24-131 (U.S. Aug. 2,
  2024) ............................................................................................ 6

*Ramos v. Louisiana*,
  590 U.S. 83 (2020) ........................................................................ 17

*Range v. Att'y Gen. U.S.*,
  124 F.4th 218 (3d Cir. 2024) (en banc) ......................................... 13

*Rupp v. Bonta*,
  723 F. Supp. 3d 837 (C.D. Cal. 2024), *appeal docketed*, No. 24-2583 (9th Cir.
  Apr. 24, 2024) ....................................................................... 12, 13

*Timbs v. Indiana*,
  586 U.S. 146 (2019) ...................................................................... 18

*United States v. Class*,
  930 F.3d 460 (D.C. Cir. 2019) ................................................. 18, 19

*United States v. Greno*,
  679 F.3d 510 (6th Cir. 2012) ........................................................ 11

iii

*United States v. Rahimi*,
  602 U.S. 680 (2024) ................................................................ *passim*

*We the Patriots, Inc. v. Lujan Grisham*,
  697 F. Supp. 3d 1222 (D.N.M. 2023), *appeal dismissed*, 119 F.4th 1253
  (10th Cir. 2024) .........................................................................12

*Wolford v. Lopez*,
  116 F.4th 959 (9th Cir. 2024) ............................................... *passim*

*Worth v. Jacobson*,
  108 F.4th 677 (8th Cir. 2024), *petition for cert. filed*, No. 24-____ (U.S. Jan.
  18, 2025) ....................................................................................13

## Other Authorities

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction*
  (1998) .................................................................................16, 17

Archives of Maryland (Biographical Series): Cornelius Mills (c.1755–1823),
  *available at* https://tinyurl.com/yc3nfzzv ....................................22

Brief for Independent Institute as Amicus Curiae, *New York State Rifle &
  Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (No. 20-843) ....................5

Burch, Benjamin, *History, Art, & Archives – United States House of
  Representatives*, https://tinyurl.com/46wbn2cr ..............................23

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13
  Charleston L. Rev. 205 (2018) ......................................................5

Del. Const. of 1776, art. 28, *reprinted in Constitutions of the Several
  Independent States of America* (1786) ..........................................21

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1
  (2022) ......................................................................................14

*Guarding the White House*, White House Hist. Ass'n,
  https://www.whitehousehistory.org/press-room/press-timelines/guarding-
  the-white-house .........................................................................24

J. William Harris, *Portrait of a Small Slaveholder: The Journal of Benton
  Miller*, 74 Georgia Historical Quarterly 1 (1990) ..........................24

*John Quincy Adams Digital Diary, Dated 22 March 1838*, Primary Source
  Cooperative at the Massachusetts Historical Society,
  https://tinyurl.com/25am8xmk ....................................................24

*John Quincy Adams Digital Diary, Dated 7 December 1831*, Primary Source Cooperative at the Massachusetts Historical Society, https://tinyurl.com/yjvusktm ........................................................................ 23

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) .......... 14

Katie Zezima, *People Used to Be Able to Walk into the White House. Legally.*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND ...................... 24

Kurt L. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439) ....................................................................... 17

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ........................................................................................ 15

Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe ...................... 21

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ................... 14

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ...................................................... 14

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ................................................................................................... 14

Transcript of Oral Argument, *New York State Pistol & Rifle Ass'n v. Bruen*, 597 U.S. 1 (2022) (No. 20-843)........................................................................ 14

United States Capitol Police, *Mission & History*, https://www.uscp.gov/the-department/our-mission.............................................................................. 24

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Illinois's restriction on the carrying of loaded, unsecured firearms within its public-transit system is constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024),

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

for the reasons set out in the State's brief, Dkt. 24 ("State Br.").[2] Everytown submits this amicus brief to expand on two points that support the constitutionality of this restriction.

*First*, in conducting the Second Amendment historical inquiry, *Bruen* and *Rahimi*, as well as the recent decision in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2491 (2024), make clear that this Court should give significant weight to Reconstruction-era and later evidence. This is so regardless of which time period is the central focus of that inquiry—the founding era, when the Second Amendment was ratified, or the Reconstruction era, when it was made applicable to the states through the Fourteenth Amendment. And while the Court need not resolve the question of which of those periods should be the central focus to decide this appeal and uphold Illinois's law, if it chooses to do so, it should conclude that the historical analysis properly centers on the Reconstruction era and 1868.

