Nos. 24-2643, 24-2644 (consol.)

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

| | | |
|---|---|---|
| BENJAMIN SCHOENTHAL, *et al.*, | ) | Appeal from the United States |
| | ) | Court for the Northern District of |
| | ) | Western Division. |
| Plaintiffs-Appellees, | ) | |
| | ) | District Court No. 3:22-CV-50326 |
| v. | ) | |
| | ) | The Honorable |
| KWAME RAOUL, *et al.*, | ) | IAIN D. JOHNSTON, |
| | ) | Judge Presiding. |
| Defendants-Appellants. | ) | |

---

## BRIEF FOR THE CHICAGO TRANSIT AUTHORITY AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANTS' APPEAL

KENT S. RAY
General Counsel
Chicago Transit Authority
567 West Lake Street – 6th Floor
Chicago, Illinois 60661
(312) 681-2924
Sbaker@transitchicago.com

SISAVANH B. BAKER
  Deputy General Counsel
  Chief Counsel
SAMUEL W. T. WILSON
  Senior Attorney
  Of Counsel

Nos. 24-2643, 24-2644 (consol.)

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SEVENTH CIRCUIT

---

| | | |
|---|---|---|
| BENJAMIN SCHOENTHAL, *et al.*, | ) | Appeal from the United States |
| | ) | Court for the Northern District of |
| | ) | Western Division. |
| Plaintiffs-Appellees, | ) | |
| | ) | District Court No. 3:22-CV-50326 |
| v. | ) | |
| | ) | The Honorable |
| KWAME RAOUL, *et al.*, | ) | IAIN D. JOHNSTON, |
| | ) | Judge Presiding. |
| Defendants-Appellants. | ) | |

---

### <u>CIRCUIT COURT RULE 26.1 DISCLOSURE STATEMENT</u>

The Chicago Transit Authority is a governmental party, and no Disclosure

Statement is required under Circuit Rule 26.1 or Fed. R. App. P. 26.1.

Attorney's Signature: <u>s/Sisavanh Baker</u>     Date: January 22, 2025
Attorney's Printed Name: Sisavanh Baker

Please indicate if you are *Counsel of Record* for the above Amicus Curiae brief
pursuant to Circuit Rule 3(d).  Yes:<u> X </u>          No: ___

Address:     Chicago Transit Authority
             567 West Lake Street – 6th Floor
             Chicago, Illinois 60661

Phone Number:     (312) 681-2924
Fax Number:       (312) 681-2995
E-Mail Address:   Sbaker@transitchicago.com

# TABLE OF CONTENTS

**INTRODUCTION AND INTEREST OF CHICAGO TRANSIT AUTHORITY** .1

**SUMMARY OF ARGUMENT** ......................................................................4

**ARGUMENT** ............................................................................................5

    **I.**  Plaintiffs Have No Redressability and, Therefore, No Standing Under Article III ................................................................................................5

    **II.**  The Statute Is A Proper Exercise Of Government As Proprietor...................9

    **III.**  The Public Transit Statute Is Constitutional As Applied to Plaintiffs Under Second Amendment Jurisprudence....................................................11

        A.  The Public Transit Statute Is An Analogue To Our Nation's Historical Tradition of Firearm Regulation.................................................11

        B.  The Public Transit Statute Is Constitutional As A Sensitive Place ........15

**CONCLUSION** ..........................................................................................18

**APPENDIX**

# TABLE OF AUTHORITIES

**CASES**                                                                **Page(s)**

*Anderson v. Milwaukee Cnty.,*
    433 F. 3d 975 (7th Cir. 2006). ............................................................ 10-11, 16

*Anderson v. Chi. Transit Auth.,*
    2019 IL App (1st) 181564 ..............................................................1, 17

*Antonyuk v. Chiumento,*
    89 F.4th 271, 364 (2d Cir. 2023) ..............................................................16

*Bilyk v. Chi. Transit Auth.,*
    125 Ill. 2d. 230 (Ill. 1988) ..............................................................1

*Cafeteria & Rest. Workers v. McElroy,*
    367 U.S. 886 (1961) .............................................................. 9

*Cedar Point Nursery v. Hassid,*
    594 U.S. 139 (2021) ..............................................................14

*Chi. Motor Coach Co. v. Chicago,*
    337 Ill. 200 (1929) ..............................................................13

*Chi. Rys. Co. v. Chi. Transit Auth.,*
    160 F.2d 59 (7th Cir. 1947), ..............................................................12, 13

*Chi. Transit Auth v. Danaher,*
    40 Ill. App. 3d 913 (Ill. App. 1st Dist. 1976) ..............................................................8

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ..............................................................18

*Engquist v. Or Dep't of Agric.,*
    553 U.S. 591 (2008) ..............................................................9

*Harp Advert. Ill v. Vill. of Chi. Ridge,*
    9 F.3d 1290 (7th Cir. 1993) ..............................................................7, 8

*In re Lisse,*
    905 F.3d 495 (7th Cir. 2018) ..............................................................12

*Koons v. Platkin,*
    673 F. Supp. 3d 515 (D. N.J. 2023) ...................................................16

*Lakeshore & Mich. S. Ry. Co. v. Smith,*
    173 U.S. 684 (1899) ...........................................................................14

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .............................................................................5

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) ......................................................................11, 15

*Pa. R.R. Co. v. Langdon,*
    92 Pa. 21 (1879) ......................................................................... 14-15

*Papasan v. Allain,*
    478 U.S. 265 (1986) ...........................................................................12

*People v. Chi. Transit Auth.,*
    64 N.E. 2d 4 (Ill. 1945) ................................................................ 13-14

*People v. Chicago,*
    110 N.E. 366 (Ill. 1915) ................................................................12, 13

*People v. Chicago,*
    182 N.E. 419 (Ill. 1932) ....................................................................12

*Renne v. Geary,*
    501 U.S. 312 (1991) ..............................................................................7

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ...............................................................................6

*Sprague v. Biggs,*
    390 Ill. 537 (1945) ......................................................................12, 13

*Wolford v. Lopez,*
    116 F.4th 959 (9th Cir. 2024) ....................9, 11, 14, 15, 16, 17, 18

*United States v. Rahimi*,
    602 U.S. 680 (2024) .............................................................................11

**STATUTES**

70 ILCS 3605/3 .................................................................................2, 13

70 ILCS 3605/7 .....................................................................................13

70 ILCS 3605/8 .....................................................................................13

70 ILCS 3605/12 ...................................................................................10

70 ILCS 3605/30 .....................................................................................6

70 ILCS 3605/31 .....................................................................................6

70 ILCS 3615/2.40(b) .............................................................................7

70 ILCS 3615/4.02 ...............................................................................10

430 ILCS 66/65(a)(5) ..........................................................................6, 8

430 ILCS 66/65(a)(8) ..........................................................................2, 8

720 ILCS 5/24-1(a)(4)(iii) ...............................................................15, 17

720 ILCS 5/24-1(a)(10)(iii) .............................................................15, 17

720 ILCS 5/24-1.6(c) ............................................................................15

Ill. Const. 1970, art. VII, § 1 ..................................................................8

Ill. Const. 1970, art. XIII, § 7 ...............................................................1

**OTHER AUTHORITIES**

CTA Ordinance 11 (1947) ......................................................................13

CTA Ordinance 52-222 (1952) ..............................................................13

CTA Ordinance 016-110 (2016) .....................................................6, 7, 10

CTA Ordinance 016-030 (2016) ............................................................10

CTA Ordinance 023-64 (2023) ..............................................................10

CTA Ordinance 024-2 (2024) .............................................................................6, 7

CTA Ordinance 024-076 (2024) ............................................................................10

Fed. Transit Admin. Circular 5010.1F ..................................................................10

Joshua Hochman, Note, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation,* 133 Yale L.J. 1676 (2024)..........2, 12, 14, 15

Passenger Code of Conduct, Metra .......................................................................10

**INTRODUCTION AND INTEREST OF CHICAGO TRANSIT AUTHORITY**

The Chicago Transit Authority ("CTA") submits this brief[1] in support of Defendant-Appellants Kwame Raoul and Eileen O'Neill Burke, in their official capacities, pursuant to Fed. R. App. Proc. 29(a).[2]

The delivery of safe, swift, and reliable public transportation is vital for the Chicago-land area, providing access to healthcare, employment, education, and, for many, groceries, and the other necessities of life.[3] A well-maintained and efficient public transportation system enhances a community's overall social, environmental, and economic well-being.[4] Its importance is reflected in the Illinois Constitution. *See* Ill. Const. 1970, art. XIII, § *7* ("Public transportation is an essential public purpose for which public funds may be expended."). "The courts and legislature have recognized that the continued operation of the CTA is essential for the Chicago metropolitan area." *Anderson v. Chi. Transit Auth.*, 2019 IL App (1st) 181564, ¶52, (citing *Bilyk v. Chi. Transit*

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), CTA states that its in-house counsel authored this brief in whole. No party or counsel to any party in this matter authored this brief in part or in whole; no party or counsel to any party or person other than CTA contributed money to fund the preparation or submission of this brief.

[2] This Court would be the first to consider the merits of public transportation regulation on Second Amendment rights with an independent brief from the regulated public transit agency.

[3] *See, e.g., Transportation: Transit*, Chi. Metro. Agency for Plan., https://cmap.illinois.gov/focus-areas/transportation/transit/#:~:text=Northeastern%20Illinois'%20transit%20system%20drives,transit%20system%22for%20the%20region (last visited Jan. 20, 2025).

[4] Press Release, CTA, *Argonne-led Research Shows Robust Investment in Transit Benefits Both Transit and Non-Transit Users* (Sept. 11, 2024) (available at https://www.transitchicago.com/argonne-led-research-shows-robust-investment-in-transit-benefits-both-transit-and-non-transit-users).

*Auth.*, 125 Ill. 2d 230, 238 (Ill. 1988)). The challenging responsibility of ensuring efficient public transportation rests with public transit agencies like CTA, but these challenges have been exacerbated by the proliferation of firearms.[5]

Public transit agencies, including CTA and their private predecessors, have long barred firearms and other weapons on their systems as part of their codes of conduct for passengers, in recognition that the presence of firearms on public transportation not only makes for a less safe environment but also detrimentally impacts their ability to control their operations. The targeted statute, Section 66/65(a)(8) of the Firearm Concealed Carry Act (hereafter, the "Public Transit Statute"), codifies historical rules of private and public transit agencies in their efforts to operate their systems safely, by prohibiting the carrying of loaded and accessible firearms on public transportation.

CTA is an Illinois municipal corporation and political subdivision operating bus and rail transportation services for the public in Cook County, Illinois. 70 ILCS 3605/3. It is one of the largest public transit agencies in the country, serving over 3,000,000 residents and providing over a million rides each weekday on its nearly 1,900 buses and 1,500 rail cars.[6]

---

[5] Sarah Freishtat & Joe Mahr, *CTA Boosted Security Spending, But Violent Crime Rate Remains Above Pre-Pandemic Levels*, Chi. Trib., Sept. 8, 2024, https://www.chicagotribune.com/2024/09/08/cta-boosted-security-spending-but-violent-crime-rate-remains-above-pre-pandemic-levels; *see also,* Joshua Hochman, Note, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation,* 133 Yale L.J. 1676, 1678-79 (2024).

[6] *See CTA President's 2025 Budget Recommendations*, at vii [hereinafter 2025 Budget Book] (available at https://www.transitchicago.com/assets/1/6/FY2025_CTA_Budget_Book.pdf.

