**No. 24-2643, 24-2644 (consol.)**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

BENJAMIN SCHOENTHAL, et al.,

*Plaintiffs-Appellees,*

v.

KWAME RAOUL, in his official capacity
as Attorney General of Illinois, et al.,

*Defendants-Appellants.*

---

BENJAMIN SCHOENTHAL, et al.,

*Plaintiffs-Appellees,*

v.

EILEEN O'NEILL BURKE, in her official capacity as
State's Attorney of Cook County, Illinois,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS (No. 3:22-cv-50326)
HONORABLE IAN D. JOHNSTON

---

### BRIEF OF PLAINTIFFS-APPELLEES

---

David G. Sigale
(Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
Tel: (630) 452-4547
Fax: (630) 596-4445
dsigale@sigalelaw.com

David H. Thompson
  *Counsel of Record*
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Avenue,
N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellees*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-2643 & 24-2644</u> (consol.)

Short Caption: <u>Benjamin Schoenthal, et al v. Kwame Raoul, et al; Benjamin Schoenthal, et al v. Eileen O'Neill Burke</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>BENJAMIN SCHOENTHAL, MARK WROBLEWSKI, JOSEPH VESEL, DOUGLAS WINSTON</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Cooper & Kirk, PLLC; Law Firm of David G. Sigale, P.C.</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ David H. Thompson</u>    Date: <u>March 17, 2025</u>

Attorney's Printed Name: <u>David H. Thompson</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☑  No ☐

Address: <u>Cooper & Kirk, PLLC, 1523 New Hampshire Ave., N.W., Washington, DC 20036</u>

Phone Number: <u>(202) 220-9600</u>    Fax Number: <u>(202) 220-9601</u>

E-Mail Address: <u>dthompson@cooperkirk.com</u>

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-2643 & 24-2644</u> (consol.)

Short Caption: <u>Benjamin Schoenthal, et al v. Kwame Raoul, et al; Benjamin Schoenthal, et al v. Eileen O'Neill Burke</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>BENJAMIN SCHOENTHAL, MARK WROBLEWSKI, JOSEPH VESEL, DOUGLAS WINSTON</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Cooper & Kirk, PLLC; Law Firm of David G. Sigale, P.C.</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Peter A. Patterson</u>    Date: <u>March 17, 2025</u>

Attorney's Printed Name: <u>Peter A. Patterson</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: <u>Cooper & Kirk, PLLC, 1523 New Hampshire Ave., N.W., Washington, DC 20036</u>

Phone Number: <u>(202) 220-9600</u>    Fax Number: <u>(202) 220-9601</u>

E-Mail Address: <u>ppatterson@cooperkirk.com</u>

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-2643 & 24-2644</u> (consol.)

Short Caption: <u>Benjamin Schoenthal, et al v. Kwame Raoul, et al; Benjamin Schoenthal, et al v. Eileen O'Neill Burke</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>BENJAMIN SCHOENTHAL, MARK WROBLEWSKI, JOSEPH VESEL, DOUGLAS WINSTON</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Cooper & Kirk, PLLC; Law Firm of David G. Sigale, P.C.</u>

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ William V. Bergstrom</u>    Date: <u>March 17, 2025</u>

Attorney's Printed Name: <u>William V. Bergstrom</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: <u>Cooper & Kirk, PLLC, 1523 New Hampshire Ave., N.W., Washington, DC 20036</u>

_____

Phone Number: <u>(202) 220-9600</u>    Fax Number: <u>(202) 220-9601</u>

E-Mail Address: <u>wbergstrom@cooperkirk.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-2643, 24-2644 (cons,)</u>

Short Caption: <u>Benjamin Schoenthal, et al v. Kwame Raoul, et al; Benjamin Schoenthal, et al v. Eileen O'Neill Burke</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
      <u>Benjamin Schoenthal, Joseph Vesel, Douglas Winston, Mark Wroblewski</u>

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
      <u>Law Firm of David G. Sigale, P.C.</u>

      <u>Cooper & Kirk, PLLC</u>

(3)      If the party, amicus or intervenor is a corporation:

      i)      Identify all its parent corporations, if any; and

          <u>N/A</u>

      ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          <u>N/A</u>

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

      <u>N/A</u>

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

      <u>N/A</u>

Attorney's Signature: <u>/s/ David G. Sigale</u>    Date: <u>March 17, 2025</u>

Attorney's Printed Name: <u>David G. Sigale</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☐  No ☑

Address: <u>LAW FIRM OF DAVID G. SIGALE, P.C.</u>

      <u>55 West 22nd Street, Suite 230, Lombard, IL 60148</u>

Phone Number: <u>630.452.4547</u>    Fax Number: <u>630.596.4445</u>

E-Mail Address: <u>dsigale@sigalelaw.com</u>

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................ii

JURISDICTIONAL STATEMENT ........................................... 1

INTRODUCTION ....................................................................... 1

BACKGROUND............................................................................ 1

SUMMARY OF ARGUMENT .................................................... 3

ARGUMENT ................................................................................. 5

  I.   Plaintiffs have Article III standing. ................................. 5

     A. The district court had jurisdiction to issue a declaratory judgment................................................................. 6

     B. The public transit system's firearms policies do not create a redressability problem. ........................................... 9

  II.  There is no "government proprietor" exception to the Second Amendment. ................................................................ 15

  III. Carrying firearms on public transportation falls within the "plain text" of the Second Amendment.......................... 28

  IV. There is no historical principle that can support the Public Transit Ban............................................................... 29

     A. *Bruen* and *Rahimi*'s historical method. ............... 29

     B. There is no historical regulatory tradition that excuses banning firearms on public transit. ..................... 34

       1. There is no tradition of banning firearms in "crowded places." ............................................................. 35

       2. Private railroad regulations from the 1800s are entirely irrelevant. .......................................................... 44

       3. If the government wants to declare a place "sensitive," it must treat that place as "sensitive" by securing it....... 51

CONCLUSION ......................................................................... 64

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Adderley v. Florida,*
    385 U.S. 39 (1966) ........................................................... 21, 23

*Andrews v. State,*
    50 Tenn. 165 (1871) ............................................................... 43

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024) ............................................ 30, 39

*Arce v. Chi. Transit Auth.,*
    193 F. Supp. 3d 875 (N.D. Ill. 2016) ............................... 11, 12

*Bevis v. City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023) ............................................... 30

*Bonidy v. USPS,*
    790 F.3d 1121 (10th Cir. 2015) ............................................ 28

*Bridgeville Rifle & Pistol Club v. Sall,*
    176 A.3d 632 (Del. 2017) ................................................. 26, 59

*California v. Texas,*
    593 U.S. 659 (2021) ........................................................... 6, 8

*Davis v. Massachusetts,*
    167 U.S. 43 (1897) ............................................................... 25

*District of Columbia v.*
    *Heller,* 554 U.S. 570 (2008) ................ 32, 36, 44, 49, 51, 59, 60, 61

*English v. State,*
    35 Tex. 473 (1871) ............................................................... 42

*Engquist v. Oregon Department of Agriculture,*
    533 U.S. 591 (2008) ............................................................. 22

*Espinoza v. Mont. Dep't of Revenue,*
    591 U.S. 464 (2020) ............................................................. 32

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) .............................................. 5, 6

*Gilles v. Blanchard,*
    477 F.3d 466 (7th Cir. 2007) .......................................... 22, 23

*Hague v. Comm. for Indus. Org.*,
    307 U.S. 496 (1939) ............................................................ 26

*Harp Advertising Illinois, Inc. v. Village of Chicago Ridge*,
    9 F.3d 1290 (7th Cir. 1993) .................................. 10, 11, 12

*Hill v. State*,
    53 Ga. 472 (1874)........................................................ 43, 44

*Jamison v. State of Tex.*,
    318 U.S. 413 (1943) ............................................................ 26

*Koons v. Platkin*,
    673 F. Supp. 3d 515 (D.N.J. 2023)................................ 20, 22, 33, 35

*Koontz v. St. Johns River Water Management District*,
    570 U.S. 595 (2013) ............................................................ 24

*Lara v. Comm'r Pa. State Police*,
    125 F.4th 428 (8th Cir. 2024)........................................... 29

*Larson v. Valente*,
    456 U.S. 228 (1982) .............................................................. 9

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................... 7, 11

*Mahoney v. Sessions*,
    871 F.3d 873 (9th Cir. 2017) ....................................... 27, 28

*Maldonado v. Metra*,
    743 F. Supp. 563 (N.D. Ill. 1990) ..................................... 12

*Maldonado v. Morales*,
    556 F.3d 1037 (9th Cir. 2009) ..................................... 12, 13

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803)............................................. 12

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ..................................................... 18, 26

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ........................................... 29

*Morse v. Frederick*,
    551 U.S. 393 (2007) ........................................................... 52

*Nashville, Chattanooga & St. Louis Ry. Co. v. Wallace,*
    288 U.S. 249 (1933) ........................................................................ 8

*New York State Rifle & Pistol Association v. Bruen,*
    597 U.S. 1 (2022) .................................... 1, 18, 19, 29, 30, 31, 32, 33,
                               34, 35, 38, 41, 42, 43, 44, 46,
                               47, 48, 49, 51, 59, 62, 63, 64

*Nordyke v. King,*
    681 F.3d 1041 (9th Cir. 2012) ....................................................... 28

*Parklane Hosiery Co. v. Shore,*
    439 U.S. 322 (1979) ...................................................................... 15

*People v. Buonavolanto,*
    606 N.E.2d 509 (Ill. App. Ct. 1992).............................................. 15

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of
    Health,*
    699 F.3d 962 (7th Cir. 2012) ................................................... 24, 25

*Reese v. BATFE,*
    127 F.4th 583 (5th Cir. 2025)........................................................ 53

*Renne v. Geary,*
    501 U.S. 312 (1991) ...................................................................... 11

*Rodriguez v. Plymouth Ambulance Serv.,*
    577 F.3d 816 (7th Cir. 2009) ........................................................ 14

*Solomon v. Cook Cnty Bd. of Comm'rs,*
    559 F. Supp. 3d 675 (N.D. Ill. 2021) ............................................ 20

*State v. Huntly,*
    25 N.C. 418 (1843) ........................................................................ 38

*State v. Shelby,*
    2 S.W. 468 (Mo. 1886)................................................................... 43

*State v. Wilforth,*
    74 Mo. 528 (1881) ......................................................................... 43

*Sweeney v. Raoul,*
    990 F.3d 555 (7th Cir. 2021) .......................................................... 7

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am.,*
    508 U.S. 439 (1993) .................................................................... 8, 9

iv

*United States v. Rahimi,*
    602 U.S. 680 (2024) ............ 19, 31, 32, 33, 34, 38, 44, 48, 59, 60, 62

