**Nos. 24-2643, 24-2644 (cons.)**

# In the United States Court of Appeals
# for the Seventh Circuit

◆

BENJAMIN SCHOENTHAL, MARK WROBLEWSKI, JOSEPH VESEL, and
DOUGLAS WINSTON,

*Plaintiffs-Appellees*,

v.

KWAME RAOUL, in his official capacity as Attorney General of Illinois;
ROBERT BERLIN, in his official capacity as State's Attorney of DuPage
County, Illinois; and EILEEN O'NEILL BURKE, in her official capacity as
State's Attorney of Cook County, Illinois,

*Defendants-Appellants.*

◆

On Appeal from the United States District Court
for the Northern District of Illinois, Western Division
No. 3:22-cv-50326

◆

**BRIEF OF THE NATIONAL RIFLE ASSOCIATION
OF AMERICA AND THE CALIFORNIA RIFLE & PISTOL
ASSOCIATION AS *AMICI CURIAE* IN SUPPORT
OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

◆

ERIN M. ERHARDT
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
eerhardt@nrahq.org
*Counsel of Record*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2643

Short Caption: Schoenthal v. Raoul

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

          ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

National Rifle Assocation of America; California Rifle & Pistol Association, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

National Rifle Association of America

(3)    If the party, amicus or intervenor is a corporation:

        i)    Identify all its parent corporations, if any; and

            none

        ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

            none

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Erin M. Erhardt    Date: 3/21/2025

Attorney's Printed Name: Erin M. Erhardt

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address: 11250 Waples Mill Road, Fairfax, VA 22030

Phone Number: 720-584-4578    Fax Number: 703-267-3999

E-Mail Address: eerhardt@nrqhq.org

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................ii

STATEMENT OF *AMICI CURIAE* ........................................................1

CONSENT TO FILE ..............................................................................2

SUMMARY OF ARGUMENT .................................................................3

ARGUMENT ........................................................................................5

   I.   The Second Amendment's plain text covers carrying a
       handgun in public for self-defense.................................................5

  II.  History does not support banning firearms on public transit. ......6

    A.  All firearms regulations must be historically justified..............6

    B.  Earlier generations regulated the discharge, not carry, of
        firearms on public transportation. ..........................................10

 III.  History does not support treating public transit as a
     "sensitive place." .......................................................................15

    A.  Public transit does not provide a core function of
        deliberative government..........................................................17

    B.  Public transit is not treated as "sensitive" by the
        government. ............................................................................20

CONCLUSION ...................................................................................26

CERTIFICATE OF COMPLIANCE.......................................................27

CERTIFICATE OF SERVICE...............................................................28

# TABLE OF AUTHORITIES

## Cases

*Atkinson v. Garland*,
  70 F.4th 1018 (7th Cir. 2023) ............................................................. 9

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................. *passim*

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ......................................................................... 16

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ..................................................................... *passim*

*State v. Hill*,
  53 Ga. 472 (1874) ..................................................................... 19, 20

*United States v. Bena*,
  664 F.3d 1180 (8th Cir. 2011). ............................................................ 8

*United States v. Rahimi*,
  602 U.S. 680 (2024). ............................................................. 6, 7, 8, 9

*Wolford v. Lopez*,
  116 F.4th 959 (9th Cir. 2024) ............................................................. 2

## Constitutional Provisions

DEL. CONST. art. 28 (1776) ................................................................... 18

MD. CONST. art. 1 (1776) ..................................................................... 23

U.S. CONST. amend. II ............................................................. 5, 6, 9, 10

U.S. CONST. amend. XIV ....................................................................... 5

## Statutes

1647 Md. Laws 216 .................................................................................. 17

1650 Md. Laws 273 .................................................................................. 17

18 U.S.C. § 922(g)(1) ............................................................................... 9

18 U.S.C. § 922(g)(8) ........................................................................... 7, 8

1855 Ind. Acts 153 .................................................................................. 13

1870 La. Acts 159–60 .............................................................................. 18

1879 Wyo. Sess. Laws 97 ........................................................................ 13

1886 Md. Laws 315 .................................................................................. 18

1892 Ga. Laws 108 .................................................................................. 14

1897 Ga. Laws 96–97 .............................................................................. 14

1898–99 Ala. Laws 154 ........................................................................... 14

1899 Fla. Laws 93 ................................................................................... 14

430 ILCS 66/65(a)(8) ................................................................................ 3

## Other Authorities

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF
VIRGINIA (1803) ................................................................................... 22

A COMPILATION OF THE LAWS OF THE STATE OF GEORGIA (1812) .............. 21

A DIGEST OF THE LAWS OF TEXAS, vol. 2 (4th ed. 1874) ............................ 18

