Nos. 24-2643, 24-2644 (consol.)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| BENJAMIN SCHOENTHAL, MARK WROBLEWSKI, JOSEPH VESEL, and DOUGLAS WINSTON, | ) Appeal from the United States<br>) District Court for the Northern<br>) District of Illinois, Western<br>) Division |
| Plaintiffs-Appellees, | ) |
| | ) |
| v. | ) |
| | ) |
| KWAME RAOUL, in his official capacity as Attorney General of Illinois; ROBERT BERLIN, in his official capacity as State's Attorney of DuPage County, Illinois; and EILEEN O'NEILL BURKE, in her official capacity as State's Attorney of Cook County, Illinois, | ) No. 3:22-cv-50326<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | ) The Honorable |
| | ) IAIN D. JOHNSTON, |
| Defendants-Appellants. | ) Judge Presiding. |

**REPLY BRIEF OF DEFENDANTS-APPELLANTS
KWAME RAOUL AND ROBERT BERLIN**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

**ALEX HEMMER**
Deputy Solicitor General
**R. SAM HORAN**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3312

Attorneys for Defendants-Appellants
Kwame Raoul and Robert Berlin

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................ii

ARGUMENT ...........................................................................................1

I.    The public-transit restriction is consistent with the Nation's historical tradition of regulating firearms on passenger railroads......................................1

A.    The Nation has a well-established historical tradition of prohibiting firearms in crowded spaces. ...........................................................2

1.    Plaintiffs' methodological criticisms of *Antonyuk* and *Wolford* are meritless.................................................................................2

2.    Plaintiffs' objections to specific analogues do not undermine the existence of a relevant historical tradition. ...................................5

3.    Historical laws requiring carriage at certain public assemblies do not change the analysis. ..........................................................8

B.    The public-transit restriction is relevantly similar to historical firearm restrictions on passenger railroads..........................................12

1.    Passenger-railroad firearm regulations are valid historical analogues under *Bruen*. ..................................................................12

2.    The public-transit restriction is consistent with passenger-railroad firearm regulations in how and why it restricts the right to armed self-defense.................................................................15

II.   The public-transit restriction is consistent with the Nation's historical tradition of regulating firearms in sensitive places. ...........................................18

A.    Plaintiffs' proposed sensitive-place standards ignore precedent, history, and common sense.......................................................19

B.    Plaintiffs' other arguments lack merit....................................24

CONCLUSION .......................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Andrews v. State,*
    50 Tenn. 165 (1871)........................................................................................ 8

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024) ..................................................................*passim*

*Bevis v. City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023)............................................... 3, 12, 17, 26

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .................................................................. 3, 8, 19, 25

*Dowd v. Albany Ry.,*
    62 N.Y.S. 179 (App. Div. 1900) ........................................................... 18

*English v. State,*
    35 Tex. 473 (1871) ................................................................................. 8

*Hill v. State,*
    53 Ga. 472 (1874)................................................................................... 7

*Nat'l Rifle Ass'n v. Bondi,*
    133 F.4th 1108 (11th Cir. 2025) (*en banc*)........................................... 4, 9, 13, 16

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) .................................................................*passim*

*Olcott v. Supervisors,*
    83 U.S. (16 Wall.) 678 (1872) ............................................................. 15

*State v. Shelby,*
    2 S.W. 468 (Mo. 1886).................................................................... 7, 8

*State v. Wilforth,*
    74 Mo. 528 (1881) ............................................................................... 7

*Township of Pine Grove v. Talcott,*
    86 U.S. (19 Wall.) 666 (1874) ............................................................. 15

*Wolford v. Lopez,*
    116 F.4th 959 (9th Cir. 2024)...................................................*passim*

*United States v. Class*,
  930 F.3d 460 (D.C. Cir. 2019) ............................................................ 20

*United States v. Rahimi*,
  602 U.S. 680 (2024) ........................................ 3, 6, 9, 10, 16, 19, 24, 27

*United States v. Rush*,
  130 F.4th 633 (7th Cir. 2025).............................................................. 4

## Historical Statutes

2 *Laws of the State of Delaware* (1797),
  https://tinyurl.com/5futnh8h ............................................................ 22

19 (pt. 1) *The Colonial Records of the State of Georgia*
  (Allen D. Candler ed., 1911), https://tinyurl.com/487k8e7d ............................ 10

1 *Laws of the State of New York* (1802),
  https://tinyurl.com/32d9txpj ............................................................ 21

10 *The Statutes at Large of Pennsylvania from 1682 to 1801*
  (James T. Mitchell & Henry Flanders eds., 1904),
  https://tinyurl.com/4fdes8fj ............................................................ 20

1869-1870 (1st Sess.) Tenn. Pub. Acts 23, ch. 22, § 2.............................. 5, 16

1870 Tex. Gen. Laws 63, ch. 46, § 1.................................................. 19

## Statutes

720 ILCS 5/24-1 ...................................................................... 25

## Other Authorities

John Adams, *Adams' Argument for the Defense*, Nat'l Archives,
  https://tinyurl.com/5n84cdw9 (last visited May 2, 2025)................................ 11

Brief of *Amicus Curiae* the Independent Institute in Support of Petitioners,
  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)
  (No. 20-843), 2021 WL 3127146.......................................................... 14

*Cornelius Mills (c.1755-1823)*, Archives of Md.,
  https://tinyurl.com/y5f4zssx (last visited May 2, 2025) .............................. 22

*Fire-arms*, *A Comprehensive Dictionary of the English Language*
  (Joseph E. Worcester ed., 1871), https://tinyurl.com/2pjbw63h........................ 16

Mark Anthony Frassetto, Essay, *Meritless Historical
  Arguments in Second Amendment Litigation*,
  46 Hastings Const. L.Q. 531 (2019) .................................................................. 11

*Gun*, *A Comprehensive Dictionary of the English Language*
  (Joseph E. Worcester ed., 1871), https://tinyurl.com/2pjbw63h ........................ 16

Joshua Hochman, Note, *The Second Amendment on Board:
  Public and Private Historical Traditions of Firearm Regulation*,
  133 Yale L.J. 1676 (2024) ............................................................................ 17, 18

Ill. Bd. of Higher Educ., *IBHE First Look —
  Fall Enrollment 2024-25* (2024), https://tinyurl.com/4rabn7bm ...................... 25