*Second*, the Court, like the district court, *see* SA48, should reject Plaintiffs' historically inaccurate theory that sensitive places are defined by comprehensive, government-provided security. "Put simply, lack of

---

[2] This brief cites entries on this Court's docket as "Dkt.," entries on the district court's docket as "D. Ct. Dkt.," and the State's short appendix as "SA."

comprehensive government security is not a determinative factor." *Wolford v. Lopez*, 116 F.4th 959, 981 (9th Cir. 2024).

## ARGUMENT

### I. Reconstruction-Era and Later Historical Evidence Is a Crucial Part of the *Bruen-Rahimi* Analysis

Plaintiffs argued below that the mid-to-late 19th-century laws and rules the State relies on in support of its public-transit restriction "come too late to be probative." D. Ct. Dkt. 87 at 36. That is wrong. Although the Supreme Court and this Court have not yet resolved the question of which period is the primary focus of the Second Amendment inquiry,[3] both have made clear that evidence from Reconstruction and beyond is a critically important part of the historical analysis. *See* State Br. 28-30 (citing cases). That principle is sufficient to reject Plaintiffs' argument and to consider all the State's evidence. If, however, the Court wishes to answer the question of which time period is the central focus, the correct originalist answer is to focus on the Reconstruction era and 1868, not the founding and 1791.

---

[3] *See Rahimi*, 602 U.S. at 692 n.1 (leaving open question of whether inquiry's central focus is Reconstruction era or founding era); *Bruen*, 597 U.S. at 37-38 (same).

A.    **Reconstruction-Era and Later Evidence Is Critically Important to the Historical Inquiry, Regardless of Which Era Is the Primary Focus**

History from Reconstruction and later is crucial to the Second Amendment analysis. *See* State Br. 28-30. *Heller* announced that examining post-ratification history "is a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008). Accordingly, the Supreme Court has repeatedly examined history from the mid-19th century and beyond when assessing the validity of firearms regulations. *Heller* itself investigated "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century," *id.*, and relied on "19th-century cases that interpreted the Second Amendment," "'discussion of the Second Amendment in Congress and in public discourse' after the Civil War," and "how post-Civil War commentators understood the right," *Bruen*, 597 U.S. at 21 (describing and quoting *Heller*, 554 U.S. at 610, 614, 616-19). Likewise, *Bruen* relied on mid-19th-century cases and statutes, *see id.* at 51-57, and surveyed "public discourse surrounding Reconstruction," *id.* at 60. *Bruen* also invoked 19th-century evidence in discussing sensitive places in particular. It said that "18th- *and 19th-century*" laws restricting the possession of guns in legislative assemblies, polling places, and courthouses satisfied its historical analysis, *id.* at 30 (emphasis added), and cited to

4

sources in which all the 19th-century laws restricting guns in the locations
the Court listed were from the *late* 19th century.[4]

*Rahimi* has now put the relevance of 19th-century evidence even
further beyond doubt. It rested its decision *upholding* a challenged law in
large part on laws passed between 1836 and 1868. *See* 602 U.S. at 695-96
(relying on Massachusetts surety statute from 1836); *id.* at 696 (invoking
similar statutes of nine other jurisdictions by citation to *Bruen*, 597 U.S. at
56 & n.23); *Bruen*, 597 U.S. at 56 & n.23 (citing 1838 Wisconsin, 1840 Maine,
1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon, 1857 District of
Columbia, 1860 Pennsylvania, and 1868 West Virginia surety laws).