The district court's grant of declaratory relief effectively permits two individuals, Joseph Vesel and Douglas Winston, to carry firearms for self-defense onto property owned and operated by CTA and Metra[7] to the extent necessary to travel on their systems, without fear of prosecution under the Public Transit Statute. This necessarily implicates CTA's operations and policies, specifically conflicting with its own code of conduct. However, even though these weighty issues are central to many public transportation agencies' interests, CTA has not been able to find one recent court opinion that includes or relies upon input or contribution from the very agencies legally tasked and uniquely qualified to speak to the issues related to firearms on public transportation. This *amicus* brief constitutes CTA's endorsement of and support for the positions of the Illinois Attorney General and Cook County State's Attorney from the perspective of CTA, an actual public transit agency, with respect to the legal propriety of the statutory prohibitions relating to firearms on public transit and the reasons why the District Court's decision must be overturned.

---

[7] This brief is brought only on behalf of CTA and any representations herein are made on behalf of CTA, not Metra.

## SUMMARY OF ARGUMENT

Plaintiffs have not met Article III standing because of two separate legal provisions that plaintiffs have failed to address in their pleadings. First, CTA has its own code of conduct, independent from the Public Transit Statute, that prohibits plaintiffs from carrying loaded and accessible firearms onto its transportation system. Additionally, firearms are prohibited in buildings under the control of a local government under Section (a)(5) of the Illinois Firearms Concealed Carry Act. Thus, plaintiffs' injuries are not redressed by their challenge to the Public Transit Statute, and this matter should be dismissed.

The Public Transit Statute is not unconstitutional because government can act as proprietor, and when it does, it can make regulations to control its operations. CTA and other public transit agencies are successors to private entities whose regulation of firearms on the transportation systems was an exercise of their common law property rights. The Public Transit Statute essentially is a codification of these long standing operational rules.

Finally, the Public Transit Statute is constitutional as applied to plaintiffs under Second Amendment jurisprudence. Specifically, it is an analogue to this Nation's historical tradition of firearm restrictions on public transit, and, modern public transportation systems bear many features common to other well-established sensitive areas, such as schools and government buildings.

# ARGUMENT

## I.     Plaintiffs Have No Redressability and, Therefore, No Standing Under Article III.

In their motion for summary judgment, plaintiffs declared an "inten[t] and desire to carry their firearms for self-defense on public transportation but have not for fear of arrest and prosecution." Doc. 70 at 1. [8]  The district court granted declaratory judgment in favor of plaintiffs. Doc. 108 at 49-50. Statements within the record, as well as the pleadings, establish that plaintiffs and the district court were aware that the public transit agencies, including CTA, had codes of conduct that independently bar plaintiffs from bringing loaded and accessible firearms onto their respective systems. Doc. 108 at 11; Doc. 87 at 6. Notwithstanding, the district court dismissed the Article III standing argument, erroneously finding that its declaration that the Public Transit Statue violates the Second Amendment redresses plaintiffs' injuries. It does not. An additional statutory provision of the Illinois Firearm Concealed Carry Act independently prohibits plaintiffs' proposed conduct, and plaintiffs' challenge will not redress their stated injury.

Under Article III standing requirements, a plaintiff must show that their stated injury is redressable, meaning it is likely, not merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[T]he relevant inquiry is whether . . . the plaintiff has shown an injury to

---

[8] This brief cites entries on the district court's docket as "Doc." and entries on this court's docket as "7th Cir. Doc.," and the short appendix as "SA."

himself that is *likely* to be redressed by a favorable decision. Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." *Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 38 (1976)* (emphasis added).

CTA adopts Defendant-Appellant County's arguments with respect to plaintiffs' lack of standing due to redressability and supplements those arguments based on CTA's code of code and Section 66/65(a)(5) of the Firearm Concealed Carry Act, both of which would prohibit plaintiffs' ability to carry firearms on public transit.

CTA's Code of Conduct prohibits, among other things, possession of any weapon, including firearms, on CTA property. *See* CTA Ordinance 016-110 § 1(28) (2016)[9] and CTA Ordinance 024-2 § 1 (2024).[10] CTA enacted this Code of Conduct under regulatory power granted by the Metropolitan Transit Authority Act,[11] which authorizes CTA to:

> pass all ordinances and make all rules and regulations proper or necessary to regulate the use, operation and maintenance of its property and facilities, and to carry into effect the powers granted to the [CTA], with such fines or penalties, including ordinances, rules, and regulations concerning the suspension of riding privileges or confiscation of fare media under Section 2.40 of the Regional Transportation Authority Act, as may be deemed proper. No fine or penalty shall exceed $300.00, and no imprisonment shall exceed six (6) months for one offense…

---

[9] *Available at* https://www.transitchicago.com/board/ordinances/?Keyword=16-110.
[10] *Available at* https://www.transitchicago.com/board/ordinances/?Keyword=024-02.
[11] Metra has a similar provision under Metra's Code of Conduct. *See Passenger Code of Conduct*, Metra, at §§ III(I), IV(H), https://metra.com/CodeofConduct#Passenger_Code_of_Conduct_Policy (last visited Jan. 22, 2025).

70 ILCS 3605/30, 31. Any passenger who violates CTA's code of conduct could be subject to immediate removal from CTA property, fines, supervision, restitution, community service, and the possibility of ridership suspension and/or confiscation of fare media. CTA Ordinance 016-110 §§ 2-3; CTA Ordinance 024-2 §§ 3-4; 70 ILCS 3615/2.40(b). Thus, even under the district court's order, plaintiffs cannot carry their firearms for self-defense on public transportation without potential prosecution and enforcement under the terms of CTA's Code of Conduct.

The district court found that plaintiffs made no argument for injunctive relief and, therefore, forfeited the right to an injunction. Doc. 108 at 49. Consequently, neither CTA nor Metra is prevented from enforcing their codes of conduct in order to allow plaintiffs' desired resolution. Plaintiffs could indeed face further concerns, including immediate removal, suspension of riding privileges, confiscation of fare media, and a fine under CTA regulations. In other words, even if plaintiffs achieve total victory in this litigation, they still could not travel on the systems with loaded and accessible firearms. *See Harp Advert. Ill. v. Vill. of Chi. Ri*dge, 9 F.3d 1290, 1291 (7th Cir. 1993) (Plaintiff lacked standing to challenge defendant's sign and zoning codes where finding the litigation "irrelevant" because plaintiffs did not contest a separate code that defendants "could block the sign simply by enforcing another valid, ordinance already on the books"); *see also Renne v. Geary*, 501 U.S. 312, 317-21 (1991).

When confronted with the CTA and Metra's codes of conduct, one plaintiff declared that he would simply ignore public transit rules if he prevailed in this litigation "despite the transit operators' policies barring firearms," and claimed a

potential future intent to seek to enjoin the transit agencies' policies if enforced against

him. Doc 87 at 6. Such a statement only highlights the lack of redressability. Therefore,

a declaration that the Public Transit Statute violates their Second Amendment rights

would not redress their injury.

Further, the Firearm Concealed Carry Act enumerates 23 "prohibited area"

categories where a person with a concealed carry permit may not take a firearm. 430

ILCS 66/65. Plaintiffs' complaint identifies one specific category, the challenged Public

Transit Statute. Doc. 1 at ¶7; *id.* at 66/65(a)(8). However, CTA's real property is also

covered under subsection (a)(5) of the Firearm Concealed Act: "any building or portion

of a building under the control of a unit of local government." *See* 430 ILCS 66/65(a)(5).

CTA is a "special district" under the umbrella of local government in Illinois, and thus,

is a "unit of local government" under the Illinois Constitution. Ill. Const. 1970, art. VII, §

1; *Chi. Transit Auth. v. Danaher,* 40 Ill. App. 3d 913, 915 (Ill. App. 1st Dist. 1976).

Because CTA is a unit of local government, the district court's order does not

protect plaintiffs from the threat of prosecution if they choose to carry loaded firearms

onto CTA's rail or bus system or into certain locations. *See*, *infra*, Section III; Doc. 108 at

50. A significant portion of CTA's system incorporates physical real property structures.

Every rail station in CTA's system incorporates a building structure for accessing the

platform. As discussed below, some of these station buildings also feature connected

structures for staging buses for passenger boarding and alighting. Thus, the two

plaintiffs granted declaratory relief for accessing CTA still cannot completely access

CTA's transportation system while armed without risking the same threat of

prosecution they challenge here. *See Harp Advert. Ill.*, 9 F.3d at 1291-92 (finding plaintiff lacked standing because even if their challenge succeeded against one village ordinance, another village ordinance independently prohibited the same conduct).

Because their challenge fails to address these other provisions that prohibit their entry onto CTA property with loaded firearms, plaintiffs have not satisfied the redressability prong for establishing standing before the Court.

**II.    The Statute Is a Proper Exercise of Government as Proprietor.**

The Supreme Court recognizes that government can exercises its traditional role in regulating as a lawmaker, but can also act "as proprietor, to manage [its] internal operations." *See Engquist v. Or Dep't of Agric.*, 553 U.S. 591, 598 (2008) (citing *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 896 (1961) ("We have long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising "the power to regulate or license, as lawmaker," and the government acting "as proprietor, to manage [its] internal operation."); *see also Wolford v. Lopez*, 116 F.4th 959, 970-71 (9th Cir. 2024) ("As the owner or operator of private property, a bank may prohibit firearms as a matter of the ordinary property-law right to exclude. And if a State operates a bank, the State, too, may exercise its proprietary right to exclude, just as a private property owner may."). CTA adopts and supplements Defendant Appellant County's argument that the Public Transit Statute is constitutional under the Second Amendment because Illinois has a proprietary interest in regulating the transportation system it created. 7th Cir. Doc. 25 at 22-43.

The government's interests as a property owner and the codes of conduct

enacted related to safety, among other things, are no less applicable because they apply to public property. In fact, these proprietary interests may be more significant as public property that is paid for by taxpayer dollars.[12] The government and the CTA are charged with not only ensuring speedy and safe transportation but also safeguarding the trains, buses, and stations and the persons who use and operate them. This is no small matter. CTA operates 1,895 buses and 1,480 rail cars over 310 square miles. *See* 2025 Budget Book, *supra* note 6, at vii. Modern electric CTA buses cost approximately $1.2 million each.[13] A single, modern 7000-series rail car costs approximately $1.7 million.[14] For 2025, the CTA's operating budget is $2.156 billion dollars, and CTA's capital improvement program is $6.96 billion dollars spread over the next five years. 2025 Budget Book, *supra* note 6, at 27, 59. Reasonable firearm regulation is necessary to safeguard these assets and ensure the critical mission of public transportation.

The firearm ban is just one rule for transit riders. The CTA's Code of Conduct has several other prohibitions, including the prohibition against distributing written material, and soliciting or petitioning on CTA, all of which implicate the First Amendment. The Seventh Circuit Court of Appeals in *Anderson v. Milwaukee County*

---

[12] Generally, federal grant money comes with requirements for local contributions. *See generally* Fed. Transit Admin. Circular 5010.1F. CTA meets these local contribution requirements through a variety of methods, such as local tax revenue and issuing bonds. *See* 70 ILCS 3605/12; 70 ILCS 3615/4.02.

[13] *See* CTA Ordinance 023-64 (2023) (available at https://www.transitchicago.com/board/ordinances/?Keyword=023-064); CTA Ordinance 024-076 (2024) (available at https://www.transitchicago.com/board/ordinances/?Keyword=024-076).