*United States v. Rush,*
    No. 23-3256, 2025 WL 750313 (7th Cir. Mar. 10, 2025) ............... 30

*Weiland v. Loomis,*
    938 F.3d 917 (7th Cir. 2019) ........................................ 62

*White v. Mass Council of Constr. Emps., Inc.,*
    460 U.S. 204 (1983) ................................................ 20, 21

*Wolford v. Lopez,*
    116 F.4th 959 (9th Cir. 2024).................................. 27, 30, 39, 59, 60

*Worth v. Jacobson,*
    108 F.4th 677 (8th Cir. 2024)....................................... 29

## Statutes

28 U.S.C.
    § 2201 .............................................................. 8
    § 2201(a)........................................................... 6, 7

55 ILCS
    5/3-9005(a)(1) ...................................................... 14

70 ILCS
    3605/1..............................................................
    3605/3 ............................................................. 12
    3615/1.03 .......................................................... 12

430 ILCS
    66/10
    66/65(a)(8) ......................................................... 2
    66/70(e)............................................................. 2

720 ILCS
    5/21-3(h) .......................................................... 10

730 ILCS
    5/5-4.5-55 ......................................................... 10
    5/5-4.5-60 ......................................................... 2

CTA Ord. No. 016-110

§ 1(27) ........................................................................ 10

§ 1(28) ........................................................................ 10

## Historical Laws and Other Authorities

1 LAWS OF THE STATE OF NEW YORK (Charles R. & George Webster
    eds., 2d ed. 1802) ........................................................ 54, 56

1 LAWS OF THE STATE OF VERMONT
    (Randolph, Sereno Wright 1808) ..................................... 54, 57

1 THE LAWS OF MARYLAND, ch. 25 (1799) ............................ 57

10 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801
    (William Stanley Ray ed., 1904) ............................... 53, 54, 57

1786 Va. Acts 35 ............................................................ 38

2 Edw. 3, c. 3 (Eng.) ...................................................... 37

2 LAWS OF THE STATE OF DELAWARE
    (Samuel & John Adams eds., 1797) ............................ 53, 56, 58

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF
    VIRGINIA (1803) ............................................................ 56

A COMPILATION OF THE LAWS OF THE STATE OF GEORGIA (Augustine
    Smith Clayton ed., Augusta, Adams & Duyckinck 1812) ............. 54

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA (Robert & George
    Watkins eds., Phila., R. Aitken 1800) ................................... 57

A JOURNAL OF THE PROCEEDINGS OF THE HONORABLE SENATE
    OF THE STATE OF NEW-HAMPSHIRE (1808),
    https://perma.cc/Y7VF-UYV4 ............................................. 55

A MANUAL OF THE LAWS OF NORTH-CAROLINA (John Haywood ed.,
    3d ed. 1814) ................................................................. 57

*About the Sergeant at Arms: Historical Overview*, U.S. SENATE,
    https://perma.cc/GA5J-Q5F9 .............................................. 55

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA
    (Augustine Davis ed., 1796) ............................................. 58

ACTS AND LAWS OF THE STATE OF CONNECTICUT
    (New London, Timothy Green 1784) ..................................... 57

John Adams, *Adams' Argument for the Defense: 3–4 December 1770*, NAT'L ARCHIVES FOUNDERS ONLINE, https://perma.cc/C82Q-WT7R ...................................................... 36

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014) ................................................................. 35, 36

ACTS AND RESOLVES OF MASSACHUSETTS, 1786–87 (Boston, Adams & Nourse 1893).................................... 57

CENTRAL PACIFIC RAILROAD AND LEASED LINES: RULES, REGULATIONS AND INSTRUCTIONS FOR THE USE OF AGENTS, CONDUCTORS, ETC. (1882) ................................................. 46, 50

Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y (2004) .............................. 35

*Gun*, 1 WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) .................................................... 45

WILLIAM HAKEWELL, *MODUS TENENDI PARLIAMENTUM*: OR, THE OLD MANNER OF HOLDING PARLIAMENTS IN ENGLAND (1671), https://perma.cc/4MZA-4M4Y ................................... 55

Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms: Young v. Hawaii*, SSRN, https://perma.cc/AXF3-PHTF ................ 39

THOMAS JEFFERSON, A MANUAL OF PARLIAMENTARY PRACTICE. FOR THE USE OF THE SENATE OF THE UNITED STATES § XVIII (1801), https://perma.cc/MC7J-J7FJ ...................................... 55

THOMAS JEFFERSON, JEFFERSON'S LEGAL COMMONPLACE BOOK (David Thomas Konig et al. eds., Princeton Univ. Press 2019) .... 37

Joshua Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L.J. 1676 (2024), https://perma.cc/XZV6-Q5E5 ....................................... 44, 45

JAMES IREDELL, LAWS OF THE STATE OF NORTH-CAROLINA (Edenton: Hodge and Wills 1791) ........................... 39, 40

Nicholas Johnson et al., FIREARMS LAW & THE SECOND AMENDMENT (2d ed. 2017)................................................. 36

Journal of the House of Delegates of the Commonwealth of Virginia (Richmond, Thomas W. White 1828).............................54

Journal of the Votes and Proceedings of the Provincial Congress of New Jersey (Burlington, Isaac Collins, *reprinted by* Woodbury, Joseph Sailer 1835) ......................................54

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. (2018).................................35, 63

Laws of the State of New Jersey (Joseph Bloomfield ed., Trenton, James J. Wilson 1811)...............................................56, 58

Md. Const. art. 1 §§ 3, 14 (1776) ...........................................58

*Our History: What is Metra?*, Metra, https://perma.cc/84ML-MEEM .. 14

Raphael Semmes, Captains and Mariners of Early Maryland (1937), https://perma.cc/7T7C-8WA4.............................56

R. Sheardown, The Duty of Constables 16 (1790), https://perma.cc/4EYV-2T5Q .......................................58

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, Harv. J.L. & Pub. Pol'y Per Curiam (Dec. 7, 2022), https://perma.cc/2ZKD-7UE9 ................30

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders*, 2020 Pepp. L. Rev. 71 (2020).............37

Jacob R. Straus, *Sergeant at Arms and Doorkeeper of the Senate: Legislative and Administrative Duties* at 1–2, Cong. Rsch. Serv. (updated Mar. 21, 2011), https://perma.cc/D9HY-8WAF ........55, 56

The Laws of the State of New Hampshire (1797) ...............................57

*The Minutes of the Senate Academicus, 1799-1842*, Univ. of Ga. Librs. (1976), https://perma.cc/J3ZV-XMEC ...........................52, 53

The Public Laws of The State of Rhode-Island (Providence, Carter & Wilkinson 1798).......................................53, 57

The Public Laws of the State of South Carolina (Phila., R. Aitken & Son 1790)...........................................54, 56, 58

Votes and Proceedings of the House of Delegates of the State of Maryland, November Session, 1791 (1791)............................54

VOTES AND PROCEEDINGS OF THE SENATE OF THE STATE OF MARYLAND, NOVEMBER SESSION, 1791 (1791) ............................................... 54, 55

## JURISDICTIONAL STATEMENT

The jurisdictional statements in Appellants' briefs are correct.

## INTRODUCTION

In *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Supreme Court held that ordinary, law-abiding citizens, like the Plaintiffs in this case, have the right to carry firearms for self-defense outside the home. That conclusion controls this case. Illinois has sharply curtailed that right by banning carriage on all modes of public transit and public transit facilities in the state, effectively disarming anyone in Illinois who uses public transit.

Defendants' attempt to save this restriction through analogy to historical restrictions fails because Illinois's law contradicts the historical principles embodied in the Second Amendment: namely, that armed citizens *promote* individual and community safety. Accordingly, there is no historical tradition of banning firearms in places like public transport—quite the opposite. This Court should affirm the judgment of the district court.

## BACKGROUND

Illinois requires an individual who wants to exercise his right to keep and bear arms in public to acquire a license. 430 ILCS 66/10. But

even with such a license, an individual cannot carry a firearm for self-defense onto "[a]ny bus, train, or form of transportation paid for in whole or in part with public funds, and any building, real property, and parking area under the control of a public transportation facility paid for in whole or in part with public funds." 430 ILCS 66/65(a)(8); *see also* 430 ILCS 66/70(e); 730 ILCS 5/5-4.5-60 (punishing violations). Collectively these regulations make up the Public Transit Ban.

Plaintiffs are individuals licensed in Illinois to carry firearms in public and who would, if not for the Public Transit Ban, carry firearms for self-defense while making use of Illinois' public transportation system. Short Appendix to Def-App. Br., Doc. 25 at SA6 (Jan. 15, 2025) ("SA"). They have, however, eschewed using public transit for fear of enforcement of these laws, which violate their right to keep and bear arms. SA7.

Plaintiffs filed this case in September 2022, alleging that Defendants' enforcement of the Public Transit Ban violates their rights protected by the Second and Fourteenth Amendments to the Constitution. Compl., Dist. Ct. Doc. 1 ¶¶ 7–8, 12, 18–22 (Sept. 20, 2022). Following cross-motions for summary judgment, Dist Ct. Docs. 63, 67, 69

(Jan. 29, 2024), the district court issued a decision granting Plaintiffs'
motion in part, denying Defendants' motions, and dismissing certain
claims against certain Defendants for lack of subject matter jurisdiction.
The Court held, however, that Plaintiffs Schoenthal, Vesel, and Winston
had standing to challenge restrictions enforced by the Attorney General
of Illinois and the State's Attorneys of DuPage and Cook Counties. SA10–
11.

The district court held that the "plain text" of the Second
Amendment extended to cover carrying firearms on public transit, SA25–
29, and furthermore, held that the Defendants had failed to show that
the Public Transit Ban could be justified by reference to any historical
tradition of firearm regulation, declaring the law unconstitutional, SA
29–50.

## SUMMARY OF ARGUMENT

The judgment of the district court should be affirmed. Cook County
raises two arguments meant to avoid Second Amendment scrutiny for the
Public Transit Ban, but neither has merit. First, the County claims that
Plaintiffs lack standing, but Plaintiffs' have pleaded an intent to engage
in a course of conduct affected with a constitutional interest but for

Defendants' enforcement of the challenged laws. Plaintiffs' standing is not impaired by the fact that the district court granted only declaratory relief, nor by the purported existence of additional restrictions that are unconstitutional for the same reasons as the Public Carry Transit Ban.

Second, that the government acts as the "proprietor," in some sense, of the public transit system cannot exempt this case from review under *Bruen*. There is no such exception to constitutional rights in general, the government's enforcement of the Public Transit Ban is indisputably in its "sovereign" and not "proprietary" capacity, and *Bruen* made perfectly clear that *every* case involving Second Amendment rights must be analyzed through the same text-and-history lens. Nothing in the County's brief supports a contrary conclusion.