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA (1800) .................. 23, 24

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA (1796) ...... 23

ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA (1784) ...... 22

ACTS AND RESOLVES OF MASSACHUSETTS (1893)......................................22

Bostock, Bill, *The weird, Wild West-era origins of people yelling 'shotgun' when they want the front seat of a car*, BUSINESS INSIDER, Sept. 19, 2019.......................................................................................12

Brightly, Frederick C., A DIGEST OF THE LAWS OF PENNSYLVANIA FROM THE YEAR ONE THOUSAND SEVEN HUNDRED TO THE SIXTH DAY OF JUNE, ONE THOUSAND EIGHT HUNDRED AND EIGHT-THREE, vol. 2 (1885)......14

Clark, R.H., THE CODE OF THE STATE OF GEORGIA (1873).......................19

*History of the National Transit Database and Transit in the United States*, FEDERAL TRANSIT ADMINISTRATION..........................................11

Holmes, Oliver W., *The Stage-Coach Business in the Hudson Valley*, 12 Q.J. N.Y. STATE HIST. ASS'N 231 (1931) ..........................................11

*Horrific details emerge in CTA train shooting that left 4 victims dead*, NBC 5 Chicago, Sept. 3, 2024..............................................................25

Johnson, Nicholas, et. al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (3d ed. 2021)..................................12

JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA (Printed by Thomas W. White, 1828)...................................21

Kopel, David B. & Greenlee, Joseph G.S., *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205 (2018)...............................................18, 20

LAWS OF THE STATE OF DELAWARE, vol. 2 (1797) .........................21, 22, 23

LAWS OF THE STATE OF NEW JERSEY (Joseph Bloomfield, 1811) .......22, 24

LAWS OF THE STATE OF NEW YORK, vol. 1 (2nd ed. 1807)..................21, 22

Marino, Joe, et. al., *Cops identify NJ woman as mystery straphanger torched to death in horrific NYC subway attack*, NEW YORK POST, Dec. 31, 2024 .......................................................................................24

McCord, David J., STATUTES AT LARGE OF SOUT CAROLINA,
vol. 9 (1841) ................................................................... 11

Price, Stepheny, *NYC stabbing: Man arrested in connection to
unprovoked attack at Grand Central on Christmas Eve*,
FOX NEWS, Dec. 25, 2024................................................ 24

PROVINCIAL CONGRESS, JOURNAL OF THE VOTES AND PROCEEDINGS OF THE
PROVINCIAL CONGRESS OF NEW-JERSEY: HELD AT TRENTON IN THE
MONTH OF OCTOBER 1775 (1835).................................... 21

PUBLIC LOCAL LAWS OF MARYLAND, vol. 2, art. 11–24 (King Bros.,
ed., 1888) ..................................................................... 18

*Stagecoach Travel*, ENCYCLOPEDIA.COM ................................ 12

*Stagecoach Travel*, THE HENRY FORD MUSEUM OF AMERICAN
INNOVATION ................................................................. 11

*stagecoach*, ENCYCLOPEDIA BRITANNICA ............................... 10

THE LAW OF MARYLAND TO WHICH ARE PREFIXED THE ORIGINAL CHARTER,
vol. 1 (1799) ................................................................. 23

THE LAWS OF THE STATE OF NEW-HAMPSHIRE (1797) ............... 23

THE LAWS OF THE STATE OF VERMONT, vol. 2 (1808).......... 21, 23

THE PAPERS OF FREDERICK LAW OLMSTED, vol. 2 (Charles Capen
McLaughlin, ed., 1981) .................................................. 13

THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND (1798)........ 21, 23

THE PUBLIC LAWS OF THE STATE OF SOUTH-CAROLINA (1790) ..... 21, 22, 23

THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, vol. 10
(Wm. Stanley Ray 1904) ............................................. 21, 22

Tsui, Karina, et. al*, Man charged with attempted murder after New
York subway shoving*, CNN, Jan. 1, 2025 ......................... 25

*Young Scalia carried rifle while riding N.Y. subway*, DESERET NEWS, (Feb. 27, 2006, 12:00 AM) ................................................................. 12

## STATEMENT OF *AMICI CURIAE*[1]

The National Rifle Association of America (NRA) is America's oldest civil rights organization and foremost defender of Second Amendment rights. It was founded in 1871 by Union generals who, based on their Civil War experiences, sought to promote firearms marksmanship and expertise amongst the citizenry. Today, the NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA has approximately four million members, and its programs reach millions more.