Nicholas J. Johnson et al., *Firearms Law and the
  Second Amendment* (1st ed. 2012) .................................................................... 10

Memorandum from Jim Derwinski, CEO/Exec. Dir., Metra,
  to Bd. of Dirs., Metra (Feb. 19, 2025), https://tinyurl.com/4sy9r4b4 ............... 25

Raphael Semmes, *Captains and Mariners of Early Maryland* (1937),
  https://tinyurl.com/3vcpbtax .............................................................................. 22

*Total Teachers:  Demographics*, Ill. State Bd. of Educ.,
  https://tinyurl.com/ykph2uhn (last visited May 2, 2025) .................................. 25

## ARGUMENT

State defendants' opening brief explained that Illinois's decision to protect public safety and order by prohibiting the carriage of loaded, unsecured firearms on public transit is constitutional for two independent reasons. First, the public-transit restriction is relevantly similar to firearm regulations historically imposed by passenger railroads, regulations that themselves fell within a broader national tradition of prohibiting firearms in crowded spaces. AT Br. 15-31.[1] Second, the modern statute is consistent with the Nation's historical tradition of regulating firearms in sensitive places. AT Br. 31-44. In response, plaintiffs offer a sweeping understanding of the Second Amendment that would require this court to misread the historical evidence and diverge from decisions of multiple other circuits. The court should decline that invitation and reverse the district court's judgment.

## I.    The public-transit restriction is consistent with the Nation's historical tradition of regulating firearms on passenger railroads.

As state defendants explained, AT Br. 15-31, the public-transit restriction "is consistent with this Nation's historical tradition of firearm regulation" on passenger railroads, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 34 (2022) — a tradition that itself followed from a broader history, recognized by both the Second and Ninth Circuits, of barring firearms in crowded spaces, *see Antonyuk v. James*, 120 F.4th 941, 1019 (2d Cir. 2024), *cert. denied*, No. 24-795, 2025 WL 1020368 (U.S. Apr. 7,

---

[1] This brief cites state defendants' opening brief as "AT Br.," plaintiffs' answering brief as "AE Br.," the brief of amicus curiae Everytown for Gun Safety as "Everytown Br.," the short appendix as "SA," plaintiffs' supplemental appendix as "Add.," and entries on the district court's docket as "Doc."

2025); *Wolford v. Lopez*, 116 F.4th 959, 986 (9th Cir. 2024). Plaintiffs urge the court to break from those circuits and reject both the existence of the underlying crowded-space tradition and the relevance of the railroad regulations. That request should be rejected.

### A.    The Nation has a well-established historical tradition of prohibiting firearms in crowded spaces.

Plaintiffs contend that this court should diverge from the Second and Ninth Circuits and hold that the Nation has no historical tradition of restricting access to firearms in crowded spaces. AE Br. 35-44; *see Antonyuk*, 120 F.4th at 1019 (setting out "the Nation's history of regulating firearms in quintessentially crowded areas"); *Wolford*, 116 F.4th at 986 (similar). But plaintiffs' objections to those circuits' methodology lack merit, as do their responses to specific historical analogues. And plaintiffs' view that modern crowded-space regulations are unconstitutional because some historical laws required carriage at certain public assemblies misunderstands the *Bruen* analysis and overreads the historical record.

#### 1.    Plaintiffs' methodological criticisms of *Antonyuk* and *Wolford* are meritless.

As state defendants explained, the Second and Ninth Circuits have each held that the Nation has a historical tradition of restricting access to firearms in crowded spaces. *See Antonyuk*, 120 F.4th at 1019; *Wolford*, 116 F.4th at 986. Plaintiffs ask the court to depart from those holdings, but their criticisms of the methodology set out in those cases lack merit.

First, plaintiffs are wrong to assert that *Antonyuk* and *Wolford* (and state defendants) identify too few historical analogues to establish a historical crowded-

space tradition.  AE Br. 42.  As state defendants explained, AT Br. 30-31, the historical record supporting a crowded-space tradition is significantly more robust than the one on which *Bruen* relied in describing courthouses, legislative assemblies, and polling places as "sensitive places," 597 U.S. at 30 (cleaned up); indeed, the Court's conclusion rested on only one or two historical laws for each location, *see Antonyuk*, 120 F.4th at 972; *Wolford*, 116 F.4th at 979-80.  Plaintiffs assert that the *Bruen* Court could rely on a slimmer historical record because the statutes it cited were "representative laws that could be fit into a broader tradition" of restricting access to firearms "where the government provides comprehensive security."  AE Br. 42.  But that argument is circular, in that it presumes the existence of a historical "principle" rather than asking whether the historical evidence "reveal[s]" one. *United States v. Rahimi*, 602 U.S. 680, 740 (2024) (Barrett, J., concurring).  And the "comprehensive security" principle that plaintiffs assert unifies the historical evidence on which *Bruen* relied is found nowhere in the opinion itself and, as discussed below, *infra* pp. 20-23, finds no support in the historical record, either.

Plaintiffs also assert that *Antonyuk* and *Wolford* "are wrong" because they placed too much weight on evidence from Reconstruction.  AE Br. 29-32.  State defendants explained in their opening brief that the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), *Bruen*, and *Rahimi*, as well as this court's decision in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024), all support the Second and Ninth Circuits' use of such evidence.  AT Br. 28-30.  Several new decisions point the

3

same way. In *United States v. Rush*, 130 F.4th 633 (7th Cir. 2025) (cited at AE Br. 30-31), this court emphasized that "the government is not constrained to only Founding Era laws" and cited an 1856 statute as evidence of a historical tradition. *Id.* at 642. The *en banc* Eleventh Circuit similarly relied on "[m]id-to-late-nineteenth-century laws" in a recent Second Amendment case. *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1121 (11th Cir. 2025) (*en banc*) (W. Pryor, J.). At minimum, as plaintiffs concede, AE Br. 30-31, later history can supplement earlier evidence to demonstrate a continuing tradition. And even under that standard, the record shows a tradition of crowded-space regulations that long predates the Founding, beginning with the 1328 Statute of Northampton. AT Br. 16. Plaintiffs' methodological objection is thus irrelevant to the issues presented here.