This Court and other circuits have likewise recognized that 19th-
century and later laws are critical to the historical inquiry. In *Bevis*, this
Court found evidence supporting the constitutionality of Illinois's restrictions
on assault weapons and large-capacity magazines in laws from the 19th
century through the late 20th century. *See* 85 F.4th at 1201-02 (relying on,

---

[4] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places"
Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana
law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision
upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17,
*Bruen*, 597 U.S. 1 (No. 20-843) (disputing relevance of 19th-century laws but
(at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws
that prohibited guns in (among others) polling places).

among others, laws from 1877, 1884, 1890, 1893, 1934, 1968, and 1986).[5] In *Antonyuk*, the Second Circuit explained that "evidence from the Reconstruction Era regarding the scope of the right to bear arms … is at least as relevant as evidence from the Founding Era." *Antonyuk v. James*, 120 F.4th 941, 988 n.36 (2d Cir. 2024). And in *Wolford*, the Ninth Circuit agreed that, at least in sensitive-places challenges like this one, it would "look to the understanding of the right to bear arms *both* at the time of the ratification of the Second Amendment in 1791 *and* at the time of the ratification of the Fourteenth Amendment in 1868." 116 F.4th at 980. Many other courts, including the First and Fourth Circuits, have also adopted this "long view of … history," *Bianchi v. Brown*, 111 F.4th 438, 471 (4th Cir. 2024) (en banc), *petition for cert. filed sub nom. Snope v. Brown*, No. 24-203 (U.S. Aug. 21, 2024), and considered historical sources from the 19th- and 20th- centuries.[6]

---

[5] Plaintiffs' efforts below to rely on this Court's post-*Bruen* decision in *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023), as supporting a myopic focus on 1791, *see* D. Ct. Dkt. 70 at 9, are meritless. *Atkinson* itself also noted a role for "[p]ost-Founding history," and that *Bruen* considered historical analogues "as recent as the late 1800s." 70 F.4th at 1020-21. And *Bevis* has since confirmed the propriety of relying on even later evidence.

[6] *See Bianchi*, 111 F.4th at 465-71 (considering 19th- and 20th-century evidence in rejecting Second Amendment challenge); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46-48, 51-52 (1st Cir. 2024) (same), *petition for cert. filed*, No. 24-131 (U.S. Aug. 2, 2024); *see also, e.g.*, *Frey v. Nigrelli*, 661 F. Supp. 3d 176, 205-06 (S.D.N.Y. 2023) (relying on many of the same Reconstruction-era and later sources that the State points to here in rejecting

This focus on Reconstruction-era and later evidence follows the Supreme Court's instruction, noted above, that "examination of a variety of legal and other sources to determine the *public understanding* of a legal text in the period *after* its enactment or ratification" is "a critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605) (second emphasis added). As Justice Kavanaugh explained in *Rahimi*, "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool" of constitutional interpretation. 602 U.S. at 725 (Kavanaugh, J., concurring); *see also id.* at 728-29 (collecting over thirty Supreme Court cases relying on post-ratification history, including evidence from long after the founding). Justice Barrett likewise emphasized in *Rahimi* that "postenactment history can be an important tool," including to "liquidate ambiguous constitutional provisions." *Id.* at 738 (Barrett, J., concurring) (cleaned up). And that is consistent with *Bruen*'s instruction that "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." 597 U.S. at 35-36 (cleaned up).

Plaintiffs, for their part, have incorrectly suggested that 1868 (when the Fourteenth Amendment was ratified) is somehow a cutoff for the Court's

---

a similar challenge to a New York law restricting firearms on public transit), *appeal docketed*, No. 23-365 (2d Cir. Mar. 13, 2023).

historical analysis. *See* D. Ct. Dkt. 70 at 13. But it is "implausible" that "public understanding would promptly dissipate whenever [one] era gave way to another." *Antonyuk*, 120 F.4th at 973. This Court confirmed as much in *Bevis*, pointing to evidence after Reconstruction and into the 20th century as "representative" of the relevant, "long-standing" historical tradition. 85 F.4th at 1199, 1201-02. After all, "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011).

In other words, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era or later tradition also reflects the founding-era understanding. Such a presumption reflects and confirms the principle that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37. Here, there is no founding-era evidence that contradicts later tradition, so there is no reason to think that there was some drastic shift in the understanding of the Second Amendment from 1791 to 1868.