[14] *See* CTA Ordinance 016-030 (2016) (available at https://www.transitchicago.com/board/ordinances/?Keyword=016-030).

found that a similar regulation, which prohibited the distribution of protected speech under the First Amendment in the form of religious literature on public buses, was constitutional because the interior of a city bus is a nonpublic forum and therefore the government may limit protected speech so long as the restrictions are not content-based. 433 F.3d 975, 979 (7th Cir. 2006). The Seventh Circuit characterized bus passengers as a "captive audience" who can neither avoid nor escape from a speaker riding the bus with them and concluded that the government's interest in protecting its passengers was superior to the plaintiff's First Amendment speech. *Id*. at 980. Bus and rail passengers are equally "captive" for purposes of a Second Amendment analysis.

Because the Public Transit Statute is grounded in the government's proprietary interest to control its operations and to protect its passengers, it is constitutional.

### III. The Public Transit Statute Is Constitutional As Applied to Plaintiffs Under Second Amendment Jurisprudence.

#### A. The Public Transit Statute Is An Analogue To Our Nation's Historical Tradition of Firearm Regulation.

There are two ways to analyze a modern regulation under the Second Amendment. The first is the historical analogue test, which asks whether a challenged modern regulation is an analogue to historical laws that previously have been so well accepted or uncontroversial as to be deemed constitutional under the Second Amendment. *Wolford*, 116 F.4th at 976-78 (citing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 26-27 (2022). "The appropriate analysis involves considering whether the challenged regulation is consistent with *the principles* that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (citing *Bruen*, 597

11

U.S. at 26-31) (emphasis added).

In the United States, public transportation historically was owned and operated by private entities, much in the way that private entities own and operate the airlines today. *See* Hochman, *supra* note 5, at 1685–86. CTA adopts and incorporates the thorough history of privately owned public transportation systems as presented in the Appellant State's Brief. 7th Cir. Doc. 24 at 19-21.

Specifically, as to CTA, it is a matter of public record that CTA is the successor of private transportation companies.[15] In 1859, the first private streetcar company, using rail track laid into streets and powered by overhead wires (similar to San Francisco's or New Orleans' streetcars), began operations in Chicago, and in 1892, the iconic elevated rail lines began operation. *People v. Chicago,* 182 N.E. 419, 426 (Ill. 1932).[16] By the 20th century, Chicago had four private railway companies[17] and four private streetcar companies[18] all operating independently of each other. In 1913, the City of Chicago

---

[15] CTA requests this Court take judicial notice of historical facts contained in public records regarding CTA's creation. Fed. R. Evid. 201(b); *Papasan v. Allain*, 478 U.S. 265, 268-72, 268 n.1 (1986); *In re Lisse*, 905 F.3d 495, 497 (7th Cir. 2018) (finding the request for judicial notice properly belongs in briefs, rather than filing a separate motion).

[16] *See also* Kevin Zolkiewicz, *A Brief History of Chicago Surface Lines*, ChicagoBus.org, https://www.chicagobus.org/history (last visited Jan. 8, 2025); *The Original "L" Companies*, Chicago"L".org,  https://www.chicago-l.org/history/4line.html (last visited Jan. 8, 2025).

[17] These included the Northwestern Elevated Railway Company, South Side Elevated Railway Company, Metropolitan West Side Elevated Railway Company, and Chicago and Oak Park Elevated Railway Company. *Sprague v. Biggs*, 62 N.E.2d 420, 422 (Ill. 1945).

[18] These included the Chicago Railways Company, the Chicago City Railway Company, the Southern Street Railway Company, and the Calumet and South Chicago Railway Company. *Chi. Rys. Co. v. Chi. Transit Auth.,* 160 F.2d 59, 61 (7th Cir. 1947); *People v. Chicago*, 110 N.E. 366, 369-70 (Ill. 1915).

passed an ordinance to force the streetcar companies into unified operation as the

Chicago Surface Lines, and eventually, the railway companies consolidated into one

private company, the Chicago Rapid Transit Company, in 1924.[19] One precursor to

CTA's bus system, the Chicago Motor Coach Company, also began servicing Chicago in

1913.[20] The Chicago Surface Lines also operated buses on some routes in less densely

populated areas of Chicago. Three decades later, recognizing the essential nature of

public transportation to the well-being and prosperity of the community, City of

Chicago and State of Illinois lawmakers forced the various rail and motorcoach

providers into a single entity, and in 1945, Illinois created the CTA through the

Metropolitan Transit Authority ("MTA") Act, with territorial jurisdiction in Chicago

and most of Cook County. 70 ILCS 3605/3, 3605/7, and 3605/8;[21] *see also People v. Chi.*

*Transit Auth.*, 64 N.E.2d 4, 7 (Ill. 1945). CTA began operations in its relatively modern

form after acquiring the Chicago Rapid Transit Company and Chicago Surface Lines in

1947. CTA also became the predominant operator of Chicago transit after acquiring the

Chicago Motor Coach Company in 1952. SA1-2 (CTA Ordinance 11 (1947)); SA13 (CTA

Ordinance 52-222 (1952)).[22] Prior to the 1945 Act, passenger transportation services in

Chicago and Cook County were exclusively private, comparable to other private

railroad companies at the time. *See* Doc. 64-11 at 24-26; *People v. Chi. Transit Auth.*, 64

---

[19] *Biggs*, 62 N.E.2d at 422; *People v. Chicago*, 110 N.E. at 369.
[20] *Chi. Motor Coach Co. v. Chicago*, 169 N.E. 22, 23-24 (Ill. 1929).
[21] *See Chi. Rys. Co.*, 160 F.2d at 61-63.
[22] These CTA Ordinances are not digitally stored. *See also About Us*, Chicago Transit Authority, https://www.transitchicago.com/about/ (last visited Jan. 22, 2025).

N.E.2d at 7-8, 11.

Because public transportation agencies were privately owned in the mid-1800s, one additional principle for consideration is the private property default rule, which is the right of a private property owner to exclude others, including those bearing arms. *See Wolford*, 116 F.4th at 994 (citing *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021)). The same history, facts, and law as articulated above (*see*, *supra* Section II) related to the private property default rule apply as a principle here, namely, it is well accepted that in the mid-1800s private entities operating public transit could regulate firearms on the system. *See Wolford*, 116 F.4th at 994. "Nothing in the text of the Second Amendment or otherwise suggests that a private property owner—even owners who open their private property to the public—must allow persons who bear arms to enter." *Id.*

This principle also applies to government when it is acting as a proprietor. *See*, *supra* Section II. As private entities, transit agencies were entitled to enact their own rules and regulations for riders as a proprietor, *e.g.* to manage their operations, to issue rules to control the use for swift and safe transportation purposes, and to protect and maintain the property against destruction or harm. *See* Hochman, supra note 5, at 1686-89, 1688 n.63 ("U.S. law treated railroad corporations as regulators in their own right," and ultimately deemed them to be quasi-public entities that 'had a general right…to conduct and manage [their] own affairs.'" (citing *Lakeshore & Mich. S. Ry. Co. v. Smith*, 173 U.S. 684, 691 (1899))). "Across state courts in the nineteenth century, it went unquestioned that railroads had the authority to protect the safety of their passengers

through regulation." Hochman, *supra* note 5, at 1690 & n.77; *see, e.g.*, *Pa. R.R. Co. v. Langdon*, 92 Pa. 21, 27 (1879) ("The right of a railroad company to make reasonable rules for its own protection, and for the safety and convenience of passengers, has been repeatedly recognised."[sic]).

When the State of Illinois enacted the Public Transit Statute, it codified the public transit agencies' "historical tradition of prohibiting the carry of loaded firearms or the carry of firearms not stored." *See Wolford*, 116 F.4th at 1001. This is most apparent in light of Illinois's criminal code, specifically the unlawful use of a weapons provision, which prohibits one from accessing a loaded or unsecured firearm but allows the transportation of a firearm if it is "unloaded and enclosed in a case, firearm carrying box, shipping box, or other container." *See* 720 ILCS 5/24-1(a)(4)(iii), (10)(iii); *id.* at 5/24-1.6(c). This stowage concept arose out of the regulatory traditions of the mid-1800ies, as articulated by State Appellants. *See* 7th Cir. Doc. 24 at 19-21.

**B. The Public Transit Statute Is Constitutional As A Sensitive Place**

The Public Transit Statute's ban on loaded firearms on public rail and bus transit also satisfies the sensitive places analysis, which allows courts to use analogies to the settled sensitive locations, such as schools, government buildings, legislative assemblies, polling places, and courthouses, to determine if the modern regulations prohibiting the carry of firearms in new and analogous places are constitutionally permissible. *See Wolford*, 116 F.4th at 979 (quoting *Bruen*, 597 U.S. at 30). As the Ninth Circuit Court of Appeals in *Wolford* observed, "public transit bears some features common to other sensitive places, such as government buildings and schools." *Id.* at

1001. Namely, many of the sensitive-place regulations aimed to protect public safety and order. *See* 7th Cir. Doc. 24 at 39-40 (discussing the purpose of the public-transit restriction).

CTA adopts Appellant Defendant State and County's arguments related to sensitive places and supplements these arguments here. 7th Cir. Doc. 24 at 31-43; 7th Cir. Doc. 25 at 46-54. In addition, CTA notes the analysis does not differentiate between the various properties at issue. In order to make the sensitive places analysis, it is important to analyze rail cars and buses separately from what CTA considers government buildings, namely connected bus structures and rail stations. *See Wolford*, 116 F.4th at 989-92 (analyzing parking lots separately from the sensitive places to which they relate); *Koons v. Platkin*, 673 F. Supp. 3d 515, 647-50 (D. N.J. 2023) (analyzing airports separately from "transportation hubs" under *Bruen*'s framework).

The train and bus environment is comparable to discrete, densely crowded physical spaces previously deemed to be sensitive, such as theaters and zoos (*see Antonyuk v. Chiumento*, 89 F.4th 271, 364, 375 (2d Cir. 2023)), as well as casinos, stadiums, amusement parks, museums, and libraries (*see Wolford*, 116 F.4th at 987-89). Indeed, buses and rail cars are frequently even more discrete, in that the space is smaller than theaters or zoos, and densely crowded than those enumerated sensitive places. *See Anderson v. Milwaukee Cnty.*, 433 F.3d at 980 (where the Seventh Circuit characterized bus passengers as a "captive audience" who can neither avoid nor escape from a speaker riding the bus with them and concluded that the government's interest in protecting its passengers was superior to the plaintiff's First Amendment speech.*)

Moreover, a bullet discharged within a railcar or bus, regardless of who fires it, has the possibility of striking other passengers, the operator, and damaging the bus or railcar.

Illinois law permits weapons that "are broken down in a non-functioning state, "are not immediately accessible," or "are loaded and enclosed in [the proper container]." 720 ILCS 5/24-1(a)(4), (a)(10). Illinois' regulation is precisely the kind the court in *Wolford* declared would be constitutional, *see Wolford*, 116 F.4th at 1002, and they are sensible in today's modern environment. Unlike the private vehicles used in transit in the past, CTA buses and rail cars both do not have a separate area for checked baggage, or an additional employee separate from the vehicle operator who can check the method of carrying the firearm. *See Anderson*, 2019 IL App (1st) 181564, ¶53 (recognizing the infeasibility of CTA to hire sufficient staff to accommodate duties unrelated to transit operations). CTA typically has a single Operator for each train and bus. Checking every passenger's belongings to verify that they have properly stored or unloaded firearms upon boarding is impossible to meet CTA's schedules and operations. Unlike a national transit provider such as Amtrak,[23] CTA is used exclusively for short, local trips, and its rail service extends only to the Cook County suburbs nearest to Chicago.