Applying the *Bruen* analysis here demonstrates that the Public Transit Ban is inconsistent with the Second Amendment's text and history. Both the State and County offer a variety of principles to support the ban, but all lack merit. A thorough review of historical sources shows at the Founding, which is the most critical period for the analysis, the *only* time when the government banned carriage of firearms was when it took upon itself the obligation to secure a location from the unlawful

4

carriage of firearms. But the general rule was and is that individuals are empowered to bear arms for their own defense. In fact, in places that were not secured by the government, history indicates the default went precisely the other way from the Public Transit Ban and *required* law-abiding citizens to carry firearms as a means of promoting collective defense from danger. The State's and County's alternative historical principles—that firearms can be banned to promote public safety, or because children are present, or because a place is crowded, or because it is the government's own property, are historically unsupported and are so broad as to effectively neutralize the Second Amendment.

## ARGUMENT

### I.  Plaintiffs have Article III standing.

The County opens its brief with a lengthy attack on Plaintiffs' standing, but there is nothing to its arguments. Plaintiffs had standing to receive a declaratory judgment because, as the district court correctly concluded, "[t]he undisputed facts show that each plaintiff would carry a concealed handgun on public transportation for the purpose of self-defense if not for the Firearm Concealed Carry Act's ban and its threat of arrest and prosecution." SA10. Thus, each Plaintiff was forced to either

forgo his desire to protect himself while traveling or potentially subject himself to criminal penalties. *See Ezell v. City of Chicago*, 651 F.3d 684, 695–96 (7th Cir. 2011).

Cook County believes that the calculus is not so simple for two reasons. First, it contends that Plaintiffs have forfeited their right to obtain an injunction, which deprived the district court of jurisdiction to enter a declaratory judgment. *See* Br. of Def-App. Eileen O'Neill Burke, Doc. 25 at 6–11 (Jan. 15, 2025) ("County Br."). Second, it argues that because the Chicago Transit Authority ("CTA") and Board of the Commuter Rail Division of the Authority ("Metra") have policies that also prohibit carrying firearms on public transportation, Plaintiffs' injuries were not redressed by the favorable judgment. *Id.* at 11–22. Both arguments are wrong.

### A. The district court had jurisdiction to issue a declaratory judgment.

The Declaratory Judgment Act permits federal courts to declare "the rights and other legal relations" of parties if there is otherwise a justiciable case between the parties. 28 U.S.C. § 2201(a). The Act itself does not, however, confer jurisdiction where it does not otherwise exist. *See California v. Texas*, 593 U.S. 659, 672 (2021). Thus, a plaintiff suing

for a declaratory judgment must satisfy the traditional requirements of standing: an "injury in fact" that is "caus[ed]" by the defendant and "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation omitted).

Plaintiffs met these criteria. They suffered an injury in fact because they alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and a credible threat of prosecution thereunder." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (cleaned up). The injury was traceable to Defendants because they enforce the unconstitutional statute that prohibits Plaintiffs' intended "course of conduct." *Id.* And the injury is redressable through *either* an injunction against Defendants or a declaration that enforcing the Public Transit Statute against them would be unconstitutional. *Id.* Thus, Plaintiffs had, and continued to have, standing regardless of "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

The County is therefore wrong to assert that the district court's holding that Plaintiffs forfeited their argument that they are entitled to an injunction deprived the court of jurisdiction to award even declaratory

7

relief. First, as described above, all that is required to enter a declaratory judgment is a plaintiff who possesses *standing* to obtain other relief, not a plaintiff who is entitled to, or even seeks, such relief. *See California*, 593 U.S. at 672; 28 U.S.C. § 2201. The Supreme Court held almost 100 years ago that Article III jurisdiction is satisfied by a claim for declaratory relief that is accompanied by no other claims. *See Nashville, Chattanooga & St. Louis Ry. Co. v. Wallace*, 288 U.S. 249, 262–63 (1933). Whether or not Plaintiffs forfeited their right to receive an injunction by failing to sufficiently brief some of the permanent injunction factors below simply has no bearing on the court's jurisdiction to enter a declaratory judgment.

Even if, as the County mistakenly contends, Plaintiffs were required to bring an additional claim for relief alongside their claim for a declaratory judgment, they still had standing. Plaintiffs' complaint included a request for an injunction against all Defendants. Compl., Doc. 1 at 20. Just because the district court (mistakenly) concluded they were not entitled to that remedy does not mean that the court lost jurisdiction. Otherwise, a court could never consider forfeited arguments, which is plainly not true. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am.*,

8

508 U.S. 439, 446–47 (1993). Every case that Cook County relies upon to argue the contrary involves an amended complaint that abandoned a claim, not the failure to sufficiently brief a specific form of relief. *See* Cook Cnty. Br. at 10 (collecting inapposite cases).

### B. The public transit system's firearms policies do not create a redressability problem.

Cook County further contends that Plaintiffs lacked standing to receive a declaratory judgment because they failed to challenge separate prohibitions placed on the carrying of firearms by the Chicago Transit Authority and Metra. Thus, the judgment in their favor would not redress Plaintiffs' injury. Cook County is wrong.

For an injury to be sufficiently redressable to satisfy Article III, a judgment in favor of the plaintiff must be "likely to" provide him at least *some* relief, but a plaintiff "need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Here, the declaration entered by the district court granted at least some relief to Plaintiffs. *See id.* Before this suit, the State's Attorney of Cook County and the Attorney General of Illinois could prosecute Plaintiffs for carrying a concealed firearm on public transportation under the Public Transit Ban. Under the district court's declaratory judgment, such a

prosecution is now unlawful. Thus, Plaintiffs are no longer at risk of being subjected to the criminal penalties laid out in the Statute, which include up to 364 days in jail and a fine of $2,500. *See* 730 ILCS 5/5-4.5-55. That is relief that redressability requires.

Cook County points out that both CTA and Metra have separate rules against carrying firearms and whether a person who violates those rules can be removed from public transit and charged with criminal trespass. *See* CTA Ord. No. 016-110 §§ 1(27), (28); 720 ILCS 5/21-3(h). Because Plaintiffs did not challenge these policies or sue the CTA or Metra, Cook County contends that Plaintiffs' injury could not be redressed by a favorable judgment against Defendants.

For this theory, Cook County relies heavily on *Harp Advertising Illinois, Inc. v. Village of Chicago Ridge*, 9 F.3d 1290 (7th Cir. 1993). In *Harp*, this Court held that a plaintiff who challenged an allegedly content-based zoning restriction on billboards lacked standing because "[a]n injunction against the portions of the sign and zoning codes that it has challenged would not let it erect the proposed sign; the village could block the sign simply by enforcing another, valid, ordinance [prohibiting signs of a certain size] already on the books." *Id*. at 1292.

But it would be vastly overreading *Harp* to suggest that redressability is necessarily absent if another law may inhibit the action that plaintiffs wish to engage in. The key point in *Harp* was that there was "another, *valid*, ordinance already on the books." *Id.* (emphasis added). In other words, the substance of the challenge in *Harp*, if successful, would in no way have undermined the unquestioned validity of a separate law that barred the plaintiffs from erecting a billboard. *Id.* The Supreme Court case that *Harp* relied upon made a similar point about the necessity that the two prohibitions be unrelated to create a redressability issue, observing that there is only "reason to doubt" standing if the "invalidation of one [ordinance] may not impugn the validity of another." *Renne v. Geary*, 501 U.S. 312, 319 (1991).

To be sure, the policies of the CTA and Metra that prohibit firearms are not being directly challenged in this litigation. But a ruling in favor of Plaintiffs would "likely," at a bare minimum, lead to the CTA and Metra bans not being successfully enforced against Plaintiffs. *Lujan*, 504 U.S. at 560–61. If this Court holds, as the district court declared, that Plaintiffs have a right to carry firearms on public transit then enforcing the rules enacted by government entities like the CTA and Metra would

11

similarly violate the Constitution. *See, e.g.*, *Arce v. Chi. Transit Auth.*, 193 F. Supp. 3d 875, 893 (N.D. Ill. 2016) (stating that CTA is state actor covered by 42 U.S.C. § 1983); *Maldonado v. Metra*, 743 F. Supp. 563, 566 (N.D. Ill. 1990) ("Metra, as a state actor, cannot incur § 1981 liability".); *see also* 70 ILCS 3605/3 (creating CTA as a "a political subdivision, body politic and municipal corporation"); 70 ILCS 3615/1.03 (establishing Metra in a similar manner). It is black-letter law that a rule which is preempted by the Constitution is no rule at all. *See, e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803). Thus, if Plaintiffs are entitled to relief because the Second and Fourteenth Amendments protect their right to carry firearms on public transportation, then there is not actually any legally binding rule against them entering these carriers with their firearms, regardless of which government entity purported to enact it.

As a result, this case is not like *Harp* at all—there is no separate "valid" restriction that would equally preclude Plaintiffs from carrying firearms if Plaintiffs are correct about the constitutionality of the Public Transit Ban. 9 F.3d at 1292. This case is more like *Maldonado v. Morales*, another lawsuit involving overlapping restrictions in which the plaintiffs challenged just one of two "similarly-worded" laws preventing the

construction of certain billboards. 556 F.3d 1037, 1043 (9th Cir. 2009). Agreeing with *Harp* but explaining why it was inapposite, the Ninth Circuit asserted that "[w]hen evaluating redressability, the key question is whether the harm alleged by the plaintiff is *likely* to be alleviated by a ruling in its favor." *Id.* (emphasis in original). Thus, only if the separate prohibition was "clearly identifiable, enforceable, and distinct from the" one challenged would *Harp* foreclose redressability. *Id.*

 "Although the [unchallenged] ordinance" in *Morales* "might [have] present[ed] another obstacle in Maldonado's path were he to prevail in this litigation, it is one that a favorable ruling here would likely allow him to surmount" because the two prohibitions were legally similar. *Id.* at 1043–44. The same is true here. Because the constitutionality of the Public Transit Statute and the bans instituted by the CTA and Metra rise and fall together, the existence of those bans is no impediment to this Court resolving this case. *Id.*

Cook County also asserts in a single sentence that some private railroads restrict the carrying of firearms "on their property." Cook County Br. at 12. But it is unclear why that is relevant here. The County does not claim, much less demonstrate, that Plaintiffs will need to enter

13

private property to access public transportation. Indeed, even when Metra partners with private entities, it still owns all of the "rolling stock," i.e., the train cars. *See Our History: What is Metra?*, METRA, https://perma.cc/84ML-MEEM. So even if a private company owns the rails underneath or assists in staffing the trains, passengers are still not on that entity's property. Additionally, if the private company is operating under Metra or the CTA's authorization and its operations are intertwined with theirs, it is likely to be treated as a state actor, casting doubt on its firearm prohibition. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009).