Founded in 1875, California Rifle & Pistol Association, Inc. (CRPA) is a nonprofit organization that seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. In service of its mission to preserve the constitutional and statutory rights of gun ownership, CRPA regularly participates as a party or *amicus* in firearm-related litigation. Recently, CRPA prevailed in the Ninth Circuit against

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *Amici* and their members contributed money intended to fund its preparation or submission.

a similar ban on carrying on public transportation. *See Wolford v. Lopez*, 116 F.4th 959, 1001 (9th Cir. 2024) ("Unlike a ban on carrying at, say, the circus, a ban on carrying on public transit unavoidably affects some persons' rights to bear arms on a nearly daily basis.").

*Amici* have an interest in this case because the right to keep and bear arms encompasses the right to carry arms in public for self-defense, and carrying arms for self-defense necessarily includes the right to have those arms ready for use in case of confrontation.

## CONSENT TO FILE

All parties consent to the filing of this brief.

## SUMMARY OF ARGUMENT

Over the past several years, news headlines have been rife with stories of violent incidents by bad actors against innocent public transit riders: waiting passengers being pushed onto subway tracks, riders being terrorized by other passengers, knife attacks, even a woman burned alive as she slept on a train.

Understandably, many people who use public transportation want to do what they can to protect themselves. One way Plaintiffs wish to protect themselves is by carrying firearms for self-defense while on public transit. In order to be an effective tool in case of confrontation, a firearm necessarily must be accessible and loaded. Yet the Illinois Firearm Concealed Carry Act, 430 ILCS 66/65(a)(8) (hereinafter the "Public Transit Ban"), requires concealed handguns on public transit to be unloaded and secured—effectively rendering them useless in case of confrontation.

The Public Transit Ban is unconstitutional. Plaintiffs' proposed conduct—carrying a firearm in public for purposes of self-defense—is plainly covered by the text of the Second Amendment. Therefore, the

government bears the burden of demonstrating that the Ban is supported by the history and tradition of firearms regulation in this country.

It is not. First, there is no historical tradition of banning firearms on public transit. At best, previous generations regulated the *discharge* of firearms on public transit, but did not restrict the mode or manner of carry. Second, public transit is not analogous to historical "sensitive places." It does not provide a core function of government deliberation, nor does the government treat it as a sensitive place by providing for passengers' security. There is no historical basis for the Public Transit Ban.

# ARGUMENT

## I.  The Second Amendment's plain text covers carrying a handgun in public for self-defense.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022).

*Bruen* plainly established that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. at 10; *see also id.* at 33 ("The Second Amendment's plain text … presumptively guarantees … a right to 'bear' arms in public for self-defense."); *see also District of Columbia v. Heller*, 554 U.S. 570, 584 (2008) ("bear arms" "refers to carrying for a particular purpose—confrontation."). Plaintiffs, who are licensed concealed-carry permit holders, want to carry firearms on public transit for purposes of self-defense. Def.'s Br. at 5–6. Thus, the Second Amendment "presumptively protects" Plaintiffs' proposed course of conduct, and the government bears the burden of demonstrating that its Public Transit

Ban is consistent with this country's history of firearm regulation. The government has not carried that burden, nor can it.

## II. History does not support banning firearms on public transit.

### A. All firearms regulations must be historically justified.

The *Bruen* Court declared that its text-and-history test was "*the standard* for applying the Second Amendment," 597 U.S. at 24 (emphasis added), and explained thrice that the *only* way the government can justify a firearms regulation is with historical tradition, *id.* at 17 ("*Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.") (quotation marks omitted and emphasis added); *id.* at 24 ("*Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.) (quotation marks omitted and emphasis added); *id.* at 34 ("*Only if* respondents carry that burden can they show that the pre-existing right codified in the Second Amendment . . . does not protect petitioners' proposed court of conduct.") (emphasis added).

The *Bruen* Court—and, more recently, the *Rahimi* Court—made clear that this historical test applies even to the "presumptively lawful" regulations identified in *Heller*, 554 U.S. at 627 n.26. *Heller* deemed three categories of "longstanding" laws "presumptively lawful": "prohibitions on the possession of firearms by felons and the mentally ill"; "laws imposing conditions and qualifications on the commercial sale of arms"; and "laws forbidding the carrying of firearms in sensitive places." *Id.* at 626–27 & n.26.

In *Bruen*, the government "attempt[ed] to characterize New York's proper-cause requirement as a 'sensitive-place' law." 597 U.S. at 30. The Court consulted "the historical record" to determine what "locations were 'sensitive places'" and concluded that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York Police Department." *Id.* at 30–31. *Bruen* thus held the alleged "sensitive place" restriction to the same historical standard that applies to all firearms regulations.