Plaintiffs also incorrectly contend that Reconstruction Era statutes from southern States and regulations enacted by territorial governments are categorically entitled to less weight in the Second Amendment analysis. AE Br. 41. Plaintiffs offer no logical explanation for disregarding these authorities, and *Bruen* does not provide one. Although that decision reasoned that some specific regulations that happened to come from the postbellum South or the territories provided an insufficient basis to uphold the statute at issue, it did so only because the proposed analogues were "outliers," 597 U.S. at 65, that "conflict[ed] with the Nation's earlier approach to firearm regulation," *id.* at 67; *see Antonyuk*, 120 F.4th at 971-72. Here, in contrast, postbellum southern and territorial sources are consistent with the broader national

4

tradition and so are valid historical analogues.  *See Antonyuk*, 120 F.4th at 1020-21; *Wolford*, 116 F.4th at 986-88.

Finally, the Second and Ninth Circuits' recognition of a crowded-space tradition is consistent with *Bruen*'s observation that New York could not prohibit firearms from the "island of Manhattan . . . simply because it is crowded."  597 U.S. at 31.  *Contra* AE Br. 35.  The discrete locations implicated by the crowded-space tradition — for example, ballrooms, fairs, and public assemblies, *see, e.g.*, 1869-1870 (1st Sess.) Tenn. Pub. Acts 23, 23-24, ch. 22, § 2 — are wholly unlike the diverse and heterogeneous range of locations that would be encompassed by a prohibition on carriage in an entire borough of New York City.  Nor did the defendants in *Bruen* even attempt to provide any "historical basis" for imposing a blanket prohibition on firearms across a major urban area.  597 U.S. at 31.  The impermissibility of that sweeping regulation thus says nothing about the more targeted restrictions within the crowded-space tradition.

### 2.    Plaintiffs' objections to specific analogues do not undermine the existence of a relevant historical tradition.

Plaintiffs also object to a handful of specific historical analogues cited in *Antonyuk*, *Wolford*, and state defendants' opening brief.  AE Br. 37-44.  Those objections are meritless.

First, plaintiffs assert that the Statute of Northampton and its progeny are irrelevant to any tradition of crowded-space regulations because, plaintiffs say, these measures prohibited arms-bearing in fairs and markets only when done with intent

to terrify others.  AE Br. 37-38.  But a historical analogue "need not be a 'dead ringer'" for the modern law.  *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30).  Instead, it need only provide evidence of "the principles that underpin our regulatory tradition."  *Id.*  And, even with a terror requirement, the Statute of Northampton and its progeny still demonstrate a "principle[ ]" that crowding, such as that present at fairs and markets, provides a basis for special firearm restrictions.  Later policymakers built on this principle with crowded-space restrictions that included no terror requirement.  *See Antonyuk*, 120 F.4th at 1039 (observing that "the tradition beginning with [the Statute of Northampton] evolved . . . to prohibit firearms in quintessentially crowded places absolutely"); AT Br. 16-19, 27-28.  The Statute of Northampton thus represents the start of a long tradition of firearm regulations in crowded spaces that grew to encompass passenger-railroad rules and, eventually, the public-transit restriction.

In any event, as *Antonyuk* and *Wolford* explain, the historical evidence establishes a crowded-space tradition even without the Statute of Northampton and its progeny.  *See Antonyuk*, 120 F.4th at 1018-19, 1037-39; *Wolford*, 116 F.4th at 986-88; AT Br. 16-19, 27-28.  Plaintiffs argue that the Second Circuit recognized this tradition only because it misinterpreted a Founding Era North Carolina analogue of the Statute of Northampton, AE Br. 38-39, but *Antonyuk* emphasized that its holding rested on a far broader body of authorities, including statutes and judicial decisions from Arizona, Missouri, Oklahoma, Tennessee, and Texas, 120 F.4th at 1037-39; *see also* AT Br. 17-19.  And, as plaintiffs admit, AE Br. 39, the Ninth Circuit reached the

6

same conclusion even after expressly disclaiming any reliance on the Statute of Northampton or similar measures, 116 F.4th at 998 n.12. Plaintiffs' arguments concerning the Statute of Northampton therefore do not undercut the crowded-space tradition.

Nor can plaintiffs distinguish away state supreme court decisions establishing a historical understanding that crowded-space regulations were constitutional. AE Br. 42-44. Plaintiffs' assertion that *Hill v. State*, 53 Ga. 472 (1874), turned on unique characteristics of firearm regulations at courthouses is flatly inconsistent with the decision's reasoning, which emphasized that a State may prohibit carriage at public assemblies totally unrelated to the judicial process, including "concerts, . . . prayer-meetings, and elections." *Id.* at 476.[2] Plaintiffs are also wrong that *State v. Shelby*, 2 S.W. 468 (Mo. 1886), involved a statute prohibiting only *concealed* carriage at public assemblies. Although the Missouri Supreme Court had previously stated in dicta that the State's crowded-space statute barred only concealed carriage, *see State v. Wilforth*, 74 Mo. 528, 531 (1881), *Shelby* emphasized that "concealment [was] made no part of" the statutory offense, and reasoned that even a complete prohibition on

---

[2] Plaintiffs suggest that *Hill*'s allusion to a "constitutional duty of the state to protect" individuals at public assemblies, 53 Ga. at 478, is a reference to the comprehensive security that, plaintiffs contend, was available at historical courthouses. AE Br. 44. As discussed below, *infra* pp. 20-21, however, plaintiffs have not shown that courthouses historically featured any meaningful security. And, even if such security existed, *Hill* could not have been referencing it, since the court described the State's "duty" as extending to other public assemblies, such as church services, that did not feature government-provided security. 53 Ga. at 478. Instead, the decision is best read as endorsing crowded-space regulations as a tool for protecting the public from gun violence.

carriage at public assemblies was constitutional, 2 S.W. at 469.  The Tennessee Supreme Court's decision in *Andrews v. State*, 50 Tenn. 165 (1871), similarly recognized that individuals could constitutionally "be prohibited from carrying [their] arms to church, or other public assemblage." *Id.* at 182; *accord id.* at 186. The fact that the court also held that the State could not prohibit possession of a pistol in the home only confirms that the decision was consistent with our modern understanding of the scope of the Second Amendment right.  *See id.* at 186-88; *see also Heller*, 554 U.S. at 636 (same rule).  Finally, state defendants' opening brief explained that, although "*Bruen* criticized the Texas Supreme Court's decision in *English* [*v. State*, 35 Tex. 473 (1871),] as an outlier, 'it did so only insofar as *English* held that the state could lawfully restrict carriage to those with reasonable grounds for fearing an unlawful attack,'" and thus did "not 'cast doubt on *English*'s holding as to the Texas statute's separate restriction relating to public assembly.'"  AT Br. 18 n.9 (cleaned up) (quoting *Antonyuk*, 120 F.4th at 1021 n.83).  Although plaintiffs criticize state defendants for citing *English*, AE Br. 42-43, they do not respond to (or even acknowledge) this basic distinction.