Plaintiffs have also wrongly suggested that "[t]he absence of Founding-era restrictions on public conveyances" means that Illinois's prohibition is unconstitutional. D. Ct. Dkt. 70 at 18. To begin with, it is a "serious

problem[]" to "assume[] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring). In other words, the absence of particular legislation does not mean that anybody thought such legislation was unconstitutional; as the Supreme Court explained in *Dobbs*, for example, "the fact that many States in the late 18th and early 19th century did not criminalize pre-quickening abortions does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022); *see also, e.g.*, *Antonyuk*, 120 F.4th at 969 ("Legislatures past and present have not generally legislated to their constitutional limits."). And in any event, as the State explains, the later history it points to is "built on a historical tradition of crowded-space laws dating back to medieval England," State Br. 30, and also "'fits neatly within the tradition' established by historical sensitive-places regulations" already recognized by the Supreme Court, *id.* at 40 (quoting *Rahimi*, 602 U.S. at 698).

In sum, Plaintiffs are wrong to claim that late 19th- and early 20th-century history came "too late." D. Ct. Dkt. 87 at 36, 41. Instead, that history plays a critical role in the *Bruen-Rahimi* historical analysis.

**B.    If This Court Chooses To Resolve the Time-Period Question, the Proper Focus Is the Reconstruction Era, Not the Founding Era**

For the reasons just set out, this Court should consider 19th-century and later evidence and uphold Illinois's public-transit restriction regardless of whether the Reconstruction era or the founding era is the most relevant time period. But if it chooses to address that time-period question, it should conclude that the inquiry centers on the Reconstruction era and 1868.

To begin, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35). Accordingly, focusing on 1868 in a case concerning a state law is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? Since the people chose to extend the Bill of Rights to the states in 1868, it is their understanding of the scope of each right at that time that should control the originalist analysis today.

Indeed, holding otherwise would not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010); *see also id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then

10

define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 120 F.4th at 973.

That is presumably why this Court in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified."[7] *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *accord United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018).[8]

---

[7] Plaintiffs pointed below to *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), claiming that it supports their position that "the key starting point is the Founding era, centering on 1791." D. Ct. Dkt. 70 at 9. But *Moore* does not countermand *Ezell*. It referred to 1791, but did not hold that 1791 is the only relevant time period for historical inquiry. Moreover, *Moore* did not acknowledge the implications for originalism of the fact that the Second Amendment did not apply against the states until the 1868 ratification of the Fourteenth Amendment (which is mentioned nowhere in the opinion). Instead, *Moore* cited a passage in *McDonald* saying that the standards against the state and federal governments should be the same. *See* 702 F.3d at 935 (citing *McDonald*, 561 U.S. at 765-66, 766 n.14). But that merely flags the issue that *Bruen* and *Rahimi* acknowledged before leaving open the question whether the 1868 or 1791 understanding should control. *See* 597 U.S. at 37-38; 602 U.S. at 692 n.1.

[8] These courts reached this conclusion at the first, historical step of the pre-*Bruen* Second Amendment framework used by lower federal courts. Those analyses generally remain good law. *Bruen* rejected the second step (means-end scrutiny), but explained that the first "is broadly consistent with *Heller*." 597 U.S. at 19.

In fact, since *Bruen*, courts have seen a notable "trend … of recognizing the Reconstruction Era as more probative of the Second Amendment's scope than the Founding Era," in cases involving state or local laws. *LaFave v. County of Fairfax*, No. 1:23-cv-01605, 2024 WL 3928883, at *8 (E.D. Va. Aug. 23, 2024), *appeal docketed*, No. 24-1886 (4th Cir. Sept. 16, 2024); *see Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023) ("[H]istorical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era."), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023);[9] *Rupp v. Bonta*, 723 F. Supp. 3d 837, 851, 876-78 (C.D. Cal. 2024) (reaching same conclusion), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024); *Md. Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 582-83 (D. Md. 2023) (agreeing with *Bondi*), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *We the Patriots, Inc. v. Lujan Grisham*, 697 F. Supp. 3d 1222, 1234 (D.N.M. 2023) (agreeing with *Bondi* and *Maryland Shall Issue*), *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024). And, as noted, still more courts have accepted that *both* Reconstruction- and founding-era evidence are relevant. *See supra* pp. 5-

---

[9] Despite being vacated for rehearing en banc, *Bondi*'s robust reasoning and authorities remain persuasive. *See Antonyuk*, 120 F.4th at 973-74 (continuing to find *Bondi* persuasive on this point).