Finally, rail stations and connected bus structures should be considered government buildings under the sensitive places doctrine. CTA is a unit of local

---

[23] Compare to Amtrak's policy of allowing firearms on checked baggage. Amtrak has the ability to do this because that service does have an area for checked baggage. *Firearms in Checked Baggage*, Amtrak, https://www.amtrak.com/firearms-in-checked-baggage (last visited Dec. 9, 2024).

government, and as such, its buildings definitionally fit an accepted sensitive place: "government buildings." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Like other government buildings, the construction and upkeep of CTA rail stations is paid for with taxpayer funds. CTA's connected bus structures are not merely bus stops, but an extension of the rail station building that serves as a staging area for multiple CTA or Pace bus routes.[24] These are structures that are "so intertwined with the main structure as to be considered part of the sensitive area itself." *See Wolford*, 116 F.4th at 989 (discussing how some parking areas are so intertwined with the main structure, like courthouses and jails or fall within a reasonable buffer zone, like parking areas of schools, that firearms may be prohibited there). In these connected bus structures, CTA permits only CTA or Pace buses access to them. They are not intended as parking lots[25] or drop-off locations for passengers. Therefore, rail stations and connected bus structures by extension, are "sensitive places" through analogy to government buildings.

## CONCLUSION

For these reasons, this Court should reverse the lower court's Memorandum Opinion and Order in favor of Appellants.

---

[24] CTA has sixteen connected bus structures that fit this definition, servicing approximately 51 individual CTA bus routes and 39 individual Pace bus routes. Examples include the bus structures connected to CTA's 95th/Dan Ryan Red Line Terminal and Midway Orange Line Terminal, both of which serve multiple CTA and Pace bus routes.

[25] Some connected bus structures are adjacent to parking lots and CTA agrees that they would not constitute a part of the sensitive places.

Dated: January 22, 2025        Respectfully submitted,

KENT S. RAY
General Counsel

*/s/ Sisavanh Baker*
BY:   SISAVANH BAKER
     Deputy General Counsel
     Chicago Transit Authority
     SAMUEL W. T. WILSON
     Senior Attorney
      Of Counsel

*Counsel for Amicus Curiae*

# SHORT APPENDIX

## TABLE OF CONTENTS

Page

Chicago Transit Authority Ordinance 11 (1947)......................................................SA1

Chicago Transit Authority Ordinance 52-222 (1952) ..........................................SA11

Pages: 65

Filed: 01/24/2025

Document: 45

Case: 24-2643

## ORDINANCE NO. 11.

### AN ORDINANCE

Prescribing the Rates and Charges for the Services
of the Transportation System Operated by
Chicago Transit Authority.

WHEREAS, under the terms of the Metropolitan Transit Authority Act approved April 12, 1945, the General Assembly of the State of Illinois imposed upon the Chicago Transit Board the duty

(1) to rehabilitate, reconstruct and modernize, as promptly as possible, all portions of any transportation system acquired by Chicago Transit Authority (hereinafter sometimes called "Authority"); and

(2) to maintain at all times an adequate and modern transportation system suitable and adapted to the needs of the municipalities served by the Authority, and for safe, comfortable and convenient service; and

(3) to fix rates, fares and charges for transportation sufficient in the aggregate to provide revenues for the payment of (a) interest and principal on its revenue bonds and of all other charges upon its revenues as provided by any trust agreement; (b) operating and maintenance costs including wages, materials, supplies and services, injuries and damages, and all other costs incidental to operation of its transportation system; (c) all costs and charges for acquisition, modernization, construction, extension and depreciation; and (d) for compensation to municipalities for the use of streets, subways and other public ways; and

Case: 24-2643     Document: 45     Filed: 01/24/2025     Pages: 65

WHEREAS, Chicago Transit Authority is the successful bidder for the purchase of the properties known as Chicago Surface Lines and Chicago Rapid Transit System, and proposes to acquire these properties for approximately $90,000,000 and to operate them on and after 12:01 A.M. (Central Standard Time) on October 1, 1947; and

WHEREAS, the properties to be so acquired are in urgent need of unification and extensive rehabilitation and modernization estimated to cost $150,000,000 if adequate and modern transportation suitable and adapted to the needs of the municipalities served by these lines is to be provided and maintained; and

WHEREAS, the City of Chicago, with the approval of the people of that city, by ordinance passed April 23, 1945, has granted to Chicago Transit Authority an exclusive right and franchise to acquire, construct, reconstruct, maintain and operate these facilities for local transportation within the City of Chicago; and

WHEREAS, by the terms of said ordinance, Chicago Transit Authority is likewise required to establish a single unified and modern comprehensive transit system which will provide attractive, convenient, efficient and economical local transportation service, which the City Council determined would require an expenditure for improvements and extensions estimated at that time at $125,000,000; and

WHEREAS, by the terms of said ordinance Chicago Transit

Case: 24-2643    Document: 45    Filed: 01/24/2025    Pages: 65

Authority is likewise required to establish and publish a
schedule of the rates, charges, and transfer privileges for
the services to be performed by it, which shall include a con-
tinuous ride in one general direction within the City of
Chicago upon payment of the established fare; and

WHEREAS, the present rates, fares and charges now
established for the Chicago Surface Lines and Chicago Rapid
Transit System do not provide revenue sufficient for the re-
quired modernization of those services, in addition to the cost
of operation and maintenance,

THEREFORE, BE IT ORDAINED BY THE CHICAGO TRANSIT BOARD OF CHICAGO
TRANSIT AUTHORITY;

1. That the following rates, fares and charges
(including transfer privileges)for the use of the transportation
facilities and services of Chicago Transit Authority, effective
as of 12:01 A.M. (Central Standard Time) on October 1, 1947
are hereby determined and established;

SURFACE DIVISION OF CHICAGO TRANSIT AUTHORITY

Street railway and bus service

General Fares

Each passenger 12 years of age or over (except
school children with identification card),
a fare of . . . . . . . . . . . . . . . . . . . . . . 10 cents

Each passenger under 12 years of age,
a fare of . . . . . . . . . . . . . . . . . . . . . . 5 cents

A child under 7 years of age when accompanied
by an adult paying a fare . . . . . . . . . . . . . . free

A child under 7 years of age,unaccompanied
by an adult fare paying passenger, a fare of. . . . 5 cents

**SA3**

Pages: 65

Filed: 01/24/2025

Document: 45

Case: 24-2643

## School Childrens Fare

A school child, 12 years of age or over upon presentation of an identification card (see rules and regulations) stating in effect that such child is a bonafide full time student of a public, private or parochial elementary or high school, a fare of . . . . . . . . . . . . . 5 cents

## Transfers

Transfers will be issued upon request to fare-paying passengers for use between lines of surface division — governed by time, direction and "use" rules and regulations . . . . . . . . . free

Transfers will be issued upon request to fare-paying passengers for use in the middle zone of the rapid transit division — governed by time, direction and "use" rules and regulations, as follows:

Adults: In addition to 10 cent fare . . . . . 2 cents

Children:Paying a fare . . . . . . . . . . . . free

School children: Paying a fare . . . . . . . . .free

Transfers issued upon request to passengers paying a fare in the middle rapid transit zone and having a destination in the north or west rapid transit zones — governed by time, direction and "use" rules and regulations, as follows:

Adults: In addition to 10 cent fare . . . . . . 5 cents

Children: In addition to 5 cent fare . . . . . 4 cents

School children:In addition to 5 cent fare. . 4 cents

- - - -

## RAPID TRANSIT DIVISION OF CHICAGO TRANSIT AUTHORITY

Elevated and subway train service is divided into three zones as follows:

1. Middle Zone - All rapid transit service in the city of Chicago and between Chicago and Oak Park, Forest Park, Cicero and Berwyn.

**SA4**

Pages: 65

Filed: 01/24/2025

Document: 45

Case: 24-2643

2. <u>North Zone</u> — All rapid transit service from Howard
   Street north, and between Evanston, Wilmette and
   Skokie.

3. <u>West Zone</u> — All rapid transit service from Des
   Plaines Avenue west, and between Maywood, Bell-
   wood and Westchester.

### General Fares — Rapid Transit Division

Each passenger 12 years of age, or over (except
school children with identification card)

    Middle Zone – a fare of . . . . . . . . . . . . . .12 cents

    North Zone – a fare of . . . . . . . . . . . . . . 8 cents

    West Zone – a fare of . . . . . . . . . . . . . . 8 cents

Through tickets good between any two adjacent
zones on the rapid transit division, including
free transfer to the surface division, will be
issued on request for . . . . . . . . . . . . . . . . . .15 cents

Fare between any two adjacent zones without
through tickets. . . . . . . . . . . . . . . . two general fares

Each passenger under 12 years of age:

    Middle Zone, a fare of . . . . . . . . . . . . . . 5 cents

    North Zone, a fare of . . . . . . . . . . . . . . . 4 cents

    West Zone, a fare of . . . . . . . . . . . . . . . .4 cents

    Between any two adjacent zones . . . . . . . . . .9 cents

A child under 7 years of age, when accompanied
by an adult fare-paying passenger . . . . . . . . . . .free

A child under 7 years of age, unaccompanied
by an adult fare-paying passenger:

    Middle Zone – a fare of . . . . . . . . . . . . . . 5 cents

    North Zone – a fare of . . . . . . . . . . . . . . .4 cents

    West Zone – a fare of . . . . . . . . . . . . . . . 4 cents

**SA5**

Pages: 65

Filed: 01/24/2025

Document: 45

Case: 24-2643

## School Childrens Fare

A school child, 12 years of age or over, upon
presentation of an identification card (see
note) stating in effect that such child is a
bonafide full time student of a public, private
or parochial elementary or high school:

Middle Zone . . . . . . . . . . . . . . . . . . . 5 cents

North Zone . . . . . . . . . . . . . . . . . . . . 4 cents

West Zone . . . . . . . . . . . . . . . . . . . . . 4 cents

Between any two adjacent zones . . . . . . . . . 9 cents

## Transfers

Transfers issued upon request to fare-paying
rapid transit passengers for use between ele-
vated and subway services at points of inter-
change on rapid transit division - governed
by time, direction and "use" rules and
regulations . . . . . . . . . . . . . . . . . . . . free

Transfers issued upon request to fare (cash or
ticket) paying rapid transit passengers for use
on surface division - governed by time, direction
and "use" rules and regulations . . . . . . . . . free

## Free Transportation

Employees of Chicago Transit Authority when in full uni-

form or wearing an official badge of the Authority, and

municipal policemen and firemen, when in full uniform, shall

be permitted to ride within the municipality in which they

are employed upon any of the lines or routes of the Authority

without payment of fare. Special passes or tickets will be

issued to all Authority employees, and upon certification of

the commissioner of police, to members of the police force

of such municipality assigned to duty in civilian clothes.