Further proving that the judgment in this case is at least "likely" to grant Plaintiffs some relief is the fact that Defendant Burke, State's Attorney of Cook County, is tasked with enforcing the trespass law that the County claims Plaintiffs could be charged under. *See* 55 ILCS 5/3-9005(a)(1) (explaining that Defendant Burke is tasked with "all … criminal" prosecutions "in the circuit court for the county, in which the people of the State *or* county may be concerned"). Because she is a defendant here, she will be collaterally estopped from arguing that Plaintiffs did not have a right to bring their firearms onto public

transportation. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979) ("Under the doctrine of collateral estoppel . . . the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action."); *People v. Buonavolanto*, 606 N.E.2d 509, 514 (Ill. App. Ct. 1992) (holding that State was "collaterally estopped from pursuing a criminal conviction where the State has first failed to prevail in a civil . . . proceeding based upon the same issue").

CTA as amicus points to an additional state law that bars carrying firearms on government property and contends that it is a separate bar to redressability. Thus, in addition to challenging Section 66/65(a)(8) of the Firearm Concealed Carry Act, Plaintiffs also must have challenged Section 66/65(a)(5) of that statute. For the same reasons that Cook County's arguments do not work, amicus' do not work either.

## II. There is no "government proprietor" exception to the Second Amendment.

Both the State and the County make separate arguments that the fact that the government owns the transit system gives it the leeway to restrict the carriage of firearms on the transit system. *See* Br. of Defs-Apps. Kramer Raoul & Robert Berlin, Doc. 24 at 37 (Jan. 15, 2025) ("State Br."); County Br. 7–33. The County, in particular, makes this claim a

centerpiece of its brief. But there is no "government proprietor" exception to the Second Amendment.

The State's argument on this point—that there is a tradition of treating "government-owned and -operated spaces … as sensitive places" is a straightforward, if misguided, attempt at the historical analysis under *Bruen*. *See* State Br. 37. Plaintiffs, therefore, deal with it below. The County's argument, however, is significantly broader, as it claims because the public transit system is state owned and operated, Plaintiffs' claims fall entirely outside the *Bruen* analysis. Indeed, the County's argument is that there are presumptively *no* constitutional rights that Plaintiffs may claim when on property owned and maintained by the government, as it asserts that there is a "background rule [which] provides that governmental proprietary interests are normally governed only by the minimal requirements of due process rational-basis review, not by the heightened requirements of a particular constitutional amendment." County Br. 36.

This argument is, as the district court noted, "breathtaking, jawdropping, and eyepopping." SA14. Indeed, while Cook County acts as though it is relating a well-worn fundamental principle of constitutional

interpretation, its argument, if accepted, would significantly erode constitutional protections—it would just as easily permit, to offer just two examples, the State to ban the wearing of yarmulkes or hijabs on city busses that it operates or to permit warrantless searches of anyone who commutes by train, because, in Cook County's view, the Bill of Rights becomes simply irrelevant when someone steps foot on government property. To avoid this obvious implication, Cook County's brief is directly contradictory on this point, claiming both that that this "background rule" is all encompassing and, simultaneously, entirely irrelevant to most constitutional claims. *Compare* County Br. 26 ("[T]he Supreme Court has applied this [government-proprietor] principle to all manner of constitutional claims, whether they arise under the Fourth Amendment[,] … the First Amendment[,] … or the Fifth Amendment." (citations omitted)) *with id.* at 37 ("[T]he Fifth Amendment right against takings would still be offended if the government could force valuable property rights to be sacrificed merely to obtain a permit. And the Fourth Amendment right against unreasonable searches and seizure still applies with full force on government property. … Again, the First Amendment

still applies with full force to public property that also constitutes a public fora." (citations omitted)).

In essence, though it speaks broadly, Cook County is asking this Court to recognize a specific "government proprietor" exception to the Second Amendment. That alone is reason enough to dispense with this argument, as the Supreme Court has been clear: the Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)).

There are two other major problems with this argument. First, *Bruen* makes clear that the Second Amendment does not permit *any* limitations on the right to "keep and bear arms" except those that can be established by reference to history; there is *no* Second Amendment case for which *Bruen*'s analysis is irrelevant, including Second Amendment cases involving carrying on property owned by the government. Second, even assuming there were some greater latitude for the government-as-proprietor to regulate firearms, the laws challenged here are not actions Illinois has taken as proprietor of the public transit system but instead

18

exercises of its sovereign authority, under which even in the County's view, its actions are subject to the full measure of constitutional scrutiny.

First, this Court is bound to reject the County's attempts to evade Second Amendment scrutiny because the Supreme Court could not possibly have been clearer that *all* Second Amendment cases are subject to the same text-then-history analysis. In *Bruen*, the Court was emphatic in holding that the interest-balancing regime that had taken root following *Heller* in most courts of appeals was *categorically* inappropriate in Second Amendment cases: "*Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17 (emphasis added) (citation omitted). And in *United States v. Rahimi*, the Court reiterated "that when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" 602 U.S. 680, 691 (2024) (quoting *Bruen*, 597 U.S. at 24). As both *Bruen* and *Rahimi* makes clear, shouldering that burden *always* requires a showing that the regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

19

The County's argument that *Bruen* only applies where the conduct in question does not take place on government property cannot be squared with the *Bruen* analysis since, as the district court correctly noted, *Bruen* "rejects the relevance of place to the threshold question of whether certain conduct is covered by the Second Amendment," SA18. And the specific mode of analysis the County advocates for in the context of a government-as-proprietor regime is just a weakened form of the interest-balancing that the Supreme Court has forbidden. *See* SA20. As a result, it is not surprising that, following *Bruen*, courts have held that even "where the government is acting as an 'employer' or 'proprietor' or 'market participant,' allegations of government infringement are nevertheless resolved according to the applicable analytical framework." *Koons v. Platkin*, 673 F. Supp. 3d 515, 603 (D.N.J. 2023).

Second, Illinois has not acted as proprietor in banning firearms on public transit, but as sovereign. *Accord id.* at 601–02; *Solomon v. Cook Cnty Bd. of Comm'rs*, 559 F. Supp. 3d 675, 694–95 (N.D. Ill. 2021). The challenged provisions are part of the State's criminal code and backed by criminal penalties, which a normal proprietor cannot make or enforce. That makes this case different from cases where "a state or local

government enters the market as a participant." *White v. Mass. Council of Constr. Emps., Inc.*, 460 U.S. 204, 208 (1983).

Indeed, there simply is no general "government proprietor exception" to the Second Amendment, any more than there is for any other constitutional right. The County calls Plaintiffs' position "frivolous," County Br. 39, and asserts that a general proprietor exception to the Bill of Rights exists "in at least three contexts in which the government's proprietary interests are at their zenith," *id.* at 23, citing cases showing (1) that the government has significantly greater authority over its employees in employment contexts than it does over citizens generally, *id.* at 23, (2) that the government, as property owner, has the right to exclude from that property "to preserve the property under its control for the use to which it is lawfully dedicated," *id.* at 24 (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)), and (3) that the government may "set terms … on the receipt of government funds or benefits" which are "subject only to the unconstitutional conditions doctrine," County Br. 25.

The district court correctly described this argument as "an impressive bricolage, cobbling together broad statements of principle

drawn from disparate areas of law" but with no application here. SA16 n.14. As to the first basis, the State is wrong to equate the powers of "proprietor" and "employer." Its chief case, *Engquist v. Oregon Department of Agriculture*, contains broad language on the point, finding "a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, *to manage its internal operation*." 553 U.S. 591, 598 (2008) (cleaned up) (emphasis added). But the Court goes on to make plain that "[t]his distinction has been particularly clear in our review of state action *in the context of public employment*." *Id.* (emphasis added). The County, to its detriment, entirely equates the power of the government as employer, with the power of the government as a proprietor, and it cites not *one* case from the latter camp showing that the government can disregard the constitutional rights of citizens who use a service it runs in a semi-private fashion. *See Koons*, 673 F. Supp. 3d at 601–03 (collecting cases).

As to the second basis, while the government has a limited right to exclude individuals who seek to exercise their First Amendment rights in a disruptive manner in places maintained by the government, *see, e.g.*,

*Gilles v. Blanchard*, 477 F.3d 466, 469–70 (7th Cir. 2007) (itinerant preacher banned from university library lawn), the County does not have a single case that suggests that the government as proprietor can refuse access to places held open to the public irrespective of the restrictions in the Bill of Rights in other contexts or when doing so is not disruptive. Unlike a disruptive speaker on private university grounds, Plaintiffs use the transit system in the same way as all other citizens do and have every right to be there, they only wish to do so while lawfully carrying a firearm for their defense. Nothing about that use threatens the government's "power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley*, 385 U.S. at 47. Indeed, it *is* the use for which it is lawfully dedicated.

For its third basis, the County affirmatively argues that the government's provision of public transportation is a "public benefit" and that a law requiring an individual to forego carrying a firearm while making use of that benefit should be subject only to review as an "unconstitutional condition." County Br. 32. The County *then* argues this Court "need not consider" "whether the Public Transit Statute violates the unconstitutional conditions doctrine" because Plaintiffs failed to

argue below "that the Public Transit Statute imposed an unconstitutional condition on access to the public transit system Illinois created." *Id.*

This is not an "unconstitutional conditions" case. The State is not threatening simply to kick people who carry firearms off of public transportation unless they disarm (which, to be clear, would likewise be unconstitutional). *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). Rather, it will prosecute Plaintiffs as criminals for exercising their right on public transit property. The case is squarely within the mold of an ordinary pre-enforcement challenge to a criminal statute, and should be analyzed as such. Indeed, under Cook County's conception every criminal statute could be reframed as an unconstitutional condition. For example, a ban on carrying on public sidewalks could be reframed on conditioning use of the sidewalks on refraining from carrying a firearm. That is not the law.