*Rahimi* similarly considered a regulation—18 U.S.C. § 922(g)(8)— that some lower courts had analogized to the "presumptively lawful"

regulations on firearm possession by felons and the mentally ill. *United States v. Rahimi*, 602 U.S. 680, 699 (2024); *see also, e.g., United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) ("this statute—like prohibitions on the possession of firearms by violent felons and the mentally ill—is focused on a threat presented by a specific category of presumptively dangerous individuals."). Significantly, however, the *Rahimi* Court declined to assume the prohibition was "presumptively lawful." Instead, the Court analyzed Section 922(g)(8) the same way it analyzed the sensitive place argument in *Bruen*—by "considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi,* 602 U.S. at 692.

*Bruen*'s and *Rahimi*'s treatment of "presumptively lawful" regulations is consistent with *Heller*, which indicated that those regulations must still be historically justified. The *Heller* Court specified that "nothing *in our opinion* should be taken to cast doubt on" the "presumptively lawful" categories of regulations noted therein, 554 U.S. at 626 (emphasis added), and further asserted that "there will be time enough to expound upon *the historical justifications* for the exceptions we have mentioned if and when those exceptions come before us," 554 U.S.

8

at 635 (emphasis added). Thus, *Heller* merely maintained the status quo for those "presumptively lawful" regulations, leaving the historical and constitutional analysis thereof for a later day.

In fact, this Circuit has already recognized that the historical analysis applies to *Heller*'s categories of "presumptively lawful" regulations. *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023). In *Atkinson*, the government urged this court to skip the historical analysis of 18 U.S.C. § 922(g)(1) "based on oft-quoted dicta describing felon-in-possession laws as 'presumptively lawful.'" *Id.* (quoting *Heller*, 554 U.S. at 626–27 & n.26). This court refused, holding that "[n]othing allows us to sidestep *Bruen* in the way the government invites" and "return[ing] the case to the district court for a proper, fulsome analysis of the historical tradition supporting § 922(g)(1)." *Id.*

The Supreme Court has clearly and repeatedly defined its Second Amendment analysis. *See Bruen*, 597 U.S. at 17, 24; *Rahimi*, 602 U.S. at 692. As this Circuit recognized in *Atkinson*, the Court has not articulated an exception for regulations it deemed "presumptively lawful" in *Heller*. Rather, the Court has expressly stated that "a court [may] conclude that the individual's conduct falls outside the Second Amendment's"

protection "*[o]nly if* a firearm regulation is consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at 17. Thus, for the Public Transit Ban to stand, the government must demonstrate that it is consistent with this country's historical tradition of firearm regulation. It cannot do so.

## B. Earlier generations regulated the discharge, not carry, of firearms on public transportation.

*Bruen* instructs that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing the problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 597 U.S. at 26. Moreover, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26–27.

Firearms, public transportation, and the risk of violence thereon have all existed since the 18th century. In early America, overland public transportation was accomplished by stagecoaches: "public coach[es] regularly travelling a fixed route between two or more stations (stages)." *stagecoach*, ENCYCLOPEDIA BRITANNICA, https://www.britannica.com/technology/stagecoach-vehicle (last visited Mar. 20, 2025). "The stagecoach

10

was the major vehicle for overland group transport until railroads began to dominate in the 1850s." *Stagecoach Travel*, THE HENRY FORD MUSEUM OF AMERICAN INNOVATION, https://www.thehenryford.org/collections-and-research/digital-collections/expert-sets/11773/ (last visited Mar. 20, 2025); *see also* Oliver W. Holmes, *The Stage-Coach Business in the Hudson Valley*, 12 Q.J. N.Y. STATE HIST. ASS'N 231, 232–33 (1931) ("Staging had developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia.").

For transportation along and across waterways, ferries and riverboats were common during the Founding era. Boston operated a public ferryboat by 1630. *History of the National Transit Database and Transit in the United States*, FEDERAL TRANSIT ADMINISTRATION, https://www.transit.dot.gov/ntd/history-ntd-and-transit-united-states (last visited Mar. 20, 2025). And South Carolina established a "public ferry" by 1725. 9 David J. McCord, STATUTES AT LARGE OF SOUTH CAROLINA 60–61 (1841).