### 3. Historical laws requiring carriage at certain public assemblies do not change the analysis.

Plaintiffs also put forward an alternative view of the Nation's historical tradition regarding crowded spaces, arguing that firearm restrictions in such areas are unconstitutional because some historical laws required carriage at certain public assemblies, such as church services.  AE Br. 35-37.  Plaintiffs' alternative account is flawed on multiple levels.

Most basically, plaintiffs' argument misunderstands the *Bruen* analysis. Historical legislatures, no less than modern ones, were entitled to make different policy choices within constitutional bounds — including by requiring individuals to carry firearms in certain spaces, even where those States might have constitutionally chosen to restrict carriage instead. As Justice Barrett explained in *Rahimi*, to take a contrary view of the historical record is to "assume[ ] that founding-era legislatures maximally exercised their power to regulate," 602 U.S. at 739-40 (concurring opinion) — an assumption that cannot be squared with basic principles of federalism or common sense. Applying the same logic, the *en banc* Eleventh Circuit recently held that the government may constitutionally prohibit firearm sales to individuals between ages eighteen and twenty-one, even though many Founding Era laws required men in that age range to bear arms in the militia, because States also restricted those individuals' access to firearms in other respects. *See Bondi*, 133 F.4th at 1111, 1118-22. The same rule applies here: that some historical policymakers chose to require carriage at some assemblies does not mean that others could not make a different choice, and the historical record establishes that many did so by restricting access to firearms in crowded spaces. In other words, as the district court recognized, plaintiffs' account at most shows that Illinois *could* allow carriage on public transit — something no one disputes. SA46. It does not mean "that there can *never* be a restriction of a firearm on public transit." SA46.

In any event, plaintiffs' cited statutes are poor analogues under *Bruen*. Most date from long before the Founding or Reconstruction and so are less probative of the

Second Amendment's meaning than the more contemporaneous sources supporting the crowded-space tradition. *Compare* AE Br. 36 (referencing primarily laws from between 1619 and 1665), *with* AT Br. 16-19 (discussing regulations from Founding and Reconstruction). Further, plaintiffs' authorities, which sought to promote collective defense against perceived external threats, addressed a different concern under different circumstances than does the public-transit restriction. *See Rahimi*, 602 U.S. at 692 ("Why and how the regulation burdens the right are central to [the Second Amendment] inquiry."); *Wolford*, 116 F.4th at 997 (rejecting plaintiffs' argument). The seventeenth-century laws reflected a fear of attacks by Native Americans on the colonial frontier. For example, the 1643 Connecticut statute required bearing arms to church "[t]o prevent or withstand such sudden assaults as may be made by Indeans upon the Sabboth or lecture dayes [sic]." Nicholas J. Johnson et al., *Firearms Law and the Second Amendment* 106 (1st ed. 2012). In the same vein, southern legislators intended the eighteenth-century laws to provide "for the better security of [white populations] against the insurrections and other wicked attempts of Negroes and other Slaves." *Id.* at 108 (quoting 1743 South Carolina statute); *see* 19 (pt. 1) *The Colonial Records of the State of Georgia* 137-38 (Allen D. Candler ed., 1911), https://tinyurl.com/487k8e7d (1770 statute requiring "male white persons to carry fire arms" to church to protect against "insurrections"). None of these sources shed light on the scope of a right to individual self-defense in modern cities, where people will not encounter the perceived external collective threats to which the laws responded.

Plaintiffs' other sources do not fill the gap. Their extended discussion of Cesare Beccaria's philosophy shows only that some Founders were generally aware of his work and that Thomas Jefferson once quoted Beccaria in his notebook. AE Br. 36-37. Plaintiffs cite no authority showing that the Founders agreed with Beccaria's views on firearm policy, that they put those views into practice, or that those views ever reflected the broader "public understanding of the right to keep and bear arms." *Bruen*, 597 U.S. at 38. And plaintiffs' interpretation of John Adams's discussion of the right to bear arms during the Boston Massacre trial is simply inaccurate: Adams did not assert that there is a general right to bear arms at public gatherings, *contra* AE Br. 36, but instead that a private person may "arm himself for the purpose[ ]" of self-defense against "dangerous rioters" if he "cannot otherwise suppress them," John Adams, *Adams' Argument for the Defense*, Nat'l Archives, https://tinyurl.com/5n84cdw9 (last visited May 2, 2025) (cleaned up); *see* Mark Anthony Frassetto, Essay, *Meritless Historical Arguments in Second Amendment Litigation*, 46 Hastings Const. L.Q. 531, 542-44 (2019). Adams did not even claim that the colonists whose rights he was discussing carried firearms, rather than "clubs" or "sticks." Adams, *supra*.

In short, plaintiffs provide no basis for this court to disagree with the Second and Ninth Circuits' conclusion that the Nation has "a well-established tradition of prohibiting firearms at crowded places," *Wolford*, 116 F.4th at 986; *accord Antonyuk*, 120 F.4th at 1019, a tradition that preceded and gave rise to the tradition of railroad regulation from which Illinois's law descends.

**B.    The public-transit restriction is relevantly similar to historical firearm restrictions on passenger railroads.**

As state defendants explained, AT Br. 19-21, beginning during Reconstruction, the Nation's crowded-space tradition extended to the novel context of passenger railroads, with at least five major railroad companies restricting riders' access to firearms on their trains.  The Ninth Circuit — the only circuit to examine this history — concluded that these railroad rules establish "a historical tradition of prohibiting the carry of loaded firearms or the carry of firearms not properly stored" that justifies modern regulations like the public-transit restriction.  *Wolford*, 116 F.4th at 1001-02.  Resisting this conclusion, plaintiffs assert both that the railroad rules, as private regulations that first appeared in the nineteenth century, are not probative of the scope of the Second Amendment right and that, even if they are relevant, they are insufficiently similar to the public-transit restriction to justify it.  Plaintiffs are wrong on both counts.