6 and note 6; *see also Bevis*, 85 F.4th at 1201-02 (considering evidence from

both eras, as well as later evidence).[10]

    The conclusion that the 1868 understanding should govern in a case

against a state is far from radical. It is the answer former Solicitor General

---

    [10] This Court should not follow the Third Circuit's focus on 1791 in
*Lara v. Commissioner Pennsylvania State Police*, --- F.4th ----, 2025 WL
86539, at *9-10 (3d Cir. Jan. 13, 2025), or the Eighth Circuit's similar
approach in *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024), *petition for
cert. filed*, No. 24-____ (U.S. Jan. 17, 2025). Instead of engaging with
originalist principles, the court in *Lara* based its conclusion on a "general
assumption" in several Supreme Court cases cited by *Bruen*. *Lara*, 2025 WL
86539, at *9 (citing *Bruen*, 597 U.S. at 37). In *Worth*, the Eighth Circuit
pointed to this same assumption to conclude that Reconstruction-era laws
"carry less weight than Founding-era evidence." 108 F.4th at 692-93, 697. But
the Supreme Court made clear that this general assumption did not resolve
the time-period issue—otherwise, it would have just said so in *Bruen* and
*Rahimi*, rather than leaving the issue open. *See Bondi*, 61 F.4th at 1323.
Moreover, the cases *Bruen* cited in describing that assumption did not
address the significance of the Fourteenth Amendment's ratification for this
issue and cannot have resolved the question that *Bruen* and *Rahimi*
expressly left open. *See Bruen*, 597 U.S. at 37-38; *Rahimi*, 602 U.S. at 692
n.1. Thus, *Lara* and *Worth* are not persuasive. *See, e.g., Antonyuk*, 120 F.4th
at 974 (rejecting similar reasoning in earlier opinion in *Lara*); *Rupp*, 723 F.
Supp. 3d at 877-78 (declining to follow earlier opinion in *Lara* because,
"[r]ather than elevate an assumption to a holding, the Court thinks it best to
address the issue from first principles"). Moreover, even *Lara* acknowledged
that "laws 'through the end of the nineteenth century' … can be 'a "critical
tool of constitutional interpretation"' because they can be evidence of a
historical tradition and shed important light on the meaning of the
Amendment as it was originally understood," *Lara*, 2025 WL 86539, at *10
(quoting *Bruen*, 597 U.S. at 35)—so long as those laws do not "contradict[]
earlier evidence," *id.* (quoting *Bruen*, 597 U.S. at 66); *see also Range v. Att'y
Gen. U.S.*, 124 F.4th 218, 229 n.9 (3d Cir. 2024) (en banc) (recognizing that,
under *Bruen*, even 20th-century history may be considered as part of the
Second Amendment historical analysis where it does not "contradict[] earlier
evidence" (quoting *Bruen*, 597 U.S. at 66 n.28)).

Paul Clement, as counsel for New York's NRA affiliate, gave when asked by Justice Thomas during oral argument in *Bruen*.[11] It is also the position of prominent originalist scholars "across the political spectrum." *Bondi*, 61 F.4th at 1322 n.9 (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo).[12] Both Justice Thomas and Justice Scalia have expressed similar views. *See Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 212 (2021) (Thomas, J., dissenting) ("While the majority entirely ignores the relevant history, I would begin the assessment of the scope of free-speech rights incorporated against the States by looking to what ordinary citizens at

---

[11] *See* Tr. of Oral Arg. at 8:2-17, *Bruen*, 597 U.S. 1 (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

[12] *See* Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52-53 (2010); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008); *see also* Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008).

To be clear, we do not suggest that each of these scholars also believes that 1868 is the correct focus for analyzing the meaning of the right in cases against the federal government. But, as explained below, the weight of authority and analysis favors 1868. *See infra* pp. 15-17.

the time of the Fourteenth Amendment's ratification would have understood the right to encompass." (cleaned up) (citation omitted)); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) (calling for "further evidence of common practice in 1868, since I doubt that the Fourteenth Amendment time-warped the post-Civil War States back to the Revolution"). Simply put, a faithful originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.