SA6

Case: 24-2643    Document: 45    Filed: 01/24/2025    Pages: 65

## Transfers with Chicago Motor Coach Company

Subject to acceptance by the Chicago Motor Coach Company, the following charges for transfers to and from the lines and routes of Chicago Transit Authority and those of Chicago Motor Coach Company shall prevail:

### Surface Division

Transfers will be issued to adult fare-paying passengers on the street cars and buses of the surface division of the Authority for use on the Chicago Motor Coach Company system at points of interchange as heretofore established – governed by time direction and "use"rules and regulations. . **free**

Transfers issued to adult fare-paying passengers by the Chicago Motor Coach Company for use on the street railway and bus lines of the Surface division of the Authority at points of interchange with the Chicago Motor Coach Company heretofore established, governed by time, direction and "use" rules and regulations will be accepted . . . . . . . . . . . . . . . . . . . .   free

### Rapid Transit Division

Transfers will be issued to adult fare(cash or ticket)paying passengers for use on the Chicago Motor Coach Company's system at points of interchange previously established between the rapid transit division and the Chicago Motor Coach Company, governed by time, direction and "use" rules and regulations . . . . . . . . . . . . . . . . . . . . .   free

Transfers issued to adult fare-paying passengers by the Chicago Motor Coach Company for use on the rapid transit division at points of interchange previously established between the Chicago Motor Coach Company and the rapid transit division, governed by time, direction and "use" rules and regulations, will be honored as follows;

SA7

Pages: 65

Filed: 01/24/2025

Document: 45

Case: 24-2643

For destinations in the middle zone of
the rapid transit division of the
Authority, upon payment to the receiv-
ing agent or collector of the rapid
transit division of . . . . . . . . .  2 cents

For destination in the north or west
zones of the Authority, upon payment
to the receiving agent or collector
of the rapid transit division of. . . .5 cents

## Joint Tariff with Steam and Electric Railroads

Negotiations will be entered into between Chicago Transit
Authority and the various steam and electric railroads furnish-
ing suburban service or utilizing joint facilities, to establish
tariffs covering rates, charges and payments for joint use of
the respective facilities. Pending approval by parties in
interest of such transfer and joint use agreements or further
action by the Chicago Transit Board, the transfer of passengers
and continuation of joint service between the rapid transit
division of the Authority and the Chicago North Shore and
Milwaukee Railroad Company, the Chicago Aurora and Elgin
Railroad Company and the Chicago Junction Railroad Company
will be maintained under conditions as they exist as of the
date when the furnishing of service is assumed by the Authority.

## Special Rates

Special rates for special transportation services, in-
cluding charter and deluxe operations, will be caused to be
established from time to time by the General Manager of the
Authority. Rates and charges for new express services shall
be fixed from time to time, on recommendation of said General
Manager, by the Chicago Transit Board.

SA8

## Rules and Regulations

Rules and regulations covering operating procedures in accordance with this ordinance, and rules governing the collection of fares and the limitations on the use of transfers in accordance herewith, will be issued from time to time by the General Manager of the Authority.

> The identification card required to qualify school children, riding on both surface and rapid transit divisions, to a reduced school fare and broadened transfer privileges, shall be of special design furnished by the Authority, and shall state thereon the current semester of the school year and the date on which the card expires. It shall contain the students signature, address, sex and age, the name and address of the school and the signature of the principal or teacher. The student must show the card to the conductor, operator or agent in order to ride at the student fare. The student shall be entitled to such fare only for transportation to or from school. The trip must be commenced between 6:00 A.M. and 6:00 P.M. (Standard or Daylight Saving Time as the case may be) on a regular school day. The card so issued shall be for the exclusive use of the student whose name appears on its face. If presented by any other person on or after the expiration date of the card, the conductor, operator or agent will take it up and collect the regular fare.

2. That negotiations be promptly instituted looking to the establishment of joint or special rates of fare and transfer privileges for combination rides over the lines and routes of the transportation system of the Authority, including City-owned subways, and every other transportation public utility serving the Chicago Metropolitan Area, including but not limited to suburban street car and bus lines, and steam and electric railroads.

SA9

Case: 24-2643    Document: 45    Filed: 01/24/2025    Pages: 65

3. That negotiations be promptly instituted looking to the making of an agreement for payment by the United States Post Office Department of compensation to the Authority for the transportation of letter carriers.

4. That negotiations be promptly instituted with the Chicago North Shore and Milwaukee Railroad, the Chicago Junction Railroad, and the Chicago Aurora and Elgin Railroad for new operating agreements covering the joint use of their facilities and those of the Authority (including the City-owned subways) and for the establishment of equitable joint rates of fare, charges and payments, for passengers making joint use of such facilities.

5. That attention be directed to the officials of the municipalities outside Chicago served by the Authority that, under the provisions of the Metropolitan Transit Authority Act, no special tariffs are hereby established for purely intraurban service other than for the City of Chicago, pending the adoption by them of franchise ordinances as required by the terms of said Act.

6. All ordinances or parts thereof insofar as in conflict herewith are hereby repealed and this ordinance shall be in force and effect from and after its passage and approval as provided by law.

Approved:                          Adopted:

_Titus, Harrught_                  _William H McLenn_
        Chairman                            Secretary

Date  _Sept 26, 1947_        Date  _Sept 24, 1947_

-10-

**SA10**

STATE OF ILLINOIS )
                  )  SS.
COUNTY OF COOK    )

     The undersigned hereby certifies that he is the duly appointed, qualified and acting Secretary of Chicago Transit Board, the governing and administrative body of Chicago Transit Authority, and that attached hereto is a true, correct and complete copy of Ordinance No. 52-222 , which, following a reading thereof, was duly adopted by said Chicago Transit Board at its regular meeting on September 30, 1952, whereat all members of said Board were present, and upon motion for the adoption of said Ordinance, duly seconded, all members voted in favor thereof, all as shown by the records of said Chicago Transit Board of which the under-signed is the lawful custodian.

     IN WITNESS WHEREOF the undersigned has hereunto affixed his official signature and the seal of said Authority this 30th day of September, 1952.

                      _William W. McCann_
                  Secretary, Chicago Transit Board

(SEAL)

Filed: 01/24/2025    Pages: 65
Case: 24-2643    Document: 45

**SA11**

Case: 24-2643    Document: 45    Filed: 01/24/2025    Pages: 65

## ORDINANCE No. 52—222

**AN ORDINANCE** providing for the acquisition, construction and reconstruction of extensions of and improvements to its transportation system by Chicago Transit Authority, including the acquisition of assets and facilities of Chicago Motor Coach Company, and providing for the issuance of revenue bonds and for the execution and delivery of a supplemental trust agreement in connection therewith.

\*    \*    \*    \*

WHEREAS Chicago Transit Authority, a political subdivision, body politic and municipal corporation embracing all the territory in the County of Cook, State of Illinois, lying east of the east line of Range Eleven, East of the Third Principal Meridian of the United States Government Survey and designated as "Metropolitan area of Cook County" was created by Act of the General Assembly of the State of Illinois known as "Metropolitan Transit Authority Act," approved April 12, 1945, and pursuant thereto did heretofore acquire and presently owns, operates and maintains for public service a transportation system in the metropolitan area of Cook County, and in connection with such acquisition did heretofore issue its Revenue Bonds, Series of 1947, to the amount of one hundred five million dollars ($105,000,000) secured by a Trust Agreement with The First National Bank of Chicago, Trustee, dated as of July 1, 1947, and pursuant to the terms of said Metropolitan Transit Authority Act and said Trust Agreement the Authority may for the purpose of acquiring, constructing or reconstructing extensions of or improvements to its transportation system, including part or all of the assets of any existing company, facility or facilities, and to pay the cost of such extensions and improvements, issue additional revenue bonds under specified conditions secured by said Trust Agreement and ranking on a parity with said Revenue Bonds, Series of 1947; and

WHEREAS for the better accommodation and more economical use by the public it is desirable that extensions and

SA12

Case: 24-2643    Document: 45    Filed: 01/24/2025    Pages: 65

improvements be acquired including substantially all of the assets of Chicago Motor Coach Company, all as hereinafter more particularly identified in general terms, and the specified conditions currently prevail whereunder such additional revenue bonds ranking on a parity as aforesaid may be issued;

Now, THEREFORE, Be It Ordained by the Chicago Transit Board of Chicago Transit Authority, as follows:

SECTION 1. Chicago Transit Authority shall acquire extensions of and improvements to its transportation system consisting of assets of Chicago Motor Coach Company, generally described as consisting of all real estate including office buildings, shops and garages; leaseholds used principally for storage and turn around of buses; all motor coaches including operating rights in connection therewith and service vehicles, shop equipment, furniture and fixtures, materials and supplies; all maintenance and operating books and records; rights in existing contracts including labor and pensions, and other property used or useful in connection with the operation of the foregoing, exclusive of securities, cash, accounts receivable, claims, rights of action and corporate records, and shall also acquire, construct and reconstruct further extensions of and improvements to said transportation system generally described as consisting of additional el-subway cars, additional and rehabilitation of garage and bus housing facilities, additional snow fighting and removal equipment, and additional mechanical car and bus washers, as well as rehabilitating, improving and enlarging existing rapid transit and surface line facilities.

SECTION 2. For the purpose of acquiring, constructing and reconstructing said extensions and improvements there shall be and there are hereby presently authorized to be issued revenue bonds of Chicago Transit Authority to the aggregate principal amount of twenty-three million dollars ($23,000,000), which shall be designated as ''Chicago Transit Authority, Revenue Bonds, Series of 1952''; shall bear date of July 1, 1952; shall be of the denomination of $1,000 each; shall be numbered consecutively from 1 upward to

and including 23000; shall bear interest at the rate of *Four and One-Half* per cent (4½%) per annum payable semi-annually on January 1 and July 1 of each year, and all of said bonds shall become due July 1, 1982 unless sooner retired or theretofore called for redemption.

Chicago Transit Authority shall reserve the right and option to call and redeem said bonds prior to maturity at the times and upon terms as follows: All of said bonds which may be outstanding shall be redeemable as a whole at any time and in part, from time to time, when selected by lot, on any interest payment date, on or after July 1, 1954, upon payment of the principal amount thereof plus accrued interest at the coupon rate to the redemption date and a premium of five per cent (5%) of the principal amount thereof if called for redemption on or prior to July 1, 1963; four per cent (4%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1968; three per cent (3%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1973; two percent (2%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1978, and one per cent (1%) of the principal amount thereof if called for redemption thereafter and prior to maturity. Said bonds shall also be redeemable from time to time in part, when selected by lot, on any interest payment date, on or after July 1, 1953 for the purpose of permitting application of available revenue or income from the transportation system theretofore deposited in the Revenue Bond Amortization Fund, and on or after July 1, 1960 for the purpose of permitting application of available revenue or income from the transportation system theretofore deposited in the Series of 1952 Sinking Fund, all as more specifically provided in the Trust Agreement as hereinafter identified upon payment of the principal amount thereof plus accrued interest at the coupon rate to the redemption date and a premium of two and one-half per cent (2½%) of the principal amount thereof if called for redemption on or prior to July 1, 1963; two per cent (2%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1968; one

Case: 24-2643     Document: 45     Filed: 01/24/2025     Pages: 65

Case: 24-2643    Document: 45    Filed: 01/24/2025    Pages: 65

and one-half per cent (1½%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1973; one per cent (1%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1978; and one-half of one per cent (½%) of the principal amount thereof if called for redemption thereafter and prior to maturity. In the event any of said bonds are called for redemption notice thereof shall be given by publication once each week for two successive weeks, the first publication to be not less than thirty days prior to the redemption date in a newspaper of general circulation published in the city of Chicago, Illinois, and a newspaper carrying financial news, or a financial paper published and of general circulation in the city of New York, New York. Such notice of redemption will set forth the redemption date, the series designation, the date of maturity and, if less than all of the bonds then outstanding are to be redeemed, the numbers of the bonds to be redeemed. All bonds as to which Chicago Transit Authority exercises its right of redemption as aforesaid and as to which notice as aforesaid shall have been given and for the redemption of which, upon the terms aforesaid, funds are duly provided, will cease to bear interest on the redemption date. Both principal of and interest on said bonds shall be payable in lawful money of the United States of America at the principal office of The First National Bank of Chicago, in the city of Chicago, Illinois (said Bank being Trustee under the Trust Agreement as hereinafter provided), or, at the option of the holder of the respective bonds, at the principal office of the paying agents of Chicago Transit Authority in the city of New York, New York and in the city of San Francisco, California. The respective paying agents of Chicago Transit Authority in the cities of New York and San Francisco heretofore designated and now acting as such in connection with payment of the interest on and principal of the Revenue Bonds, Series of 1947, are hereby designated and authorized to act in a similar capacity in connection with said Revenue Bonds, Series of 1952.