Even if this were an unconstitutional conditions case, that does not exempt the Public Transit Ban from scrutiny under *Bruen*. Rather, "[t]he first step in any unconstitutional-conditions claim is to identify the nature and scope of the constitutional right arguably imperiled by the

24

denial of a public benefit." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 986 (7th Cir. 2012). And if, as explained below and the district court held, Plaintiffs have a right to carry firearms on public transportation, the requirement that they forego transportation or abandon that right, is without a doubt an unconstitutional condition on the provision of that "benefit," as the entire basis of the unconstitutional conditions doctrine is that Illinois cannot coerce Plaintiffs to abandon a right it cannot compel them not to exercise. *Id.*

None of the County's other scattered arguments can save its "government-proprietor principle" either. It points to *Davis v. Massachusetts*, in which the Supreme Court held that the Fourteenth Amendment "does not destroy the power of the states to enact police regulations as to the subjects within their control," such that "[f]or the legislature absolutely or conditionally to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house." 167 U.S. 43, 47 (1897); *see* County Br. 27. The County claims that in subsequent caselaw, although the Supreme Court has repudiated

the holding of *Davis* as to its specific application against speech, it emphasized that there were legitimate applications of the statute to the extent it "was addressed as well to other activities, not in the nature of civil rights," *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) (Roberts, J., plurality)—one of which, the County claims, was a restriction on firing guns in the park. This all leads the County to conclude that this Court is *bound* to rule against Plaintiffs because *Davis* stands for the proposition that the Second Amendment places no limit on the government's ability to pass criminal laws concerning property it controls, County Br. 28. Again, none of that follows. *Davis*'s approach to constitutional rights has been "directly rejected" by the Supreme Court, *Jamison v. Texas*, 318 U.S. 413, 415–16 (1943), not just to the First Amendment, but to any incorporated right that limits the government, *see Bridgeville Rifle & Pistol Club v. Small*, 176 A.3d 632, 653 n.108 (Del. 2017). The fact that there was also a provision of the law in *Davis* related to firearms was irrelevant given that there was no Second Amendment issue raised in the case. And even if there had been, the Second Amendment had not, at the time, been incorporated against the states (for that matter, neither had the First). *See McDonald*, 561 U.S. at 780.

26

In any event, to the extent that *Davis* means that states are not bound to respect the Second Amendment rights of citizens on public property, that holding has been abrogated by *McDonald* and *Bruen*.

Nor can the County drum up support from the several cases that it claims have recognized the alleged "government-proprietor principle" in the Second Amendment context. County Br. 30. It leans on overbroad (and, in light of the foregoing, inaccurate) dicta from *Wolford v. Lopez* that claimed that "if a State operates a bank, the State, too, may exercise its proprietary right to exclude, just as a private property owner may." 116 F.4th 959, 970–71 (9th Cir. 2024). But the assertion that even this broad language covers this case runs headlong into the fact that *Wolford* went on to assess a ban on public transit, acknowledged that the facilities where firearms were banned were "State-owned" and *nevertheless* held that the law (1) needed to be analyzed according to the *Bruen* methodology and (2) was likely unconstitutional after applying that methodology, *id.* at 1001–02. It therefore cannot stand for the broad rule the County claims.

The County next points to *Mahoney v. Sessions*, but that case involved a suit by police officers challenging restrictions on their use of

27

force "while acting in the course and scope of their official duties as police officers," under the Second Amendment, and it fits squarely into the "government-as-employer" context discussed above, which is different from the County's novel theory. 871 F.3d 873, 880 (9th Cir. 2017). And its final two cases, *Bonidy v. USPS*, 790 F.3d 1121 (10th Cir. 2015), and *Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012) (en banc), are both irrelevant in a post-*Bruen* regime. Neither *Bonidy*'s holding that, under intermediate scrutiny, the government should be accorded more flexibility when acting as a proprietor to manage the "inherent risks" associated with public carry, 790 F.3d at 1126, nor *Nordyke*'s blessing of a law that prohibited even possessing a firearm on County property, 681 F.3d at 1044, can be squared with *Bruen*'s rejection of interest balancing and guarantee that the Second Amendment protects the right to carry firearms in public.

## III.    Carrying firearms on public transportation falls within the "plain text" of the Second Amendment.

Applying *Bruen*, as this Court must, the threshold question for this Court to answer is whether Plaintiffs' conduct falls within the "plain text" of the Second Amendment. Neither the State nor the County attempts, on appeal, to argue that the plain text does not cover Plaintiffs' conduct,

and for good reason. Just as "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 597 U.S. at 32, nothing in the Second Amendment's text makes *any* distinction about *where* in public Plaintiffs may lawfully carry for self-defense. Such limitations, if any, must be found through history.

## IV. There is no historical principle that can support the Public Transit Ban.

### A. *Bruen* and *Rahimi*'s historical method.

Under *Bruen* and *Rahimi*, three general considerations should guide this Court's consideration of the State's historical evidence.

First, evidence from the Founding era, when the Second Amendment was ratified, has controlling weight. *See Bruen*, 597 U.S. at 34–35; *accord Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 438–443 (holding that 1791 is the most probative period); *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history.").

This Court recognized pre-*Bruen* that 1791 is the "critical year for determining the [Second] [A]mendment's historical meaning," *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), and nothing in *Bruen* undermines that conclusion. Indeed, this Court recently reaffirmed

*Moore*'s rule, explaining that "because '[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*[,]' we give considerable weight to the time periods immediately leading up to and during the adoption of the Second Amendment in 1791." *United States v. Rush*, No. 23-3256, 2025 WL 750313, at *7 (7th Cir. Mar. 10, 2025) (quoting *Bruen*, 597 U.S. at 34) (emphasis in *Bruen*). Evidence that long pre- or post-dates 1791 is less probative, *Bruen*, 597 U.S. at 34–37, and laws from the 20th-century are categorically too late to matter, *id.* at 66 n.28; *see also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, Harv. J.L. & Pub. Pol'y Per Curiam (Dec. 7, 2022), https://perma.cc/2ZKD-7UE9.

The State, lacking good evidence from this critical period (discussed below), argues that "nineteenth-century historical evidence is relevant to the Second Amendment analysis" as well, State Br. 29, pointing to this Court's use of such evidence in *Bevis v. City of Naperville*, 85 F.4th 1175, 1201–02 (7th Cir. 2023), as well as the Ninth Circuit's in *Wolford*, 116 F.4th at 980, and the Second Circuit's in *Antonyuk v. James*, 120 F.4th 941, 988 n.36 (2d Cir. 2024). *See* State Br. 29–30. Plaintiffs do not dispute

30

that nineteenth century evidence *can* be *relevant*, but to the extent *Wolford* and *Antonyuk* accorded parity to 19th century evidence and evidence from nearer to 1791, they are wrong, and out of step with this Circuit's approach in *Rush*. Later evidence can do no more than confirm the meaning of the Second Amendment as established by evidence from the Founding. *See Bruen*, 597 U.S. 36 ("But to the extent later history contradicts what the text says, the text controls.").

*Bruen*'s reasoning underscores that evidence from 1868 cannot overcome evidence (or the lack thereof) from 1791 as to the permissibility of a given restriction on the right. After initially rejecting "medieval English regulations," *Id.* at 40; *accord Rahimi*, 602 U.S. at 694 (rejecting English traditions that failed to make it to "this side of the Atlantic"), *Bruen* turned to sources leading up to the ratification of the Second Amendment, including the 1689 English Bill of Rights, *see* 597 U.S. at 44–45. After finding these sources somewhat probative of the Amendment's original meaning, the Court focused on "the history of the Colonies and early Republic," plus "the first decade after [the Second Amendment's] adoption." *Id.* at 46, 50. And it found that the challenged law had "no historical basis" because no analogue in that relevant

31

historical period supported it. *Id.* at 50. Later evidence was much less important. Only after canvassing the historical evidence from English, colonial, Early Republic, and Reconstruction periods did the Court discuss post-1868 sources and the late-19th century. *Id.* at 60–70. But the Court found that much of this later evidence "conflict[s] with the Nation's earlier approach to firearm regulation" and is "most unlikely to reflect 'the origins and continuing significance of the [Second] Amendment.'" *Id.* at 67 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 614 (2008)). Thus, the Court declined to rely on such laws and regulations. *See Bruen*, 597 U.S. at 66–68; *accord Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (holding that "more than 30" provisions of state law enacted "in the second half of the 19th century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions were not grounded in Founding era practice). *Bruen* thus cautioned lower courts to "guard against giving postenactment history more weight than it can rightly bear." 597 U.S. at 35.

Second, *Bruen* held that forming a historical tradition requires proof of representative, relevantly similar analogues. As *Rahimi*

explained, such historical laws must evidence the "principles that underpin our regulatory tradition" and that "underly[] the Second Amendment." 602 U.S. at 692. Analogues are representative, therefore, if they are broadly applicable and widely accepted legal restrictions on activity that falls within the textual scope of the Second Amendment. On the other hand, a couple of state laws that are disconnected, in principle, to earlier or later enactments do not make a "historical tradition" of regulation sufficient to inform the original public meaning of the right at the Founding, *Bruen*, 597 U.S. at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation" and rejecting regulations applying to only 1% of the population (emphasis omitted)). Put differently, laws existing in only a few jurisdictions—historical "outliers"—should be disregarded. *Id.* at 30 (quotation marks omitted); *see also Koons*, 673 F. Supp. 3d at 622 (finding three Reconstruction era laws non-representative); *see also id.* at 642 (finding "one state law and . . . 25 local ordinances[,]" covering less than 10% of nation's population, insufficient).

Third, any analogues must be "relevantly similar" based on "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Bruen,* 597 U.S. at 29. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id.* The analysis of this relevant similarity yields, under *Rahimi,* the historical "principles" to be applied in assessing a modern statute's constitutionality. 602 U.S. at 692. This requirement means that Founding era laws arising in different contexts, and for different reasons, will be inapt comparators to a modern law, since they are not motivated by the same underlying principles.

### B. There is no historical regulatory tradition that excuses banning firearms on public transit.

The State offers two historical traditions that it argues are independently capable of justifying the Public Transit Ban: a "historical tradition of prohibiting unsecured firearms on passenger railroads" and a tradition "of restricting access to firearms in crowded spaces." State Br. 15. Neither alleged tradition can support the Public Transit Ban.

### 1. There is no tradition of banning firearms in "crowded places."

Beginning with the State's broader tradition of "restricting firearms in crowded places," its argument fails because there simply never has been any such tradition. To start with, Supreme Court precedent forecloses the argument. *Bruen* specifically rejected that there was any "historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded." 597 U.S. at 31; *see also id.* at 58 (rejecting the argument that historically, "merely carrying firearms in populous areas breached the peace *per se*" (internal quotation marks omitted)). Quite the opposite. "The colonial generation required the settlers to carry weapons during public assemblies to defend against hostilities." *Koons*, 673 F. Supp. 3d at 628. Beginning in the colonial period, and continuing through the Founding, there was a robust tradition of permitting (and sometimes requiring) firearm carriage when people entered crowded places of public assembly. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 204, 232–34 & n.108 (2018); Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2004); Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8

LIBERTY UNIV. L. REV. 653, 697–99 (2014); Nicholas Johnson et al., FIREARMS LAW & THE SECOND AMENDMENT 183–85 (2d ed. 2017) (summarizing laws requiring carriage either at church or at places of public assembly from Virginia in 1619, 1632, and 1665; Connecticut in 1643 and 1644; Massachusetts Bay in 1637 and 1643; Rhode Island in 1639; Maryland in 1642; South Carolina in 1740 and 1743; and Georgia in 1770). For example, *Heller* cited a 1770 Georgia law that required men to carry firearms "to places of public worship." 554 U.S. at 601 (quotation marks omitted). At one public gathering, now remembered as the Boston Massacre, British soldiers opened fire on a crowd of colonists in 1770. In defending the soldiers at trial, John Adams conceded that, in this country, "every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence." John Adams, *Adams' Argument for the Defense: 3–4 December 1770*, NAT'L ARCHIVES FOUNDERS ONLINE, https://perma.cc/C82Q-WT7R.