Yet firearms were not historically prohibited on public transportation. "Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching carbines, or (most

often) a pair of ordinary pistols." Nicholas Johnson, et. al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021). In fact, "[o]ne common form of entertainment was to shoot at the wild animals, such antelope and prairie dogs, visible from coach windows"—a sport that necessarily required passengers to carry loaded weapons on board. *Stagecoach Travel*, ENCYCLOPEDIA.COM, https://www.encyclopedia.com/science-and-technology/technology/technology-terms-and-concepts/stagecoach (last visited Mar. 20, 2025).[2] And the "age-old trick of calling 'shotgun' to claim the front passenger seat of a car" dates back to the stagecoach era, when a guard armed with a shotgun "used to ride alongside a stagecoach driver as his protection, keeping a keen eye out for bandits and highwaymen." Bill Bostock, *The weird, Wild West-era origins of people yelling 'shotgun' when they want the front seat of a car*, BUSINESS INSIDER (Sept. 19, 2019,

---

[2] Much more recently—circa 1950—future Supreme Court Justice Antonin Scalia was part of his school's rifle team and would "travel on the subway from Queens to Manhattan with a rifle." *Young Scalia carried rifle while riding N.Y. subway*, DESERET NEWS, (Feb. 27, 2006, 12:00 AM), https://www.deseret.com/2006/2/27/19940521/young-scalia-carried-rifle-while-riding-n-y-subway/.

2:49 AM), https://www.businessinsider.com/wild-west-origin-shotgun-front-seat-car-2019-8.

As railroads became popular, individuals continued the practice of carrying firearms on public transit. Frederick Law Olmsted wrote about a young man "walking through with the handle of a Colt out of his pocket-skirt behind" on a Kentucky railroad car in 1853; his companions described this practice of carrying handguns as "common[]." 2 THE PAPERS OF FREDERICK LAW OLMSTED 232–33 (Charles Capen McLaughlin, ed., 1981).

Defendants make much of the fact that, as railroads became common in the late nineteenth century, some private railroads prohibited the carriage of firearms by passengers. Def.'s Br. at 19–21. But rules of private companies do not define the Nation's public regulatory tradition. Indeed, at the same time *private companies* were prohibiting firearms in passenger railcars, *states* were addressing the problem of violence on public transportation in a different—and much less burdensome—way: by prohibiting the discharge of weapons on public transport. *See* 1855 Ind. Acts 153 (making it a misdemeanor to shoot "at or against any locomotive, or car, or train of cars containing persons, on any railroad in

13

this State"); 1879 Wyo. Sess. Laws 97 ("It shall be unlawful for any person in this territory to fire any rifle, revolver, or other fire arm of any description whatever from any window, door, or other part of any railroad car or train"); 1892 Ga. Laws 108 (making it a misdemeanor to "shoot while in such car or cars [of a passenger train of a railroad] any gun, pistol, or other weapon"); 1897 Ga. Laws 96–97 ("it shall be unlawful for any person to fire any pistol, gun or other firearm on any excursion train, or at any picnic, except in his or her defense"); 1898–99 Ala. Laws 154 ("That it shall be unlawful for any person to discharge any gun, pistol, or other firearm, except in self defense, while on a passenger train in this State; or to recklessly handle any firearm or other weapon in the presence of any other person or persons on any train carrying passengers in this State."); 1899 Fla. Laws 93 (same); 2 Frederick C. Brightly, A DIGEST OF THE LAWS OF PENNSYLVANIA FROM THE YEAR ONE THOUSAND SEVEN HUNDRED TO THE SIXTH DAY OF JUNE, ONE THOUSAND EIGHT HUNDRED AND EIGHT-THREE 1451 (1885) (1876 law prohibiting the "discharge [of] any pistol or gun … in or near the building" of any railway).

Thus, history shows that public transportation, and the problem of firearms violence thereon, has existed throughout America's history. Yet

earlier generations of legislators dealt with the problem in a distinctly different way: by regulating the discharge of firearms, not the mode or manner of carry. Under *Bruen*'s "fairly straightforward" inquiry, then, Illinois's public transit ban is unconstitutional. *See Bruen*, 597 U.S. at 26.

## III. History does not support treating public transit as a "sensitive place."

The state cannot save its public transit ban by analogy to historically "sensitive" government buildings.

*Bruen* recognized that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." 597 U.S. at 28. Therefore, when a regulation "implicate[s] unprecedented societal concerns or dramatic technological changes," the historical analysis "may require a more nuanced approach." *Id.* at 27. In such a case, "the historical inquiry … will … involve reasoning by analogy." *Id.* at 28. But *Bruen* also specified that "analogies to those historical regulations of 'sensitive places'" are appropriate only when considering "regulations prohibiting the carry of firearms in *new* and analogous sensitive places." *Id.* at 30 (emphasis in original). And public transit is

not new. Its form and usage may have been updated and expanded in the intervening centuries, but as discussed *supra*, various modes of public transportation have existed since the American Founding.