**1.    Passenger-railroad firearm regulations are valid historical analogues under *Bruen*.**

Plaintiffs argue that the railroad rules are irrelevant to the *Bruen* analysis both because they appeared too late in the Nation's history and because they were promulgated by purportedly private parties.  AE Br. 44-47.  Both arguments fail.

First, plaintiffs' timing argument fails for substantially the reasons set out above.  *Supra* pp. 3-4.  These rules first appeared during Reconstruction, and both this court and others have repeatedly relied on such evidence in considering Second Amendment claims under *Bruen*.  *See* AT Br. 28-30; *Bevis*, 85 F.4th at 1201-02.  And

the rules are consistent with the longer tradition of crowded-space regulations that stretches back beyond the Founding. *Supra* p. 4; *see Wolford*, 116 F.4th at 1001-02.

Plaintiffs' private-party argument, for its part, conflicts with decisions of multiple other circuits, *Bruen* itself, and railroads' historical quasi-public role. For one, both the Ninth and Eleventh Circuits have expressly relied on private entities' conduct or rules in evaluating "the public understanding of the right to keep and bear arms." *Bruen*, 597 U.S. at 38. As noted, *supra* p. 12; AT Br. 24, the Ninth Circuit considered the railroad rules notwithstanding that they were promulgated "by private entities," *Wolford*, 116 F.4th at 1001-02. More recently, the Eleventh Circuit looked to private rules in multiple respects in upholding Florida's ban on firearm purchases by individuals under age twenty-one. First, the court considered "private university codes" while assessing young people's historical ability to access firearms. *Bondi*, 133 F.4th at 1120. Second, the court emphasized that firearm sellers at the Founding were reluctant to sell firearms to minors because, at common law, all contracts with minors were void or voidable, with the result that such sales rarely took place. *See id.* at 1118. Private firearm sellers' conduct, in other words, shaped and limited young people's right to bear arms. The railroad regulations had the same effect on passengers' rights during their journeys, and thus properly figure in the historical analysis.

Nothing in *Bruen* precludes this approach. For example, while plaintiffs declare that *Bruen* "looks to *government* regulation," AE Br. 44 (citing *Bruen*, 597 U.S. at 34), the portion of the decision they cite says no such thing. Instead, it

13

explains that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them."  597 U.S. at 34 (cleaned up). *Bondi* and *Wolford* establish that private conduct and rules, just like statutory enactments, can shape public understanding in ways relevant to the historical analysis.

Indeed, as explained in state defendants' opening brief, far from barring consideration of private rules, *Bruen*'s recognition of schools as sensitive places appears to have rested on more private university rules (four) than public ones (two). AT Br. 26-27; Brief of *Amicus Curiae* the Independent Institute in Support of Petitioners at 14-16, *Bruen*, 597 U.S. 1 (No. 20-843), 2021 WL 3127146 (hereinafter Independent Institute Brief).  Plaintiffs claim that the Court relied on the amicus brief collecting these rules only with respect to courthouses, legislative assemblies, and polling places, AE Br. 47, but the sentence at issue referred to the "historical record" concerning "sensitive places" generally, and plaintiffs cannot explain why, if their theory were correct, the Court would have cited the portion of the amicus brief dealing exclusively with historical firearm restrictions in schools, *Bruen*, 597 U.S. at 30 (cleaned up) (citing Independent Institute Brief, *supra*, at 11-17).  Nor do they identify any other reason the Court might have declared it "settled" that schools "were sensitive places where arms carrying could be prohibited."  *Id.* (cleaned up). *Bruen* itself thus cuts against plaintiffs' position.

Finally, reliance on the railroad rules is particularly appropriate given the quasi-public nature of the industry in the eighteenth century, as state defendants

explained. AT Br. 24-25; *see Wolford*, 116 F.4th at 1001 (railroad companies "provid[ed] essentially a public service and were more properly characterized as mixed public-private entities"). Contemporaneous Supreme Court decisions recognized that railroads were "[i]n their very nature . . . public highways . . . of which the public ha[d] a right to avail itself." *Olcott v. Supervisors*, 83 U.S. (16 Wall.) 678, 696 (1872); *see id.* at 695 ("No matter who is the agent, the function performed [by a railroad] is that of the State."); *Township of Pine Grove v. Talcott*, 86 U.S. (19 Wall.) 666, 676 (1874) (similar). Restrictions on access to firearms while exercising this "right" to rail travel would affect the "public understanding of the [Second Amendment] right" no less than government-imposed restrictions. *Bruen*, 597 U.S. at 38. The railroad rules are valid analogues for the *Bruen* analysis.

### 2. The public-transit restriction is consistent with passenger-railroad firearm regulations in how and why it restricts the right to armed self-defense.

As the Ninth Circuit properly reasoned, the public-transit restriction is consistent with both how and why the railroad rules burdened the right to armed self-defense. *See Wolford*, 116 F.4th at 1001-02; AT Br. 21-24. Plaintiffs' contrary arguments are unpersuasive.

Two of these arguments focus on *how* the railroad rules burdened the Second Amendment right. First, citing a dictionary that predates the rules by roughly fifty years, plaintiffs assert that the railroad rules governing "guns" may not have applied to handguns, as opposed to long guns, like rifles or shotguns. AE Br. 44-45. But a contemporaneous dictionary defined "gun" as "[a] general name for all kinds of

fire-arms." *Gun*, *A Comprehensive Dictionary of the English Language* (Joseph E. Worcester ed., 1871), https://tinyurl.com/2pjbw63h; *see also Fire-arms*, *A Comprehensive Dictionary of the English Language*, *supra* ("Guns, muskets, pistols, &c."). The rules' focus on safety, *see infra* pp. 17-18, would also provide no basis for excluding handguns. Further, even if the regulations covered only some weapons, they would still "reveal a principle" that transportation providers may restrict access to firearms in their vehicles. *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). A "dead ringer" is not required. *Id.* at 692 (majority opinion) (quoting *Bruen*, 597 U.S. at 30).