This conclusion raises the question (not directly presented here) as to the correct temporal focus in cases challenging *federal* laws. To be sure, the choice between 1791 and 1868 is a less straightforward one for federal laws. "Originalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* seemed to reject the possibility of different standards for the state and federal governments, requiring incorporated rights to "have the same scope" against each. 597 U.S. at 37. Accordingly, it appears that originalists must justify applying either the 1868

understanding or the 1791 understanding (if they conflict) to all levels of government.

Existing doctrine does not resolve this choice. In *Rahimi*, the Supreme Court specifically declined to resolve it—in a case concerning a federal law. *See* 602 U.S. at 692 n.1. And in *Bruen*, the Court noted only that prior decisions had "*assumed*" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." 597 U.S. at 37 (emphasis added). If the majority believed those decisions controlled the issue, it would have said so.

Instead, the Court expressly left the question open, pointing to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id*. at 37-38. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published

at 97 Ind. L.J. 1439)).[13] The Court's choice to highlight *only* these two scholars suggests a belief that their views are correct, and thus that Reconstruction should be the central focus.

Nor would prioritizing the Reconstruction-era understanding of the right "effectively throw out decades of jurisprudence," as Plaintiffs asserted below. D. Ct. Dkt. 70 at 11. To the contrary, "[r]eliance on post-ratification history 'has shaped scores of Court cases spanning all domains of constitutional law, every era of the nation's history, and Justices of every stripe.'" *Rahimi*, 602 U.S. at 728 (Kavanaugh, J., concurring) (citation omitted); *see id.* at 728-29 (collecting cases). Indeed, even in the cases Plaintiffs relied on in the district court, *see* D. Ct. Dkt. 70 at 10-11, the Court has routinely looked at a wide span of history, including from the Reconstruction era, in assessing constitutional claims.[14]

---

[13] On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning as to not only the states, but also the federal government. *See* Amar, *The Bill of Rights*, *supra*, at xiv, 223, 243 (referring to this as a doctrinal "feedback effect"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866."). More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, … invest[ing] those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 597 U.S. at 38. On this view, too, 1868 meanings bind both the states and the federal government.

[14] *See, e.g.*, *Ramos v. Louisiana*, 590 U.S. 83, 90-92 (2020) (looking to sources from 14th through late-19th centuries to determine meaning of Sixth

\*      \*      \*

In sum, relying on evidence from the Reconstruction era and beyond is entirely consistent with—indeed, compelled by—controlling precedent from this Court and the Supreme Court. *Bevis* was correct to consider 19th- and 20th-century history in rejecting a Second Amendment challenge to Illinois gun laws. The Court should do the same in this case.

## II. Sensitive Places Are Not Defined By Government-Provided Security

Plaintiffs might argue, as they did below, that the Second Amendment forbids prohibiting guns in the absence of "comprehensive, government-provided security." D. Ct. Dkt. 70 at 20. The district court correctly rejected that argument. SA46-48; *see* State Br. 44. Several other courts have done so as well, both before and after *Bruen*. *See Wolford*, 116 F.4th at 981; *United States v. Class*, 930 F.3d 460, 464-65 (D.C. Cir. 2019); *LaFave*, 2024 WL 3928883, at \*13; *Kipke v. Moore*, 695 F. Supp. 3d 638, 649-50 (D. Md. 2023).

This Court should follow those well-reasoned decisions and reject Plaintiffs' argument for at least two reasons. *First*, the government-security argument is impossible to reconcile with *Heller* and *Bruen*'s recognition that

---

Amendment right to jury trial); *Timbs v. Indiana*, 586 U.S. 146, 150-53 (2019) (looking to sources from the Magna Carta to colonial era to Reconstruction to present day in interpreting Eighth Amendment Excessive Fines Clause and finding that it applies against the states).

guns may be prohibited in schools and government buildings. *Second*, the argument is also irreconcilable with *Bruen*'s confirmation that prohibitions in legislative buildings, polling places, and courthouses are constitutional.