Each of said bonds shall be executed on behalf of Chicago Transit Authority by the facsimile of the signature of the

Chairman of the Chicago Transit Board, countersigned by the facsimile of the signature of the Treasurer of said Board, attested by its Secretary, and a facsimile of the official seal of the Authority shall be imprinted thereon, and the interest coupons attached to said bonds shall be executed with the facsimile signatures of said Chairman and Treasurer. All of said bonds together with interest thereon shall be payable solely from the revenue or income to be derived from the transportation system of said Authority, and payment of said bonds shall be secured by the original Trust Agreement dated July 1, 1947 (hereinafter sometimes referred to as "Original Trust Agreement") and the supplemental trust agreement (hereinafter provided for and sometimes hereinafter referred to as "Supplemental Trust Agreement," and said Original Trust Agreement, together with said Supplemental Trust Agreement, being hereinafter sometimes collectively referred to as the "Trust Agreement"). Each of the bonds shall be authenticated by the Trustee in the manner provided in said Trust Agreement and for which provision is hereinafter made. Each of said bonds shall be registrable as to principal alone and as to both principal and interest in the manner hereinafter and in said Trust Agreement provided, and each of said bonds, the coupons to be attached thereto, and the endorsements to appear thereon, shall be in substantially the following form:

(Form of Definitive Bond)

STATE OF ILLINOIS

CHICAGO TRANSIT AUTHORITY

REVENUE BOND
SERIES OF 1952

Due July 1, 1982

Number.......... $1,000

KNOW ALL MEN BY THESE PRESENTS that Chicago Transit Authority, a political subdivision, body politic and municipal corporation, in the County of Cook and State of Illinois, for value received hereby promises to

pay to the bearer hereof, or if this bond be registered as to principal then to the registered holder hereof, but solely from the source and in the manner hereinafter provided, the sum of One Thousand Dollars ($1,000) on the first day of July 1982, and, in like manner, to pay interest thereon at the rate of ........................ per cent (....%) per annum from the date hereof, semi-annually on January 1 and July 1 of each year until paid, except as the provisions hereinafter set forth with respect to prepayment and redemption may become applicable hereto. Such interest as aforesaid as may accrue on and prior to the maturity date of this bond is payable only upon presentation and surrender of the annexed interest coupons as they severally become due; both principal and interest being payable in lawful money of the United States of America at the principal office of The First National Bank of Chicago in the city of Chicago, Illinois, or, at the option of the holder hereof, at the principal office of the paying agents of said Chicago Transit Authority in the city of New York, New York and in the city of San Francisco, California; provided, that while this bond is registered as to both principal and interest such interest will be paid at the times aforesaid to the registered holder hereof as hereinafter provided.

This bond is one of a series, limited to the aggregate principal amount of $23,000,000, duly authorized to be issued by Chicago Transit Authority pursuant to the constitution and laws of the State of Illinois, and particularly an Act of the General Assembly of the State of Illinois entitled "An Act to create a municipal corporation for public ownership and operation of a transportation system in the metropolitan area of Cook County," approved April 12, 1945, known as the Metropolitan Transit Authority Act, and authorized by ordinance duly adopted September 30, 1952, by Chicago Transit Board as the governing and administrative body of said Chicago Transit Authority, for the purpose of evidencing money borrowed to pay the cost of acquiring, constructing and reconstructing extensions of and improvements to the transportation system of said Chicago Transit Authority, including the acquisition of assets and facilities of Chicago

Motor Coach Company. The bonds constituting said authorized series, together with all interest thereon, and any additional revenue bonds heretofore or that hereafter may be issued under the conditions set forth in the Trust Agreement to which reference is hereinafter made, are payable solely from revenue or income derived from said transportation system, for which purpose a sufficient portion of said revenue or income remaining after payment of the cost of operation and maintenance thereof is pledged and will be set aside in special funds, and under no circumstances shall this bond or any interest thereon be or become an indebtedness of Chicago Transit Authority within the purview of any constitutional limitation or provision, or an indebtedness or obligation of the State of Illinois or of any other political subdivision or municipality within the State. Under the provisions of the Trust Agreement there are required to be placed in said special funds, out of the revenue or income derived from the operation of said transportation system, such sums as shall be sufficient for the payment of the principal of and interest on this bond and all other revenue bonds outstanding under the Trust Agreement. Chicago Transit Authority covenants and undertakes to fix rates, fares and charges for transportation sufficient to provide for such payments and the prompt payment of the principal of and the interest on all revenue bonds and other obligations of the Authority, as provided in and by the Trust Agreement.

This bond and the series of which it is a part are issued and outstanding under and are secured by a Trust Agreement dated as of the First day of July, 1947, made by and between Chicago Transit Authority and The First National Bank of Chicago, as Trustee, as supplemented by a Supplemental Trust Agreement dated as of July 1, 1952 (said Trust Agreement as so supplemented being herein collectively referred to as the "Trust Agreement"), to which Trust Agreement reference is hereby made for a more complete description of the transportation system, the nature and extent of the security, the rights of and restrictions upon the holders of all revenue bonds secured thereby, and the terms, restrictions and conditions under which payment of all such revenue bonds is to be made and

Case: 24-2643     Document: 45     Filed: 01/24/2025     Pages: 65

such bonds have been and are to be issued and secured and the method of payment and redemption thereof, to all of which the holder hereof, by the acceptance of this bond hereby assents with like effect as if the same were herein fully set forth.

In the manner provided in and subject to the terms and provisions of the Trust Agreement Chicago Transit Authority hereby reserves the right and option to call and redeem bonds of the series of which this bond is one, prior to maturity at the times and upon terms as follows: All of said bonds which may be outstanding shall be redeemable as a whole at any time, and in part from time to time when selected by lot, on any interest payment date on or after July 1, 1954, upon payment of the principal amount thereof plus accrued interest at the coupon rate to the redemption date and a premium of five per cent (5%) of the principal amount thereof if called for redemption on or prior to July 1, 1963; four per cent (4%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1968; three per cent (3%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1973; two per cent (2%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1978, and one per cent (1%) of the principal amount thereof if called for redemption thereafter and prior to maturity. Said bonds shall also be redeemable from time to time in part when selected by lot, on any interest payment date on or after July 1, 1953 for the purpose of permitting the application of available revenue or income from the transportation system theretofore deposited in the Revenue Bond Amortization Fund, and on or after July 1, 1960 for the purpose of permitting the application of available revenue or income from the transportation system theretofore deposited in the Series of 1952 Sinking Fund, all as more specifically provided in the Trust Agreement, upon payment of the principal amount thereof, plus accrued interest at the coupon rate to the redemption date and a premium of two and one-half per cent (2½%) of the principal amount thereof if called for

Case: 24-2643     Document: 45     Filed: 01/24/2025     Pages: 65

redemption on or prior to July 1, 1963; two per cent (2%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1968; one and one-half per cent (1½%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1973; one per cent (1%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1978; and one-half of one per cent (½%) of the principal amount thereof if called for redemption thereafter and prior to maturity. In the event bonds of this series are called for redemption notice thereof will be given by publication once each week for two successive weeks, the first publication to be not less than thirty days prior to the redemption date, in a newspaper of general circulation published in the city of Chicago, Illinois, and a newspaper carrying financial news, or a financial paper published and of general circulation in the city of New York, New York. Such notice of redemption will set forth the redemption date, the series designation, date of maturity and, if less than all of the bonds then outstanding are to be redeemed, the numbers of the bonds to be redeemed. All bonds as to which Chicago Transit Authority exercises its right of redemption as aforesaid and as to which notice as aforesaid shall have been given, and for the redemption of which, upon the terms aforesaid, funds are duly provided, will cease to bear interest on the redemption date.

To the extent permitted by the terms of the Trust Agreement modifications of or amendments to the Trust Agreement or any amendment thereof or supplement thereto may be made by Chicago Transit Authority after an affirmative vote at a meeting of the bondholders, or with the written consent without a meeting, of the holders of at least seventy-five per cent in principal amount of the bonds then outstanding, provided, that no such modification or amendment shall permit a reduction in the rate of interest on the bonds or in the amount of the principal obligations thereof, or affect the promise of Chicago Transit Authority to pay the principal and interest of the bonds as the same shall come due, or make other changes prohibited by the Trust Agreement without the consent of the holders of such bonds.

This bond is fully negotiable, but in the manner and upon payment of the expenses provided in said Trust Agreement may be registered as to principal in the name of the owner on the books of Chicago Transit Authority provided for that purpose in the office of the Trustee, such registration to be evidenced by notation by the Trustee in the registration blank hereon endorsed. While this bond remains so registered payment of the principal hereof shall be made only to the registered owner, and no transfer hereof, except upon said books and similarly noted hereon, shall be valid unless the last registration shall have been to bearer, in which case negotiability and transferability by delivery shall be restored. Registration as aforesaid shall not affect negotiability or transferability by delivery of the interest coupons hereto attached, provided, that if upon registration of this bond, or at any time thereafter, while this bond is registered in the name of the owner, the unmatured coupons hereto attached evidencing interest to be thereafter paid thereon shall be surrendered to the Trustee, the Trustee, as registrar, is authorized to endorse a statement to that effect hereon, and thereafter interest evidenced by such surrendered coupons will be paid at the times provided therein to the registered owner of this bond by mail. This bond, when converted into a bond registered as to both principal and interest, may be reconverted by the Trustee into a coupon bond at the written request and expense of the registered owner. Upon such conversion of this bond into coupon form the Trustee will attach hereto the coupons representing the interest to thereafter become due to the date of maturity hereof and will note in the registration blank hereon endorsed whether this bond is then registered as to principal alone or payable to bearer.

Execution by the Trustee of its certificate of authentication hereon is essential to the validity of this bond and the coupons hereto attached, and is conclusive of the due issuance hereof under the Trust Agreement.

It is hereby certified and recited that all acts, conditions and things required to exist, happen and be performed precedent to and in the issuance of this bond do exist, have

happened and have been performed in the manner and form required by law; that the amount of this bond together with all other obligations of Chicago Transit Authority does not exceed any limitation prescribed by law; that Chicago Transit Authority will cause said transportation system to be operated as a revenue producing undertaking in the manner and as required by said Metropolitan Transit Authority Act; that a sufficient amount of the revenue or income derived from the operation of said transportation system has been pledged to and will be set aside in special funds for the purpose of paying the interest on this bond and all other revenue bonds outstanding under said Trust Agreement and of redeeming and fully discharging said bonds at or prior to the maturity thereof.