The Founders well knew that requiring disarmament *because* a place is crowded or frequented by the public, while undoubtedly effective in deterring carriage of firearms by law-abiding citizens who are a danger

to no one, would be unlikely to impact the actions of criminals intent on violence—except insofar as they identify easy targets where potential victims are unlikely to be armed for their protection. "Such laws make things worse for the assaulted and better for the assailants." Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders*, 2020 PEPP. L. REV. 71, 83 (2020) (explaining that the Founders were influenced by prominent Enlightenment thinker Cesare Beccaria, who was critical of gun control laws for this reason); THOMAS JEFFERSON, JEFFERSON'S LEGAL COMMONPLACE BOOK 521 (David Thomas Konig et al. eds., Princeton Univ. Press 2019), Add.2 (quoting Beccaria on this point).

The State's argument to the contrary is unfounded. Going all the way back to the 1328 Statute of Northampton, the State attempts to draw out a tradition of restricting carrying firearms in public based on that statute's prohibition on going "armed by night []or by day, in [f]airs[ ] [or] [m]arkets." 2 Edw. 3, c. 3 (Eng.), Add.4; *see* State Br. 16. It claims that Virginia and North Carolina adopted similar statutes, proving that the Statute of Northampton remained good law to the Founders and that it applied to prevent carrying in crowded public locations like markets. State Br. 16. The State's problem is that Northampton and its analogues

in fact *refute* the State's claims, because, as *Bruen* unequivocally held, those laws did not bar carry in fairs and markets or other unsecured public places unless done *with evil intent* or *to terrify* others. 597 U.S. at 40–44. In *Rahimi*, the Supreme Court reaffirmed this view, classing all of the State's proposed support for this proposition as affray laws and explaining that "[a]lthough the prototypical affray involved fighting in public, commentators understood affrays to encompass the offense of 'arm[ing]' oneself '*to the Terror of the People*.' " *Rahimi*, 602 U.S. at 697 (quoting THEODORE BARLOW, THE JUSTICE OF THE PEACE: A TREATISE 11 (1745)) (emphasis added). The State's American analogues make this clear. Virginia's law expressly included a "terror" element. *See* 1786 Va. Acts 35, Add.6 (criminalizing going armed "in fairs or markets … in terror of the county"). And the courts in North Carolina similarly understood the offense to include a terror element. *State v. Huntly*, 25 N.C. 418, 422–23 (1843) ("[I]t is to be remembered that the carrying of a gun *per se* constitutes no offence. … It is the wicked purpose—and the mischievous result—which essentially constitute the crime.").

The State touts *Wolford* and *Antonyuk* as advancing its position that history supports banning firearms in crowded places, *see* State Br.

at 16, but *Wolford* notably rejects any reliance on the Statute of Northampton or its American analogues for exactly the reasons Plaintiffs have explained. *See* 116 F.4th at 998 n.12. And *Antonyuk*, which did rely on the Statute of Northampton, specifically based its conclusion that it was relevant on an alleged North Carolina statute codifying its prohibitions *without* an express "terror" element like in Virginia. 120 F.4th at 1038–39. But the title of the source cited by *Antonyuk* makes clear it was not a compilation of statutes passed by the North Carolina legislature but rather a compilation of *English* statutes that the compiler thought remained in force in the state. *See id.* at 1019–20 (citing "Collection of Statutes *of the Parliament of England* in Force in the State of North Carolina") (emphasis added). And "[l]ater compilers" criticized this collection as "utterly unworthy." Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms:* Young v. Hawaii at 21, SSRN, https://perma.cc/AXF3-PHTF (quoting *Preface of the Commissioners of 1838* at xiii, *in* REVISED CODE OF NORTH CAROLINA (1855)). Trustworthy contemporary sources, like future Supreme Court Justice James Iredell's officially commissioned compilation of the laws in force in North Carolina make no mention of the Statute of Northampton. *See* JAMES IREDELL,

LAWS OF THE STATE OF NORTH-CAROLINA 70 (Edenton: Hodge and Wills 1791), Add.8. In any event, even if Northampton were in effect in North Carolina at the founding, that would not make a difference because, as explained, by that time Northampton was understood to contain a terror element.

On appeal, the State wisely does not cite this nonexistent law, but asserts that its existence (or not) "is beside the point" because either way, *Huntly* shows that North Carolina recognized the crime of affray at common law. State Br. 16 n.7. But as noted *Huntly* recognized an express "terror" element, and it was the lack of such an element that was critical to the Second Circuit's decision in *Antonyuk*, on the State places significant weight.

The State's later historical catalogue is similarly insufficient to support its broad theory. It cites an 1817 ordinance from New Orleans prohibiting firearms in ballrooms and an 1852 New Mexico law banning firearms "at any ball or fandango." *Id.* at 17 (quotations omitted). And then it alleges that in 1870–71 similar laws were enacted in four southern states during reconstruction, with three more territories enacting similar restrictions between 1889 and 1903. *See id.* at 17–18. There are several

reasons that these laws do not establish a tradition of regulation that would help the State. First, just two of them—one covering only the city of New Orleans—predate even the Fourteenth Amendment, while six of the State's "nine States or territories [that] expressly prohibited the possession of firearms in crowded places," *id.* at 18, came from the Reconstruction and late-19th-century time periods that *Bruen* held "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." 597 U.S. at 66. (The State's ninth law, from Montana in 1903, comes even later, from a period that *Bruen* entirely ignored. *See id.* at 66 n.28.) These were also laws from places that *Bruen* suggests are deserving of less weight in the analysis. For example, the-post-Civil-War south is an inauspicious place to look to define our Nation's fundamental rights. *See id.* at 64–65 (discounting unrepresentative postbellum Texas law). And *Bruen* expressly discounted territorial restrictions because they were "transitory" and "temporary." *Id.* at 67–69. Finally, even if all nine of the State's analogues were counted, there were 45 states in the Union by 1900, so at best, the State has demonstrated a minority rule that applied in only 20% of the country—neither longstanding nor representative.

The State attempts to wave away these deficiencies by claiming that *Bruen* based its statement that courthouses, legislative assemblies and polling places were "sensitive places" on "just one or two historical regulations for each location," so nine should be enough here. State Br. at 31. And it further argues that courts reviewing these laws demonstrate their constitutionality. *Id.* at 18. As for the first argument, as discussed in detail below, *Bruen*'s example of "sensitive places" laws is illuminating—those laws were not, like the State's historical evidence, a grab bag of outlier laws from a 100-year period, but rather were representative laws that could be fit into a broader tradition, going back to the Statute of Northampton, and animated by the same fundamental underlying principle—that people may be temporarily prohibited from bearing arms consistent with the Second Amendment where the government provides comprehensive security. The State's laws lack any such cohesive rationale and run entirely contrary to the background legal principle at the Founding that the need for personal self-defense was heightened, not lessened, in crowded places. As for the alleged support the State finds in caselaw, it cites four cases. *See id.* Only *English v. State*, 35 Tex. 473 (1871), arguably supports the State, but Texas at the

time had a constitutional right to bear arms that permitted broad state regulation and *Bruen* specifically called *English* an "outlier" that "provide[s] little insight into how postbellum courts viewed the right to carry protected arms in public." 597 U.S. at 64–65. In *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886), the court relied upon *State v. Wilforth*, 74 Mo. 528 (1881), for the constitutionality of a law restricting carriage at public assemblies. *Wilforth*, in turn, construed the law to be limited to a restriction on *concealed* carriage only, to save it from a charge that it violated the right to keep and bear arms. 74 Mo. at 531. *Andrews v. State* stated in dicta that restrictions on the carrying of firearms in places of "public assemblage[ ]" may well be constitutional, but to the extent the challenged law, which made no distinctions with regard to "time or place, or circumstances" applied to the types of arms it deemed protected, it held the law unconstitutional. 50 Tenn. 165, 186–87 (1871). Finally, *Hill v. State* dealt specifically with an indictment for carrying a firearm into a court, which as Plaintiffs detail below, is an entirely different form of restriction, and differently justified, than a general prohibition on all forms of carry into populous areas. 53 Ga. 472, 473, 480–81 (1874).

Indeed, *Hill* was premised on the "high constitutional duty of the state to protect" individuals in the restricted locations. *Id.* at 478.

### 2. Private railroad regulations from the 1800s are entirely irrelevant.

The State next claims that a series of regulations by private railroad companies similarly support the Public Transit Ban. But this misunderstands the *Bruen* analysis. As *Rahimi* succinctly put it, the purpose of "examin[ing] our 'historical tradition of firearm regulation' [is] to help delineate the contours of the right." 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 17). *Bruen*'s text-then-history framework looks to *government* regulation to assess historic limitations on the right to keep and bear arms free from *government* infringement. *See Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35). This analysis only makes sense if the evidence of historical restrictions on the right were *legal* restrictions, not the policies of private actors, because the Second Amendment only restricts *state action*. To be sure, there are many reasons to disregard this evidence. For example, these rules come too late to be probative. *See* State Br. 19 ("The practice began at least as early as 1875."). It also is not clear that they applied to handguns as opposed to long "guns," like rifles or shotguns. *See, e.g.*, Joshua Hochman, *The*

*Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L.J. 1676, 1693 (2024), https://perma.cc/XZV6-Q5E5 (noting that an 1875 North Pennsylvania Railroad Company bylaw directed the conductor to "see that no person passes the gate without a ticket, and that passengers do not take into the cars guns, dogs, valises, large bundles or baskets" (quotation marks and citation omitted)); *see also Gun*, 1 WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), Add.10 (explaining that "one species of fire-arms, the pistol, is never called a gun" (emphasis omitted)). But the strongest reason for disregarding them is that they simply say nothing at all about the scope of the Second Amendment because the railroads that put them in place were not bound by the Second Amendment in any way, just as a private business today (or indeed, a private train) is free to tell its customers they cannot carry firearms onto its property irrespective of *Heller* and *Bruen*.