Nevertheless, the government claims public transit is a "sensitive place" because it is a government operation susceptible to crowding by vulnerable populations. Def.'s Br. at 32. But *Bruen* did not say that all government buildings or operations are sensitive; rather, *Bruen* points out that "the historical record yields relatively few 18th- and 19th-century" government buildings "where weapons were altogether prohibited": specifically, "legislative assemblies, polling places, and courthouses." 597 U.S. at 30.[3] Even if analogies to historical "sensitive places" were appropriate in the instant case—and they are not—public transit is analogous to none of these.

"*Heller* and *McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010)] point toward at least two metrics" that can determine whether

---

[3] Additionally, a location is not sensitive simply because it is crowded. *See Bruen*, 597 U.S. at 31 ("[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly…. [T]here is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded.").

regulations are "relevantly similar under the Second Amendment": "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29 (emphasis added). Both the "how" and "why" are different for public transit than for legislative assemblies, polling places, and courthouses. The latter are all places of government deliberation—the core functions of democratic government. Public transit is not. And since the earliest days of America, states treated legislative assemblies, polling places, and courthouses as "sensitive" by providing for armed security at those locations. Public transit passengers do not generally enjoy such protection.

### A. Public transit does not provide a core function of deliberative government.

Traditional "sensitive places"—legislative assemblies, polling places, and courthouses—are all bastions of government deliberation. Historically, arms prohibitions in these locations have been allowed in order to prevent interference with the deliberative process by means of armed intimidation.

Maryland forbade carrying arms in the state legislature over a century before the American Founding, in 1647 and 1650. 1647 Md. Laws 216; 1650 Md. Laws 273.

With regard to polling places, the only Founding era ban was in Delaware, which included an article in its constitution banning arms at polling places, in order to prevent intimidation. DEL. CONST. art. 28 (1776). More polling place bans followed during the Reconstruction era, when groups like the Ku Klux Klan would show up armed to prevent blacks and Republicans from voting. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 244–45 (2018). During the 1870s and 1880s, two states and two counties enacted laws restricting firearms on election days. 1870 La. Acts 159–60 (Louisiana law prohibiting all carry of firearms and other dangerous weapons "on any day of election during the hours the polls are open, or on any day or registration or revision of registration, within a distance of one-half mile of any place of registration or revision"); 2 A DIGEST OF THE LAWS OF TEXAS 1317–18 (4th ed. 1874) (Texas law prohibiting all carry of firearms and other dangerous weapons "on any day of election, during the hours the polls are open, within a distance of one half mile of any place of election"); 2 PUBLIC LOCAL LAWS OF MARYLAND, art. 11–24, at 1457 (King Bros., ed., 1888) (Kent County law prohibiting carry of firearms and other

weapons "on the days of election); 1886 Md. Laws 315 (Calvert County law prohibiting all carry of firearms and other weapons "on the days of election and primary election within three hundred yards of the polls.").[4]

The state of Georgia prohibited carrying arms into a court of justice. R.H. Clark, THE CODE OF THE STATE OF GEORGIA (1873), § 4528 (1870 law); *see also State v. Hill*, 53 Ga. 472 (1874). In the first case analyzing a "sensitive place" ban, the Georgia Supreme Court upheld the prohibition, holding that "the right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms." *Hill*, 53 Ga. at 477–78. Moreover, one's "right of free access to the courts is just as much restricted" by armed intimidation in the courtroom "as is the right to bear arms infringed by prohibiting the practice before courts of justice." *Id.* at 478. Thus, a limited prohibition on carrying arms was justified for "the fulfillment of the other constitutional duties … provided the restriction does not interfere with the ordinary bearing and using

---

[4] In fact, according to gun control advocate Giffords, even as recently as the 2020 election, only "[s]ix states and the District of Columbia explicitly prohibit guns at polling locations altogether, while an additional four states prohibit concealed firearms at the polls." *Preventing Armed Voter Intimidation*, GIFFORDS LAW CENTER (Sept. 25, 2020), https://giffords.org/lawcenter/report/preventing-armed-voter-intimidation-a-state-by-state-analysis/.

arms, so that the 'people' shall become familiar with the use of them." *Id.* at 483.

Thus, history shows that the only government buildings that were traditionally considered "sensitive places" were those that were "centers of government deliberation"—places where disputes were settled, where laws were made, and where votes were cast. *See* Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. at 244. However important public transit may be in the everyday life of many Americans, public transit does not serve a core function of government deliberation and therefore is not "sensitive" for the same reasons—*Bruen*'s "why"—as legislative assemblies, polling places, and courthouses.