Second, plaintiffs emphasize that the railroad regulations, unlike the public-transit restriction, did not carry criminal penalties. AE Br. 48. But, again, *Bruen* requires a historical analogue, not a "historical twin." *Rahimi*, 602 U.S. at 692 (cleaned up). *Rahimi*, for example, upheld a modern criminal statute based in part on historical surety laws, which often punished breaches of the peace with only forfeiture of a bond. *Id.* at 695, 698-99. Similarly, *Bondi* relied on historical contract law in rejecting a Second Amendment challenge to another modern criminal provision. *See* 133 F.4th at 1118. And, in any event, the railroad rules were part of the broader tradition of crowded-space regulations, many of which did carry criminal penalties. *See, e.g.*, 1869-1870 (1st Sess.) Tenn. Pub. Acts 23, 24, ch. 22, § 3; *cf. Rahimi*, 602 U.S. at 698-99 (drawing on aspects of multiple historical analogues). The public-transit restriction is thus relevantly similar to its historical predecessors in how it burdens the Second Amendment right.

Plaintiffs also cannot show that the public-transit restriction differs from the railroad rules in *why* it restricts carriage. Their leading argument — that preserving public safety and order is too general a justification under *Bruen*, AE Br. 48-49 — cannot be squared with this court's decision in *Bevis*, which upheld a firearm restriction as part of "an unbroken tradition of regulating weapons" to "protect public health, safety, and welfare," 85 F.4th at 1200.[3] It also ignores the specific context in which both the modern and the historical regulations arose: the public-transit restriction, like the railroad rules, does not advance a generalized interest in preventing gun violence anywhere, but a more particularized interest in preserving public safety and order in a crowded, confined space where the risks of gun violence are particularly acute. AT Br. 22-23.

As a final fallback, plaintiffs contend that the railroad regulations sought to address "unwieldy or inconvenient" baggage, rather than safety issues. AE Br. 50. The historical record shows otherwise. Multiple railroads, for example, required that firearms be either unloaded, carried in cases, or both — requirements that would have no effect on convenience but obvious benefits for safety. *See* Joshua Hochman, Note, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 Yale L.J. 1676, 1693-94, 1697-98 (2024). A "concern[ ] with people carrying items that are unwieldy or inconvenient . . . into passenger cars," AE

---

[3] Plaintiffs assert that *Bruen* "refused to rely on such a [public-safety] justification," AE Br. 49, but it did so only because "the historical materials" did not demonstrate a tradition of firearm restrictions based on public-safety concerns, 597 U.S. at 27. This case poses no such problem.

Br. 50, also cannot explain the Central Pacific railroad's policy of prohibiting firearms in checked baggage, *see* Hochman, *supra*, at 1697.  Indeed, a railroad with that concern would have sought to *encourage* checking of firearms to keep them out of passengers' way.  And plaintiffs' theory disregards a New York court's conclusion that the Albany Railway properly refused to allow a passenger to travel with two firearms because they were "so obviously dangerous."  *Dowd v. Albany Ry.*, 62 N.Y.S. 179, 180 (App. Div. 1900); *see* Hochman, *supra*, at 1695-96.  Taken together, the evidence shows that the railroad rules, like the public-transit restriction, aimed to address the safety risk created by access to firearms in a crowded, enclosed space.

The public-transit restriction is consistent with the historical railroad rules, and the broader tradition of crowded-space regulations, in how and why it limits access to firearms.  It thus does not violate the Second Amendment.

## II.     The public-transit restriction is consistent with the Nation's historical tradition of regulating firearms in sensitive places.

As state defendants explained, AT Br. 31-44, the public-transit restriction is constitutional for the separate reason that it is consistent with the Nation's historical tradition of regulating firearms in sensitive places, including courthouses, government buildings, legislative assemblies, polling places, and schools.  *See Bruen*, 597 U.S. at 30.  Plaintiffs respond mainly by advancing two alternative theories for identifying sensitive places.  Those theories are irreconcilable with precedent, history, and common sense, and, to the extent the historical sources plaintiffs muster have any relevance, they provide further evidence that the public-transit restriction is constitutional.  Plaintiffs' other arguments are similarly without merit.  The

sensitive-place tradition thus provides an additional basis on which to reverse the district court's decision.

### A.    Plaintiffs' proposed sensitive-place standards ignore precedent, history, and common sense.

Plaintiffs advance two theories for defining sensitive places — one for schools, and one for courthouses, legislative assemblies, and polling places. AE Br. 51-59. Neither can be squared with precedent, history, or "common sense." *Rahimi*, 602 U.S. at 698.

Start with plaintiffs' theory concerning schools:  that historical firearm restrictions were the product of schools' "*in loco parentis* authority over students" and did not apply to the public at large. AE Br. 52. That assertion runs headlong into *Bruen*'s recognition of schools as "'sensitive places' where weapons were *altogether prohibited*" (not merely places where possession was limited to adults). 597 U.S. at 30 (emphasis added) (quoting *Heller*, 554 U.S. at 626).  Nor does history support plaintiffs' view.  As state defendants explained, AT Br. 17-18, 38-39, during Reconstruction, an array of States and territories barred "any person" — not just students — from carrying firearms in schools, *e.g.*, 1870 Tex. Gen. Laws 63, 63, ch. 46, § 1 (Doc. 64-43).  Those historical laws reflect a tradition of "prohibiting guns in schools . . . to protect a vulnerable population," rather than as an exercise of any special authority over students. *Antonyuk*, 120 F.4th at 1011.

Plaintiffs' other theory — that government may treat a location as sensitive only if it "provid[es] comprehensive security," AE Br. 59 — fares no better. AT Br. 44.  The district court correctly joined the Ninth and D.C. Circuits in rejecting this

argument, which "flatly contradicts *Bruen*" because "[m]any schools and polling places have few security measures — now or in the past — yet the Supreme Court listed those places as conclusively sensitive." *Wolford*, 116 F.4th at 981; *see United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) ("[W]e do not look to the 'level of threat' posed in a sensitive place."), *abrogated on other grounds by Bruen*, 597 U.S. 1; SA48 (explaining that plaintiffs' argument "makes little sense"); *see also* Everytown Br. 18-25 (rebutting plaintiffs' argument). Indeed, plaintiffs do not attempt to fit schools or even most government buildings into this framework, leaving it badly incomplete. But even with respect to courthouses, legislative assemblies, and polling places, plaintiffs' evidence not only fails to support but affirmatively undermines their case.