**A.      Schools and government buildings.** *Heller* recognized that guns may be prohibited in schools and government buildings, and *Bruen* reiterated *Heller*'s statement. *See Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 30; *see also id.* at 81 (Kavanaugh, J., concurring). The constitutionality of these prohibitions alone is sufficient to defeat the comprehensive-security argument. Schools—which typically include not only buildings but yards, play areas, and athletic fields—routinely lack comprehensive, government-provided security. *See, e.g.*, *Wolford*, 116 F.4th at 981 (rejecting argument because "[m]any schools and polling places have few security measures—now or in the past—yet the Supreme Court listed those places as conclusively sensitive"); *Class*, 930 F.3d at 465 (observing that "many schools and government buildings—the paradigmatic 'sensitive places' identified in [*Heller*]—are open to the public, without any form of special security or screening" (cleaned up)); State Br. 44. Thus, "because *Bruen* conclusively named schools … [as] sensitive places, … [the] argument that sensitive places are limited to buildings with comprehensive, state-provided security is baseless." *Kipke*, 695 F. Supp. 3d at 650.

19

The same is true of government buildings. Any number of government buildings lack comprehensive security, such as public libraries, community recreation centers, and post offices. *See, e.g.*, *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1123 (10th Cir. 2015) (stating, in rejecting Second Amendment challenge to prohibition on firearms in post offices, that specific post office at issue "d[id] not regularly employ any security officers"); *see also LaFave*, 2024 WL 3928883, at *13 (observing that "many recognized sensitive spaces lack enhanced security").

In essence, Plaintiffs' comprehensive-security argument first ignores *Heller* and *Bruen*'s endorsement of firearms prohibitions in schools and government buildings, then invents a principle purportedly (but incorrectly, *see infra* Part II.B) based on the other location restrictions *Bruen* approves, and then tries to deploy that principle as a reason to ignore the Supreme Court's endorsement of prohibitions in schools and government buildings. That is hopelessly circular.

**B.    Legislative buildings, polling places, and courthouses.**

Even leaving aside that Plaintiffs' argument is impossible to reconcile with the constitutionality of firearms restrictions in schools and government buildings, their argument also fails on its own terms. Plaintiffs have failed to establish that the three additional locations *Bruen* named—legislative

assemblies, polling places, and courthouses—all feature comprehensive security.

Polling places, for example, routinely lack government security. *See Wolford*, 116 F.4th at 981. Indeed, law enforcement officers are often "barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process." *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion) (describing Tennessee law); *see also*, *e.g.*, Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe (quoting Minnesota Secretary of State explaining that "you can't preemptively station or assign [police officers] to a polling place. You just can't do it. It's unlawful."). The same was true historically. *See* Del. Const. of 1776, art. 28, *reprinted in The Constitutions of the Several Independent States of America* 143-44 (1786) (mandating that "*no person[s]* shall come armed" to any election and that no "battalion or company, in the pay of the continent, or of this or any other State" shall come within one mile of any election-place for twenty-four hours before or after an election (emphasis added)).

Plaintiffs' efforts to support their argument with historical evidence fall well short, as the district court correctly found. SA48. Their legislative-assembly laws, for example, *see* D. Ct. Dkt. 70 at 21, do not come close to

proving that these buildings routinely had comprehensive security.[15] They cite statutes permitting payments to "door-keepers"—in almost all cases, just one or two individuals for a legislative house. *See, e.g.*, D. Ct. Dkt. 72, Ex. 29, p. 240 (New Jersey statute providing for payment to single door-keeper); *id.*, Ex. 26, pp. 426-27 (South Carolina statute, one door-keeper for each legislative chamber); *id.*, Ex. 28, pp. 372-73 (Georgia statute, one individual in dual role of "messenger and door-keeper" for each chamber). None of these statutes, however, mandated how often these door-keepers attended the legislative buildings, explained their duties when they did so, or ensured that these positions were constantly (or ever) filled.