IN WITNESS WHEREOF Chicago Transit Authority has caused this bond to be executed on its behalf by the facsimile signature of the Chairman of said Chicago Transit Board, countersigned by the facsimile signature of the Treasurer of said Board, attested by its Secretary, and a facsimile of the official seal of said Authority to be imprinted hereon, and the interest coupons attached hereto to be executed with the facsimile signatures of said Chairman and Treasurer, all as of the first day of July, 1952.

(Facsimile)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Chairman, Chicago Transit Board

Countersigned:

(Facsimile)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Treasurer, Chicago Transit Board

Attest:

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Secretary, Chicago Transit Board

(Form of Coupon)

No. . . . . . . . .                                    $. . . . . . . . .

On . . . . . . . . . . . 1, 19. . ., upon surrender hereof, unless the bond mentioned below shall previously have become

payable and payment shall have been duly provided for, Chicago Transit Authority will pay to bearer ............ .................... Dollars ($.........) at the principal office of The First National Bank of Chicago in the city of Chicago, Illinois, or, at the option of the holder hereof, at the principal office of the paying agents of said Chicago Transit Authority, in the city of New York, New York and in the city of San Francisco, California, as provided in and being interest then due on its Revenue Bond, Series of 1952, dated July 1, 1952, Number ........

(Facsimile)

.............................................
Chairman

(Facsimile)

.............................................
Treasurer

(Form of Trustee's Certificate)

This bond is one of the series of bonds referred to herein and described in the within mentioned Trust Agreement.

THE FIRST NATIONAL BANK OF CHICAGO, Trustee,

By ...............................
Authorized Officer

(Form for Registration)

| Date of Registration | Name of Registered Owner | Manner of Registration | Signature of Registrar |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

SECTION 3. That for the purpose of securing the payment of said bonds and the interest thereon on a parity with said Revenue Bonds, Series of 1947, and for the purpose of setting forth the covenants and undertakings of

Case: 24-2643      Document: 45      Filed: 01/24/2025      Pages: 65

Chicago Transit Authority in connection with the issuance thereof and the issuance of any additional revenue bonds payable from the revenue or income of said transportation system, as well as the use and application of such revenue or income, a supplemental trust agreement shall be executed and delivered by and on behalf of Chicago Transit Authority in substantially the form hereto attached as Exhibit A and by this reference incorporated herein and constituting a part of this ordinance, and particularly the provisions and references in and by said Supplemental Trust Agreement are hereby incorporated in this ordinance whereby there have been heretofore established and created by the Trust Agreement dated as of July 1, 1947, special funds and accounts designated as Transit Revenue Fund, Series of 1947 Interest Fund, Series of 1947 Serial Bond Maturity Fund, Series of 1947 Sinking Fund, Series of 1947 Revenue Bond Reserve Fund, Depreciation Reserve Fund, Operating Expense Reserve Fund, and Modernization Fund, and also the provisions in and by the Supplemental Trust Agreement whereby there are established and created separate funds designated as Series of 1952 Interest Fund, Series of 1952 Sinking Fund, Series of 1952 Revenue Bond Reserve Fund, and Revenue Bond Amortization Fund, and also whereby provisions are made for payments into said funds and accounts from specified sources and with the prescribed preferences and priorities, and also whereby provisions are made for the custody, disbursement and application of moneys in said special funds and accounts.

SECTION 4. That said bonds and coupons and the Trust Agreement securing the same under no circumstances shall constitute a lien on any physical property owned or acquired by Chicago Transit Authority, nor create or be or become an indebtedness or obligation of the State of Illinois or of any other political subdivision or municipality within the State of Illinois. Any obligation or liability arising out of this ordinance or out of said bonds or coupons or said Trust Agreement, or out of any covenant, promise, stipulation, condition, agreement, undertaking or provision contained in said bonds or coupons or Trust Agreement, or out of any breach of any covenant, promise,

stipulation, condition, agreement, undertaking or provision contained in this ordinance or in said bonds or coupons or Trust Agreement, shall be payable solely out of the revenue or income to be derived from the transportation system of Chicago Transit Authority, as in said Trust Agreement provided.

Nothing in this ordinance nor in said bonds or coupons or Trust Agreement contained, expressed or implied, is intended or shall be construed to confer upon or to give to any person, firm or corporation, public or private, other than Chicago Transit Authority, the Trustee and the holders from time to time of outstanding revenue bonds issued under and secured by the Trust Agreement, any right, remedy or claim thereunder or by reason thereof; and all the covenants, stipulations, promises and agreements in this ordinance contained shall be for the sole and exclusive benefit of Chicago Transit Authority, the Trustee and the holders from time to time of outstanding revenue bonds issued under and secured by the Trust Agreement.

SECTION 5. Whenever and so long as any of the bonds hereby authorized may be outstanding and unpaid, all of the revenue and income of said transportation system as defined in the Trust Agreement are hereby appropriated and pledged for the uses and purposes set forth in the Trust Agreement.

SECTION 6. That after the execution and delivery of the Supplemental Trust Agreement and the issuance of bonds hereby authorized Chicago Transit Authority and its appropriate officers, agents and employees charged with the performance of the covenants and undertakings expressed in the Trust Agreement, and the Chicago Transit Board and the members thereof, shall from time to time do, perform, observe and discharge each and every of the acts, terms, covenants and undertakings provided in and by the Trust Agreement to be done, performed, observed and discharged by said Authority, its officers, agents and employees, and said Chicago Transit Board, respectively.

SECTION 7. This ordinance and the Trust Agreement shall constitute a contract by and between Chicago Transit

SA25

Case: 24-2643    Document: 45    Filed: 01/24/2025    Pages: 65

Authority and the Trustee and the holder or holders of any of the bonds issued pursuant hereto; provided, however, that the right is hereby reserved from time to time to enact ordinances supplemental hereto and not in conflict herewith relating to the issuance of revenue bonds as in the Trust Agreement authorized and permitted. It is hereby found that pursuant to prior directions of this Board said bonds have been offered for sale as a unit; that advertisement for bids has been duly published at least three times in the Chicago Herald-American, a daily newspaper of general circulation published in the Metropolitan Area of Cook County; that responsive to such advertisement an agreement was made for the sale and award of said bonds upon terms of . *95.5* . . . .% of par and accrued interest to *HARRIS, HALL & COMPANY INCORPORATED; THE FIRST BOSTON CORPORATION; BLYTH & CO., INC.; A. C. ALLYN AND COMPANY INCORPORATED; JOHN NUVEEN & CO;*

and that the award and sale of said bonds responsive to said agreement is hereby ratified and confirmed.

SECTION 8. Pending the preparation and execution of the bonds hereinbefore authorized in definitive form, a like principal amount of temporary bonds are hereby authorized to be issued and to be authenticated by the Trustee, of the denomination of $1,000,000, numbered consecutively from T-1 to T-23, inclusive, and shall have four interest coupons attached for evidencing interest thereon from the date thereof to July 1, 1954. Said temporary bonds shall be exchangeable for the definitive bonds when prepared and executed, and until so exchanged said temporary bonds shall be entitled to the security and benefit of the Trust Agreement hereinbefore provided. All such temporary bonds and coupons hereby authorized shall be executed on behalf of the Authority and authenticated by the Trustee in like manner to that provided by this ordinance for the execution and authentication of definitive bonds and said temporary bonds and the interest coupons to be attached

thereto shall respectively be in substantially the following form:

(Form of Temporary Bond)

TEMPORARY BOND EXCHANGEABLE FOR DEFINITIVE BOND
WHEN PREPARED AND READY FOR DELIVERY

STATE OF ILLINOIS

CHICAGO TRANSIT AUTHORITY

REVENUE BOND
SERIES OF 1952

Due July 1, 1982

No. T-                                    $1,000,000

KNOW ALL MEN BY THESE PRESENTS that CHICAGO TRANSIT AUTHORITY, a policital subdivision, body politic and municipal corporation, in the County of Cook and State of Illinois, for value received hereby promises to pay to the bearer hereof, or if this bond be registered as to principal then to the registered holder hereof, but solely from the source and in the manner hereinafter provided, the sum of One Million Dollars ($1,000,000) on the first day of July, 1982, and, in like manner, to pay interest thereon at the rate of . . . . . . . . . . . . . . . . . . per cent ( . . . %) per annum from the date hereof, semi-annually on January 1 and July 1 of each year until paid, except as the provisions hereinafter set forth with respect to prepayment and redemption may become applicable hereto. Such interest as aforesaid as may accrue on and prior to July 1, 1954, is payable, only upon presentation and surrender of the annexed interest coupons as they severally become due, provided, that while this bond is registered as to both principal and interest during the period aforesaid such interest will be paid to the registered holder hereof as hereinafter provided, and interest accruing after July 1, 1954, if the definitive bonds with interest coupons for which this bond is exchangeable as hereinafter recited shall not be ready for exchange, shall be payable on presentation of this bond and endorsement hereon of such payment; both principal and interest being

payable in lawful money of the United States of America at the principal office of The First National Bank of Chicago in the city of Chicago, Illinois, or, at the option of the holder hereof, at the principal office of the paying agents of said Chicago Transit Authority in the city of New York, New York, and in the city of San Francisco, California.

This bond is a temporary bond issued pending the preparation of definitive bonds and is exchangeable at the principal office of the Trustee hereinafter named for a like principal amount of definitive bonds of the denomination of $1000 expressing the same maturity and interest rate, when such definitive bonds have been prepared and are ready for delivery, and until exchanged for such definitive bonds this temporary bond shall in all respects be entitled to the same benefits and security as said definitive bonds. All matured interest coupons will be detached from said definitive bonds and all unmatured interest coupons appertaining to this temporary bond must accompany same when such exchange is made. This bond is one of a series, limited to the aggregate principal amount of $23,000,000 duly authorized to be issued by Chicago Transit Authority pursuant to the constitution and laws of the State of Illinois, and particularly an Act of the General Assembly of the State of Illinois, entitled "An Act to create a municipal corporation for public ownership and operation of a transportation system in the metropolitan area of Cook County," approved April 12, 1945, known as the Metropolitan Transit Authority Act, and authorized by ordinance duly adopted September 30, 1952, by Chicago Transit Board as the governing and administrative body of said Chicago Transit Authority, for the purpose of evidencing money borrowed to pay the cost of acquiring, constructing and reconstructing extensions of and improvements to the transportation system of said Chicago Transit Authority, including the acquisition of assets and facilities of Chicago Motor Coach Company. The bonds constituting said authorized series, together with all interest thereon, and any additional revenue bonds heretofore and that hereafter may be issued under the conditions set forth in the Trust Agreement to which reference is hereinafter made, are payable solely from revenue or income derived from said transportation system, for which purpose

Case: 24-2643     Document: 45     Filed: 01/24/2025     Pages: 65

a sufficient portion of said revenue or income remaining after payment of the cost of operation and maintenance thereof is pledged and will be set aside in special funds, and under no circumstances shall this bond or any interest thereon be or become an indebtedness of Chicago Transit Authority within the purview of any constitutional limitation or provision, or an indebtedness or obligation of the State of Illinois or of any other political subdivision or municipality within the State. Under the provisions of the Trust Agreement there are required to be placed in said special funds, out of the revenue or income derived from the operation of said transportation system, such sums as shall be sufficient for the payment of the principal of and interest on this bond and all other revenue bonds outstanding under the Trust Agreement. Chicago Transit Authority covenants and undertakes to fix rates, fares and charges for transportation sufficient to provide for such payments and the prompt payment of the principal of and the interest on all revenue bonds and other obligations of the Authority, as provided in and by the Trust Agreement.