The State tries to get around this obvious deficiency, by arguing that railroads were "quasi public corporations" in the 19th century. *See* State Br. 24–25 (cleaned up). But that railroad companies benefited from eminent domain, or were subject to mandamus actions in some cases,

45

does not transform their rules for what passengers were permitted or not to carry into the cars with them into state action, and the State has not identified *any* evidence showing a railroad company's own regulations were treated as such. Indeed, the regulations refute a reading that they operated anything like a statute or regulation. *See, e.g.*, CENTRAL PACIFIC RAILROAD AND LEASED LINES: RULES, REGULATIONS AND INSTRUCTIONS FOR THE USE OF AGENTS, CONDUCTORS, ETC. 193 (1882), Add.12 (prefacing rules regarding firearms in train cars by addressing its intended audience: "As baggagemen, you are intrusted with the safekeeping and transportation of effects … [and] expected and required by the Company you serve to exercise the utmost vigilance, that all baggage intrusted to your care be correctly checked, promptly forwarded, carefully handled, and safely delivered[.]").

The State argues that the Supreme Court has implicitly condoned reasoning from private regulations, both by its statement that the purpose of the *Bruen* analysis is to assess the "public understanding of the right to keep and bear arms," State Br. 25 (quoting *Bruen*, 597 U.S. at 38) and because, the State asserts, the Supreme Court has condoned bans on arms in schools based on sources that, when drilled down,

amount to one state statute and four college rules, State Br. 26–27. But as explained above, restrictions by non-state actors that are not bound by the Second Amendment cannot shed any light on the Second Amendment, and it is not true that the Supreme Court has even hinted otherwise. After all, businesses in New York are as free today as they were at the founding to prohibit carrying firearms on their premises, and that did not matter for the *Bruen* majority's conclusion that the Constitution prevents the *states* from restricting carriage. The State's example rests on the assertion that the Supreme Court cited an article by David Kopel and Joseph Greenlee, as well as an amicus brief from the Independent Institute, for the proposition that restrictions in schools were well-founded, and that those briefs and articles in turn disclosed mostly private sources of authority for those restrictions. *Id.* at 27. However, the Court cited those sources specifically with reference to restrictions in "legislative assemblies, polling places, and courthouses" while conspicuously *not* mentioning schools, *Bruen*, 597 U.S. at 30, so if anything, *Bruen*'s reference to those sources suggests the exact opposite of the conclusion the State attempts to draw.

47

In any event (and for similar reasons), even if they are considered, these regulations are poor analogies for the Public Transit Ban, both in "how" and "why" they restrict the right to keep and bear arms. As for the "how," the regulations in question were baggage limitations imposed by a private company on passengers, and guidance to baggage handlers about enforcing those limits. They were not *criminal* prohibitions, by the State, on carrying firearms on State property where the owner has the right to be.

As for "why" the State suggests that both its law, and these private baggage rules, were "motivated by a concern for passenger safety." State Br. 22. But, even if that were the case, a broad concern with "public safety" is far too general a "principle" to justify a restriction on the right. *Rahimi* cautioned that a law should not only be "consistent with the principles that underpin our regulatory tradition," but must also "comport with the principles underlying the Second Amendment." 602 U.S. at 692. And a key principle underlying the Second Amendment is that carriage of firearms in public by law abiding citizens itself contributes to public safety. *See Bruen*, 597 U.S. at 29; *contra* State Br. 23 ("[I]t will best protect the safety of all public-transit riders and

employees in the State if individuals are not able to access loaded firearms while in transit."). It is hard to imagine any modern firearm law that its proponents would not say is intended "to enhance public safety." Indeed, in *Heller*, Justice Breyer in dissent extolled the District of Columbia's unconstitutional ban on handguns for seeking "to further the sort of life-preserving and public-safety interests that the Court has called 'compelling.' " 554 U.S. at 705 (citation omitted) (Breyer, J., dissenting). *Bruen* similarly refused to rely on such a justification. *See* 597 U.S. at 27 ("[W]e find no such tradition," attempting to curb the public safety threats of "handgun violence, primarily in urban areas," "in the historical materials that respondents and their *amici* have brought to bear on that question." (cleaned up)). Indeed, the ease of making a claim to such a justification was part of the reason that the Supreme Court was critical, in *Bruen*, of the interest-balancing regime that had grown up in the wake of *Heller. See Bruen*, 597 U.S. at 77 (Alito, J., concurring) (noting that in an earlier case, the Second Circuit had upheld a law as "substantially related to the city's interests in *public safety* and crime prevention. … [A]fter we agreed to review that decision, the city

repealed the law and admitted that it did not actually have any beneficial effect on public safety" (emphasis added)).

In any event, there is nothing in these regulations to suggest that passengers were disarmed by the railroads for safety reasons. Rather, the regulations, on their face, are concerned with people carrying items that are unwieldy or inconvenient with them into passenger cars. When the Central Pacific railroad forbade carriage of "[g]uns, umbrellas, walking sticks, baby wagons, saddles, jewelry boxes, lunch baskets, and parrots" because they "are not baggage, and must not, under any circumstances be checked," but permitted "[g]uns, in cases and not loaded, and canary birds, in cages" to be "carried in day or sleeping cars without charge," the railroad was not concerned with the safety of having armed passengers, but with the proper handling of unwieldy baggage and inconvenience to customers bringing large items with them into cars for passengers. CENTRAL PACIFIC RAILROAD AND LEASED LINES, *supra*, at 196, 204–05, Add.13–14 (The regulations do not, notably, forbid the carrying of any *other* weapon, including knives, for instance, and as discussed above "gun" in this context may not have been understood to denote a pistol.)

**3. If the government wants to declare a place "sensitive," it must treat that place as "sensitive" by securing it.**

Finally, both the State and the County assert that the Public Transit Ban can be justified by reference to the tradition of restricting firearms in certain "sensitive locations like courthouses, government buildings, legislative assemblies, polling places, schools, and 'analogous sensitive places.'" State Br. 13 (quoting *Bruen*, 597 U.S. at 30). This is wrong. Although *Heller* mentioned restrictions on firearm possession in "schools and government buildings" as presumptively constitutional, 554 U.S. at 626, the Court did not purport to resolve the precise contours of locations where firearms can be banned. And that is not surprising, given that sensitive place restrictions were not at issue in the case. *Bruen* provided further refinement. When discussing the "sensitive places" tradition in that case, the Court was much more fine-grained and singled out Founding-era "legislative assemblies, polling places, and courthouses[,]" as places where firearms had historically been restricted and invited analogies from them. *Bruen*, 597 U.S. at 30. Even so, the Court never specified the historical principles underlying restrictions on carry in these locations or in schools—again, an absence that is not

51

surprising given the nature of the law before the Court in *Bruen*. To the extent the government desires to benefit from these restrictions, then, it is incumbent upon it to establish the principles that should guide the analysis.

For schools, the principle is plain, and plainly inapplicable here— states traditionally exercised *in loco parentis* authority over students that allowed them to exercise enhanced authority over them. *Morse v. Frederick*, 551 U.S. 393, 413 n.3 (2007); *id.* at 416 (Thomas, J., concurring). Notably, Founding-era restrictions on firearm possessions in schools all applied only to students, *see, e.g.*, *The Minutes of the Senate Academicus, 1799-1842* at 86, UNIV. OF GA. LIBRS. (1976), https://perma.cc/J3ZV-XMEC (restriction dating to 1810), and they were frequently accompanied by other requirements and restrictions on students' freedoms that, absent *in loco parentis* authority, would have been certainly unconstitutional, *see, e.g., id.* at 38 ("Every Student, whether a Graduate or Undergraduate, shall be subject to the laws and government of the College and show in speech and behavior, all proper respect and obedience to the President, Professors and Tutors of the College.") (1803 restriction); *id.* at 85–86 ("If any scholar shall be guilty

of profane swearing … [or] [i]f he shall disturb others by noise[,] loud talking[,] or singing during the time of study[ ] … he shall for either of those offences be punished.") (1810 restriction). They therefore "say little about the general scope of Constitutional rights and protections." *Reese v. BATFE*, 127 F.4th 583, 596 (5th Cir. 2025); *see Worth*, 108 F.4th at 695.

For legislative assemblies, courthouses, and polling places, the unifying principle is the provision of enhanced, government-provided security that reduces the need for armed self-defense and effectively keeps bad actors from bringing arms where they are not allowed.

Founding era examples of government-provided security in these locations abound. Start with legislatures. Rhode Island, Delaware, Pennsylvania, South Carolina, New York, Georgia, New Jersey, Virginia, and Vermont enacted statutes compensating law enforcement to attend and provide security for legislatures. *See* THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND 220, 222 (Providence, Carter & Wilkinson 1798), Add.16–17 (providing fees for sheriffs, town sergeants, and constables to attend general assembly); 2 LAWS OF THE STATE OF DELAWARE 1100, 1118 (Samuel & John Adams eds., 1797), Add.22–23 (similar); 10 THE

53

STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801 at 376, 378 (William Stanley Ray ed., 1904), Add.26–27 (referencing sergeant-at-arms and door-keeper for legislature); THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 426–27 (Phila., R. Aitken & Son 1790), Add.33–34 (providing payment of door-keepers for legislature); An Act for the Support of the Government, *in* 1 LAWS OF THE STATE OF NEW YORK 532 (Charles R. & George Webster eds., 2d ed. 1802), Add.37 (similar); A COMPILATION OF THE LAWS OF THE STATE OF GEORGIA 372–73 (Augustine Smith Clayton ed., Augusta, Adams & Duyckinck 1812), Add.39–40 (similar); JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY 239–40 (Burlington, Isaac Collins, *reprinted by* Woodbury, Joseph Sailer 1835), Add.42–43 (similar); JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA 77 (Richmond, Thomas W. White 1828), Add.45 (similar); 1 LAWS OF THE STATE OF VERMONT 382, 387 (Randolph, Sereno Wright 1808), Add.47–48 (similar). Likewise, Maryland and New Hampshire appointed sergeants-at-arms or door-keepers. *See* VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND, NOVEMBER SESSION, 1791 at 2 (1791), Add.50 (recording appointment of sergeant-at-arms and door-keeper); VOTES AND

PROCEEDINGS OF THE SENATE OF THE STATE OF MARYLAND, NOVEMBER SESSION, 1791 at 1 (1791), Add.51 (similar); A JOURNAL OF THE PROCEEDINGS OF THE HONORABLE SENATE OF THE STATE OF NEW-HAMPSHIRE 6 (1808), https://perma.cc/Y7VF-UYV4 (similar).