## B.    Public transit is not treated as "sensitive" by the government.

In addition to being homes of government deliberation, the core government buildings historically considered "sensitive places" shared another important characteristic: they were protected by armed security. When the government assumes security for a location, the need for armed self-defense is reduced.

By 1800, several state legislatures paid guards.[5] More states followed suit during the first decade of the 1800s.[6] Thus, by the end of the 1810s, nine of the seventeen states then admitted to the Union provided for paid armed security at their legislative assemblies.

Fully thirteen of the sixteen states admitted by the turn of the 19th century provided for armed security at court proceedings. Five required

---

[5] PROVINCIAL CONGRESS, JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW-JERSEY: HELD AT TRENTON IN THE MONTH OF OCTOBER 1775, at 239–40 (1835) (outlining payment "to the door keeper"); 10 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 376, 378 (Wm. Stanley Ray 1904) (outlining fees for "The sergeant-at-arms," "The door-keeper of the council and the door-keeper of the house of assembly"); JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA 77 (Printed by Thomas W. White, 1828) (providing "allowances" for the sergeant-at-arms and door-keepers); THE PUBLIC LAWS OF THE STATE OF SOUTH-CAROLINA 426–27 (1790) (providing for the payment of "Two Door-keepers"); 2 LAWS OF THE STATE OF DELAWARE 1100, 1118 (1797) (outlining "fees belonging to the Sergeant at Arms" and "Fees to the Door-keepers of the respective Houses"); THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND 220, 222 (1798) ("Sheriffs," "Town Sergeants, and Constables" are allowed fees for "attending the General Assembly"); 2 THE LAWS OF THE STATE OF VERMONT 382, 387 (1808) (1798 law providing compensation for sheriffs and constables for "attendance on the general assembly").

[6] 1 LAWS OF THE STATE OF NEW YORK 532 (2nd ed. 1807) (allocating funds for "the serjeant at arms and the door keepers of the senate and assembly"); A COMPILATION OF THE LAWS OF THE STATE OF GEORGIA 372–73 (1812) (1808 law providing funds "to the messenger and door-keeper of the Senate, and messenger and door-keeper of the House of Representatives").

the attendance of sheriffs or constables as a matter of course.[7] A sixth did

not outright require such attendance, but gave courts "power to ... compel

the attendance of sheriffs, coroners, constables, and other ministerial

officers." 10 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO

1801, at 57 (Wm. Stanley Ray 1904) (1780 law). And another seven

provided compensation for sheriffs and constables to attend court

proceedings.[8]

---

[7] THE PUBLIC LAWS OF THE STATE OF SOUTH-CAROLINA 268, 271 (1790) (providing that "sheriffs shall by themselves, or their lawful deputies respectfully, attend all the courts hereby appointed, or directed to be held, within their respective districts."); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 69–71 (1803) (1792 law stating "The keeper of the public jail, shall constantly attend the General Court" and "the Sheriff, or so many of the Under-Sheriffs as shall be thought necessary, of the County where such Court may be held, shall attend the said Court during their Sessions."); 2 LAWS OF THE STATE OF DELAWARE 1088, 1091 (1797) (1793 law providing that "the Sheriff of Kent county . . . shall be attendant on the said High Court of Errors and Appeals during the sitting thereof."); LAWS OF THE STATE OF NEW JERSEY 49, 50, 58 (Joseph Bloomfield ed., 1811) (1798 law providing that "the constables of the several townships in such county shall be the ministerial officers of the said court" and "shall be appointed to attend the jury."); 1 LAWS OF THE STATE OF NEW YORK 172 (2nd ed. 1807) (1801 law requiring "sheriffs and their officers" to attend court "to do those things which to their officers shall appertain.").

[8] ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 63–65 (1784) (outlining a fee schedule for court attendance by sheriffs and constables); ACTS AND RESOLVES OF MASSACHUSETTS 235 (1893) (1786 law providing for payment to "[e]very Constable who shall attend the

A handful of states during the Founding era also provided security

at polling places. Maryland, Virginia, and South Carolina accomplished

this by having sheriffs administer and judge elections.[9] Georgia and New

---

Supreme Judicial Court, or Court of General Sessions of the Peace, or Common Pleas."); A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 471, 473–74, 478 (1800) (1792 law providing for fees for court attendance for sheriffs and constables); THE LAWS OF THE STATE OF NEW-HAMPSHIRE 112–16 (1797) (providing "Sheriff's fees" for "every trial," "attending the grand jury," and "attending the petit jury."); THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND 220, 222 (1798) ("The Sheriffs" and "Town Sergeants, and Constables" "shall be allowed" fees for attendance at "the Supreme Judicial Court, and the Courts of Common Please, by the day."); 2 THE LAWS OF THE STATE OF VERMONT 382, 387 (1808) (1798 law providing for payment to sheriffs and constables for "attending before a justice's court, when required," "attending freeholders' courts," and "attendance on the … supreme or county court."); 1 THE LAW OF MARYLAND TO WHICH ARE PREFIXED THE ORIGINAL CHARTER, ch. XXV (1799) (providing for payment for "[e]very Constable who shall attend the Supreme Judicial Court, or Court of General Sessions of the Peace, or Common Pleas.").