First, plaintiffs fall well short of demonstrating a historical tradition of comprehensive security in courthouses. Plaintiffs rely on an assortment of statutes assigning sheriffs and constables various responsibilities connected with courts. AE Br. 56-58. But none required those officers to provide security for the public; at most, some suggested that officers might sometimes have been responsible for guarding prisoners. *See, e.g.*, Add. 76 (1786 Massachusetts statute referencing sheriff's responsibility for prisoners).[4] Instead, the sources gave officers

---

[4] Several of the statutes also did not require regular attendance. *See, e.g.*, 10 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 57 (James T. Mitchell & Henry Flanders eds., 1904), https://tinyurl.com/4fdes8fj (1780 statute giving court authority "to require and compel the attendance of sheriffs, . . . constables and other ministerial officers"); Add. 16 (1798 Rhode Island statute setting daily rate for sheriff's attendance at court without creating attendance requirement).

administrative roles, such as executing judgments, managing juries, and serving process or writs.  *See, e.g.*, Add. 59 (1798 New Jersey statute making constables "ministerial officers of the . . . court" responsible for "execut[ing] and return[ing] all precepts, summons, warrants, writs and other process"); Add. 67-68 (1792 Georgia statute listing sheriffs' fees for executing judgments, summoning juries, and other administrative tasks).  And the Maryland statute plaintiffs cite is even further afield: rather than imposing any duties on sheriffs generally, it merely required one named sheriff to appear in court to pay a bond.  Add. 72-73.  The sources thus do not demonstrate that courthouses historically had any meaningful security — let alone comprehensive security.

Plaintiffs' evidence concerning legislative assemblies is equally unpersuasive. Plaintiffs cite statutes appointing or setting daily pay for doorkeepers or sergeants-at-arms for legislative bodies, AE Br. 53-56, but those statutes did not specify how often those individuals would attend legislative sessions, identify their duties, require them to be armed, or even mention security.  Several plainly contemplated irregular attendance.  *See* Add. 43 (1775 New Jersey ordinance setting doorkeeper's pay "for each day that he hath or shall attend"); 1 *Laws of the State of New York* 534 (1802), https://tinyurl.com/32d9txpj (1801 statute requiring sergeants-at-arms and doorkeepers to have attendance record certified by legislative leaders for pay purposes).  Other historical evidence demonstrates that these roles did not focus on security.  *See* Everytown Br. 22-25.  For example, the duties of one doorkeeper for Maryland's House of Delegates, Cornelius Mills, "included supplying wood for the use

of the [legislature] and maintaining the furniture." *Cornelius Mills (c.1755-1823)*, Archives of Md., https://tinyurl.com/y5f4zssx (last visited May 2, 2025). *Contra* AE Br. 54 (identifying Mills's appointment as evidence of security measures). While serving as doorkeeper and, later, as sergeant-at-arms, Mills also worked "as a carpenter/joiner, ran a boardinghouse, and advertised his experience as an auctioneer" — not roles requiring any security expertise. *Cornelius Mills (c.1755-1823)*, *supra*.[5] And, in any event, one or two individuals could not plausibly have provided the comprehensive security envisioned by plaintiffs for an entire legislative body. *Contra* AE Br. 59 (asserting that sensitive places must have security screening and "controlled entry points" (cleaned up)).

The six historical laws plaintiffs cite governing polling places also do not demonstrate a tradition of comprehensive security. *Contra* AE Br. 58. Three gave sheriffs roles in administering, not securing, elections. Add. 88 (1778 Virginia statute requiring sheriffs to announce, and collect votes for, certain local elections); Add. 32 (1785 South Carolina statute noting sheriffs' fees for "publishing writs for electing members to the General Assembly, taking the ballots and returning the writ"); 2 *Laws of the State of Delaware* 984-86 (1797), https://tinyurl.com/5futnh8h (1790 statute requiring sheriffs to announce elections; "attend, conduct, and regulate" polling; and deliver results). The cited New Jersey statute allowed election officials

---

[5]  Plaintiffs imply that, "[i]n one notable incident," the doorkeeper for one house of Maryland's legislature barred armed individuals from entering the chamber, AE Br. 56, but their source states that "the Burgesses" — that is, the legislators themselves — denied the individuals entry. Raphael Semmes, *Captains and Mariners of Early Maryland* 286 (1937), https://tinyurl.com/3vcpbtax.

to "commit any person or persons" who engaged in disorderly conduct at a polling place to a constable or jailer without a court order, but did not require any law-enforcement official to be on site for security.  Add. 57.  And although Georgia and Maryland did require sheriffs to attend elections to maintain order, they did not mandate comprehensive security in the form of visitor screening or "controlled entry points," AE Br. 59 (cleaned up) — they simply required some law-enforcement presence.  Add. 70, 89-90.

In sum, plaintiffs do not establish a historical tradition of any meaningful, let alone comprehensive, security at courthouses, legislative assemblies, or polling places.  At most, they show that some historical sensitive places sometimes had a law-enforcement officer present, almost always for non-security reasons.  That level of security is significantly below that present on the modern public transit that plaintiffs seek to ride — CTA buses and Metra trains.  SA9.  The CTA protects riders with police patrols, hundreds of security guards, and more than 33,000 security cameras, Doc. 64-32 at 3-4, and the Metra employs a security force of "more than 140 sworn officers and civilian support staff," Doc. 64-33 at 2.  Plaintiffs' evidence thus does not support their theory that comprehensive government security is the sole necessary and sufficient condition to render a non-school location sensitive, and, to whatever limited extent the presence of some security at certain historical sensitive places might be relevant, it cuts in favor of treating modern public transit — which features even greater security — as sensitive.

Perhaps recognizing the precedential and historical problems with their theories, plaintiffs fall back to an argument that their view reflects "common sense." AE Br. 59 (quoting *Rahimi*, 602 U.S. at 698).  Quite the opposite.  The implications of plaintiffs' theories are startling.  Under their reasoning, for example, any adult not otherwise disqualified from public carriage would have a constitutional right to bring a loaded, accessible firearm into a public kindergarten.  Or to a polling place if, like most polling places, *see Wolford*, 116 F.4th at 981, it lacked comprehensive security. Precedent, history, and common sense confirm that that is not the law.