It is not even clear that a door-keeper routinely provided security. A source from the Maryland State Archives, for example, indicates that the regular tasks of one of Maryland's legislative door-keepers included "supplying wood for the use of the General Assembly and maintaining the furniture." Archives of Maryland (Biographical Series): Cornelius Mills (c.1755–1823), *available at* https://tinyurl.com/yc3nfzzv (describing the tasks

---

[15] The U.S. Department of Justice recently detailed similar flaws in historical security claims made with respect to polling places and courthouses, in defending a challenge against the federal restriction on carrying guns in post offices. *See* Defendants' Combined Motion for Summary Judgment & Opposition to Plaintiffs' Motion for Summary Judgment, *Firearms Policy Coal. v. Garland*, No. 4:24-cv-00565 (N.D. Tex., Nov. 27, 2024), Dkt. 27, at 12-20.

of Mr. Cornelius Mills as door-keeper in October 1778 (footnotes omitted)); *see id.* ("During this time, Mills also worked on the James Brice House in Annapolis as a carpenter/joiner, ran a boardinghouse, and advertised his experience as an auctioneer.").

Even if the duties of door-keepers did include security, moreover, a tiny contingent of door-keepers for an entire legislative house would not amount to meaningful, let alone "comprehensive," security. *See* SA48. Observations John Quincy Adams made about a number of 19th-century door-keepers of the U.S. House of Representatives further undermine any such suggestion. For example, in 1831, the final year of Benjamin Burch's 10-year service as House door-keeper, Adams noted that the 70-year-old Burch "has been for several years and yet is an invalid, confined to his house"—suggesting that Burch had spent several years employed as door-keeper without even being present in the House. *See John Quincy Adams Digital Diary, Dated 7 December 1831*, Primary Source Cooperative at the Massachusetts Historical Society, https://tinyurl.com/yjvusktm; Burch, Benjamin, *History, Art, & Archives – United States House of Representatives*, https://tinyurl.com/46wbn2cr. Burch's successor, Overton Carr, died from ill health while still employed in his position—and Adams described him as having been "many mo[n]ths in decline." *John Quincy Adams Digital Diary, Dated 22 March 1838*, Primary Source Cooperative at the Massachusetts

23

Historical Society, https://tinyurl.com/25am8xmk; *see also* J. William Harris,

*Portrait of a Small Slaveholder: The Journal of Benton Miller*, 74 Georgia

Historical Quarterly 1, 14 (1990) (explaining that Benton Miller, who served

as door-keeper in Georgia House from 1873 to 1883, had lost "more than four

inches of his left leg" in the Civil War and walked with crutch and cane).

Further, even such indisputably sensitive places as the U.S. Capitol

and the White House lacked serious security for decades. *See* United States

Capitol Police, *Mission & History*, https://www.uscp.gov/the-department/our-

mission (explaining that when Congress moved to Washington, DC in 1800, a

"lone watchman, John Golding, was hired to protect the Capitol Building,"

and that the watch remained one person until 1828, when it was expanded to

four); Katie Zezima, *People Used to Be Able to Walk into the White House.*

*Legally.*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND

("Despite being open to the public, there was very little security at the White

House until a drunk man threw rocks at President John Tyler…. Abraham

Lincoln … stationed guards at the White House. After the Civil War,

however, security measures dropped off."); *Guarding the White House*, White

House Hist. Ass'n, https://www.whitehousehistory.org/press-room/press-

timelines/guarding-the-white-house (timeline describing no guards at White

House before 1830, other than militia presence on White House grounds

during War of 1812, and no permanent security force until a four-man guard

was established in 1842). Accordingly, it cannot be the case that a place is "sensitive" only if, as Plaintiffs contended below, is "protected by comprehensive, government-provided security." D. Ct. Dkt. 70 at 20. This Court should reject any such argument here.

## CONCLUSION

This Court should reverse the judgment of the district court.

Dated: January 22, 2025          Respectfully submitted,

/s/ Sana S. Mesiya
Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, DC 20044
(202) 517-6620
smesiya@everytown.org

Janet Carter
William J. Taylor
Priyanka Gupta Sen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163

*Counsel for amicus curiae*
*Everytown for Gun Safety*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Circuit Rule 29 because this brief contains 5962 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) as modified by Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 13-point Century Schoolbook font.

<u>/s/ Sana S. Mesiya</u>
Sana S. Mesiya
*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2025, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Sana S. Mesiya
Sana S. Mesiya
*Counsel for amicus curiae*
*Everytown for Gun Safety*