This bond and the series of which it is a part are issued and outstanding under and are secured by a Trust Agreement dated as of the First day of July, 1947, made by and between Chicago Transit Authority and The First National Bank of Chicago, as Trustee, as supplemented by a Supplemental Trust Agreement dated as of July 1, 1952 (said Trust Agreement as so supplemented being herein collectively referred to as the "Trust Agreement"), to which Trust Agreement reference is hereby made for a more complete description of the transportation system, the nature and extent of the security, the rights of and restrictions upon the holders of all revenue bonds secured thereby, and the terms, restrictions and conditions under which payment of all such revenue bonds is to be made and such bonds have been and are to be issued and secured and the method of payment and redemption thereof, to all of which the holder hereof, by the acceptance of this bond hereby assents with like effect as if the same were herein fully set forth.

In the manner provided in and subject to the terms and provisions of the Trust Agreement Chicago Transit Authority hereby reserves the right and option to call and redeem bonds of the series of which this bond is one prior

Case: 24-2643     Document: 45     Filed: 01/24/2025     Pages: 65

Case: 24-2643     Document: 45     Filed: 01/24/2025     Pages: 65

to maturity at the times and upon terms as follows: All of said bonds which may be outstanding shall be redeemable as a whole at any time and in part, from time to time, when selected by lot, on any interest payment date, on or after July 1, 1954, upon payment of the principal amount thereof plus accrued interest at the coupon rate to the redemption date and a premium of five per cent (5%) of the principal amount thereof if called for redemption on or prior to July 1, 1963; four per cent (4%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1968; three per cent (3%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1973; two per cent (2%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1978, and one per cent (1%) of the principal amount thereof if called for redemption thereafter and prior to maturity. Said bonds shall also be redeemable from time to time in part when selected by lot, on any interest payment date, on or after July 1, 1953 for the purpose of permitting the application of available revenue or income from the transportation system theretofore deposited in the Revenue Bond Amortization Fund, and on or after July 1, 1960 for the purpose of permitting the application of available revenue or income from the transportation system theretofore deposited in the Series of 1952 Sinking Fund, all as more specifically provided in the Trust Agreement, upon payment of the principal amount thereof, plus accrued interest at the coupon rate to the redemption date and a premium of two and one-half per cent (2½%) of the principal amount thereof if called for redemption on or prior to July 1, 1963; two per cent (2%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1968; one and one-half per cent (1½%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1973; one per cent (1%) of the principal amount thereof if called for redemption thereafter and on or prior to July 1, 1978; and one-half of one per cent (½%) of the principal amount thereof if called for redemption thereafter and prior to maturity. In the event bonds of this series are called for redemption notice thereof will be given by publication once each week for two successive weeks, the first publication to be not less than thirty days

Case: 24-2643   Document: 45   Filed: 01/24/2025   Pages: 65

prior to the redemption date in a newspaper of general circulation published in the city of Chicago, Illinois, and a newspaper carrying financial news, or a financial paper published and of general circulation in the city of New York, New York. Such notice of redemption will set forth the redemption date, the series designation, date of maturity and, if less than all of the bonds then outstanding are to be redeemed, the numbers of the bonds to be redeemed. All bonds as to which Chicago Transit Authority exercises its right of redemption as aforesaid and as to which notice as aforesaid shall have been given, and for the redemption of which, upon the terms aforesaid, funds are duly provided, will cease to bear interest on the redemption date.

To the extent permitted by the terms of the Trust Agreement modifications of or amendments to the Trust Agreement or any amendment thereof or supplement thereto may be made by Chicago Transit Authority after an affirmative vote at a meeting of the bondholders, or with the written consent without a meeting, of the holders of at least seventy-five per cent in principal amount of the bonds then outstanding, provided, that no such modification or amendment shall permit a reduction in the rate of interest on the bonds or in the amount of the principal obligation thereof, or affect the promise of Chicago Transit Authority to pay the principal and interest of the bonds as the same shall come due, or make other changes prohibited by the Trust Agreement without the consent of the holders of such bonds.

This bond is fully negotiable, but in the manner and upon payment of the expenses provided in said Trust Agreement may be registered as to principal in the name of the owner on the books of Chicago Transit Authority provided for that purpose in the office of the Trustee, such registration to be evidenced by notation by the Trustee in the registration blank hereon endorsed. While this bond remains so registered payment of the principal hereof shall be made only to the registered owner, and no transfer hereof, except upon said books and similarly noted hereon, shall be valid unless the last registration shall have been to bearer, in which case negotiability and transferability by delivery shall be restored. Registration as aforesaid

shall not affect negotiability or transferability by delivery of the interest coupons hereto attached, provided that if, upon registration of this bond, or at any time thereafter, while this bond is registered in the name of the owner, the unmatured coupons hereto attached evidencing interest thereon on and prior to July 1, 1954, shall be surrendered to the Trustee, the Trustee, as registrar, is authorized to endorse a statement to that effect hereon, and thereafter interest evidenced by such surrendered coupons will be paid at the times provided therein to the registered owner of this bond by mail. This bond, when converted into a bond registered as to both principal and interest, may be reconverted by the Trustee into a coupon bond at the written request and expense of the registered owner. Upon such reconversion of this bond into coupon form the Trustee will attach hereto the coupons representing the interest to accrue on and prior to July 1, 1954, and will note in the registration blank hereon endorsed whether this bond is then registered as to principal alone or payable to bearer.

Execution by the Trustee of its certificate of authentication hereon is essential to the validity of this bond and the coupons hereto attached and is conclusive of the due issuance hereof under the Trust Agreement.

It is hereby certified and recited that all acts, conditions and things required to exist, happen and be performed precedent to and in the issuance of this bond do exist, have happened and have been performed in the manner and form required by law; that the amount of this bond together with all other obligations of Chicago Transit Authority does not exceed any limitation prescribed by law; that Chicago Transit Authority will cause said transportation system to be operated as a revenue producing undertaking in the manner and as required by said Metropolitan Transit Authority Act; that a sufficient amount of the revenue or income derived from the operation of said transportation system has been pledged to and will be set aside in special funds for the purpose of paying the interest on this bond and all other revenue bonds outstanding under said Trust Agreement and of redeeming and fully discharging said bonds at or prior to the maturity thereof.

Case: 24-2643     Document: 45     Filed: 01/24/2025     Pages: 65

IN WITNESS WHEREOF Chicago Transit Authority has caused this bond to be executed on its behalf by the facsimile signature of the Chairman of said Chicago Transit Board, countersigned by the facsimile signature of the Treasurer of said Board, attested by its Secretary, and a facsimile of the official seal of said Authority to be imprinted hereon, and the interest coupons attached hereto to be executed with the facsimile signatures of said Chairman and Treasurer, all as of the First day of July, 1952.

(Facsimile)

...................................
Chairman, Chicago Transit Board

Countersigned:

(Facsimile)

...................................
Treasurer, Chicago Transit Board

Attest:

...................................
Secretary, Chicago Transit Board

(Form of Coupon)

No. ........                                      $..........

On .............. 1, 19..., upon surrender hereof, unless the bond mentioned below shall previously have become payable and payment shall have been duly provided for, Chicago Transit Authority will pay to bearer ................... Dollars ($.........) at the principal office of The First National Bank of Chicago in the city of Chicago, Illinois, or, at the option of the holder hereof, at the principal office of the paying agents of said Chicago Transit Authority in the city of New York, New York and in the city of San Francisco, California, as provided in and being interest then due on its Revenue Bond, Series of 1952, dated July 1, 1952, Number T.........

(Facsimile)

...................................
Chairman

(Facsimile)

...................................
Treasurer

Case: 24-2643    Document: 45    Filed: 01/24/2025    Pages: 65

SA33

(Form of Trustee's Certificate)

This bond is one of the series of bonds referred to herein and described in the within mentioned Trust Agreement.

THE FIRST NATIONAL BANK OF CHICAGO,
Trustee,

By ................................
Authorized Officer

(Form for Registration)

| Date of Registration | Name of Registered Owner | Manner of Registration | Signature of Registrar |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

SECTION 9. The proceeds of said bonds hereby authorized shall be delivered to the Trustee and be by it deposited in the Modernization Fund as heretofore created pursuant to Section 802 of the Original Trust Agreement, and simultaneously with such deposit a sufficient portion thereof shall be disbursed to pay the cost of acquiring the assets and facilities of Chicago Motor Coach Company as hereinbefore generally described, and the balance of said proceeds shall be disbursed from time to time to pay the cost of acquiring, constructing and reconstructing extensions and improvements to the transportation system as hereinbefore generally described.

SECTION 10. It is hereby represented and declared that the Authority is not presently in default in the payment of principal of or interest on any outstanding bonds or similar obligations or in default in the payment of any prescribed sinking fund payments, reserve fund payments, or other prescribed payments for servicing any outstanding bonds or similar obligations, and that responsive to Section 505 of the Original Trust Agreement it is hereby found and declared that the amount by which the revenue or income of the transportation system of the Authority, including the revenue or income from the additional property to be acquired through the issuance of the bonds hereby authorized, exceeds the operating expenses of said transportation system and said additional property (after such revenue or income from the additional property and the operating expenses thereof as reported by the official

Case: 24-2643     Document: 45     Filed: 01/24/2025     Pages: 65

records of the owner thereof have been adjusted to reflect ownership and operation by the Authority), as certified by Arthur Andersen & Co., a firm of independent accountants, computed for twelve consecutive months within the eighteen months immediately preceding the date of the adoption of this ordinance was equal to or in excess of 200% of the maximum principal, sinking fund and interest charges occurring in any one year upon (1) all revenue bonds now outstanding, and (2) the additional revenue bonds herein authorized to be issued. Upon execution of the Supplemental Trust Agreement, as hereinbefore authorized, the Secretary of Chicago Transit Board is hereby authorized to deliver an executed counterpart thereof to the Trustee responsive to paragraph (b) of Section 503 of the Original Trust Agreement, and said Secretary is hereby further authorized to file with the Trustee a certified copy of this ordinance and a manually signed copy of the certificate by the independent accountants hereinbefore referred to, all responsive to paragraphs (a) and (c) of said Section 503, and that in compliance with the provisions of paragraph (d) of said Section 503 Messrs. Chapman and Cutler, as counsel, is hereby authorized and requested to file with the Trustee a written opinion expressing the conclusion that the bonds hereby authorized will, upon authentication and delivery by the Trustee, constitute the valid and binding obligations of the Authority and entitled to the benefits of the Trust Agreement. When all of said documents have been so delivered to and filed with the Trustee the Trustee is hereby requested and authorized to authenticate, issue and deliver the bonds hereby authorized to the purchaser hereinbefore by Section 7 identified, upon payment of the purchase price, namely *755%* of the principal amount thereof plus accrued interest.

SECTION 11. This ordinance shall be in full force and effect immediately upon its adoption and approval as provided by law.

Adopted, September *30*, 1952.
Approved, September *30*, 1952.

....*RALPH BURR*............
                                       Chairman

Attest:

*WILLIAM M. MCKENNA*..
                 Secretary

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 4,854 words.

2. This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(a) because it has been prepared in a proportionally spaced typeface (12-point Book Antiqua) using Microsoft Word.


Dated: January 22, 2025             */s/ Sisavanh Baker*
                                       SISAVANH BAKER

**CERTIFICATE OF SERVICE**

I hereby certify that on January 22, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: January 22, 2025                    */s/ Sisavanh Baker*
                                           Sisavanh Baker