As their name suggests, these positions carried with them obligations to secure the legislature, including from armed attack. Both were positions the Americans adapted from England's parliament, *see About the Sergeant at Arms: Historical Overview*, U.S. SENATE, https://perma.cc/GA5J-Q5F9, and in Parliament, both doorkeepers and sergeants-at-arms had long been tasked with securing the legislative chambers against unauthorized visitors and threats, *see, e.g.*, WILLIAM HAKEWELL, *MODUS TENENDI PARLIAMENTUM*: OR, THE OLD MANNER OF HOLDING PARLIAMENTS IN ENGLAND 22–23 (1671), https://perma.cc/4MZA-4M4Y, and they carried out those functions here following the Revolution, *See* THOMAS JEFFERSON, A MANUAL OF PARLIAMENTARY PRACTICE. FOR THE USE OF THE SENATE OF THE UNITED STATES § XVIII (1801), https://perma.cc/MC7J-J7FJ ("[T]he door of the house ought not to be shut, but to be kept by porters, or serjeants at arms, assigned for that purpose."); *see also* Jacob R. Straus, *Sergeant at Arms*

*and Doorkeeper of the Senate: Legislative and Administrative Duties* at 1–2, CONG. RSCH. SERV. (updated Mar. 21, 2011), https://perma.cc/D9HY-8WAF. In one notable incident, for example, three members of the Upper House of the Maryland legislature were refused admission to the Lower House "unless [they] first left [their] sword[s] with the doorkeeper," which they refused to do. RAPHAEL SEMMES, CAPTAINS AND MARINERS OF EARLY MARYLAND 285–86 (1937), https://perma.cc/7T7C-8WA4.

Courthouses were similarly, as now, secured. South Carolina, Virginia, Delaware, New Jersey, New York, and Pennsylvania by statute required law enforcement officials to attend court. *See* THE PUBLIC LAWS OF SOUTH CAROLINA, *supra*, at 271, Add.29 ("The Said sheriffs by themselves, or lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts."); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 69–71 (1803), Add.53–55 (similar); 2 LAWS OF THE STATE OF DELAWARE, *supra*, at 1088, 1091, Add.20–21 (similar); LAWS OF THE STATE OF NEW JERSEY 49–50, 58 (Joseph Bloomfield ed., Trenton, James J. Wilson 1811), Add.58–60 (similar); 1 LAWS OF NEW YORK, *supra*, at 176, Add.36 (requiring during court "all justices of the peace, coroners, bailiffs, and

constables within their respective counties, that they be then and there in their own persons… . And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); 10 STATUTES AT LARGE OF PENNSYLVANIA, *supra*, at 57, Add.25 (similar).

Beyond these statutory requirements, the legislative record in other states indicates that law enforcement officials were compensated for attending judicial proceedings. *See* ACTS AND LAWS OF THE STATE OF CONNECTICUT 63–65 (New London, Timothy Green 1784), Add.62–64; A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 471, 473–74, 478 (Robert & George Watkins eds., Phila., R. Aitken 1800), Add.66–69 (1792 law); 1 THE LAWS OF MARYLAND, ch. 25 (1799), Add.72–73 (1799 law); ACTS AND RESOLVES OF MASSACHUSETTS, 1786–87 at 235 (Boston, Adams & Nourse 1893), Add.76 (1786 law); THE LAWS OF THE STATE OF NEW HAMPSHIRE 112–16 (1797), Add.78–82; A MANUAL OF THE LAWS OF NORTH-CAROLINA 190–91, 196 (John Haywood ed., 3d ed. 1814), Add.84–86; THE PUBLIC LAWS OF RHODE ISLAND, *supra*, at 220, 222, Add.16–17; LAWS OF VERMONT, *supra*, at 382, 387, Add.47–48 (1798 law). And as is fairly implicit in the requirement that law-enforcement attend court, sheriffs or other law-enforcement officials were specifically directed to maintain

57

order and prevent violence there. *See* R. SHEARDOWN, THE DUTY OF CONSTABLES 16 (1790), https://perma.cc/4EYV-2T5Q ("It is a considerable part of your duty, under the directions of the high constable or bailiff of the hundred, to preserve quietness, order, and decency, in the *Courts of Justice*, where you are required to attend for that very purpose.").

Polling places were also secured by government-provided security at the Founding, including in Georgia, Virginia, New Jersey, Maryland, Delaware, and South Carolina. *See* A DIGEST OF THE LAWS OF GEORGIA, *supra*, at 611, Add.70 ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (Augustine Davis ed., 1796), Add.88 (similar); LAWS OF THE STATE OF NEW JERSEY, *supra*, at 36, Add.57 (providing security at polling places); MD. CONST. art. 1 §§ 3, 14 (1776), Add.89–90 (similar); 2 LAWS OF THE STATE OF DELAWARE, *supra*, at 984, Add.19 (similar); THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA, *supra*, at 386–88, Add.30–32 (table of fees includes payment to sheriffs for polling-place security).

In other words, the historical principle underlying these regulations strongly indicates that legislative assemblies, polling places, and courthouses were sensitive *because* the government treated them as such by providing comprehensive security. Their sensitive nature was never a matter of simple government fiat. As in *Rahimi*, that history teaches that the government can prohibit firearms only in places secured by its own comprehensive security "confirm[s] what common sense suggests[.]" 602 U.S. at 698. The point of the Second Amendment is ensuring that Americans can be "armed and ready," *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 584), for "ordinary self-defense needs," *id.* at 60. But when the government secures a location and protects those in it, there is less of a need for ordinary, law-abiding Americans to be ready to defend themselves. The problem for the State is that its public transit locations do not have these features. Visitors are not "screened by security" to ensure the absence of arms and transit facilities "do not have controlled entry points." *Bridgeville Rifle & Pistol Club*, 176 A.3d at 659.

Both the State and the County offer different visions of what it means for a place to be "sensitive." The State points out that *Wolford* rejected this argument, on the basis that, for example, polling places had

"few security measures—now or in the past." State Br. 44 (quoting *Wolford*, 116 F.4th at 981). But for the reasons just stated, *Wolford* was wrong on that point regarding past security. As for present security, that is irrelevant to whether the *past* restrictions were valid or whether present restrictions that comply with the historical principle would be justified. The Government cannot continue to insist a place remains "sensitive" if it withdraws from securing that place. That would be precisely the sort of "law trapped in amber" that *Rahimi* specifically refutes. 602 U.S. at 691. Indeed, if the Government suddenly defunded the United States Marshals, it would be nothing short of delusional, and obviously dangerous, to continue to act as though courthouses remained secure because it remains illegal to carry firearms on their premises. Anyone could see that the people who previously secured the place were gone. But it does not render the past prohibition unconstitutional because there had been security when the prohibition was in place.

The State nevertheless is wrong to suggest that its burden is less than the burden imposed by these historical restrictions because it does not outright ban firearms but rather permits them to be transported unloaded in cases. State Br. 34. That is not a lesser burden. In *Heller*,

firearms could be stored in homes in inoperable condition, but that was no better than a ban on their possession, since that "makes it impossible for citizens to use them for the core lawful purpose of self-defense." 554 U.S. at 630. If anything, the burden is more significant with the Public Transit Ban than with historical sensitive place laws. Most people seldom have occasion to visit polling places and courthouses, but many people rely on public transit every day to carry them from place to place. For those people, temporary disarmament is not an occasional and discrete event, but a daily limitation on their ability to defend themselves.

And even if this were a minor restriction, the State's and County's alternative rationales to justify it is anything *but* minor, and the State cannot hide behind an allegedly limited application of the broad principle if the principle would permit a much more sweeping infringement if adopted by this Court. Both claim for themselves the power to ban firearms in places that are "state-operated," where children are present, or in "confined spaces," as justifications for what makes them "sensitive." State Br. 37–39; *see* County Br. 45, 47–48. The County also argues sensitive places include anywhere where people exercise civic duties or constitutional rights, like courthouses or polling places. *See* County Br.

48. Even if true, the County makes no connection between this principle and banning firearms on public transit.

As for the state-owned claim, that cannot be a principle underlying the historical restrictions on the right to keep and bear arms because, as discussed in detail above, there is no "government proprietor" exception to the Constitution, and as an historical analogical matter, it sweeps far too broadly. It would excuse bans in a host of historical locations where they never were enacted or contemplated, and runs contrary to the cornerstone "principle[] underlying the Second Amendment," *Rahimi*, 602 U.S. at 692, that "law-abiding citizens with ordinary self-defense needs" have a general right carry arms for their self-defense except for in limited "exceptional circumstances," *Bruen*, 597 U.S. at 60, 70. The County's response, that the government's ability to ban firearms on its property is tied to its duty to protect people on its premises who cannot defend themselves because it has specifically limited their freedom, *see Weiland v. Loomis*, 938 F.3d 917, 921 (7th Cir. 2019), sounds in the same vein as Plaintiffs' argument that government security is the sine qua non of any "sensitive place" and it notably does not apply here, as the

government has taken on no such duty with respect to individuals who use the transit system.

As for the fact that children ride the train, children just as well go to restaurants, walk on sidewalks, ride in cars, frequent parks, and can be found almost anywhere that adults can be found—including the island of Manhattan, which the Supreme Court has already held is not a sensitive place. *See Bruen*, 597 U.S. at 31. The district court was right to disregard that as a possible justification, both because it would effectively permit the State to ban firearms wherever it chooses, notwithstanding the Second Amendment, but also because, as discussed above, the Founding-era response to the presence of crowds or vulnerable populations in places where the government could not provide security was to fall back on our country's robust tradition of permitting (and sometimes requiring) firearm carriage in public places, not banning them in name only. *See* Kopel & Greenlee, *supra*, at 232–34 & n.108.

Finally, there is no tradition of banning firearms because a place is crowded or confined. Indeed, *Bruen* refuted the notion that a place could be "sensitive" "simply because it is crowded," and the same rationale holds for places that are specifically "confined"—there too, the rationale

would support exempting essentially all buildings from the Second Amendment. 597 U.S. at 30–31. That conclusion is untenable.

## CONCLUSION

This Court should affirm the district court's judgment that the Public Transportation Ban is unconstitutional.

Dated: March 17, 2025

David G. Sigale
(Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
Tel: (630) 452-4547
Fax: (630) 596-4445
dsigale@sigalelaw.com

Respectfully submitted,

/s/David H. Thompson
David H. Thompson
   *Counsel of Record*
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Avenue,
N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellees*

64

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Circuit Rule 32(c) because it contains 12,994 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

March 17, 2025                      <u>/s/ David H. Thompson</u>
                                   David H. Thompson

                                   *Attorney for Plaintiffs-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 17, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ David H. Thompson</u>
David H. Thompson

*Attorney for Plaintiffs-Appellees*