[9] MD. CONST. art. 1, §§ 3, 14 (1776) ("[T]he Sheriff of each county, or . . . his Deputy . . . shall hold and be the judge of the said election"); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (1796) (1778 law providing that "[t]he sheriff shall attend and take the poll at such election, entering the names of the persons voted for."); THE PUBLIC LAWS OF THE STATE OF SOUTH-CAROLINA 386–88 (1790) (providing payment to the sheriffs for "publishing writs for electing members of the General Assembly, taking the ballots and returning the writ."); 2 LAWS OF THE STATE OF DELAWARE 984 (1797) ("the Sheriffs" and other officials are "to attend, conduct, and regulate the election.").

Jersey required the attendance of sheriffs or constables specifically for purposes of keeping the peace.[10]

Public transit passengers, by contrast, are not generally protected by the presence of armed security. This fact has become painfully obvious in recent months, as numerous fatal and near-fatal incidents have occurred across the country. On December 22, 2024, a woman was set on fire on the New York subway. Joe Marino, et. al., *Cops identify NJ woman as mystery straphanger torched to death in horrific NYC subway attack*, NEW YORK POST (Dec. 31, 2024, 10:47 AM), https://nypost.com/2024/12/31/us-news/mystery-woman-torched-to-death-in-horrific-nyc-subway-attack-finally-identified-by-cops-sources/. On December 24, two people were slashed at New York City's Grand Central Station. Stepheny Price, *NYC stabbing: Man arrested in connection to unprovoked attack at Grand Central on Christmas Eve*, FOX NEWS (Dec. 25, 2024, 7:39 PM), https://www.foxnews.com/us/nyc-

---

[10] A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 611 (1800) (sheriffs must attend elections "for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); LAWS OF THE STATE OF NEW JERSEY 36 (Joseph Bloomfield ed. 1811) (providing constables and other election officers with authority to detain "riotous" or "disorderly" people to maintain "good order" and "for the security of the election officers from insult and personal abuse.").

stabbing-man-arrested-connection-unprovoked-attack-grand-central-
christmas-eve?msockid=047bbd772a806d9c204faeb62b206ca8.          On
December 31, a man was pushed off a platform onto New York City
subway tracks. Karina Tsui, et. al*., Man charged with attempted murder
after New York subway shoving*, CNN (Jan. 1, 2025, 3:01 AM),
https://edition.cnn.com/2025/01/01/us/man-charged-attempted-murder-
new-york-subway-shoving-hnk/index.html.

These are just three examples, from a single city in a single month,
of unprovoked attacks on unarmed victims utilizing public
transportation. But this violence is not limited to New York City. In
Illinois—where Plaintiffs in this case live and seek to carry firearms on
public transit for self-defense, four victims were killed on a Chicago
Transit Authority train in September. *Horrific details emerge in CTA
train shooting that left 4 victims dead*, NBC 5 CHICAGO (Sept. 3, 2024,
6:15    AM),          https://www.nbcchicago.com/news/local/horrific-details-
emerge-in-cta-train-shooting-that-left-4-victims-dead/3537544/.

Far from protecting vulnerable populations, then, all a public
transit ban does is prevent innocent, law-abiding victims from carrying

tools to defend themselves—while doing nothing to ensure their safety against criminal attackers.

Public transit is not analogous to "sensitive" government locations. They are dissimilar in both how they are treated by the government—traditionally "sensitive" government locations are protected by armed security; public transit is not generally protected—and why—traditionally "sensitive" government locations perform core functions of deliberative government; public transit does not. Public transit is not a "sensitive place." The state cannot save its ban by claiming it is.

***

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s/ *Erin M. Erhardt*
ERIN M. ERHARDT
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
eerhardt@nrahq.org
*Counsel of Record*

Counsel for *Amici Curiae*

26

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,063 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Erin M. Erhardt*
Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on March 21, 2025, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Erin M. Erhardt*
Counsel for *Amici Curiae*

28