### B.     Plaintiffs' other arguments lack merit.

Plaintiffs' other attempts to place the public-transit restriction outside the sensitive-place tradition also fail.  As state defendants' opening brief explained, AT Br. 31-44, the modern statute is relevantly similar to historical sensitive-place regulations in both how and why it burdens the right to armed self-defense, *see Rahimi*, 602 U.S. at 692.  Plaintiffs have not shown otherwise.

With respect to *how*, plaintiffs offer no serious response to state defendants' showing that the public-transit restriction imposes a comparable or lesser burden than historical sensitive-place regulations did.  AT Br. 32-35; *see Rahimi*, 602 U.S. at 698-99.  Plaintiffs first assert that allowing unloaded, secured firearms on transit is no less burdensome than banning firearms completely, as historical sensitive-place regulations did, since either approach prevents use of firearms for self-defense.  AE Br. 60-61.  But, although both regulations disarm an individual while she is in the sensitive place, the public-transit restriction allows her to carry a concealed handgun

24

both before and after that period if she unloads and secures it while on transit. *See* 720 ILCS 5/24-1(a)(4)(i)-(iii). The complete firearm prohibitions imposed by the historical sensitive-place regulations approved by the Supreme Court, in contrast, required individuals either to find somewhere to store firearms when entering sensitive places or to forgo public carriage altogether. *See Bruen*, 597 U.S. at 30. The modern restriction is therefore less burdensome than its ancestors.

Plaintiffs' other argument concerning burdensomeness — that the public-transit restriction is more onerous than historical regulations because some people use public transit more often than they "visit polling places [or] courthouses," AE Br. 61 — fails for multiple reasons. Some problems are factual. No plaintiff in this as-applied challenge claims to be a regular transit rider. Doc. 71 ¶¶ 11-12, 19-20, 27-28, 38-39. Plaintiffs also ignore that hundreds of thousands or millions of Illinoisans work in or visit government buildings, schools, and other sensitive places daily, such that, at minimum, the number of people affected by firearm restrictions at those locations is comparable to the number affected by the public-transit restriction.[6] Plaintiffs also misunderstand the nature of the inquiry. The Second Amendment protects an individual, not a collective, right. *See Heller*, 554 U.S. at 579-95. As discussed, the burden imposed by the public-transit restriction on any individual

---

[6] *Compare, e.g.*, Memorandum from Jim Derwinski, CEO/Exec. Dir., Metra, to Bd. of Dirs., Metra 9 (Feb. 19, 2025), https://tinyurl.com/4sy9r4b4 (average 2024 weekday Metra ridership of 158,600), *with, e.g.*, Ill. Bd. of Higher Educ., *IBHE First Look — Fall Enrollment 2024-25*, at 1 (2024), https://tinyurl.com/4rabn7bm (185,590 students in Illinois public universities in fall 2024 ); *Total Teachers: Demographics*, Ill. State Bd. of Educ., https://tinyurl.com/ykph2uhn (last visited May 2, 2025) (over 137,000 public-school teachers in Illinois).

concealed-carry licenseholder is lighter than that imposed by historical sensitive-place regulations, since the licenseholder can easily carry a firearm on either side of her transit journey.  The public-transit restriction is accordingly consistent with its historical antecedents in how it burdens the Second Amendment right.

The public-transit restriction also matches historical sensitive-place regulations in *why* it limits access to firearms:  to safeguard public safety and order in a space with multiple characteristics that make that purpose particularly urgent, including the need to protect government operations, the presence of vulnerable populations, and frequent crowding in a confined area.  AT Br. 35-40.  Plaintiffs' response — that each of these rationales is, on its own, too broad — is unpersuasive for at least four reasons.  First, plaintiffs' concern about breadth more naturally falls within the *how* prong of the *Bruen* analysis and, as discussed, *supra* pp. 24-26; AT Br. 32-35, multiple factors combine to ensure that the public-transit restriction is, if anything, less burdensome than historical sensitive-place regulations were.  Second, plaintiffs' view that preserving public safety and order is too general a justification to support a firearm regulation is, again, inconsistent with this court's decision in *Bevis*, which approved just such a justification.  *See* 85 F.4th at 1200 (upholding a firearm restriction as part of "an unbroken tradition of regulating weapons" to "protect public health, safety, and welfare"); *supra* p. 17.  Third, even setting *Bevis* aside, courts of appeals have recognized each of the cited rationales as a historically valid motivation for place-based firearm regulations.  *See, e.g.*, *Wolford*, 116 F.4th at 970-71 (government operations); *Antonyuk*, 120 F.4th at 1010-12 (vulnerable

populations); *id.* at 1019-24 (crowding in confined space).  And fourth, despite plaintiffs' divide-and-conquer approach, the court need not decide whether each of these characteristics would be independently sufficient to justify the public-transit restriction.  Collectively, these similarities place the modern law "comfortably within [the historical] tradition."  *Rahimi*, 602 U.S. at 690; *see id.* at 698-99 (analogizing to different characteristics of multiple categories of historical sources).  That is enough to resolve this case.

## CONCLUSION

For these reasons, the court should reverse the decision below and remand with instructions to enter judgment in favor of defendants.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

/s/ Alex Hemmer                        **JANE ELINOR NOTZ**
**ALEX HEMMER**                        Solicitor General
Deputy Solicitor General
**R. SAM HORAN**                       115 South LaSalle Street
Assistant Attorney General            Chicago, Illinois 60603
115 South LaSalle Street              (312) 814-3312
Chicago, Illinois 60603
(312) 814-5526                         Attorneys for Defendants-Appellants
Alex.Hemmer@ilag.gov                   Kwame Raoul and Robert Berlin

May 2, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) and Circuit Rule 32(c) because it contains 7,000 words (excluding the parts exempted by Federal Rule of Appellate Procedure 32(f)).  This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface (12-point Century Schoolbook BT) using Microsoft Word.

<u>/s/ Alex Hemmer</u>
ALEX HEMMER

May 2, 2025

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on May 2, 2025, I electronically filed this brief with the

Clerk of the Court for the United States Court of Appeals for the Seventh Circuit

using the CM/ECF system.

All participants in the case are registered CM/ECF users and service will be

accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER